# EXHIBIT F

F I L E D
Electronically
PR19-00231
2019-04-26 03:09:33 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7240960 : yviloria

**$3645**
William E. Peterson, Bar No. 1528
Janine C. Prupas, Bar No. 9156
SNELL & WILMER L.L.P.
50 West Liberty Street, Suite 510
Reno, Nevada 89501
Telephone: 775-785-5440
Facsimile: 775-785-5441
Email: wpeterson@swlaw.com
        jprupas@swlaw.com

*Attorneys for Petitioners*

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

| | |
|---|---|
| IN THE MATTER OF THE | Case No. |
| PEE PEE POP TRUST, PEE PEE POP TRUST II, PEE PEE POP TRUST III, MAN CUB TRUST, MAN CUB TRUST II, MAN CUB TRUST III, DATED JULY 22, 2013. | Dept. No. |

## PETITION TO ASSUME JURISDICTION

This is a Petition by John Hurry, Trustee of the Pee Pee Pop Trust, Pee Pee Pop Trust II, Pee Pee Pop Trust III, Man Cub Trust, Man Cub Trust II, and Man Cub Trust III dated July 22, 2013 (collectively the "Trusts"), for this Court to assume jurisdiction over the Trusts, and, along with Interested Parties, Alpine Securities Corporation ("Alpine") and Scottsdale Capital Advisors Corporation ("Scottsdale" and collectively the "Corporations"), that are indirectly owned by the Trusts through SCA Clearing LLC and Scottsdale Capital Advisors Holdings, LLC, that are wholly owned by the Trusts (collectively "SCA"), for declaratory and injunctive relief against Financial Industry Regulatory Authority, Inc ("FINRA"). Specifically, Petitioners seek an order that statutory *"Certifications of Trust in Lieu of Trust Instruments"* as provided for under NRS 164.400 are sufficient proof of the existence and terms of the Trusts to satisfy the requirements for continued membership in FINRA, to enjoin FINRA from terminating those memberships for failure to provide actual trust instruments and other information protected from disclosure under

1   Nevada law, or in the alternative, if this Court or another judicial body determines that such

2   Certificates in Lieu of Trust Instruments are not sufficient, for an order permitting the Trusts to

3   disclose the trust instruments and other information, notwithstanding trust provisions precluding

4   the Trustees from providing them.

5        Pursuant to NRS 153.010, NRS 164.010, and NRS 164.015, John Hurry, Trustee of the

6   Trusts and the Corporations, by and through their attorneys, Snell & Wilmer L.L.P., petition the

7   court as follows: (1) to assume jurisdiction over the Trusts, (2) to declare the rights and

8   obligations of the Trusts and the Corporations to furnish information regarding the Trust,

9   including copies of the trust instruments to FINRA, (3) to restrain and enjoin FINRA from

10   demanding and compelling disclosure of all trust provisions and provide copies of the trust

11   instruments to FINRA, as a condition of maintaining the FINRA memberships of the

12   Corporations indirectly owned by the Trusts, and (4) in the event disclosure is required, to issue

13   an order permitting the Trustees to provide the documents and information as the Trusts forbid

14   such disclosure without a court order. In support of the Petition, Petitioners allege and aver as

15   follows:

16   **A.      Introduction and Relief Requested.**

17        1.      John Hurry and his wife Justine Hurry are the Trustees of the Hurry Trust. John

18   and Justine Hurry are residents of the State of Nevada, own multiple properties in Washoe

19   County, and administer the Hurry Trust from numerous locations, including Washoe County,

20   Nevada. The Hurry Trust is and was a Nevada domiciled trust under NRS 164.010.

21        2.      In 2017, trust counsel for John and Justine Hurry determined that solely for tax and

22   estate planning purposes, the Hurry Trust should be divided into two and then six essentially

23   identical trusts, with John and Justine Hurry continuing as Trustees and managing trust assets,

24   and with the same beneficiaries. The Trusts are domiciled in the State of Nevada because the

25   Trustees are residents of the State of Nevada, the Trusts own property in the State of Nevada, and

26   part of the administration of the Trusts occurs in the State of Nevada. NRS 164.010(2).

27        3.      FINRA is a private corporation incorporated in the State of Delaware and does

28   business nationwide, including in Nevada. FINRA is registered to do business in Nevada and

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

- 2 -

1   does business in Nevada under foreign entity no. C5791-1991. FINRA is registered with the U.S.

2   Securities and Exchange Commission ("SEC") as a private corporation that aids and assists the

3   SEC in regulating securities and brokerage firms. Of critical importance to brokers and dealers is

4   that any firm dealing with or in securities is required to be a member of FINRA, unless it is

5   regulated by a similar organization registered with the SEC.

6       4.    The Corporations, indirectly owned by the Trusts through SCA, are licensed and

7   registered members of FINRA and engaged in the brokerage business in numerous states,

8   including Nevada. The Corporations are now and for many years past have been wholly owned

9   by SCA.

10       5.    When the Hurry Trust acquired Scottsdale in 2011, the Corporations filed with

11   FINRA a form supplied by FINRA denominated as a Continuing Membership Application

12   ("CMA"), disclosing to FINRA that Scottsdale was being acquired by SCA, and that SCA was, in

13   turn, owned by a Hurry Trust. That application was granted, no issue was raised regarding the

14   change in ownership of Scottsdale, and FINRA did not demand any further information regarding

15   the terms or conditions of the Trust, or the trust instrument.

16       6.    After the Hurry Trust was divided, and in direct response to a communication from

17   FINRA, on April 10, 2019 the Corporations filed CMAs with FINRA noting (1) that the

18   ownership of the Corporations had not changed (SCA continued to own them), (2) that legal

19   ownership of SCA itself also had not changed (it was still owned by John and Justine Hurry as

20   Trustees), (3) nor had the beneficial ownership changed (the beneficiaries remained the same), (4)

21   nor had the administration, operation or control of the Corporations, or SCA changed, (5) that

22   each trust owner of SCA was identical and administration remained with the same trustees, but

23   that the form and structure of the trust had been reformatted from a single trust instrument to six

24   separate instruments.

25       7.    In addition to providing the foregoing information, the Corporations also provided

26   FINRA with Certificates of Trust In Lieu of Trust Instruments, in the exact form permitted under

27   Nevada law to prove not only the existence, but also the essential terms and conditions of the

28   Trusts. NRS 164.400 et. seq. That statute expressly provides that a trustee may present a

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

- 3 -

1 certification of trust to any person, in lieu of a copy of any trust instrument, to establish the

2 existence or terms of the trust, and may present such certification voluntarily or to any person on

3 request with whom the trustee is dealing. The certification must be in affidavit form and signed

4 and acknowledged by the trustee. NRS 164.410 expressly provides that the certification may

5 confirm or provide the information regarding the existence of the trust, and identify or describe

6 the settlor, trustees, powers of trustees, revocability, and other information, but need not disclose

7 the dispositive provisions of the trust. Any person receiving such certificate is expressly

8 authorized to rely on it without further inquiry and can fully enforce his or her rights against trust

9 assets in accordance with the representations in the Certificate.

10        8.     The statutory provisions providing for the "Certifications of Trust In Lieu of Trust

11 Instrument" codifies Nevada's strong public policy protecting the privacy and confidentiality of

12 Nevada Trusts, and promotes Nevada as a favorable state for the location and administration of

13 trusts. Apart from Nevada Public Policy of maintaining the confidentiality of a Nevada domiciled

14 trust, the Trusts also expressly preclude disclosure except pursuant to lawful process or court

15 order.

16        9.     FINRA declined to accept the CMAs, including the Certificates, deeming them

17 incomplete, and demanded to see all provisions of the Trusts, and be provided with copies of all

18 the trust instruments, in direct contravention of Nevada law. FINRA threatened that if such

19 information is not provided by April 25, 2019, FINRA will suspend the licenses and memberships

20 of the Corporations in FINRA, which effectively puts them out of business immediately, and

21 utterly destroys these assets of the Trusts.

22       10.     FINRA's actions are not required, demanded or even permitted under its own

23 operating rules and procedures, and also severely undermine, indeed contravene and repudiate the

24 public policy of Nevada to protect and preserve trust confidentiality, by essentially precluding

25 trusts from owning and or operating any business in the securities broker and dealer industry

26 unless they forfeit their rights under Nevada law to provide Certificates of Trust In Lieu of Trust

27 Instruments, and perhaps, as in this case, violate the Trusts by compelling disclosure of all terms

28 and conditions of the Trusts and the trust instruments without a court order.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

- 4 -

1        11.    As noted, the trust instruments contain express provisions precluding the Trustees

2    from disclosing the terms of the Trusts or trust documents in the absence of a court order, and

3    FINRA has no right to inflict loss and damage on the Trusts by destroying the value of their

4    assets unless the Trusts forfeit their rights under Nevada law,  disclose all information regarding

5    their terms to FINRA, and also provide FINRA with a copy of the trust documents, at least until

6    such time as a court of law determines that FINRA has a right to such information and trust

7    documents, and further, that in such case, the court enters an order permitting the Trustees to

8    provide and disclose the trust instruments.

9        12.    The Trusts seek an order from this court declaring the rights and obligations of the

10    Parties, and temporarily restraining FINRA from suspending the memberships of the

11    Corporations until such time as the rights and obligations of the Parties are determined by this

12    court or in another proceeding convened for such purpose, and in the event disclosure is required,

13    to issue an order permitting the Trustees to disclose, and in the event disclosure is required, to

14    issue an order permitting the Trustees to disclose.

15    **B.**    **Jurisdiction.**

16        13.    This Court has jurisdiction under NRS 164.010 which provides that on petition of

17    a trustee, the district court of the county in which the trustee resides or conducts business, or in

18    which the trust is domiciled, shall assume jurisdiction of the trust as a proceeding in rem. A trust

19    is domiciled in this state if the trustee resides in the state, or the trust owns property in the state,

20    one or more beneficiaries resides in the state, or part of the administration occurs in the state. All

21    of these nexuses are satisfied. When the court assumes jurisdiction (as it may under the foregoing

22    provisions), it may consider granting orders on other matters relating to the trust, including

23    matters that might be addressed in a declaratory judgment relating to the trust, or petitions filed

24    pursuant to NRS 164.015 and 153.031, whenever such matters are raised in connection with a

25    petition filed under NRS 164.010. NRS 164.015 also provides that a petition may be brought for

26    declaratory relief that relates to the trust, all matters pertaining to the administration of trusts,

27    matters pertaining to rights involving trustees, and other matters for appropriate relief. NRS

28    153.031 provides that a trustee may bring a petition regarding any aspect affecting the affairs of a

Snell & Wilmer
LLP.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1  trust, including compelling compliance with applicable law and instruct the Trustees.

2      14.    Under Nevada trust law, an interested person is any person whose rights or

3  interests in a trust may be materially affected by a decision of the court. NRS 132.185. Such

4  person includes persons whose enforcement rights or interests may be affected by the outcome of

5  the proceeding. The Corporations, though named as Petitioners, are also interested parties in this

6  proceeding, as is FINRA.

7      15.    NRS 164.005 provides that all provisions of Chapter 155 of the NRS apply to

8  Chapter 164. NRS 155.180 provides that all rules of the Nevada Rules of Civil Procedure apply to

9  Chapter 155 proceedings. This would include NRCP 65 (injunctive relief) and NRCP 57

10  (declaratory judgments).

11  **C.    Declaratory and Injunctive Relief.**

12      16.    Petitioners restate and reallege each and every one of their averments above.

13      17.    A real and present controversy has arisen between FINRA and Petitioners in that

14  FINRA claims that it has the right to suspend the membership or licenses to do business of the

15  Corporations unless the Trusts provide FINRA with complete and detailed information regarding

16  the terms and conditions of the Trusts, and the trust instruments, and Petitioners deny that FINRA

17  has the right to such information or the right to obtain copies of the trust instruments as a

18  condition for maintaining membership and to avoid suspension of their memberships.

19      18.    Petitioners will suffer immediate and irreparable harm in the event the

20  memberships in the Corporations are terminated or suspended without hearing, because they will

21  sustain a total loss of their business, business prospects and goodwill, which could never be

22  restored, and for the additional reason that the total loss of their business will be difficult to

23  measure or ascertain with any definiteness or certainty, and for the additional reason that the

24  Trusts preclude disclosure absent an order of the court permitting such.

25      19.    Petitioners are likely to succeed on the merits of their claims, public policy favors

26  granting injunctive relief, and the balance of hardships and equities strongly favors Petitioners.

27      Wherefore, Petitioners pray,

28      1.    That the Court enter an order declaring that Petitioners are not obligated to provide

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

1    FINRA with all information concerning the Trusts or copies of the trust instruments as a

2    condition of membership in FINRA, or as a condition to avoid suspension of their membership in

3    FINRA, until such time as the Court determines the rights and obligations of the Parties, or in the

4    event such is required, to issue an order permitting such.

5         2.      That the Court determine that Petitioners are not obligated to provide FINRA with

6    all information concerning the Trusts, or copies of the trust instruments as a condition of

7    maintaining their membership in FINRA.

8         3.      For an order enjoining and restraining FINRA from terminating or suspending

9    Petitioners membership in FINRA until such time as the court has determined the rights and

10   obligations of the Parties.

11        4.      For such further relief as the court deems just in the premises.

**AFFIRMATION**
**Pursuant to NRS 239B.030**

The undersigned does hereby affirm that the preceding document does not contain the social

security number of any person.

Dated: April 26, 2019                    SNELL & WILMER L.L.P.

                                         By: _____
                                         William E. Peterson, No. 1528
                                         Janine C. Prupas, No. 9156
                                         50 West Liberty Street, Suite 510
                                         Reno, Nevada  89501

                                         *Attorneys for Petitioners*

**VERIFICATION**

Under penalties of perjury, the undersigned declares that he is the attorney for the Petitioners named in the Petition to Assume Jurisdiction of Trusts and For Order Granting Declaratory and Injunctive Relief Against Financial Industry Regulatory Authority, and knows the contents thereof, that the Petition is made by the undersigned because the Petitioners are absent from the County where I reside, and the matters set forth in the Petition that are based on the documents provided in my Declaration are true of my own knowledge and belief based on reasonable inquiry and that the averments and facts alleged that are not based on such, I believe to be true on information and belief after inquiry.

WILLIAM E. PETERSON

STATE OF NEVADA                )
                              ) ss.
COUNTY OF WASHOE           )

On April 26, 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared William E. Peterson, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the above instrument.

WITNESS my hand and official seal.

NOTARY PUBLIC

HOLLY W. LONGE
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No. 96-2982-2 - Expires May 16, 2020

- 8 -

F I L E D
Electronically
PR19-00231
2019-04-26 03:09:33 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7240960 : yviloria

1   **2222**
2   William E. Peterson, Bar No. 1528
    Janine C. Prupas, Bar No. 9156
3   SNELL & WILMER L.L.P.
    50 West Liberty Street, Suite 510
    Reno, Nevada 89501
4   Telephone: 775-785-5440
    Facsimile: 775-785-5441
5   Email: wpeterson@swlaw.com
           jprupas@swlaw.com
6
    *Attorneys for Petitioners*
7

8       IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
9                   IN AND FOR THE COUNTY OF WASHOE
10

11  IN THE MATTER OF THE                        Case No.

12  PEE PEE POP TRUST, PEE PEE POP              Dept. No.
    TRUST II, PEE PEE POP TRUST III, MAN
13  CUB TRUST, MAN CUB TRUST II, MAN
    CUB TRUST III, DATED JULY 22, 2013.
14

15          **MOTION FOR TEMPORARY RESTRAINING ORDER**
                **AND PRELIMINARY INJUNCTION**
16

17  **I.     Statement of Motion.**

18          Comes now, Petitioners John Hurry, Trustee of Pee Pee Pop Trust, Pee Pop Trust II, Pee

19  Pee Pop Trust III, Man Cub Trust, Man Cub Trust II and Man Cub Trust III dated July 22, 2013

20  (collectively the "Trusts"), and Alpine Securities Corporation ("Alpine") and Scottsdale Capital

21  Advisors Corporation ("Scottsdale" and collectively the "Corporations"), by and through their

22  attorneys, Snell & Wilmer L.L.P., and move this Court for an order temporarily restraining, and

23  after hearing, preliminarily enjoining, Respondent Financial Industry Regulatory Authority, Inc.

24  ("FINRA"), from terminating or suspending the memberships of Alpine and Scottsdale, in

25  FINRA, for failing to provide FINRA with the trust documents and information referenced and

26  identified and described in Exhibit A to the Declaration of William Peterson ("Peterson

27  Declaration") attached hereto as Exhibit 1, until this Court or another judicial body has conducted

28  a hearing to determine whether FINRA is entitled to such information as a condition for

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1 | maintaining the Corporations' membership interests in FINRA.

2 |     This motion is made on all the pleadings and papers in this action, the Points and

3 | Authorities that follow, the Peterson Declaration, and exhibits attached to the Peterson

4 | Declaration, and any evidence that may be presented at a hearing on the Motion.

5 | **II.**     **Introduction.**

6 |     As set forth in the Petition to Assume Jurisdiction by the Trusts, this proceeding seeks to

7 | determine whether FINRA is entitled to suspend the FINRA memberships of the Corporations for

8 | failing to provide the trust instruments and detailed information regarding six family trusts

9 | domiciled in Nevada and governed by Nevada law, that collectively own, in equal parts, SCA

10 | Clearing LLC and Scottsdale Capital Advisors Holdings LLC (collectively referred to as "SCA"),

11 | which own the Corporations (Alpine and Scottsdale). If so, the Petition seeks an order from the

12 | Court authorizing and permitting such disclosure, as the trust instruments forbid disclosures

13 | without a court order.

14 |     The Corporations, which are indirectly owned by the Nevada Trusts, are engaged in the

15 | business of brokering and dealing in securities in several western states, including Nevada.

16 | Respondent FINRA is a private corporation registered with the U.S. Securities and Exchange

17 | Commission ("SEC") whose corporate mission is to aid and assist the SEC in regulating broker

18 | dealers in the United States. FINRA conducts business throughout the United States and is

19 | registered with the Nevada Secretary of State to do business in Nevada as a foreign corporation

20 | (C5791).

21 |     No person may engage in the business of brokering or dealing in securities in the United

22 | States unless they are members of FINRA. FINRA is a Self-Regulating Organization ("SRO")

23 | under the SEC, has a system in place to oversee the business and operations of broker dealers, and

24 | can sanction members for violation of the securities laws and/or for noncompliance with FINRA

25 | rules and regulations.

26 |     The Corporations have been members of FINRA for many years and are fully authorized

27 | to engage in the business of brokering and dealing in securities. The Corporations are and have

28 | been owned by SCA for at least eight years, the interests in SCA are held in a trust of the Hurry

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

- 2 -

1  Family. John Hurry and his wife Justine are Nevada residents, and are the Trustees of the Trusts,

2  and along with their children, the sole beneficiaries of the Trusts. No confidential trust documents

3  had been demanded in connection with acquisitions of the Corporations. When Alpine was

4  acquired by SCA, for example, the Corporations filed a Continuing Membership Application

5  ("CMA") with FINRA disclosing that its owner, SCA, was held by one of the Trusts. FINRA

6  accepted that application without asking for any of the trust documents or requiring any further

7  information about the Hurry Trust.

8  In 2017, counsel for the Hurry Trust determined that solely for tax and estate planning

9  purposes, the Hurry Trust should be divided into six separate identical trusts, all of which, like the

10  Hurry Trust, are domiciled in Nevada. *See* Affidavit of Eric L. Johnson attached as Exhibit B to

11  Peterson Declaration. That structural change did not affect the ownership or operation of the

12  Corporations, or SCA (the owner of the Corporations), nor did it even affect the operation of the

13  Trust at the level above SCA, as there was no change in the trustees, any other participants in the

14  Trust, or any of the terms or provisions of the Trust resulting from the division of one trust into

15  six trusts. *Id.* John Hurry and his wife remained as Trustees and as sole beneficiaries along with

16  their children. *Id.*

17  Notwithstanding the absence of any changes in the operation or ownership of Alpine,

18  Scottdale, SCA, or any change in the legal or beneficial ownership of the assets in the Trust, or

19  their administration and operation, FINRA determined that Alpine and Scottsdale were required

20  to file with FINRA a Continuing Membership Application reflecting the change in the structure

21  of the Trust into the six separate trusts, that are the Petitioners herein. *See* Exhibit C to Peterson

22  Declaration.

23  Alpine and Scottsdale filed those applications as directed on April 10, 2019, and in

24  support of them, also submitted for each of the six trusts "Certifications of Trust in Lieu of Trust

25  Instruments," in strict accordance with NRS 164.400. Exhibit D to Peterson Declaration. That

26  statute expressly provides that in lieu of a copy of any trust instrument, a trustee may present a

27  certification of trust to any person, to establish the existence or terms of the trust, and may present

28  such certification voluntarily, or to any person with whom the trustee is dealing. The Certification

-3-

1    must be in affidavit form and signed and acknowledged by the trustee. NRS 164.410 expressly

2    provides that the certification may confirm or provide information regarding the existence of the

3    trust, and identify or describe the settlor, trustees, powers of trustees, revocability, power of

4    revocation and other information, but need not disclose the dispositive provisions of the trust.

5    Any person receiving such certificate is expressly authorized to rely on it without further inquiry

6    and can fully enforce his or her rights against trust assets in accordance with the representations

7    in the certificate.

8         The statutory provisions providing for the provisions of *"Certifications of Trust In Lieu

9    of Trust Instrument"* codify Nevada's strong public policy protecting the privacy and

10   confidentiality of Nevada trusts, and form an important part of the recent recodification of

11   Nevada trust law to promote Nevada as a favorable state for the location and administration of

12   trusts in the United States, just as Nevada did for corporations (to compete with Delaware).

13   Confidentiality is of course an important aspect of trust law, and an aspect of a trustee's duty of

14   loyalty and confidence (*See* Bogert Trusts and Trustees, Section 1081.14). This is especially true

15   in the context of family trusts. *See, e.g.,* NRS 669A.310 (maintaining statutory protections for

16   almost total confidentiality of provisions and terms of Nevada Family Trust Companies). Also, as

17   noted above, the Trusts forbid disclosure of the trust instruments without a court order.

18        On April 18, 2019, FINRA acknowledged receipt of the Applications but rejected them on

19   grounds that they were incomplete for failing to include all the actual trust instruments, which are

20   not required to be provided under NRS Chapter 164.400 *et seq.* if a Certificate is provided, and/or

21   which do not reflect the operation and control of the Corporations. Exhibit A to Peterson

22   Declaration. FINRA has threatened that if such information is not provided by April 25, 2019, the

23   Corporations' membership in FINRA will be suspended, without hearing, thereby putting them

24   out of business.[1] *Id.*

---

[1]    FINRA has itself indicated that its interest in identifying ownership is to determine who is
controlling the member entity, and in making that determination will ignore form over substance.
Thus, it will ignore a change in corporate form (*i.e.,* from a corporation to a limited-liability
company, etc.) and, on the other hand, not permit a change in ownership to be accomplished by
individuals acting in concert to circumvent the underlying 25% threshold for reporting a change
in control, through serial acquisitions below the 25% limit, but that collectively exceed that limit.
*See* correspondence from Trust Counsel Exhibit E to Peterson Declaration). In this instance, each

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1    The underlying proceeding seeks a declaratory judgment from this Court that FINRA is

2    obligated to accept the Certifications of Trust In Lieu of Providing Trust Instruments as evidence

3    of all the matters NRS 164.400 provides that FINRA, and all other third parties may accept and

4    rely on them for, and to prevent FINRA from defeating the public policy of Nevada by precluding

5    or denying membership in FINRA (thereby prohibiting Nevada Trusts from participating in the

6    securities markets altogether including Nevada), unless they provide FINRA with documents and

7    information expressly protected from disclosure under Nevada law. This motion is brought to

8    preserve the status quo and enjoin FINRA from terminating the memberships of the Corporations

9    and destroying their business, until Petitioners have obtained a judicial determination of this

10   matter. In the event disclosure is required, the underlying proceeding also seeks a court order

11   permitting disclosure, which is required by the Trusts prior to any disclosure.

12   **III.    Points and Authorities.**

13       *A.      Legal Standard.*

14       Temporary Restraining Orders and Injunctions are governed by NRS 33.010 and NRCP

15   65. A Temporary Restraining Order may be granted without written or oral notice to the adverse

16   party if *"it clearly appears from specific facts shown by affidavit or by the verified complaint that*

17   *immediate and irreparable [harm]... will result to the applicant before the adverse party or that*

18   *party's attorney can be heard in opposition."* NRCP 65(b).

19       NRS 33.010 provides that this Court may grant an injunction under three conditions: (1)

20   when plaintiff is entitled to the relief requested and such relief consists of restraining the

21   continuance of an act complained of, (2) when the commission or continuance of an act during

22   litigation would produce great or irreparable injury to the plaintiff, or (3) when it appears that

23   defendant is doing some act in violation of the plaintiff's rights respecting the subject matter.

24   _____

25   of the six trusts acquired a one sixth (16.7 %) interest in SCA (below the 25% threshold), but
     collectively exceeded the 25% limit. *Id.,* and Exhibit B to Peterson Declaration. FINRA

26   concluded that the Trusts were acting as a group or in concert, thereby exceeding the 25% limit,
     but at the same time ignored the inexorable conclusion from such logic that there was no change

27   in ownership at all, because the six trusts are merely a change in form of the original trust, with
     no change in ownership or control, as manifested by the fact that the Trusts had the same trustees

28   and operative provisions and were separated solely for tax and estate planning services. *Id.*

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

1    The Nevada Supreme Court held that an injunction is available upon a showing that: (1)

2    the party seeking the injunction has a reasonable likelihood of success on the merits and (2) the

3    defendant's conduct, if allowed to continue, will result in irreparable harm for which

4    compensatory damages is an inadequate remedy. *See Boulder Oaks Cmty. Ass'n v. B&J Andrews

5    Enters, LLC,* 125 Nev. 397, 403, 215 P.3d 27, 31 (2009); *University Sys. v. Nevadans for Sound

6    Gov't,* 120 Nev. 712, 721, 100 P.3d 179, 187 (2004)("In considering preliminary injunctions,

7    courts also weigh the potential hardships to the relative parties and others, and the public

8    interest.").

9            *B.     Petitioners Are Reasonably Likely to Succeed on the Merits.*

10           The essential issue presented for determination in the Declaratory Relief Action is

11   whether FINRA has the legal right to preclude entities that are indirectly owned by Nevada Trusts

12   from retaining membership in FINRA, and thereby the right and opportunity to engage in the

13   securities markets in the United States, unless they provide FINRA with complete copies of the

14   trust instrument, and any and all provisions regarding the trust, including provisions relating to

15   the trust's dispositive provisions. Under Nevada law, a trustee of a Nevada trust may present a

16   certification of trust to any person, in lieu of a copy of the trust instrument to establish the

17   existence and terms of the trust. The Certificate provided for under Nevada law confirms the

18   existence of the trust, the settlor, each trustee, the powers of the trustee and any restrictions on

19   those powers, the revocability of the trust, and other limited information set forth in the

20   Certificate. NRS 164.400. Copies of the six certificates are attached as Exhibit F to Peterson

21   Declaration.

22           There is nothing in FINRA's operating rules or regulations that would permit or require a

23   trust entity to provide any additional information beyond what is required by the Nevada statute.

24   Indeed, based on the facts of this case, there is nothing in FINRA's rules or regulations that would

25   require any information regarding these Trusts at all, since the Trusts are merely a separation of

26   the former trust into six identical trusts, collectively owning precisely the same assets as the

27   Hurry Family Trust owned prior to being separated into six trusts. *See* fn. 1 and exhibits

28   referenced therein.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1   There being no change in ownership, operation or administration in the two FINRA

2   member entities (Alpine and Scottsdale, both formerly owned and currently owned by SCA), and

3   no change in the operation of SCA, or in the ownership of SCA (as it will continue to be owned

4   by the same trustees, albeit in a restructured entity), there was no change in ownership warranting

5   a Continuing Membership Application in the first place. *See* fn. 1. But even assuming such

6   application is required, the Corporations fully complied with their obligations under Nevada law,

7   and FINRA membership rules and regulations, by providing the Trust Certificates In Lieu of

8   Trust Instruments. Based on these facts, Petitioners are, at the very least, "reasonably likely" to

9   prevail on the merits.

10          C.     *Petitioners will Suffer Irreparable Harm without Injunctive Relief.*

11          As set forth above, Petitioners Alpine and Scottsdale (indirectly owned by the Trusts), are

12   broker dealers in the securities market, and will be put out of business altogether if FINRA

13   succeeds in suspending their membership interests in FINRA. This is because membership in

14   FINRA is a condition for doing business in the securities markets. In Nevada, *"[t]he right to*

15   *carry on a lawful business…and acts committed without just cause or excuse which interfere with*

16   *the carrying on of plaintiff's business or destroy its custom, its credits, or its profits, do an*

17   *irreparable injury and thus authorize the issuance of an injunction." Guion v. Terra Marketing of*

18   *Nevada Inc.,* 90 Nev. 237, 523 P.2d 847 (1990); *accord, Gillespie v. Council,* 2016 WL 5616589

19   (Nev. App. 2016). Under Nevada law, Petitioners have met their burden of demonstrating that

20   they will suffer irreparable harm unless FINRA is restrained from terminating or suspending the

21   Corporations' memberships in FINRA.

22          D.     *The Balance of Hardships Favors Petitioners.*

23          As stated above, the hardship that will be suffered by Petitioners is irreparable in that it

24   will result in the total cessation and loss of the business they have profitably owned, conducted

25   and/or operated for many years. The restructuring of the Trusts into six trusts that now own SCA,

26   which, in turn owns the FINRA member Corporations, occurred in 2017, almost two years ago,

27   and no harm has resulted from that occurrence, or is threatened, and FINRA's threats to terminate

28   or suspend the Corporations' memberships is not based on any wrongdoing, or any alleged

- 7 -

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1    wrongdoing, or any harm, or alleged harm to FINRA, the public or the securities markets.

2    Indeed, there has been no change whatsoever in the ownership or operation of the

3    Corporations, or even in SCA, which owns them. The restructuring of the Hurry Family Trust

4    into six discrete trusts, with the same trustees and provisions, does not pose any threat of harm to

5    FINRA, or the security markets. It cannot be seriously disputed that no harm whatsoever will be

6    inflicted on FINRA or the securities markets if FINRA is restrained from terminating or

7    suspending the Corporations' memberships in FINRA pending the outcome of the declaratory

8    relief action.

9    *E.     Public Policy Favors the Issuance of an Injunction.*

10   As also stated above, Nevada has a strong public policy in protecting and preserving the

11   confidentiality of trusts in Nevada. That policy (manifested in the adoption of NRS 1674.400),

12   fully accommodates the needs of the public to know or understand when they are doing business

13   with a trust that they are, in fact, dealing with a trust, that such persons have all the essential

14   information they need to assess the risks of doing business with a trust by being informed of the

15   essential terms of the trust when doing business with it, and that they are protected by being

16   furnished with a copy of the Trust Certificate In Lieu of Trust Instrument which they are

17   authorized to rely on with all trust assets serving as security for such reliance.

18   That strong public policy will be severely undermined if FINRA is able to require Nevada

19   Trusts to provide it with a copy of trust instruments and other terms not required to be disclosed

20   under Nevada law, as a condition of engaging in the securities markets in Nevada, and elsewhere.

21   **IV.    Conclusion.**

22   It is frequently stated that the fundamental purpose of a TRO and a preliminary injunction

23   is to preserve the status quo pending ultimate determination of the dispute on the merits. *See*

24   *Swarovski Retail Ventures Ltd. v. JGB Vegas Retail Lessee, LLC*, 2018 WL 2041527, 416 P.3d

25   208 (Nev. 2018) ("*A preliminary injunction to preserve the status quo is normally available upon*

26   *a showing that the party seeking it enjoys a reasonable probability of success on the merits and*

27   *that the defendant's conduct, if allowed to continue, will result in irreparable harm for which*

28   *compensatory damage is an inadequate remedy.*"). Based on the forgoing, Petitioners have

- 8 -

1    demonstrated all the elements necessary to obtain such relief, and respectfully request that this

2    Court restrain and enjoin FINRA from suspending or terminating the memberships of the

3    Corporations pending adjudication of Petitioners' request for declaratory judgment.

4

5                                 **AFFIRMATION**
                              **Pursuant to NRS 239B.030**

6            The undersigned does hereby affirm that the preceding document does not contain the social

7    security number of any person.

8

9    Dated:  April 26, 2019                              SNELL & WILMER L.L.P.

10

11                                            By: _____
                                                 William E. Peterson, No. 1528
12                                               Janine C. Prupas, No. 9156
                                                 50 West Liberty Street, Suite 510
13                                               Reno, Nevada  89501

14                                               *Attorneys for Petitioners*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 9 -

1

<u>INDEX TO EXHIBITS</u>

2  <u>Exhibit No.</u>          <u>Title of Exhibit</u>                              <u>No. of Pages</u>

3  1.                     Declaration of William Peterson                  158

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

F I L E D
Electronically
PR19-00231
2019-04-26 03:09:33 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7240960 : yviloria

# EXHIBIT 1

1  William E. Peterson, Bar No. 1528
   Janine C. Prupas, Bar No. 9156
2  SNELL & WILMER L.L.P.
   50 West Liberty Street, Suite 510
3  Reno, Nevada 89501
   Telephone: 775-785-5440
4  Facsimile: 775-785-5441
   Email: wpeterson@swlaw.com
5         jprupas@swlaw.com

6  *Attorneys for Petitioners*

7

8         IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

9                    IN AND FOR THE COUNTY OF WASHOE

10

11  IN THE MATTER OF THE                      Case No.

12  PEE POP TRUST, PEE POP TRUST II, PEE      Dept. No.
    POP TRUST III, MAN CUB TRUST, MAN
13  CUB TRUST II, MAN CUB TRUST III,
    DATED JULY 22, 2013.
14

15      **DECLARATION OF WILLIAM E. PETERSON IN SUPPORT OF MOTION FOR
16       TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

17

18      I, William Peterson, under penalty of perjury under the laws of the State of Nevada, and

19  based on personal knowledge or, where stated, good faith belief after inquiry, declare as follows:

20      1.      I am an attorney representing the Petitioners in this proceeding.

21      2.      I am licensed to practice law and admitted to practice in all state and federal courts

22  in Nevada and California.

23      3.      Attached hereto as Exhibit A is a true and correct copy of email correspondence

24  between FINRA (as described in the Petition) and representatives of my client rejecting the

25  CMAs referred to in paragraph 6 as incomplete and demanding copies of all trust instruments and

26  various trust documentation.

27      4.      Attached hereto as Exhibit B is a true and correct copy of the Affidavit of Eric L.

28  Johnson, trust counsel for the Hurry Trusts, that was provided to FINRA in connection with the

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1    Continuing Membership Applications of Alpine Securities Corporation and Scottsdale Capital

2    Advisors Corporation.

3         5.      Attached hereto as Exhibit C is a true and correct copy of correspondence from

4    FINRA directing Alpine Securities Corporation ("Alpine") and Scottsdale Capital Advisors

5    Corporation ("Scottsdale") to file CMAs with FINRA.

6         6.      Attached hereto as Exhibit D are true and correct copies of CMAs filed with

7    FINRA by Alpine and Scottsdale.

8         7.      Attached hereto as Exhibit E is a true and correct copy of letter from Trust Counsel

9    to FINRA referred to in footnote 1 in the Petition.

10        8.      Attached hereto as Exhibit F are true and correct copies of Certifications of Trust

11   of all the Petitioner Trusts.

12        Executed this 26th day of April, 2019 in Reno, Nevada.

13

14                                              William E. Peterson

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT A

**From:** Manzo, Liza [mailto:Liza.Manzo@finra.org]
**Sent:** Thursday, April 18, 2019 5:09 PM
**To:** tdiblasi@scottsdalecapital.com
**Cc:** Cullinane, Lena; Fritz, Maranda
**Subject:** SCOTTSDALE CAPITAL ADVISORS CORP (118786); Matter # 20190622574 - CMA filing received substantially incomplete

**CAUTION EXTERNAL EMAIL**
Dear Mr. DiBlasi,

FINRA Staff ("Staff") has received the Continuing Membership Application ("CMA") that you submitted on April 10, 2019 on behalf of Scottsdale Capital Advisors Corp ("Firm"). Staff's review of the CMA filing has found the application to be substantially incomplete. Specifically, Staff notes that the application did not adequately address the Standards set forth in NASD Rule 1014, specifically, Standard 1.

**Standard 1 – Complete and accurate application**
Staff acknowledges that you provided Certificates of Trust Existence and Authority for the six trusts, however, in order for Staff to verify the ultimate ownership i.e., management and control of the Firm, provide the following:
1. Provide all trust agreements and related amendments or modifications for the following trusts identified in the CMA.
   a) The Hurry Family Trust
   b) Man Cub Trust
   c) Man Cub Trust II
   d) Man Cub Trust III
   e) Pee Pee Pop Trust
   f) Pee Pee Pop Trust II
   g) Pee Pee Pop Trust III
2. Any documentation, beyond the trust agreements provided in Request No. 1, which define or evidence for the entities identified in Request No. 1(a)-(g) any of the following:
   a) The grantor(s) of the trust, the trustee(s), the trust's beneficiaries, the purpose of the trust, the powers of the trustee(s), the rights of the grantor(s) and the rights of its beneficiaries;
   b) Guidance, restrictions or instructions of how the trustee(s) should manage and disburse the trust's assets; and
   c) Provisions governing when and/or if the grantor(s) can amend or revoke the trust.
3. The application states that SCA Capital Advisors Holdings LLC ("SCA") was owned by Hurry Family Revocable Trust, which was restructured into two trusts each of which held a partial interest in SCA. Subsequently, each of

1

those trusts was broken into three trusts. Provide a pre and post transaction organization charts indicating the percentages of ownership held by each trust in SCA.

Please be advised that the Staff will not commence processing of the application until the information identified above is filed. The filing is not considered received until it is deemed substantially complete. NASD Rule 1017(d) provides that the Department may reject an application that is not substantially complete, and deem it to not have been filed. NASD Rule 1017(c)(1) provides that a member shall file an application for approval of a change in ownership or control at least 30 days prior to such change.

However, the Staff will grant the Firm five (5) business days to provide the required information referenced above. Therefore, please provide the required information and upload to the application (via the Gateway) as an amendment, no later than close of business on **Thursday, April 25, 2019**.

Please contact me via telephone or e-mail if you have any questions.

Regards,

*Liza Mango*

FINra

Financial Industry Regulatory Authority

Associate Principal Examiner
Membership Application Program
One World Financial Center
200 Liberty Street, 9th Floor
New York, NY 10281
T. 212-858-4191

Confidentiality Notice:: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.

# EXHIBIT B

# EXHIBIT B

STATE OF ARIZONA     )
                            ) ss.
County of Maricopa    )

## AFFIDAVIT OF ERIC L. JOHNSON

THE UNDERSIGNED, being first duly sworn, says:

1.      I am a licensed attorney in the State of Arizona and with the United States Tax Court.

2.      I have represented John Hurry and Justine Hurry since January of 2013 regarding tax and estate related matters and am fully familiar with the provisions and management of The Hurry Family Revocable Trust and subsequently formed trusts.

3.      For certain tax and estate planning purposes, The Hurry Family Trust was restructured on two occasions. First, in 2013, the trust was reorganized into two trusts. In 2017, that structure was revised to six trust entities. To accomplish those administrative changes, the following trusts were created (each of which has identical trust agreement provisions): Man Cub Trust dated July 22, 2013; Pee Pee Pop Trust dated July 22, 2013; Man Cub Trust II dated October 13, 2017; Man Cub Trust III dated October 13, 2017; Pee Pee Pop Trust dated October 13, 2017; and Pee Pee Pop Trust dated October 13, 2017 (collectively, the "Trusts").

4.      At no time was there any change in terms of the participants or the provisions of the Trusts. John Hurry is and has been the current beneficiary of the Trusts at all times since their creation. John Hurry and Justine Hurry have been trustees of the Trusts at all times since their creation.

This Affidavit is made from my own knowledge, and I will testify positively to the truth of the same in any court whenever called upon for that purpose.

DATED this 8th day of April 2019.

AFFIANT:

ERIC L. JOHNSON

SUBSCRIBED AND SWORN TO before me this 8th day of April 2019

OFFICIAL SEAL
TRAVIS R CAMPBELL
Notary Public - Arizona
MARICOPA COUNTY
Commission # 340124
My Commission Expires
JULY 31, 2019

Notary Public

# EXHIBIT C

# EXHIBIT C

MacVicar, Meredith

| From: | Manzo, Liza |
|---|---|
| Sent: | Tuesday, December 12, 2017 4:26 PM |
| To: | 'henry@scottsdalecapital.com' |
| Cc: | Goro, Leyna; Levine, Eric; Cullinane, Lena; Ishak, Robert |
| Subject: | SCOTTSDALE CAPITAL ADVISORS CORP (118786); Matter # 20170566525 - Materiality Consultation Decision Letter |

Dear Mr. Diekmann,

FINRA Membership Application Program Group Staff (the "Staff") hereby acknowledges receipt of a Materiality Consultation filing, submitted on December 8, 2017 on behalf of Scottsdale Capital Advisors Corp (the "Firm"). The Firm is requesting Staff's assessment as to whether certain changes in the indirect ownership would require an application for approval for purposes of Rule 1017, in which case the Firm would be required to file a Continuing Membership Application ("CMA") with FINRA seeking approval of the ownership change.

Based on the information provided, Staff understands the following: The Firm is wholly owned by SCA Clearing LLC ("SCA"). SCA was wholly owned by The Hurry Family Trust of which the beneficiaries are John and Justine Hurry and their four children. The Trustees are John and Justine Hurry. On or around August 2017, SCA became owned equally by two separate trusts, The Man Cub Trust (50%) and PeePop Trust (50%). The beneficiaries of the trusts continued to be John and Justine Hurry and their four children; trustees are John and Justine Hurry. Most recently in November 2017, the ownership of SCA underwent another change. The change consisted of six different trusts owning each approximately 16.7% of SCA. The six different trusts will continue to have as beneficiaries John and Justine Hurry and their four children; trustees are John and Justine Hurry.

Based on the facts and representations in your letter, Staff has concluded that, for purposes of NASD Rule 1017, the indirect ownership changes does appear to require an application for approval. Staff based its determination on, among other things, the indirect ownership changes, represents over a 25% indirect change in ownership of the Firm, with, as noted, new trusts coming into the structure. While these new trusts will individually hold below 25% ownership interests, collectively, their indirect ownership will equate to 25% or more of the Firm. Please reference FINRA Notice to Members 00-73 which states, in pertinent part, that *"a group of individuals acting in concert to obtain control of 25 percent or more of the equity or partnership capital of a member will be deemed to be an 'entity' for purposes of the Rule, and as such, will trigger the requirement to submit an application to obtain approval of the ownership change"*. Based on the foregoing, the proposed change in indirect ownership does warrant a Continuing Membership Application to be filed by the Firm pursuant to Rule 1017. Staff will need to review the trust documents for all trusts through the CMA process. The filing should be made via Form CMA, available through the electronic Gateway, and the documentation should include all relevant exhibits to support the indirect ownership change. In addition, please review Regulatory Notice 12-32 regarding information on continuing membership application fees, and Regulatory Notice 13-11 for information regarding fee waivers.

This response is based upon the facts and representations provided to FINRA Staff by you and the Firm regarding the proposed change, and any different facts or conditions may require a different response. If in the future the Firm proposes to make additional changes to its business operations and/or ownership structure, please review the FINRA Membership and Registration Rules, particularly Rule 1017 and Rule 1011(k), as well as the Firm's Membership Agreement to determine whether an application is required.

Please feel free to call with any questions.

Regards,



Liza Mango

Senior Examiner
Membership Application Program
One World Financial Center
200 Liberty Street, 9th Floor
New York, NY 10281
T.  212-858-4191

# EXHIBIT D

# EXHIBIT D

> *i* This form has NOT yet been submitted to FINRA. Please review the answers you provided. You must return to the editable version of the form and press the Submit button to send this information to FINRA.

<< Back to Filing Cabinet

Introduction

# Continuing Member Application

### Introduction

The Continuing Membership Application Form ("Form CMA," "Form," or "Application") is designed to assist Applicants in the preparation of an Application filed pursuant to NASD Rule 1017 in which the Applicant seeks approval from the Financial Industry Regulatory Authority, Inc. ("FINRA") for a change in ownership, control or business operations. The completed Form, with all required questions answered, and all required supporting documentation attached, must be filed electronically with FINRA.

To assist in the completion of Form CMA, important information is provided below concerning the following:

- Completing the Form
  - Substantially Complete Requirement
  - Form Structure and Using the Form
  - Mandatory Information
  - Terms Used in the Form
  - Saving the Form Prior to Submission
  - Submitting the Form
- Maintaining the Accuracy of the Application

### Completing the Form

The Form references information and documentation required under the Membership Rules of FINRA (see NASD Rule 1010 Series). Form CMA is structured to capture information and documentation pertinent to the Applicant's proposed change in ownership, control or business operations. However, additional information and documentation may be requested once the FINRA Staff ("Staff") has had an opportunity to review the Application.

Applicants are encouraged to include as much of the requested information and documentation in their initial Form CMA submission as possible. Experience has shown that Applications containing well thought out, detailed, and complete information and documentation can be processed more efficiently with less need for Staff to seek out supplemental information. Complete Applications help the Staff to gain a prompt understanding of the Applicant's proposed change, which facilitates FINRA's ability to review whether the Applicant meets the standards for admission contained in NASD Rule 1014, against which applications submitted utilizing the Form CMA are evaluated. Applicants are encouraged to review additional materials about the Continuing Membership Application process, available on www.finra.org. Applicants should also consider consulting the Staff in advance of submitting Form CMA, particularly for any Application involving novel or complex business arrangements.

### Substantially Complete Requirement

Form CMA is intended to provide an Applicant with information and requests that are required of it in the Application process. Applicants should note that an Application will not be accepted for processing unless it is deemed substantially complete. While the Form identifies information and documentation that is minimally required in order to file Form CMA, an Applicant is urged not to limit itself to completion of the required fields if and when any optional information fields are applicable or if additional information can be provided that is material to the Applicant's planned change. It is also important to note that, since the Form is submitted exclusively on an electronic basis, it is critical that the Applicant ensure that each attached document is actually the document indicated and contains relevant information

Every Form CMA will be reviewed initially for content by Staff. Should an Applicant fail to provide accurate material information or documentation relevant to the Applicant's proposed change, a submitted Form CMA may be rejected as "not substantially complete."

### Form Structure and Using the Form

The Form is structured to collect information, data and documentation from the Applicant in order for Staff to evaluate the Application against the standards for admission contained in NASD Rule 1014. The Form requests that information be provided in formats including narrative text, fields that require a selection or mouse-click (e.g., drop-down lists, radio buttons), data entered directly into the Form, information entered into tables in the Form or connected to the Form, and attachments of supporting documents.

The Form is designed to leverage, where possible, certain information provided by the Applicant to FINRA through means other than the Form itself, in particular, information submitted via the Central Registration Depository (CRD®). In instances where information from other sources are leveraged, if any such information presented to the Applicant in the Form is inaccurate, an Applicant must update the source system before ultimately submitting or amending the Form CMA. (Typically it takes one business day after updating the source system for Form CMA to reflect such changes.)

---

**Mandatory Information**

Certain aspects of the Form are indicated with a red asterisk ( * ), indicating that such aspect (e.g., question, data field, information, document request) of the Form is a required field. A system completeness check is conducted on every Form CMA attempted to be submitted to FINRA. Any Form CMA that fails to address each of the required fields will not be permitted to proceed with submission. Failure to address required fields will, when attempting to submit the Form, result in identification of the missing or unanswered information to the Applicant, who will be responsible for addressing the missing information before attempting to resubmit the Application.

While certain aspects of the Form are indicated as required, Applicants are strongly encouraged to address any optional information fields of the Form that are applicable to the Applicant's proposed change.

---

**Terms Used in the Form**

Unless otherwise stated, the terms used in this Form (e.g., "Applicant," "Associated Person") have the same definition as prescribed in NASD Rule 1011. Additionally, the Form makes certain references that should be construed in a consistent manner. Please note the following references have the meaning prescribed here:

"Associated Person" has the meaning prescribed to such term in NASD Rule 1011(b).

"CRD system" means the Central Registration Depository, the central licensing and registration system for the U.S. securities industry and its regulators.

"SEA" means the Securities Exchange Act of 1934.

"SEA Rule" means a rule promulgated under the SEA.

---

**Saving the Form Prior to Submission**

An Applicant may review, enter, and otherwise prepare Form CMA and save the most recent version of the Form prior to submitting the Application for review by Staff. The Form need not be fully prepared or completed in order to be saved. The most recent saved version of a draft Form CMA is retained on FINRA's electronic filing platform until a final version is submitted to FINRA.

---

**Submitting the Form**

After completing the Form CMA, an Applicant must submit the Form for review by Staff. An electronic completeness check is run on the Form CMA upon attempting submission to determine whether all required fields have been addressed. Upon successfully passing the electronic completeness check, the Form is routed to Staff for a determination of whether the Application is substantially complete. If determined to be substantially complete, the Application will be assigned for continuing review. After submission, an Applicant will be able to view its submitted Form CMA via FINRA's electronic filing system.

---

**Maintaining the Accuracy of the Application**

Each Applicant with FINRA must, at all times, ensure the accuracy of its Application. The Applicant is responsible for keeping its Application current and accurate throughout the Application review process. The Applicant must amend or otherwise notify Staff of any information in, or any information omitted from, its Application that is or makes the Application inaccurate, incomplete or misleading.

Application type

# Continuing Member Application

---

## Type of Continuing Membership Application

Identify the type of change that is contemplated (select all that apply).

---

**Ownership or asset transfer changes**

☐ Merger of the member with another member

☐ Direct or indirect acquisition by the member of another member

☐ Direct or indirect acquisition or transfer of 25% or more in the aggregate of the member's assets or any asset, business or line of operation that generates revenues comprising 25% or more in the aggregate of the member's earnings measured on a rolling 36 month basis

☑ Change in the equity ownership or partnership capital of the member resulting in one person or entity directly or indirectly owning or controlling 25% or more of the equity or partnership capital

---

**Change(s) in business operations**

☐ Material change in business operations

☐ Removal or modification of a membership agreement restriction

☐ Market making, underwriting or acting as a dealer for the first time

☐ Adding a business activity that requires a higher minimum net capital under Securities Exchange Act (SEA) Rule 15c3-1.

☐ Expansion of Associated Persons, offices, or number of markets made

☐ Other

Applicant contact information

# Continuing Member Application

---

## Applicant contact information

---

Provide the following information for the person who will be the primary contact for the Applicant during FINRA's review of the Continuing Membership Application. Note that this is the person to whom FINRA will direct Application related questions and correspondence.

Firm name *          ALPINE SECURITIES CORPORATION

### Contact person

First name *          Jason
Last name *           Kane
Email address *       jkane2@alpine-securities.com
Phone number *        801-320-1321
Fax number

### Mailing address

Company name *        Alpine Securities Corporation
Street address, line 1 *   39 Exchange Place
Street address, line 2
City *                Salt Lake City
State *               UT
ZIP Code *            84111

Standard 1: Overview of the Applicant

# Continuing Member Application

---

## Standard 1: Overview of the Applicants

NASD Rule 1014(a)(1): The application and all supporting documents are complete and accurate.

---

### Overview of the proposed change

1. Provide a complete description of the proposed change, identifying *

a. the terms and nature of the proposed change,

b. the date the transaction is expected to be completed,

c. the business reason(s) for the change,

d. the financing for the transaction, including the source of funding for the purchase and recapitalization (as applicable), and

e. an overview of the impact(s) (e.g., financial, operational, managerial, supervisory), or lack thereof, to the Applicant as a result of the change.

Since its acquisition in 2011, Alpine has been owned by SCA Clearing LLC ("SCA"). At the time of that acquisition, SCA was, in turn, owned by the Hurry Family Revocable Trust. In connection with that application, a CMA was filed that identified the ownership of both Alpine and SCA and confirmed the identity of the Trustees of the Trust, Justine and John Hurry. Information and materials were submitted in connection with that application, and as further requested by FINRA. That application was granted. In 2017, and based on certain estate and tax planning issues, trust counsel Eric Johnson restructured the Hurry Trust into two trusts each of which then held a 50% interest in SCA. Two months later, and based again on estate and tax planning considerations, each of those trusts was broken into three trusts. As Mr. Johnson explains in his accompanying Affidavit, there was no change in Trustees nor was there any change in the management or operation of the trusts. For more information, see attached Alpine Securities Corp. Continuing Membership Application Cover Letter.

2. For any persons or entities, including other broker-dealers and investment advisory firms, that will become associated or affiliated with the Applicant, through ownership, employment, or otherwise, as a result of the proposed transaction, please provide the name of the person or entity, describe the relationship such person or entity will have with the Applicant, for any entity describe the business conducted by such entity, and identify whether the Applicant will be conducting business with or on behalf of the person or entity. *

This question is not applicable. Alpine did not have any new associated or affiliated persons as a result of the "change" contemplated by this application. For more information, see attached Alpine Securities Corp. Continuing Membership Application Cover Letter.

**Specify changes in direct ownership.**

Below is a read-only view of the current direct owners of the Applicant (information obtained from the CRD system).

Please click the "Refresh" button to reload the information (from CRD) below.

| Full legal name | CRD ID | Domestic or Foreign Entity, or Individual | Roles | Date role acquired | Ownership percentage | Control person? |
|---|---|---|---|---|---|---|
| SCA CLEARING LLC | | Domestic | SOLE SHAREHOLDER | 03/01/2011 | 75% or more | Y |
| DOUBEK, CHRISTOPHER ROBERT | 1705718 | Individual | CEO | 04/01/2019 | Less than 5% | Y |
| BRANT, DAVID ROBERT | 2718478 | Individual | CFO/FINOP | 06/01/2017 | Less than 5% | Y |
| KANE, JASON EDWARD | 6248715 | Individual | CHIEF COMPLIANCE OFFICER/AML OFFICER | 01/01/2019 | Less than 5% | Y |
| WALSH, JOSEPH PATRICK | 1519958 | Individual | CHIEF OF OPERATIONS | 01/01/2019 | Less than 5% | Y |

Please edit the chart below to describe the proposed changes in the Applicant's direct ownership. (Information provided here will be used solely for the review of this Application and will not update the CRD system).

**Specify changes in indirect ownership.**

Below is a read-only view of the current indirect owners of the Applicant (information obtained from the CRD system).

Please click the "Refresh" button to reload the information (from CRD) below.

| Full legal name | Domestic or Foreign Entity, or Individual | Entity in which interest is owned | Roles | Date role acquired | Ownership percentage | Control person? | CRD ID, EIN, IRS # |
|---|---|---|---|---|---|---|---|
| SCA CLEARING LLC | Domestic | SCA CLEARING LLC | MANAGER | 08/01/2017 | Other General Partners | Y | |

Please edit the chart below to describe the proposed changes in the Applicant's indirect ownership. (Information provided here will be used solely for the review of this Application and will not update the CRD system).

**1. Proposed changes in indirect ownership**

CRD ID [_____]    Name * [ Pee Pee Pop Trust II ]

Domestic or Foreign Entity, or Individual    [ Domestic ]

4/10/2019 FINRA - Continuing Membership Application Print

Entity in which interest is owned SCA Clearing LLC

Roles

Date role acquired

Ownership percentage 1/6

Control person? ○ Yes ● No

## 2. Proposed changes in indirect ownership

CRD ID | Name * Pee Pee Pop Trust

Domestic or Foreign Entity, or Individual Domestic

Entity in which interest is owned SCA Clearing LLC

Roles

Date role acquired

Ownership percentage 1/6

Control person? ○ Yes ● No

## 3. Proposed changes in indirect ownership

CRD ID | Name * Man Cub Trust III

Domestic or Foreign Entity, or Individual Domestic

Entity in which interest is owned SCA Clearing LLC

Roles

Date role acquired

Ownership percentage 1/6

Control person? ○ Yes ● No

## 4. Proposed changes in indirect ownership

CRD ID | Name * Man Cub Trust II

Domestic or Foreign Entity, or Individual Domestic

Entity in which interest is owned SCA Clearing LLC

Roles

Date role acquired

Ownership percentage 1/6

Control person? ○ Yes ● No

## 5. Proposed changes in indirect ownership

CRD ID | Name * Man Cub Trust

Domestic or Foreign Entity, or Individual Domestic

Entity in which interest is owned SCA Clearing LLC

Roles

Date role acquired

Ownership percentage 1/6

Control person? ○ Yes ● No

## 6. Proposed changes in indirect ownership

CRD ID | Name * Pee Pee Pop Trust III

FINRA - Continuing Membership Application Print

| | |
|---|---|
| Domestic or Foreign Entity, or Individual | Domestic |
| Entity in which interest is owned | SCA Clearing LLC |
| Roles | |
| Date role acquired | |
| Ownership percentage | 1/6 |
| Control person? | ○ Yes ● No |

---

**Provide supporting documents.**

1. Pre- and post-change business organizational charts, identifying the Applicant's owners and affiliated entities (indicate all direct and indirect owners of the Applicant and percentage of ownership for each) *

2. Any modified formation documents of the Applicant stemming from the change *

3. Formation documents for any entities (e.g., corporations, partnership, trusts), including holding companies, that are or will be new owners, directly or indirectly, of the Applicant *

4. As applicable, if this Application is filed on behalf of multiple firms: a signed statement, from a principal officer of each Applicant, indicating this Application is being filed on the firm's behalf

5. Any other documentation that would be pertinent to FINRA's review of this Standard

04_Man_Cub_Trust_-_20170712_trust_certificate__signed_.pdf 777794 bytes

04_Man_Cub_Trust_III_-_20171013_trust_certificate__signed_.pdf 842092 bytes

04_Pee_Pee_Pop_Trust_II_-_20171013_trust_certificate__signed_.pdf 843659 bytes

04_Man_Cub_Trust_II_-_20171013_trust_certificate__signed_.pdf 837948 bytes

04_Pee_Pee_Pop_Trust_-_20170712_trust_certificate__signed_.pdf 782254 bytes

04_Pee_Pee_Pop_Trust_III_-_20171013_trust_certificate__signed_.pdf 848992 bytes

Eric_Johnson_-_20180926_letter_general.pdf 86873 bytes

Affidavit_of_Eric_Johnson_-_20190408.pdf 689113 bytes

Standard 2: Licenses and registrations

# Continuing Member Application

---

## Standard 2: Licenses and registrations

NASD Rule 1014(a)(2): The Applicant and its Associated Persons have all licenses and registrations required by state and federal authorities and self-regulatory organizations.

---

The Applicant is reminded that failure of its Associated Persons to schedule and successfully complete any required qualification examinations in a timely manner may result in a significant delay of the Application review process, or a lapse or denial of the Application. It is strongly suggested that any qualification examination(s) be completed in advance of the filing of the Form CMA where possible or be scheduled within the first 30 days of filing Form CMA, and that all registration requirements be completed within the first 60 days of filing Form CMA to avoid delays in processing of the Application.

---

**Provide information regarding direct owners**

---

The list of direct owners below is repeated from the Applicant's input in Standard 1 above. If the information displayed is incomplete or inaccurate, please edit Standard 1 before completing this section of the Form.

Please provide the information below for all direct owners who will have an ownership stake in the Applicant after the proposed change.

**CRD IDNameContinuing education**

---

**Provide information about the Applicant following the proposed change**

---

1. Does the Applicant anticipate being registered with or withdrawing registration from any other regulatory or self-regulatory organization(s) and/or state(s) as a result of the change? *

◯ Yes ◉ No

---

Each Applicant, except a sole proprietorship, is required to have a minimum of two registered principals with respect to each aspect of its investment banking and securities business. Pursuant to the FINRA Rule 9600 Series, FINRA may waive the requirement in situations that indicate conclusively that only one person associated with an Applicant should be required to register as a principal. Each Applicant must also have a Financial and Operations (FinOp) Principal (or Introducing Broker-Dealer FinOp Principal, as applicable). Additionally, an Applicant engaged in certain activities must have other appropriately registered principals (for example, an Applicant that will be engaged in options transactions with the public must have a Registered Options Principal). Please refer to NASD Rules 1021 (Registration Requirements) and 1022 (Categories of Principal Registration) for the appropriate categories of principal registration.

---

2. Is the Applicant seeking a waiver, or seeking to maintain a waiver already in place, of the two principal requirement under NASD Rule 1021? *

◯ Yes ◉ No

3. Will the Applicant have any non-registered officers, directors, or control persons following the change? *

◯ Yes ◉ No

---

**Provide supporting documents.**

1. Management organizational chart, identifying officers, principals and supervisors of the Applicant and the proposed business activities and/or product lines supervised by each person following the change *

2. An attestation for officers, directors, owners and control persons who will not participate in the day-to-day securities or investment banking operations of the Applicant or act in any capacity that would require that these individuals become registered

3. Any other documentation that would be pertinent to FINRA's review of this Standard

---

**Provide specific information regarding supervisors.**

The list of personnel below is repeated from the Applicant's input in Standard 1 above. If the information listed is inaccurate or incomplete, please edit Standard 1 before completing this section of the Form.

CRD IDNameContinuing education

1. Does the Applicant anticipate being registered with or withdrawing registration from any other regulatory or self-regulatory organization(s) and/or state(s) as a result of the change? *

◯ Yes ◉ No

2. Does the Applicant anticipate being exempt from registration with the Securities Information Center, pursuant to SEA Rule 17f-1, following implementation of the proposed change? *

◯ Yes ◉ No

---

**Provide supporting documents.**

1. For the Applicant:

    a. Options allocation form (if applicable)

    b. Lost and stolen securities registration (if applicable)

    c. Evidence of registration with MSRB (if applicable)

2. For personnel:

a. A management organizational chart, identifying officers, principals, and supervisors of the Applicant and the proposed business activities and/or product lines supervised by each person following the proposed change '

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 3: Compliance with securities laws, just and equitable principles of trade

# Continuing Member Application

## Standard 3: Compliance with securities laws, just and equitable principles of trade

NASD Rule 1014(a)(3): The Applicant and its Associated Persons are capable of complying with the federal securities laws, the rules and regulations thereunder, and FINRA Rules, including observing high standards of commercial honor and just and equitable principles of trade. In determining whether this standard is met, the Department shall take into consideration whether:

In determining whether this standard is met, the Department shall take into consideration whether:

A. a state or federal authority or self-regulatory organization has taken permanent or temporary adverse action with respect to a registration or licensing determination regarding the Applicant or an Associated Person;

B. an Applicant's or Associated Person's record reflects a sales practice event, a pending arbitration, or a pending private civil action;

C. an Applicant or Associated Person is the subject of a pending, adjudicated, or settled regulatory action or investigation by the Commission, the Commodity Futures Trading Commission, a federal, state, or foreign regulatory agency, or a self-regulatory organization; an adjudicated, or settled investment-related private civil action for damages or an injunction; or a criminal action (other than a minor traffic violation) that is pending, adjudicated, or that has resulted in a guilty or no contest plea or an Applicant, its control persons, principals, registered representatives, other Associated Persons, any lender of 5% or more of the Applicant's net capital, and any other member with respect to which these persons were a control person or a 5% lender of its net capital is subject to unpaid arbitration awards, other adjudicated customer awards, or unpaid arbitration settlements;

D. an Associated Person was terminated for cause or permitted to resign after an investigation of an alleged violation of a federal or state securities law, a rule or regulation thereunder, a self-regulatory organization rule, or industry standard of conduct;

E. a state or federal authority or self-regulatory organization has imposed a remedial action, such as special training, continuing education requirements, or heightened supervision, on an Associated Person; and

F. a state or federal authority or self-regulatory organization has provided information indicating that the Applicant or an Associated Person otherwise poses a threat to public investors.

Explain how this Standard is met.

1. Is the Applicant or any of its Associated Persons the subject of any of the following '

a. adverse actions by state or federal authority or self-regulatory organizations with respect to registration or license determinations;

b. a sales practice event, pending arbitration or pending private civil action;

c. pending, adjudicated or settled regulatory action or investigation by any regulatory or self-regulatory authority, or any civil or criminal action resulting in guilty or no contest plea;

d. unpaid arbitration awards involving the Applicant, its control persons, principals, registered representatives, any lender of 5% or more of the Applicant's net capital, or any other Associated Person of the Applicant;

e. termination for Cause or permitted to resign after an investigation of an alleged violation of federal or state securities law, rules or regulations or a self-regulatory rule or industry standard of conduct;

f. regulatory imposed remedial action such as special training, continuing education requirements, or heightened supervision on an Associated Person by a state or federal authority or self-regulatory organization; or

g. information from an industry authority indicating the Applicant or its Associated Persons are a threat to public?

⊙ Yes ○ No

Regarding the event(s), unless details of a particular event have been reported to the CRD system, provide information (e.g., subject party, nature of the activity, any findings, any fine, other dispositions) for each event involving the Applicant and/or its Associated Persons. '

Any and all applicable events have been previously reported to the CRD system. For discussion of these issues, see attached Alpine Cover Letter.

FINRA - Continuing Membership Application Print

2. Pursuant to NASD Rule 1014(b)(1), where the history of the Applicant or its Associated Persons includes any of the events set forth in NASD Rule 1014(a)(3)(A) and (C) through (E), there is a presumption that the Application should be denied. The Applicant may overcome the presumption of denial by demonstrating that it can meet each of the standards for admission in NASD Rule 1014(a), notwithstanding the existence of any of the events set forth in NASD Rule 1014(a)(3)(A) and (C) through (E). To the extent that any of the referenced events exist for the Applicant or its Associated Persons, provide a detailed explanation, in light of the existence of such events, as to how the Applicant is nonetheless capable of complying with industry rules, regulations, laws, and observing high standards of commercial honor and just and equitable principles of trade. Please reference any controls or systems put in place and refer to any specific pages or sections in the Applicant's written supervisory procedures that address heightened supervisory requirements. *

While Alpine has been the subject of certain disciplinary actions, its continuous growth of improvement in its compliance program over the last eight years illustrate its commitment to compliance with securities laws. After the acquisition, Alpine experienced an almost complete change in its management and personnel – in particular personnel who previously were most directly involved in management and conduct of the firm's business. This occurred over a relatively short period after since the acquisition in March 2011. Along with the change in ownership and managerial personnel, Alpine adopted a different business model and greatly improved and revamped its compliance procedures to handle the different type of business. As a result, Alpine in almost every respect is nothing like it was before the 2011 change in ownership. On an ongoing basis, Alpine continues to regularly review, assess and enhance its policies to evaluate whether its current controls are sufficient or whether changes are needed. While Alpine has had some regulatory challenges in the past, it wants to assure FINRA staff that Alpine is committed to observing all federal, SRO and state securities rules and regulations. To show its commitment, Alpine made numerous changes to its operational processes and written supervisory procedures and developed a process to review its policies regularly for compliance with securities rules and regulations on an ongoing basis. Alpine continues to be committed to training its staff on a regular basis to ensure they understand the applicability of federal, SRO and state securities regulations and the role of these regulatory bodies in this process. Alpine continues to monitor its compliance program and routinely enhances its program based on guidance from regulators, peers, and legal professionals, as well as adoption of best practices in the industry. Further, the issues raised in the SEC action occurred primarily in the first two years after the acquisition, in 2011 and 2012, and relate to certain filing issues under the Bank Secrecy Act that were not well understood in the industry at that point. The SEC's evidence in that action confirmed a dramatic drop in the number of its claims from 2013 forward. Alpine, on its own initiative and in response to regulatory examination and action, has continuously worked to enhance and improve its compliance program. Because of its issues in the past, and regulator's concerns regarding transactions in the microcap markets, Alpine has been and will remain the subject of intense scrutiny and so it must and it will ensure that it is in compliance with federal securities laws. Further, Alpine has operated since 2010 in accordance with the restrictions that were specifically designed and imposed by FINRA in the interest of investor protection, and Alpine will continue to abide by those restrictions in the future. For discussion of these issues, see attached Alpine Cover Letter.

3. Indicate whether the Applicant or any Associated Persons have been found to have violated the same federal securities laws or regulations, the rules thereunder, or FINRA Rules on more than one occasion. In such instances, identify the nature of the repetitive occurrences, the corrective action the Applicant has taken to prevent future violations, and the specific persons with responsibility for supervision in the areas noted with repeat violations and/or Associated Persons who have been found to have repeat violations. *

From April 1985 through September 29, 2014, Alpine has consented to 41 AWCs (including the most recent AWC as set forth above) . As discussed above, Alpine has taken substantial steps to correct the procedural and compliance issues that led to these AWC's. Thirty-five (35) of these sanctions occurred prior to January 1, 2006. The next preceding five sanctions occurred between May 2007 and November 2011. Of the six most recent sanctions, two of them arose out of activities that occurred prior to 2006. Throughout this period of time, Alpine has continually taken steps improve and enhance its trading and supervisory systems to correct the circumstances that led to these events. This has included hiring and training of additional personnel as needed. Perhaps most significant has been the fundamental change in Alpine which arose from the change in its ownership in March 2011, following the firm's acquisition by Mr. Hurry through a business entity which acquired Alpine's stock. Alpine's sister firm, Scottsdale Capital Advisors ("Scottsdale") has also been the subject of certain disciplinary actions, those proceedings should not impact this application. First, the FINRA proceeding is presently on appeal and there are substantial issues that Scottsdale has sought to have reviewed. In fact, the SEC's decision to issue a stay in favor of Mr. Hurry may reflect the SEC's concerns regarding the merits and validity of that ruling. Second, that FINRA proceeding involved an exhaustive airing of any and all of FINRA's concerns in relation to Scottsdale, and the Panel imposed the sanctions that it deemed appropriate, i.e., a fine for the firm and sanctions against certain individuals. Those same issues that were considered by that Panel and that formed the basis for those sanctions should not now be relitigated here in the guise of a CMA. Further, that FINRA action was focused on specific Section 5 issues that are distinct from the overriding considerations concerning customer harm that are foremost in FINRA's analysis. In fact, because Scottsdale has experienced regulatory issues in the past, and given regulator's continuing concerns regarding transactions in the microcap markets, it has been and will remain the subject of scrutiny and so it must and it will ensure its compliance with federal securities laws.

4. Will this Application involve a transfer of assets without a corresponding transfer of liabilities? *

○ Yes ⊙ No

**Provide supporting documents.**

1. Documentation of any of the events described in NASD Rule 1014(a)(3), unless the event has been reported to the CRD system

3. Any other documentation that would be pertinent to FINRA's review of this Standard

FINRA - Continuing Membership Application Print

Standard 4: Contractual and business relationships

# Continuing Member Application

## Standard 4: Contractual and business relationships

NASD Rule 1014(a)(4): The Applicant has established all contractual or other arrangements and business relationships with banks, clearing corporations, service bureaus, or others necessary to:

(A) initiate the operations described in the Applicant's business plan, considering the nature and scope of operations and the number of personnel; and

(B) comply with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

---

**Explain how this Standard is met.**

1. Identify whether any new agreements or business relationships are being established or whether existing agreements are being modified in order to effectuate the proposed change. Such agreements may include, but are not limited to, expense sharing, clearing, custody, outsourcing, independent contractor, etc. *

As detailed earlier, Alpine did not undergo any changes of as a result of the "change" contemplated by this application. Moreover, Alpine has not and will not enter into any new agreements or business relationships, nor have or will any existing agreements be modified in order to effectuate the proposed transaction.

2. Identify any dependencies or conditions (e.g., shareholder approval, regulatory approval) that must be satisfied prior to conducting the proposed change. *

Alpine has identified no dependencies or conditions that had to be satisfied prior to the "change" contemplated by this application.

3. Will the proposed change result in the creation of an expense sharing agreement ("ESA") or amendment to an existing ESA? *

○ Yes ⦿ No

---

**Provide supporting documents.**

1. Copies of the Applicant's Fidelity bond and cancellation rider (if impacted by the proposed change)

2. Agreements, to the extent any such agreements are put in place, replaced or amended as a result of the proposed change, including:

    a. Clearing agreements

    b. Administrative services agreement

    c. Agreement with FinOp Principal

    d. Commission sharing agreement

    e. Technology services agreement, including arrangements with third-party providers of electronic storage media (SEC Rule 17a-4(f))

    f. Compliance services/support agreement

    g. Expense sharing agreements and supporting documents, including bank statements, tax returns, etc., as applicable

    h. Other agreements pertinent to the conduct of the proposed change

3. Transaction documents (e.g., letter(s) of intent, asset purchase agreements, share purchase agreements, merger agreements, board resolutions)

4. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 5: Facilities

# Continuing Member Application

---

### Standard 5: Facilities

NASD Rule 1014(a)(5): The Applicant has or has adequate plans to obtain facilities that are sufficient to:

(A) initiate the operations described in the Applicant's business plan, considering the nature and scope of operations and the number of personnel; and

(B) comply with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

---

**Explain how this Standard is met.**

1. Is the Applicant making any material changes to existing facilities or locations, or will any proposed change in business require additional space and/or locations? *

  ○ Yes ● No

2. As applicable, identify whether various departments (e.g., research, investment banking, trading) of the Applicant are separated by appropriate information and physical barriers, and describe the methods for maintaining such barriers.

  > This questions is not applicable. As stated, Alpine has not and will not undergo any changes with regard to facilities or otherwise as a result of the "change" contemplated by this application.

3. Will the Applicant, as a result of the proposed change, at any of its locations share office space with an entity or an individual conducting activities other than the Applicant's business? *

  ○ Yes ● No

4. Will the Applicant enter into or acquire any new lease or sublease arrangements as a result of the proposed change? *

  ○ Yes ● No

5. Will the proposed change result in any change in locations of the Applicant that are owned premises, or result in the addition of private residence used as offices of the Applicant? *

  ○ Yes ● No

---

**Provide supporting documents.**

1. For each leased location impacted by the proposed change, the master lease (the agreement between the owner of the property and the initial lessee)

2. For each sub-leased location impacted by the proposed change, the sub-lease

3. For each sub-lease impacted by the proposed change, written authorization from the landlord evidencing consent to sublet the premises (if required)

4. For each owned premises impacted by the proposed change, draft or executed deed of ownership

Note that the existence of an Expense Sharing Agreement does not negate the requirement to evidence that the Applicant has the right to operate from the premises.

5. Space sharing agreements impacted by or implemented as a result of the proposed change

6. A supervisory chart or listing which evidences the supervisory structure, the location of each designated supervisor, the number of Associated Persons currently supervised by each, and the anticipated additional number of Associated Persons to be supervised as a result of the proposed change

7. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 6: Communications and operational systems

# Continuing Member Application

---

### Standard 6: Communications and operational systems

NASD Rule 1014(a)(6): The communications and operational systems that the Applicant intends to employ for the purpose of conducting business with customers and other members are adequate and provide reasonably for business continuity in each area set forth in NASD Rule 1013(a)(1)(F)(xii).

---

Explain how this Standard is met.

1. Describe (i) the impact, if any, on the communication and operational systems of the Applicant which are utilized for the purpose of conducting business with customers and other firms, (ii) the adequacy of such systems in light of the proposed change, and (iii) the impact on plans in place to ensure business continuity. *

As previously described, the "change" contemplated by this application will not in any way change Alpine's business model, including any communication and operational systems utilized for the purpose of conducting business with customers and other firms. Alpine notes that such systems remain appropriately adequate in light of the "change" contemplated by this application and there will be no impact on business continuity as a result.

2. Describe how the systems and equipment of the Applicant will be impacted by the proposed change, and how the Applicant will address potential issues (e.g., adding new systems/equipment, modifying existing systems). *

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the firm's systems and equipment.

3. Regarding business continuity, describe how the proposed change impacts capacity in light of any anticipated increase in usage levels, and describe in detail any changes to contingency plans to address system failures, disaster recovery plans, system security, etc. *

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including business continuity.

4. Will the Applicant conduct business from multiple locations as a result of the proposed change? *

○ Yes ◉ No

5. Will, as a result of the proposed change, one or more of the Applicant's proposed locations be the residence of an Associated Person? *

○ Yes ◉ No

6. Will the proposed change affect or result in the Applicant's use of social media sites, such as blogs and social networking sites, for business communications? *

○ Yes ◉ No

---

Provide supporting documents.

1. Business continuity plan (if impacted)

2. Business continuity disclosure statement (if available)

3. A step-by-step description of the order flow on the trading platforms, supported by screenshots or schematic diagrams (as applicable to the proposed change)

4. Screenshots of both Applicant-facing and outward-facing pages of the social media sites, showing the flow from one screen to another (if applicable)

5. A systems conversion timeline, testing plan, and implementation schedule for proposed changes (if applicable)

6. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 7: Maintaining adequate net capital

# Continuing Member Application

## Standard 7: Maintaining adequate net capital

NASD Rule 1014(a)(7): The Applicant is capable of maintaining a level of net capital in excess of the minimum net capital requirements set forth in SEA Rule 15c3-1 adequate to support the Applicant's intended business operations on a continuing basis, based on information filed under NASD Rule 1013(b)(5).

The Department may impose a reasonably determined higher net capital requirement for the initiation of operations after considering:

   A. the amount of net capital sufficient to avoid early warning level reporting requirements, such as SEA Rule 17a-11;

   B. the amount of capital necessary to meet expenses net of revenues for at least twelve months, based on reliable projections agreed to by the Applicant and the Department;

   C. any planned market making activities, the number of markets to be made, the type and volatility of products, and the anticipated maximum inventory positions;

   D. any plan to enter into other contractual commitments, such as underwritings or other securities-related activities;

   E. any plan to distribute or maintain securities products in proprietary positions, and the risks, volatility, degree of liquidity, and speculative nature of the products; and

   F. any other activity that the Applicant will engage in that reasonably could have a material impact on net capital within the first twelve months of business operations.

### Explain how this Standard is met.

1. Provide a detailed description of:

   a. the nature and source of the Applicant's capital;

   b. the terms and conditions of all financing arrangements; and

   c. any impact to the Applicant's ability to maintain net capital in excess of the Applicant's existing (or revised) minimum net capital requirement, and to support, on a continuing basis the business operations as proposed by the Applicant.

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including its ability to maintain net capital in excess of its existing minimum net capital requirement and to support business operations.

2. Will the Applicant, in connection with the proposed change, rely on any form of subordinated lending relating to its capital position? *

○ Yes ⦿ No

3. Describe plans for additional funding of the Applicant, should such additional funding become necessary in the future. *

Alpine continues to rely on John Hurry for contingent funding purposes. These are short term loan arrangements, typically lasting 3 days or less. Alpine does not have any current plans to pursue a commercial line of credit at this time through a depository institution.

4. Provide a statement of the Applicant's statutory minimum net capital requirement, pursuant to SEA Rule 15c3-1, and any change in net capital calculation methodology by the Applicant, as a result of the proposed change. *

Alpine's statutory minimum net capital requirement, pursuant to SEA Rule 15c3-1, is $250,000. As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the net capital calculation methodology used.

5. Does the Applicant propose to rely on a pre-existing stream of revenue to support its capitalization in light of the proposed change? *

○ Yes ⦿ No

### Provide specific data regarding infusions of capital to fund the Applicant.

FINRA - Continuing Membership Application Print

6. In connection with the proposed change, provide a list of all persons or entities that have contributed or plan to contribute equity capital or debt financing to the Applicant's business and provide information regarding the nature of the capital and/or financing.

| Date or Anticipated Date | Source | Recipient | Amount | Transfer Instrument (e.g., wire, check) |
|---|---|---|---|---|

Provide supporting documents.

1. Verification of all funding, including but not limited to the below list. The information provided must provide Staff with a clear picture of the movement of funds from their origin to the Applicant, including any movement between intermediary and/or holding companies.

    a. For each source of funding: bank statements, checks (front and back), or wire advices (or the equivalent) covering the month of the withdrawal of funds from the source account, and also the three prior months

    b. For the Applicant: bank statements, checks (front and back), or wire advices (or the equivalent) covering the month of the deposit of funds into the Applicant's account, and also the three prior months

    c. For both the source and receiving entities, the corporate minutes (or equivalent) reflecting the authorization of funding

    d. Evidence of the financial wherewithal of anticipated sources of future funding, such as bank statements (or the equivalent)

    e. As applicable to the proposed change: pro-forma financial statements of the Applicant for twelve months, specifically identifying revenues and expenses related to the proposed change as well as the impact to equity, net capital, and projected profit or loss

    f. Financial assumptions supporting the monthly projections *

2. If the Applicant proposes to use a form of subordinated lending: a draft of the anticipated agreement and related supporting documentation (as detailed in Regulatory Notice 10-15)

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 8: Financial controls

# Continuing Member Application

## Standard 8: Financial controls

NASD Rule 1014(a)(8): The Applicant has financial controls to ensure compliance with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

Provide specific information regarding the financial controls

1. Identify the impact of the proposed change on the financial controls, systems, policies, and procedures that the Applicant will use to enable the FinOp principal to promptly access the Applicant's books and records, and to keep abreast of any financial and related problems occurring at the Applicant. *

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the firm's financial controls, systems, policies, and procedures that it uses to enable its FinOp principal to promptly access books and records, and to keep abreast of any financial and related problems occurring.

2. Describe how the proposed change will affect any of the following items: *

    a. Accounting system

    b. Hardcopy and/or electronic books and records

    c. Authorized signatories on bank and trading accounts

    d. Individual(s) responsible for daily journal entries and monthly closing of books and records

    e. Authorizations required and procedures regarding withdrawals of capital

    f. If the FinOp Principal works offsite or remotely: whether he or she will have online access to bank accounts, clearing accounts, etc., and whether that access will be read-only

g. Whether the Applicant will employ or associate other persons who will support the financial and operation functions (e.g., internal bookkeeping staff); if so, identify each such person and their roles and responsibilities

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including any of the items described in items a - g above.

**Provide specific information regarding the Applicant's FinOp Principal(s).**

3. Will the FinOp Principal change as a result of this Application? *

◯ Yes ⦿ No

4. Will the Applicant have more than one FinOp Principal as a result of the change? *

◯ Yes ⦿ No

5. Provide a detailed description of the prior work experience of the Applicant's FinOp Principal relative to the business activities the Applicant will conduct following the change. (This description must also address how the individual satisfies NASD Rule 1014(a)(10)(D) which requires one year of direct or two years related experience in the subject area to be supervised. ) *

This question is not applicable. As noted above, Alpine's FinOp did not change as a result of the "change" contemplated by this application.

6. Will the Applicant's FinOp Principal be either part-time with the Applicant or dually associated with another broker-dealer? *

◯ Yes ⦿ No

**Provide supporting documents.**

1. Rule 3270 (formerly Rule 3030) notifications for the FinOp Principal (if applicable)

2. Financial control procedures (if altered by the proposed change)

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 9: Written procedures

# Continuing Member Application

## Standard 9: Written procedures

NASD Rule 1014(a)(9): The Applicant has compliance, supervisory, operational, and internal control practices and standards that are consistent with practices and standards regularly employed in the investment banking or securities business, taking into account the nature and scope of Applicant's proposed business.

**Explain how this Standard is met.**

1. Describe any impact upon the Applicant's compliance, supervisory, operational, and internal control practices and standards in light of the proposed change.

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including its compliance, supervisory, operational, and internal control practices and standards.

**Provide supporting documents.**

1. Written supervisory procedures ("WSPs") impacted by the proposed change, including:

a. Written supervisory control procedures

b. Anti money laundering procedures

c. Financial control procedures

d. Internal operating procedures

e. Internal control procedures

Ensure that the WSPs contain a Designation of Principals identifying the principal(s) responsible for each area (e.g., AML, Supervisory Controls) and business activity or product line (including activities or product lines categorized as OTH or Other that require broker-dealer registration).

As a reminder, please ensure that the WSPs clearly state:

• Who: the identification of the principal/ supervisor responsible for conducting the subject procedure

• What: a description of the specific procedure that is to be conducted by the principal/supervisor

• When: a statement as to when or how often the specific procedure is to be conducted

• How evidenced: a statement as to how the Applicant will evidence the fact that the procedure has been conducted WSPs that do not conform to the above may not be deemed adequate under this Standard.

2. WSP checklist, as it pertains to procedures impacted by the change

3. Sample of the reports (if impacted by the proposed change) utilized to support supervisory, AML, financial control, internal operating, and internal control procedures *

4. Any other documentation that would be pertinent to FINRA's review of this Standard

**Standard 10: Supervisory structure**

# Continuing Member Application

### Standard 10: Supervisory structure

NASD Rule 1014(a)(10): The Applicant has a supervisory system, including written supervisory procedures, internal operating procedures (including operational and internal controls), and compliance procedures designed to prevent and detect, to the extent practicable, violations of the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

In evaluating the adequacy of a supervisory system, the Department shall consider the overall nature and scope of the Applicant's intended business operations and shall consider whether:

A. the number, location, experience, and qualifications of supervisory personnel are adequate in light of the number, location, experience, and qualifications of persons to be supervised; the Central Registration Depository record or other disciplinary history of supervisory personnel and persons to be supervised; and the number and locations of the offices that the Applicant intends to open and the nature and scope of business to be conducted at each office;

B. the Applicant has identified specific Associated Persons to supervise and discharge each of the functions in the Applicant's business plan, and to supervise each of the Applicant's intended offices, whether or not such offices are required to be registered under FINRA Rules;

C. the Applicant has identified the functions to be performed by each Associated Person and has adopted procedures to assure the registration with FINRA and applicable states of all persons whose functions are subject to such registration requirements;

D. each Associated Person identified in the business plan to discharge a supervisory function has at least one year of direct experience or two years of related experience in the subject area to be supervised;

E. the Applicant will solicit retail or institutional business;

F. the Applicant will recommend securities to customers;

G. the location or part-time status of a supervisor or principal will affect such person's ability to be an effective supervisor;

H. the Applicant should be required to place one or more Associated Persons under heightened supervision pursuant to Notice to Members 97-19;

I. any remedial action, such as special training or continuing education requirements or heightened supervision, has been imposed on an Associated Person by a state or federal authority or self-regulatory organization; and

J. any other condition that will have a material impact on the Applicant's ability to detect and prevent violations of the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

**Explain how this Standard is met.**

1. Describe any changes or additions to *

a. management or supervisory personnel (including heads of business lines),

b. addition of offices,

c. changes to supervisory responsibilities,

d. changes involving heightened supervision, and

e. any changes to supervisory systems or to the supervisory framework.

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including any changes to each of the items described in a - e above.

2. Persons identified in Form CMA who are or will be responsible for discharging supervisory functions must have a minimum of one year of direct experience or two years of related experience in the subject area to be supervised. (See NASD Rule 1014(a)(10)) In light of the noted requirement, describe the relevant experience of personnel to supervise new or expanded areas of the Applicant's business relating to the proposed change, including (at a minimum) *

a. where such experience was obtained,

b. duration of the experience, and

c. positions held and responsibilities.

This question is not applicable. As noted above, Alpine has not and will not change any personnel as a result of the "change" contemplated by this application.

3. Will the proposed change to the Applicant result in a change in Chief Compliance Officer? *

◯ Yes ◉ No

Provide supporting documents.

1. Rule 3270 (formerly Rule 3030) notification(s) for principals other than the FinOp Principal (addressed in Standard 8) that have outside business activities (if applicable)

2. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 11: Books and records

# Continuing Member Application

## Standard 11: Books and records

NASD Rule 1014(a)(11): The Applicant has a recordkeeping system that enables Applicant to comply with federal, state, and self-regulatory organization recordkeeping requirements and a staff that is sufficient in qualifications and number to prepare and preserve required records.

Explain how this Standard is met.

1. Describe any changes to the Applicant's recordkeeping system as a result of the proposed change, specifically identifying any impact to *

a. procedures,

b. books and records,

c. communication systems, and

d. the software and systems to be used to prepare business and financial records, including general ledger, trial balance, balance sheet, and net capital computation (e.g., PeopleSoft, ADP, Creative Solutions).

As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the firm's record-keeping system.

2. Describe any changes to, or to the scope of services provided by, any entities providing recordkeeping services to the Applicant, specifically identifying any service bureaus, clearing/correspondent arrangements, or other arrangements involving the creation and retention of books and records. *

This question is not applicable. As described above, Alpine did not experience any changes in record-keeping as a result of the "change" contemplated by this application.

3. Describe how the Applicant's records storage (including email) will be impacted by the proposed change, specifically identifying (for example): *

a. hardcopy,

b. microfilm/microfiche,

c. optical storage technology, or

d. other media or methods.

> As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the firm's record storage.

4. Describe any changes to the location where the Applicant's electronic records will be maintained (including email archives). *

> As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the firm's record storage.

5. Identify all new types of records to be created and maintained as a result of the proposed change. *

> As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the creation of firm records.

**Provide supporting documents.**

1. A conversion timeline, testing plan, and implementation schedule for the proposed recordkeeping system changes (if applicable)

2. Samples of relevant books and records that will be created and maintained relating to the new business activities or as a result of the proposed change

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 12: Continuing education

# Continuing Member Application

## Standard 12: Continuing education

NASD Rule 1014(a)(12): The Applicant has completed a training needs assessment and has a written training plan that complies with the continuing education requirements imposed by the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

**Explain how this Standard is met.**

1. Identify any changes to the Applicant's Continuing Education ("CE") program, including the Firm Element needs assessment and written training plan as a result of the proposed change. This should include identification of what additional courses may be required, which personnel will be required to participate, and the timeline for implementing the planned modification to the CE Firm Element. *

> As previously described, the "change" contemplated by this application has not and will not in any way change Alpine's business model, including the firm's continuing education program, its firm element needs assessment, and its written training plan.

2. Identify any changes to the person(s) responsible for the Firm Element and the Regulatory Element of the Applicant's CE program. *

> This question is not applicable. As described above, Alpine did not make any changes in its personnel as a result of the "change" contemplated by this application.

**Provide supporting documents.**

1. Revised continuing education training needs assessment and written training plan (if applicable)

2. Any other documentation that would be pertinent to FINRA's review of this Standard

> This form has NOT yet been submitted to FINRA. Please review the answers you provided. You must return to the editable version of the form and press the Submit button to send this information to FINRA.

<< Back to Filing Cabinet

Introduction

# Continuing Member Application

---

### Introduction

The Continuing Membership Application Form ("Form CMA," "Form," or "Application") is designed to assist Applicants in the preparation of an Application filed pursuant to NASD Rule 1017 in which the Applicant seeks approval from the Financial Industry Regulatory Authority, Inc. ("FINRA") for a change in ownership, control or business operations. The completed Form, with all required questions answered, and all required supporting documentation attached, must be filed electronically with FINRA.

---

To assist in the completion of Form CMA, important information is provided below concerning the following:

- Completing the Form
  - Substantially Complete Requirement
  - Form Structure and Using the Form
  - Mandatory Information
  - Terms Used in the Form
  - Saving the Form Prior to Submission
  - Submitting the Form
- Maintaining the Accuracy of the Application

### Completing the Form

The Form references information and documentation required under the Membership Rules of FINRA (see NASD Rule 1010 Series). Form CMA is structured to capture information and documentation pertinent to the Applicant's proposed change in ownership, control or business operations. However, additional information and documentation may be requested once the FINRA Staff ("Staff") has had an opportunity to review the Application.

Applicants are encouraged to include as much of the requested information and documentation in their initial Form CMA submission as possible. Experience has shown that Applications containing well thought out, detailed, and complete information and documentation can be processed more efficiently with less need for Staff to seek out supplemental information. Complete Applications help the Staff to gain a prompt understanding of the Applicant's proposed change, which facilitates FINRA's ability to review whether the Applicant meets the standards for admission contained in NASD Rule 1014, against which applications submitted utilizing the Form CMA are evaluated. Applicants are encouraged to review additional materials about the Continuing Membership Application process, available on www.finra.org. Applicants should also consider consulting the Staff in advance of submitting Form CMA, particularly for any Application involving novel or complex business arrangements.

### Substantially Complete Requirement

Form CMA is intended to provide an Applicant with information and requests that are required of it in the Application process. Applicants should note that an Application will not be accepted for processing unless it is deemed substantially complete. While the Form identifies information and documentation that is minimally required in order to file Form CMA, an Applicant is urged not to limit itself to completion of the required fields if and when any optional information fields are applicable or if additional information can be provided that is material to the Applicant's planned change. It is also important to note that, since the Form is submitted exclusively on an electronic basis, it is critical that the Applicant ensure that each attached document is actually the document indicated and contains relevant information

Every Form CMA will be reviewed initially for content by Staff. Should an Applicant fail to provide accurate material information or documentation relevant to the Applicant's proposed change, a submitted Form CMA may be rejected as "not substantially complete."

### Form Structure and Using the Form

The Form is structured to collect information, data and documentation from the Applicant in order for Staff to evaluate the Application against the standards for admission contained in NASD Rule 1014. The Form requests that information be provided in formats including narrative text, fields that require a selection or mouse-click (e.g., drop-down lists, radio buttons), data entered directly into the Form, information entered into tables in the Form or connected to the Form, and attachments of supporting documents.

The Form is designed to leverage, where possible, certain information provided by the Applicant to FINRA through means other than the Form itself, in particular, information submitted via the Central Registration Depository (CRD®). In instances where information from other sources are leveraged, if any such information presented to the Applicant in the Form is inaccurate, an Applicant must update the source system before ultimately submitting or amending the Form CMA. (Typically it takes one business day after updating the source system for Form CMA to reflect such changes.)

---

**Mandatory Information**

Certain aspects of the Form are indicated with a red asterisk ( ` ), indicating that such aspect (e.g., question, data field, information, document request) of the Form is a required field. A system completeness check is conducted on every Form CMA attempted to be submitted to FINRA. Any Form CMA that fails to address each of the required fields will not be permitted to proceed with submission. Failure to address required fields will, when attempting to submit the Form, result in identification of the missing or unanswered information to the Applicant, who will be responsible for addressing the missing information before attempting to resubmit the Application.

While certain aspects of the Form are indicated as required, Applicants are strongly encouraged to address any optional information fields of the Form that are applicable to the Applicant's proposed change.

---

**Terms Used in the Form**

Unless otherwise stated, the terms used in this Form (e.g., "Applicant," "Associated Person") have the same definition as prescribed in NASD Rule 1011. Additionally, the Form makes certain references that should be construed in a consistent manner. Please note the following references have the meaning prescribed here:

"Associated Person" has the meaning prescribed to such term in NASD Rule 1011(b).

"CRD system" means the Central Registration Depository, the central licensing and registration system for the U.S. securities industry and its regulators.

"SEA" means the Securities Exchange Act of 1934.

"SEA Rule" means a rule promulgated under the SEA.

---

**Saving the Form Prior to Submission**

An Applicant may review, enter, and otherwise prepare Form CMA and save the most recent version of the Form prior to submitting the Application for review by Staff. The Form need not be fully prepared or completed in order to be saved. The most recent saved version of a draft Form CMA is retained on FINRA's electronic filing platform until a final version is submitted to FINRA.

---

**Submitting the Form**

After completing the Form CMA, an Applicant must submit the Form for review by Staff. An electronic completeness check is run on the Form CMA upon attempting submission to determine whether all required fields have been addressed. Upon successfully passing the electronic completeness check, the Form is routed to Staff for a determination of whether the Application is substantially complete. If determined to be substantially complete, the Application will be assigned for continuing review. After submission, an Applicant will be able to view its submitted Form CMA via FINRA's electronic filing system.

---

**Maintaining the Accuracy of the Application**

Each Applicant with FINRA must, at all times, ensure the accuracy of its Application. The Applicant is responsible for keeping its Application current and accurate throughout the Application review process. The Applicant must amend or otherwise notify Staff of any information in, or any information omitted from, its Application that is or makes the Application inaccurate, incomplete or misleading.

Application type

# Continuing Member Application

---

### Type of Continuing Membership Application

Identify the type of change that is contemplated (select all that apply).

---

**Ownership or asset transfer changes**

☐ Merger of the member with another member

☐ Direct or indirect acquisition by the member of another member

☐ Direct or indirect acquisition or transfer of 25% or more in the aggregate of the member's assets or any asset, business or line of operation that generates revenues comprising 25% or more in the aggregate of the member's earnings measured on a rolling 36 month basis

☑ Change in the equity ownership or partnership capital of the member resulting in one person or entity directly or indirectly owning or controlling 25% or more of the equity or partnership capital

---

**Change(s) in business operations**

☐ Material change in business operations

☐ Removal or modification of a membership agreement restriction

☐ Market making, underwriting or acting as a dealer for the first time

☐ Adding a business activity that requires a higher minimum net capital under Securities Exchange Act (SEA) Rule 15c3-1.

☐ Expansion of Associated Persons, offices, or number of markets made

☐ Other

Applicant contact information

# Continuing Member Application

| Applicant contact information |
|---|

Provide the following information for the person who will be the primary contact for the Applicant during FINRA's review of the Continuing Membership Application. Note that this is the person to whom FINRA will direct Application related questions and correspondence.

Firm name *            SCOTTSDALE CAPITAL ADVISORS CORP

| Contact person |
|---|

First name *          Timothy
Last name *           DiBlasi
Email address *       tdiblasi@scottsdalecapital.com
Phone number *        4806034912
Fax number            4806034901

| Mailing address |
|---|

Company name *          Scottsdale Capital Advisors
Street address, line 1 *  7170 E. McDonald Drive
Street address, line 2    Suite 6
City *                   Scottsdale
State *                  Arizona
ZIP Code *              85253

Standard 1: Overview of the Applicant

# Continuing Member Application

| Standard 1: Overview of the Applicants |
|---|
| NASD Rule 1014(a)(1): The application and all supporting documents are complete and accurate. |

| Overview of the proposed change |
|---|

1. Provide a complete description of the proposed change, identifying *

   a. the terms and nature of the proposed change,

   b. the date the transaction is expected to be completed,

   c. the business reason(s) for the change,

d. the financing for the transaction, including the source of funding for the purchase and recapitalization (as applicable), and

e. an overview of the impact(s) (e.g., financial, operational, managerial, supervisory), or lack thereof, to the Applicant as a result of the change.

Scottsdale has been, and continues to be, owned by Scottsdale Capital Advisors Holding ("SCA") SCA was, in turn, owned by the Hurry Family Revocable Trust. Based on certain estate and tax planning issues, trust counsel Eric Johnson then restructured the Hurry Trust into two trusts each of which then held a partial interest in SCA. Subsequently, and based again on estate and tax planning considerations, each of those trusts was broken into three trusts. As Mr. Johnson explains in his accompanying Affidavit, there was no change in Trustees nor was there any change in the management or operation of the trusts. There is no change in ownership or control of the member, nor is there any change in the beneficial ownership or control of SCA. As FINRA has confirmed, it does not consider those trust entities to be the operative "owners" because they are trust entities and are associated with one another. For more information, see attached Scottsdale CMA Cover Letter.

2. For any persons or entities, including other broker-dealers and investment advisory firms, that will become associated or affiliated with the Applicant, through ownership, employment, or otherwise, as a result of the proposed transaction, please provide the name of the person or entity, describe the relationship such person or entity will have with the Applicant, for any entity describe the business conducted by such entity, and identify whether the Applicant will be conducting business with or on behalf of the person or entity. *

This question is not applicable. Scottsdale did not have any new associated or affiliated persons as a result of the "change" contemplated by this application. For more information, see attached Scottsdale CMA Cover Letter.

---

**Specify changes in direct ownership.**

Below is a read-only view of the current direct owners of the Applicant (information obtained from the CRD system).

Please click the "Refresh" button to reload the information (from CRD) below.

| Full legal name | CRD ID | Domestic or Foreign Entity, or Individual | Roles | Date role acquired | Ownership percentage | Control person? |
|---|---|---|---|---|---|---|
| SCOTTSDALE CAPITAL ADVIORS HOLDINGS LLC | | Domestic | SOLE SHAREHOLDER | 07/01/2002 | 75% or more | Y |
| DIBLASI, TIMOTHY BRIAN | 4623652 | Individual | AML OFFICER | 06/01/2012 | Less than 5% | Y |
| DIBLASI, TIMOTHY BRIAN | 4623652 | Individual | CHIEF COMPLIANCE OFFICER | 10/01/2013 | Less than 5% | Y |
| GEORGE, KENNETH RONALD | 2643369 | Individual | FINOP | 01/01/2013 | Less than 5% | N |
| DIBLASI, TIMOTHY BRIAN | 4623652 | Individual | MSRB PRINCIPAL | 04/01/2015 | Less than 5% | Y |
| DIBLASI, TIMOTHY BRIAN | 4623652 | Individual | PRESIDENT | 12/01/2018 | Less than 5% | Y |

Please edit the chart below to describe the proposed changes in the Applicant's direct ownership. (Information provided here will be used solely for the review of this Application and will not update the CRD system).

---

**Specify changes in indirect ownership.**

Below is a read-only view of the current indirect owners of the Applicant (information obtained from the CRD system).

Please click the "Refresh" button to reload the information (from CRD) below.

| Full legal name | Domestic or Foreign Entity, or Individual | Entity in which interest is owned | Roles | Date role acquired | Ownership percentage | Control person? | CRD ID, EIN, IRS # |
|---|---|---|---|---|---|---|---|
| SCA CLEARING LLC | Domestic | SCOTTSDALE CAPITAL DVISORS HOLDINGS LLC | MANAGER | 07/01/2017 | Other General Partners | Y | |

Please edit the chart below to describe the proposed changes in the Applicant's indirect ownership. (Information provided here will be used solely for the review of this Application and will not update the CRD system).

#### 1. Proposed changes in indirect ownership

CRD ID [                    ]   Name [ Pee Pee Pop Trust III ]

FINRA - Continuing Membership Application Print

| | |
|---|---|
| Domestic or Foreign Entity, or Individual | Domestic |
| Entity in which interest is owned | SCA Clearing LLC |
| Roles | |
| Date role acquired | |
| Ownership percentage | 1/6 |
| Control person? | ○ Yes  ◉ No |

### 2. Proposed changes in indirect ownership

| | |
|---|---|
| CRD ID | Name *  Pee Pee Pop Trust II |
| Domestic or Foreign Entity, or Individual | Domestic |
| Entity in which interest is owned | SCA Clearing LLC |
| Roles | |
| Date role acquired | |
| Ownership percentage | 1/6 |
| Control person? | ○ Yes  ◉ No |

### 3. Proposed changes in indirect ownership

| | |
|---|---|
| CRD ID | Name *  Pee Pee Pop Trust |
| Domestic or Foreign Entity, or Individual | Domestic |
| Entity in which interest is owned | SCA Clearing LLC |
| Roles | |
| Date role acquired | |
| Ownership percentage | 1/6 |
| Control person? | ○ Yes  ◉ No |

### 4. Proposed changes in indirect ownership

| | |
|---|---|
| CRD ID | Name *  Man Cub Trust III |
| Domestic or Foreign Entity, or Individual | Domestic |
| Entity in which interest is owned | SCA Clearing LLC |
| Roles | |
| Date role acquired | |
| Ownership percentage | 1/6 |
| Control person? | ○ Yes  ◉ No |

### 5. Proposed changes in indirect ownership

| | |
|---|---|
| CRD ID | Name *  Man Cub Trust II |
| Domestic or Foreign Entity, or Individual | Domestic |
| Entity in which interest is owned | SCA Clearing LLC |
| Roles | |
| Date role acquired | |
| Ownership percentage | 1/6 |
| Control person? | ○ Yes  ◉ No |

### 6. Proposed changes in indirect ownership

| | |
|---|---|
| CRD ID | Name | Man Cub Trust |
| Domestic or Foreign Entity, or Individual | Domestic |
| Entity in which interest is owned | SCA Clearing LLC |
| Roles | |
| Date role acquired | |
| Ownership percentage | 1/6 |
| Control person? | ○ Yes ● No |

**Provide supporting documents.**

1. Pre- and post-change business organizational charts, identifying the Applicant's owners and affiliated entities (indicate all direct and indirect owners of the Applicant and percentage of ownership for each) '

2. Any modified formation documents of the Applicant stemming from the change '

3. Formation documents for any entities (e.g., corporations, partnership, trusts), including holding companies, that are or will be new owners, directly or indirectly, of the Applicant '

4. As applicable, if this Application is filed on behalf of multiple firms: a signed statement, from a principal officer of each Applicant, indicating this Application is being filed on the firm's behalf

5. Any other documentation that would be pertinent to FINRA's review of this Standard

Eric Johnson - 20180926_letter_general.pdf 86873 bytes

Affidavit of Eric Johnson - 20190408.pdf 689113 bytes

04_Man_Cub_Trust_II_-_20171013_trust_certificate__signed_.pdf 837948 bytes

04_Man_Cub_Trust_III_-_20171013_trust_certificate__signed_.pdf 842092 bytes

04_Pee_Pee_Pop_Trust_III_-_20171013_trust_certificate__signed_.pdf 848992 bytes

04_Pee_Pee_Pop_Trust_-_20170712_trust_certificate__signed_.pdf 782254 bytes

04_Pee_Pee_Pop_Trust_II_-_20171013_trust_certificate__signed_.pdf 843659 bytes

04_Man_Cub_Trust_-_20170712_trust_certificate__signed_.pdf 777794 bytes

Standard 2: Licenses and registrations

# Continuing Member Application

## Standard 2: Licenses and registrations

NASD Rule 1014(a)(2): The Applicant and its Associated Persons have all licenses and registrations required by state and federal authorities and self-regulatory organizations.

The Applicant is reminded that failure of its Associated Persons to schedule and successfully complete any required qualification examinations in a timely manner may result in a significant delay of the Application review process, or a lapse or denial of the Application. It is strongly suggested that any qualification examination(s) be completed in advance of the filing of the Form CMA where possible or be scheduled within the first 30 days of filing Form CMA, and that all registration requirements be completed within the first 60 days of filing Form CMA to avoid delays in processing of the Application.

**Provide information regarding direct owners**

The list of direct owners below is repeated from the Applicant's input in Standard 1 above. If the information displayed is incomplete or inaccurate, please edit Standard 1 before completing this section of the Form.

Please provide the information below for all direct owners who will have an ownership stake in the Applicant after the proposed change.

**CRD IDNameContinuing education**

**Provide information about the Applicant following the proposed change**

1. Does the Applicant anticipate being registered with or withdrawing registration from any other regulatory or self-regulatory organization(s) and/or state(s) as a result of the change? *

⊙ Yes ⦿ No

Each Applicant, except a sole proprietorship, is required to have a minimum of two registered principals with respect to each aspect of its investment banking and securities business. Pursuant to the FINRA Rule 9600 Series, FINRA may waive the requirement in situations that indicate conclusively that only one person associated with an Applicant should be required to register as a principal. Each Applicant must also have a Financial and Operations (FinOp) Principal (or Introducing Broker-Dealer FinOp Principal, as applicable). Additionally, an Applicant engaged in certain activities must have other appropriately registered principals (for example, an Applicant that will be engaged in options transactions with the public must have a Registered Options Principal). Please refer to NASD Rules 1021 (Registration Requirements) and 1022 (Categories of Principal Registration) for the appropriate categories of principal registration.

2. Is the Applicant seeking a waiver, or seeking to maintain a waiver already in place, of the two principal requirement under NASD Rule 1021? *

⊙ Yes ⦿ No

3. Will the Applicant have any non-registered officers, directors, or control persons following the change? *

⊙ Yes ⦿ No

**Provide supporting documents.**

1. Management organizational chart, identifying officers, principals and supervisors of the Applicant and the proposed business activities and/or product lines supervised by each person following the change *

2. An attestation for officers, directors, owners and control persons who will not participate in the day-to-day securities or investment banking operations of the Applicant or act in any capacity that would require that these individuals become registered

3. Any other documentation that would be pertinent to FINRA's review of this Standard

**Provide specific information regarding supervisors.**

The list of personnel below is repeated from the Applicant's input in Standard 1 above. If the information listed is inaccurate or incomplete, please edit Standard 1 before completing this section of the Form.

**CRD IDNameContinuing education**

1. Does the Applicant anticipate being registered with or withdrawing registration from any other regulatory or self-regulatory organization(s) and/or state(s) as a result of the change? *

⊙ Yes ⦿ No

2. Does the Applicant anticipate being exempt from registration with the Securities Information Center, pursuant to SEA Rule 17f-1, following implementation of the proposed change? *

⊙ Yes ⦿ No

**Provide supporting documents.**

1. For the Applicant:

    a. Options allocation form (if applicable)

    b. Lost and stolen securities registration (if applicable)

    c. Evidence of registration with MSRB (if applicable)

2. For personnel:

    a. A management organizational chart, identifying officers, principals, and supervisors of the Applicant and the proposed business activities and/or product lines supervised by each person following the proposed change *

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 3: Compliance with securities laws, just and equitable principles of trade

# Continuing Member Application

## Standard 3: Compliance with securities laws, just and equitable principles of trade

NASD Rule 1014(a)(3): The Applicant and its Associated Persons are capable of complying with the federal securities laws, the rules and regulations thereunder, and FINRA Rules, including observing high standards of commercial honor and just and equitable principles of trade. In determining whether this standard is met, the Department shall take into consideration whether:

---

In determining whether this standard is met, the Department shall take into consideration whether:

A. a state or federal authority or self-regulatory organization has taken permanent or temporary adverse action with respect to a registration or licensing determination regarding the Applicant or an Associated Person;

B. an Applicant's or Associated Person's record reflects a sales practice event, a pending arbitration, or a pending private civil action;

C. an Applicant or Associated Person is the subject of a pending, adjudicated, or settled regulatory action or investigation by the Commission, the Commodity Futures Trading Commission, a federal, state, or foreign regulatory agency, or a self-regulatory organization; an adjudicated, or settled investment-related private civil action for damages or an injunction; or a criminal action (other than a minor traffic violation) that is pending, adjudicated, or that has resulted in a guilty or no contest plea or an Applicant, its control persons, principals, registered representatives, other Associated Persons, any lender of 5% or more of the Applicant's net capital, and any other member with respect to which these persons were a control person or a 5% lender of its net capital is subject to unpaid arbitration awards, other adjudicated customer awards, or unpaid arbitration settlements;

D. an Associated Person was terminated for cause or permitted to resign after an investigation of an alleged violation of a federal or state securities law, a rule or regulation thereunder, a self-regulatory organization rule, or industry standard of conduct;

E. a state or federal authority or self-regulatory organization has imposed a remedial action, such as special training, continuing education requirements, or heightened supervision, on an Associated Person; and

F. a state or federal authority or self-regulatory organization has provided information indicating that the Applicant or an Associated Person otherwise poses a threat to public investors.

---

Explain how this Standard is met.

1. Is the Applicant or any of its Associated Persons the subject of any of the following *

a. adverse actions by state or federal authority or self-regulatory organizations with respect to registration or license determinations;

b. a sales practice event, pending arbitration or pending private civil action;

c. pending, adjudicated or settled regulatory action or investigation by any regulatory or self-regulatory authority, or any civil or criminal action resulting in guilty or no contest plea;

d. unpaid arbitration awards involving the Applicant, its control persons, principals, registered representatives, any lender of 5% or more of the Applicant's net capital, or any other Associated Person of the Applicant;

e. termination for Cause or permitted to resign after an investigation of an alleged violation of federal or state securities law, rules or regulations or a self-regulatory rule or industry standard of conduct;

f. regulatory imposed remedial action such as special training, continuing education requirements, or heightened supervision on an Associated Person by a state or federal authority or self-regulatory organization; or

g. information from an industry authority indicating the Applicant or its Associated Persons are a threat to public?

&#x25C9; Yes &#x25CB; No

Regarding the event(s), unless details of a particular event have been reported to the CRD system, provide information (e.g., subject party, nature of the activity, any findings, any fine, other dispositions) for each event involving the Applicant and/or its Associated Persons. *

Any and all applicable events have been reported to the CRD system. For discussion of these issues, see attached Scottsdale cover letter.

2. Pursuant to NASD Rule 1014(b)(1), where the history of the Applicant or its Associated Persons includes any of the events set forth in NASD Rule 1014(a)(3)(A) and (C) through (E), there is a presumption that the Application should be denied. The Applicant may overcome the presumption of denial by demonstrating that it can meet each of the standards for admission in NASD Rule 1014(a), notwithstanding the existence of any of the events set forth in NASD Rule 1014(a)(3)(A) and (C) through (E). To the extent that any of the referenced events exist for the Applicant or its

Associated Persons, provide a detailed explanation, in light of the existence of such events, as to how the Applicant is nonetheless capable of complying with industry rules, regulations, laws, and observing high standards of commercial honor and just and equitable principles of trade. Please reference any controls or systems put in place and refer to any specific pages or sections in the Applicant's written supervisory procedures that address heightened supervisory requirements. ˙

Over the course of the many years since its formation in 2002, Scottsdale has developed and improved its compliance functions to ensure compliance with federal securities laws, and it will continue to do so in the future. While Scottsdale has also been the subject of certain disciplinary actions, those proceedings should not impact this application. First, the FINRA proceeding is presently on appeal and there are substantial issues that Scottsdale has sought to have reviewed. In fact, the SEC's decision to issue a stay in favor of Mr. Hurry may reflect the SEC's concerns regarding the merits and validity of that ruling. Second, that FINRA proceeding involved an exhaustive airing of any and all of FINRA's concerns in relation to Scottsdale, and the Panel imposed the sanctions that it deemed appropriate, i.e., a fine for the firm and sanctions against certain individuals. Those same issues that were considered by that Panel and that formed the basis for those sanctions should not now be relitigated here in the guise of a CMA. Further, that FINRA action was focused on specific Section 5 issues that are distinct from the overriding considerations concerning customer harm that are foremost in FINRA's analysis. In fact, because Scottsdale has experienced regulatory issues in the past, and given regulator's continuing concerns regarding transactions in the microcap markets, it has been and will remain the subject of scrutiny and so it must and it will ensure its compliance with federal securities laws.

3. Indicate whether the Applicant or any Associated Persons have been found to have violated the same federal securities laws or regulations, the rules thereunder, or FINRA Rules on more than one occasion. In such instances, identify the nature of the repetitive occurrences, the corrective action the Applicant has taken to prevent future violations, and the specific persons with responsibility for supervision in the areas noted with repeat violations and/or Associated Persons who have been found to have repeat violations. ˙

Scottsdale has been the subject of certain disciplinary actions, those proceedings should not impact this application. First, the FINRA proceeding is presently on appeal and there are substantial issues that Scottsdale has sought to have reviewed. In fact, the SEC's decision to issue a stay in favor of Mr. Hurry may reflect the SEC's concerns regarding the merits and validity of that ruling. Second, that FINRA proceeding involved an exhaustive airing of any and all of FINRA's concerns in relation to Scottsdale, and the Panel imposed the sanctions that it deemed appropriate, i.e., a fine and sanctions against certain individuals. Those same issues that were considered by that Panel and that formed the basis for those sanctions should not now be relitigated here in the guise of a CMA. Further, that FINRA action was focused on specific Section 5 issues that are distinct from the overriding considerations concerning customer harm that are foremost in FINRA's analysis. In fact, because Scottsdale has experienced regulatory issues in the past, and given regulator's continuing concerns regarding transactions in the micro cap markets, it has been and will remain the subject of scrutiny and so it must and it will ensure its compliance with federal securities laws. From April 1985 through September 29, 2014, Alpine Securities, Scottsdale's sister firm, has consented to 41 AWCs. Alpine has taken substantial steps to correct the procedural and compliance issues that led to these AWCs. Thirty-Five (35) of these sanctions occurred prior to January 1, 2006. The next preceding five sanctions occurred between May 2007 and November 2011. Of the six most recent sanctions, two of them arose out of activities that occurred prior to 2006. Throughout this period of time, Alpine has continually taken steps to improve and enhance its trading and supervisory systems to correct the circumstances that led to these events. This has included hiring and training of additional personnel as needed. Perhaps most significant has been the fundamental change in Alpine which arose from the change in its ownership in March 2011, following the firm's acquisition by Mr. Hurry through a business entity which acquired Alpine's stock.

4. Will this Application involve a transfer of assets without a corresponding transfer of liabilities? ˙

☐ Yes ☑ No

Provide supporting documents.

1. Documentation of any of the events described in NASD Rule 1014(a)(3), unless the event has been reported to the CRD system

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 4: Contractual and business relationships

# Continuing Member Application

## Standard 4: Contractual and business relationships

NASD Rule 1014(a)(4): The Applicant has established all contractual or other arrangements and business relationships with banks, clearing corporations, service bureaus, or others necessary to:

(A) initiate the operations described in the Applicant's business plan, considering the nature and scope of operations and the number of personnel; and

(B) comply with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

Explain how this Standard is met.

1. Identify whether any new agreements or business relationships are being established or whether existing agreements are being modified in order to effectuate the proposed change. Such agreements may include, but are not limited to, expense sharing, clearing, custody, outsourcing, independent contractor, etc. *

As detailed earlier, Scottsdale did not undergo any changes as a result of the "change" contemplated by this application. Moreover, Scottsdale has not and will not enter into any new agreements or business relationships, nor have or will any existing agreements be modified in order to effectuate the proposed transaction.

2. Identify any dependencies or conditions (e.g., shareholder approval, regulatory approval) that must be satisfied prior to conducting the proposed change. *

Scottsdale has identified no dependencies or conditions that had to be satisfied prior to the "change" contemplated by this application.

3. Will the proposed change result in the creation of an expense sharing agreement ("ESA") or amendment to an existing ESA? *

☐ Yes ☑ No

---

**Provide supporting documents.**

1. Copies of the Applicant's Fidelity bond and cancellation rider (if impacted by the proposed change)

2. Agreements, to the extent any such agreements are put in place, replaced or amended as a result of the proposed change, including:

   a. Clearing agreements

   b. Administrative services agreement

   c. Agreement with FinOp Principal

   d. Commission sharing agreement

   e. Technology services agreement, including arrangements with third-party providers of electronic storage media (SEC Rule 17a-4(f))

   f. Compliance services/support agreement

   g. Expense sharing agreements and supporting documents, including bank statements, tax returns, etc., as applicable

   h. Other agreements pertinent to the conduct of the proposed change

3. Transaction documents (e.g., letter(s) of intent, asset purchase agreements, share purchase agreements, merger agreements, board resolutions)

4. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 5: Facilities

# Continuing Member Application

---

**Standard 5: Facilities**

NASD Rule 1014(a)(5): The Applicant has or has adequate plans to obtain facilities that are sufficient to:

(A) initiate the operations described in the Applicant's business plan, considering the nature and scope of operations and the number of personnel; and

(B) comply with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

---

**Explain how this Standard is met.**

1. Is the Applicant making any material changes to existing facilities or locations, or will any proposed change in business require additional space and/or locations? *

○ Yes ⦿ No

2. As applicable, identify whether various departments (e.g., research, investment banking, trading) of the Applicant are separated by appropriate information and physical barriers, and describe the methods for maintaining such barriers.

This question is not applicable. As stated, Scottsdale had not and will not undergo any changes with regard to facilities or otherwise as a result of the "change" contemplated by this application.

3. Will the Applicant, as a result of the proposed change, at any of its locations share office space with an entity or an individual conducting activities other than the Applicant's business? *

○ Yes ⦿ No

4. Will the Applicant enter into or acquire any new lease or sublease arrangements as a result of the proposed change? *

○ Yes ⦿ No

5. Will the proposed change result in any change in locations of the Applicant that are owned premises, or result in the addition of private residence used as offices of the Applicant? *

○ Yes ⦿ No

**Provide supporting documents.**

1. For each leased location impacted by the proposed change, the master lease (the agreement between the owner of the property and the initial lessee)

2. For each sub-leased location impacted by the proposed change, the sub-lease

3. For each sub-lease impacted by the proposed change, written authorization from the landlord evidencing consent to sublet the premises (if required)

4. For each owned premises impacted by the proposed change, draft or executed deed of ownership

Note that the existence of an Expense Sharing Agreement does not negate the requirement to evidence that the Applicant has the right to operate from the premises.

5. Space sharing agreements impacted by or implemented as a result of the proposed change

6. A supervisory chart or listing which evidences the supervisory structure, the location of each designated supervisor, the number of Associated Persons currently supervised by each, and the anticipated additional number of Associated Persons to be supervised as a result of the proposed change

7. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 6: Communications and operational systems

# Continuing Member Application

## Standard 6: Communications and operational systems

NASD Rule 1014(a)(6): The communications and operational systems that the Applicant intends to employ for the purpose of conducting business with customers and other members are adequate and provide reasonably for business continuity in each area set forth in NASD Rule 1013(a)(1)(F)(xii).

**Explain how this Standard is met.**

1. Describe (i) the impact, if any, on the communication and operational systems of the Applicant which are utilized for the purpose of conducting business with customers and other firms, (ii) the adequacy of such systems in light of the proposed change, and (iii) the impact on plans in place to ensure business continuity. *

As previously described, the "change" contemplated by this application will not in any way change Scottsdale's business model, including any communication and operational systems utilized for the purpose of conducting business with customers and other firms. Alpine notes that such systems remain appropriately adequate in light of the "change" contemplated by this application and there will be no impact on business continuity as a result.

2. Describe how the systems and equipment of the Applicant will be impacted by the proposed change, and how the Applicant will address potential issues (e.g., adding new systems/equipment, modifying existing systems). *

As previously described, the "change" contemplated by this application has not and will not in any way change Scottsdale's business model, including the firm's systems and equipment.

3. Regarding business continuity, describe how the proposed change impacts capacity in light of any anticipated increase in usage levels, and describe in detail any changes to contingency plans to address system failures, disaster recovery plans, system security, etc. *

As previously described, the "change" contemplated by this application has not and will not in any way change Scottsdale's business model, including business continuity.

4. Will the Applicant conduct business from multiple locations as a result of the proposed change? *

○ Yes  ◉ No

5. Will, as a result of the proposed change, one or more of the Applicant's proposed locations be the residence of an Associated Person? *

○ Yes  ◉ No

6. Will the proposed change affect or result in the Applicant's use of social media sites, such as blogs and social networking sites, for business communications? *

○ Yes  ◉ No

---

**Provide supporting documents.**

1. Business continuity plan (if impacted)

2. Business continuity disclosure statement (if available)

3. A step-by-step description of the order flow on the trading platforms, supported by screenshots or schematic diagrams (as applicable to the proposed change)

4. Screenshots of both Applicant-facing and outward-facing pages of the social media sites, showing the flow from one screen to another (if applicable)

5. A systems conversion timeline, testing plan, and implementation schedule for proposed changes (if applicable)

6. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 7: Maintaining adequate net capital

# Continuing Member Application

## Standard 7: Maintaining adequate net capital
NASD Rule 1014(a)(7): The Applicant is capable of maintaining a level of net capital in excess of the minimum net capital requirements set forth in SEA Rule 15c3-1 adequate to support the Applicant's intended business operations on a continuing basis, based on information filed under NASD Rule 1013(b)(5).

The Department may impose a reasonably determined higher net capital requirement for the initiation of operations after considering:

A. the amount of net capital sufficient to avoid early warning level reporting requirements, such as SEA Rule 17a-11;

B. the amount of capital necessary to meet expenses net of revenues for at least twelve months, based on reliable projections agreed to by the Applicant and the Department;

C. any planned market making activities, the number of markets to be made, the type and volatility of products, and the anticipated maximum inventory positions;

D. any plan to enter into other contractual commitments, such as underwritings or other securities-related activities;

E. any plan to distribute or maintain securities products in proprietary positions, and the risks, volatility, degree of liquidity, and speculative nature of the products; and

F. any other activity that the Applicant will engage in that reasonably could have a material impact on net capital within the first twelve months of business operations.

**Explain how this Standard is met.**

1. Provide a detailed description of *

    a. the nature and source of the Applicant's capital;

    b. the terms and conditions of all financing arrangements; and

    c. any impact to the Applicant's ability to maintain net capital in excess of the Applicant's existing (or revised) minimum net capital requirement, and to support, on a continuing basis the business operations as proposed by the Applicant.

As previously described, the "change" contemplated by this application will not in any way change Scottsdale's business model, including its ability to maintain net capital in excess of its existing minimum net capital requirement and to support business operations.

2. Will the Applicant, in connection with the proposed change, rely on any form of subordinated lending relating to its capital position? *

    ○ Yes ● No

3. Describe plans for additional funding of the Applicant, should such additional funding become necessary in the future. *

Scottsdale continues to obtain funding from John Hurry. These are short term loan arrangements, typically lasting 3 days or less. Scottsdale does not have any current plans to pursue a commercial line of credit at this time through a depository institution.

4. Provide a statement of the Applicant's statutory minimum net capital requirement, pursuant to SEA Rule 15c3-1, and any change in net capital calculation methodology by the Applicant, as a result of the proposed change. *

Scottsdale's statutory minimum net capital requirement, pursuant to SEA Rule 15c3-1, is $250,000. As previously described, the "change" contemplated by this application will not in any way change Scottsdale's business model, including the net capital calculation methodology used.

5. Does the Applicant propose to rely on a pre-existing stream of revenue to support its capitalization in light of the proposed change? *

    ○ Yes ● No

**Provide specific data regarding infusions of capital to fund the Applicant.**

6. In connection with the proposed change, provide a list of all persons or entities that have contributed or plan to contribute equity capital or debt financing to the Applicant's business and provide information regarding the nature of the capital and/or financing.

| Date or Anticipated Date | Source | Recipient | Amount | Transfer Instrument (e.g., wire, check) |
|---|---|---|---|---|

**Provide supporting documents.**

1. Verification of all funding, including but not limited to the below list. The information provided must provide Staff with a clear picture of the movement of funds from their origin to the Applicant, including any movement between intermediary and/or holding companies.

    a. For each source of funding: bank statements, checks (front and back), or wire advices (or the equivalent) covering the month of the withdrawal of funds from the source account, and also the three prior months

b. For the Applicant: bank statements, checks (front and back), or wire advices (or the equivalent) covering the month of the deposit of funds into the Applicant's account, and also the three prior months

c. For both the source and receiving entities, the corporate minutes (or equivalent) reflecting the authorization of funding

d. Evidence of the financial wherewithal of anticipated sources of future funding, such as bank statements (or the equivalent)

e. As applicable to the proposed change: pro-forma financial statements of the Applicant for twelve months, specifically identifying revenues and expenses related to the proposed change as well as the impact to equity, net capital, and projected profit or loss

f. Financial assumptions supporting the monthly projections *

2. If the Applicant proposes to use a form of subordinated lending: a draft of the anticipated agreement and related supporting documentation (as detailed in Regulatory Notice 10-15)

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 8: Financial controls

# Continuing Member Application

## Standard 8: Financial controls

NASD Rule 1014(a)(8): The Applicant has financial controls to ensure compliance with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

### Provide specific information regarding the financial controls

1. Identify the impact of the proposed change on the financial controls, systems, policies, and procedures that the Applicant will use to enable the FinOp principal to promptly access the Applicant's books and records, and to keep abreast of any financial and related problems occurring at the Applicant. *

As previously described, the "change" contemplated by this application will not in any way change Scottsdale's business model, including the firm's financial controls, systems, policies, and procedures that it uses to enable its FinOp principal to promptly access books and records, and to keep abreast of any financial and related problems occurring.

2. Describe how the proposed change will affect any of the following items: *

a. Accounting system

b. Hardcopy and/or electronic books and records

c. Authorized signatories on bank and trading accounts

d. Individual(s) responsible for daily journal entries and monthly closing of books and records

e. Authorizations required and procedures regarding withdrawals of capital

f. If the FinOp Principal works offsite or remotely: whether he or she will have online access to bank accounts, clearing accounts, etc., and whether that access will be read-only

g. Whether the Applicant will employ or associate other persons who will support the financial and operation functions (e.g., internal bookkeeping staff); if so, identify each such person and their roles and responsibilities

As previously described, the "change" contemplated by this application will not in any way change Scottsdale's business model, including any of the items described in items a - g above.

### Provide specific information regarding the Applicant's FinOp Principal(s).

3. Will the FinOp Principal change as a result of this Application? *

○ Yes ◉ No

4. Will the Applicant have more than one FinOp Principal as a result of the change? *

○ Yes ◉ No

5. Provide a detailed description of the prior work experience of the Applicant's FinOp Principal relative to the business activities the Applicant will conduct following the change. (This description must also address how the individual satisfies NASD Rule 1014(a)(10)(D) which requires one year of direct or two years related experience in the subject area to be supervised. ) *

This question is not applicable. As noted above, Scottsdale's FinOp did not change as a result of the "change" contemplated by this application.

6. Will the Applicant's FinOp Principal be either part-time with the Applicant or dually associated with another broker-dealer? *

○ Yes ◉ No

---

**Provide supporting documents.**

1. Rule 3270 (formerly Rule 3030) notifications for the FinOp Principal (if applicable)

2. Financial control procedures (if altered by the proposed change)

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 9: Written procedures

# Continuing Member Application

---

## Standard 9: Written procedures

NASD Rule 1014(a)(9): The Applicant has compliance, supervisory, operational, and internal control practices and standards that are consistent with practices and standards regularly employed in the investment banking or securities business, taking into account the nature and scope of Applicant's proposed business.

---

**Explain how this Standard is met.**

1. Describe any impact upon the Applicant's compliance, supervisory, operational, and internal control practices and standards in light of the proposed change. *

As previously described, the "change" contemplated by this application has not and will not in any way change Scottsdale's business model, including its compliance, supervisory, operational, and internal control practices and standards.

---

**Provide supporting documents.**

1. Written supervisory procedures ("WSPs") impacted by the proposed change, including:

    a. Written supervisory control procedures

    b. Anti money laundering procedures

    c. Financial control procedures

    d. Internal operating procedures

    e. Internal control procedures

Ensure that the WSPs contain a Designation of Principals identifying the principal(s) responsible for each area (e.g., AML, Supervisory Controls) and business activity or product line (including activities or product lines categorized as OTH or Other that require broker-dealer registration).

As a reminder, please ensure that the WSPs clearly state:

- Who: the identification of the principal/ supervisor responsible for conducting the subject procedure
- What: a description of the specific procedure that is to be conducted by the principal/supervisor

- When: a statement as to when or how often the specific procedure is to be conducted

- How evidenced: a statement as to how the Applicant will evidence the fact that the procedure has been conducted
WSPs that do not conform to the above may not be deemed adequate under this Standard.

2. WSP checklist, as it pertains to procedures impacted by the change

3. Sample of the reports (if impacted by the proposed change) utilized to support supervisory, AML, financial control, internal operating, and internal control procedures '

4. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 10: Supervisory structure

# Continuing Member Application

### Standard 10: Supervisory structure

NASD Rule 1014(a)(10): The Applicant has a supervisory system, including written supervisory procedures, internal operating procedures (including operational and internal controls), and compliance procedures designed to prevent and detect, to the extent practicable, violations of the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

In evaluating the adequacy of a supervisory system, the Department shall consider the overall nature and scope of the Applicant's intended business operations and shall consider whether:

A. the number, location, experience, and qualifications of supervisory personnel are adequate in light of the number, location, experience, and qualifications of persons to be supervised; the Central Registration Depository record or other disciplinary history of supervisory personnel and persons to be supervised; and the number and locations of the offices that the Applicant intends to open and the nature and scope of business to be conducted at each office;

B. the Applicant has identified specific Associated Persons to supervise and discharge each of the functions in the Applicant's business plan, and to supervise each of the Applicant's intended offices, whether or not such offices are required to be registered under FINRA Rules;

C. the Applicant has identified the functions to be performed by each Associated Person and has adopted procedures to assure the registration with FINRA and applicable states of all persons whose functions are subject to such registration requirements;

D. each Associated Person identified in the business plan to discharge a supervisory function has at least one year of direct experience or two years of related experience in the subject area to be supervised;

E. the Applicant will solicit retail or institutional business;

F. the Applicant will recommend securities to customers;

G. the location or part-time status of a supervisor or principal will affect such person's ability to be an effective supervisor;

H. the Applicant should be required to place one or more Associated Persons under heightened supervision pursuant to Notice to Members 97-19;

I. any remedial action, such as special training or continuing education requirements or heightened supervision, has been imposed on an Associated Person by a state or federal authority or self-regulatory organization; and

J. any other condition that will have a material impact on the Applicant's ability to detect and prevent violations of the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

Explain how this Standard is met.

1. Describe any changes or additions to '

a. management or supervisory personnel (including heads of business lines),

b. addition of offices,

c. changes to supervisory responsibilities,

d. changes involving heightened supervision, and

e. any changes to supervisory systems or to the supervisory framework.

As previously described, the "change" contemplated by this application has not and will not in any way change Scottsdale's business model, including any changes to each of the items described in a - e above.

2. Persons identified in Form CMA who are or will be responsible for discharging supervisory functions must have a minimum of one year of direct experience or two years of related experience in the subject area to be supervised. (See NASD Rule 1014(a)(10)) In light of the noted requirement, describe the relevant experience of personnel to supervise new or expanded areas of the Applicant's business relating to the proposed change, including (at a minimum) '

a. where such experience was obtained,

b. duration of the experience, and

c. positions held and responsibilities.

This question is not applicable. As noted above, Scottsdale has not and will not change any personnel as a result of
the "change" contemplated by this application.

3. Will the proposed change to the Applicant result in a change in Chief Compliance Officer? *

◯ Yes ⦿ No

Provide supporting documents.

1. Rule 3270 (formerly Rule 3030) notification(s) for principals other than the FinOp Principal (addressed in Standard
8) that have outside business activities (if applicable)

2. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 11: Books and records

# Continuing Member Application

## Standard 11: Books and records

NASD Rule 1014(a)(11): The Applicant has a recordkeeping system that enables Applicant to comply with federal,
state, and self-regulatory organization recordkeeping requirements and a staff that is sufficient in qualifications and
number to prepare and preserve required records.

Explain how this Standard is met.

1. Describe any changes to the Applicant's recordkeeping system as a result of the proposed change, specifically
identifying any impact to *

a. procedures,

b. books and records,

c. communication systems, and

d. the software and systems to be used to prepare business and financial records, including general ledger, trial
balance, balance sheet, and net capital computation (e.g., PeopleSoft, ADP, Creative Solutions).

As previously described, the "change" contemplated by this application has not and will not in any way change
Scottsdale's business model, including the firm's record-keeping system.

2. Describe any changes to, or to the scope of services provided by, any entities providing recordkeeping services to
the Applicant, specifically identifying any service bureaus, clearing/correspondent arrangements, or other
arrangements involving the creation and retention of books and records. *

This question is not applicable. As described above, Scottsdale did not experience any changes in record-keeping
as a result of the "change" contemplated by this application.

3. Describe how the Applicant's records storage (including email) will be impacted by the proposed change,
specifically identifying (for example): *

a. hardcopy,

b. microfilm/microfiche,

c. optical storage technology, or

d. other media or methods.

As previously described, the "change" contemplated by this application has not and will not in any way change
Scottsdale's business model, including the firm's record storage.

4. Describe any changes to the location where the Applicant's electronic records will be maintained (including email
archives). *

As previously described, the "change" contemplated by this application has not and will not in any way change
Scottsdale's business model, including the firm's record storage.

5. Identify all new types of records to be created and maintained as a result of the proposed change. *

As previously described, the "change" contemplated by this application has not and will not in any way change
Scottsdale's business model, including the creation of firm records.

Provide supporting documents.

1. A conversion timeline, testing plan, and implementation schedule for the proposed recordkeeping system changes (if applicable)

2. Samples of relevant books and records that will be created and maintained relating to the new business activities or as a result of the proposed change

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 12: Continuing education

# Continuing Member Application

## Standard 12: Continuing education

NASD Rule 1014(a)(12): The Applicant has completed a training needs assessment and has a written training plan that complies with the continuing education requirements imposed by the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

Explain how this Standard is met.

1. Identify any changes to the Applicant's Continuing Education ("CE") program, including the Firm Element needs assessment and written training plan as a result of the proposed change. This should include identification of what additional courses may be required, which personnel will be required to participate, and the timeline for implementing the planned modification to the CE Firm Element. *

As previously described, the "change" contemplated by this application has not and will not in any way change Scottsdale's business model, including the firm's continuing education program, its firm element needs assessment, and its written training plan.

2. Identify any changes to the person(s) responsible for the Firm Element and the Regulatory Element of the Applicant's CE program. *

This question is not applicable. As described above, Scottsdale did not make any changes in its personnel as a result of the "change" contemplated by this application.

Provide supporting documents.

1. Revised continuing education training needs assessment and written training plan (if applicable)

2. Any other documentation that would be pertinent to FINRA's review of this Standard

# EXHIBIT E

# EXHIBIT E

THOMPSON
HINE          ATLANTA        CLEVELAND        DAYTON        WASHINGTON, D.C.
                             CINCINNATI       COLUMBUS       NEW YORK

April 10, 2019

Financial Industry Regulatory Authority
Department of Member Regulation
1735 K Street, NW
Washington, D.C. 20006

     RE:    *Alpine Securities Corp. Continuing Membership Application*

Dear Sir/Madam:

Alpine Securities Corp. ("Alpine"), by its counsel, hereby submits this Continuing Membership Application ("CMA"). This CMA is provided in response to the Notice of Suspension dated March 19, 2019 in which FINRA stated that, absent filing of a CMA on or before April 10, 2019, FINRA would suspend the membership of the firm.[1] FINRA based that assertion on the fact that there were certain changes in the "ownership structure" of the firm. As discussed below, those changes did not involve Alpine or its owner, SCA Clearing LLC ("SCA"). It involved only a reorganization of certain trust entities that hold the interest in SCA, and consisted only of administrative and organizational shifts that did not impact either the ownership or control of the member firm or the operation or management of the trusts.[2] Because those circumstances do not impact the operations of the member firm, Alpine requests that this CMA be approved.

## 1. Description Concerning "Change of Ownership"

Since its acquisition in 2011, Alpine has been owned by SCA. At the time of that acquisition, SCA was, in turn, owned by the Hurry Family Revocable Trust. In connection with that application, a CMA was filed that identified the ownership of both Alpine and SCA and confirmed the identity of the Trustees of the Trust. Information and materials were submitted in

---

[1] Alpine is submitting this CMA because of the position taken by FINRA in its Notice of Suspension but does not waive its objection to the imposition of that requirement and is simultaneously filing a Request for Hearing pursuant to Rules 9552 and 9559 on the issue of whether reorganization of certain trust entities of an indirect owner of Alpine triggered the CMA requirement.

[2] Because there was no change in the ownership of Alpine, no change in the ownership or control of SCA, and no "day-to-day changes in the applicant's business activities, management, supervision, assets or liabilities" Notice to Members 13-11), Alpine asks that the CMA fee associated with this filing be waived and that the CMA be approved.

---

Maranda.Fritz@ThompsonHine.com  Fax: 212.344.6101  Phone: 212.908.3966         baf

THOMPSON HINE LLP      335 Madison Avenue      www.ThompsonHine.com
ATTORNEYS AT LAW      12th Floor      O: 212.344.5680
      New York, New York 10017-4611      F: 212.344.6101

THOMPSON
HINE

Financial Industry Regulatory Authority
April 10, 2019
Page 2

connection with that application, and as further requested by FINRA.[3]  That application was granted.

Based on certain estate and tax planning issues, trust counsel Eric Johnson then restructured the Hurry Trust into two trusts each of which then held a partial interest in SCA. Two months later, and based again on estate and tax planning considerations, each of those trusts was broken into three trusts.  As Mr. Johnson explains in his accompanying Affidavit, there was no change in Trustees nor was there any change in the management or operation of the trusts.

Under Rule 1017, a CMA that "requests approval of a change in ownership or control" should describe "the names of the new owners, their percentage of ownership, and the sources of funding for the purchase and recapitalization of the member." Rule 1017(b)(2)(a).  Notice to Members 00-73 further provides that the application should include "details on the change in ownership, control of business operations including a business plan, pro forma financial statements, an organizational chart, and written supervisory procedures that reflect the change."

Here, however, there is no change in ownership or control of the member, nor is there any change in the beneficial ownership or control of SCA.  There is only an administrative or structural shift that is not even recognized by FINRA as governing the issue of ownership under Rule 1017.  FINRA has made clear that it will not be guided by the existence of the particular trust entities or the fact that each of those entities holds less than 25% of SCA.[4]  To the contrary, FINRA has cited NASD Notice to Members 00-73 for the fact that FINRA does *not* consider those trust entities to be the operative "owners" because they are trust entities and are associated with one another.  In its letter to Alpine, FINRA specifically relied on the language in Notice to Members 00-73 confirming that, where individuals are "acting in concert," it is *the "group"* that is the "'entity' for purposes of NASD Rule 1017(a)(4)" and that governs the determination of whether a new membership application must be filed (emphasis added).

This particular restructuring is less direct and substantial even than those that FINRA has described as "less significant."  As reflected in FINRA Notice 13-11, FINRA considers changes in mere corporate form or shifts among existing owners as "less significant changes that do not require substantial staff review."  Examples of such changes include instances where there are no "day-to-day changes in the applicant's business activities, management, supervision, assets or

---

[3] At no time did FINRA maintain that disclosure of confidential trust documents was necessary to "complete" the application.

[4] FINRA's position is consistent with trust law.  It is a widely recognized principle that "[a] trust is not a legal entity. A trust is not an entity distinct from its trustees and capable of legal action on its own behalf. . . ."*See Am. Jur. 2d Trusts* § 3 (2013); Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's Trusts and Trustees* § 712 (2012) ("A trust is not a legal person, nor is the trust property."). Thus, the trusts are embodied by and can only act through the trustees, which have not changed.

Тномрson
Hine

Financial Industry Regulatory Authority
April 10, 2019
Page 3

liabilities, and the applicant is only proposing a change in the: applicant's legal structure (e.g., changing from a corporation to an LLC)."[5]

Here, all of the characteristics of the trust reorganization demonstrate that it is not significant to the operations of the member: the administrative shift is occurring not at the level of the member firm, or even the member firm's owner, but rather at a third level up, it does not affect any change in ownership or control, and it involves a structural shift that FINRA does not recognize as governing the analysis under Rule 1017.

Given these circumstances, and because this restructuring in no way impacts any of the operations of the member, the general guidance concerning the content of a CMA is inapplicable. The applicant here is not identifying any individuals who constitute "new owners" within the meaning of Rule 1017(b)(2)(A). There is no new funding involved and there are no new "owners" aside from the restructured trust entities. Nor are there any written supervisory procedures that "reflect the change" or are applicable to the shift in the trust entities. Notice to Members 00-73 at 573.

The application does include Trust Certificates and pertinent provisions relating to each of the trusts.[6] Those Trust Certificates are provided because Alpine is advised by trust counsel that the underlying trust documents include confidential information and prohibit disclosure of the trust itself. *See* Letter of Eric Johnson, dated September 26. 2018. The disclosure of a Trust Certificate in lieu of private and confidential trust material is an established means by which to

---

[5] The FINRA Notice and Schedule also provide for a waiver where there is a change in "equity ownership, partnership capital or other ownership interest in an applicant held by a corporate legal structure that is due solely to a reorganization of ownership or control of the applicant within the corporate legal structure (e.g., reorganizing only to add a holding company to the corporate legal structure's ownership or control chain of the applicant); or a change in "percentage of ownership interest or partnership capital of an applicant's existing owners or partners resulting in an owner or partner owning or controlling 25 percent or more of the ownership interest or partnership and that owner or partner has no disclosure or disciplinary issues in the preceding five years." It should be noted that no "owner or partner" has had any cognizable disciplinary history in the preceding five years. A decision was issued in a FINRA matter relating to Scottsdale and John Hurry, but that decision as to Mr. Hurry was stayed and remains on appeal. Further, the definition of "disciplinary history" contained in Notice 00-73 does not include books and records issues.

[6] The Notice of Suspension included a statement, even prior to the receipt of any further information or this application, that FINRA's Membership Application Program ("MAP") would have to "review the trust documents for all trusts ... so that MAP could ascertain the ownership structure of the Firm." The Hurry trusts, with the same trustees and beneficiaries, have owned SCA since its acquisition in 2011 and at no time has FINRA previously maintained that the disclosure of the trust documents is required. In Alpine's view, the ownership structure of Alpine remains clear: it is owned by SCA which is, in turn, owned by trust entities of which Justine and John Hurry are Trustees. Confidential trust documents would not provide any further information concerning ownership and control of the member firm.

THOMPSON
HINE

Financial Industry Regulatory Authority
April 10, 2019
Page 4

disclose the operative trust provisions concerning operation and control without divulging
personal family information. [7] *Id.*

While the NASD chose not to define the term "substantially complete" in connection
with the submission of a CMA because the determination would vary based on the complexity of
the filing, the staff has advised that it turns on whether a submission would enable a reviewer to
"begin conducting a meaningful review." See Notice to Member 00-73 at 571.[8] The current
CMA filing, combined with the exhibits and with Alpine's prior submissions, more than meets
that threshold.

## 2. The Applicant Will Meet the Standards in Rule 1014(a)

While Alpine has been the subject of certain disciplinary actions, primarily its continuous
development and improvement of its compliance program over the last eight years illustrate its
commitment to compliance with securities laws.  Prior to its acquisition in 2011, Alpine was the
subject of a series of FINRA actions and entered into a number of Letters of Acceptance ,
Waiver and Consent.  At the time of Alpine's acquisition by SCA, FINRA also identified certain
issues involving John Hurry and Scottsdale Capital Advisors.  Decision Regarding Application
of Alpine Securities Corp., dated December 6, 2010.  At that time, FINRA granted the CMA of
Alpine in relation to its acquisition by SCA, concluding that any of the various issues were
properly addressed through the imposition of certain restrictions. [9]

Since its acquisition by SCA, Alpine has devoted substantial resources to the
enhancement of its compliance capabilities, dramatically expanding its compliance personnel
and continuously improving its compliance program, and actions relating to the firm since then
have been essentially limited to discrete concerns regarding its filing of SARs.  During the period
2011 and 2012, it experienced issues relating to its filing of Suspicious Activity Reports

---

[7]  Such a Certification Form is also a recognized and appropriate means by which to obtain information concerning the beneficial
owner of a legal entity.  See FinCEN Guidance FIN-2018-G001 at 5.

[8]  Pursuant to Rule 1017 (c), the Department may request additional information or documents "necessary to render a decision on
the application."

[9]  Issues relating to Scottsdale Capital Advisors and/or John Hurry are not relevant to this application.  A FINRA proceeding
against Scottsdale has resulted in findings that Scottsdale engaged in violations of Section 5, and certain penalties and sanctions
were imposed against the firms and individuals associated with it.  Among the individuals subject to sanction in that case was
John Hurry, against whom FINRA imposed a bar.  That decision was appealed to the NAC and an application for a stay of the
decision was filed as to Mr. Hurry, who had never had any prior disciplinary issue or a customer complaint in more than 20 years
in the industry.  The SEC granted a stay of the decision as to Mr. Hurry, confirming that he could continue to maintain the
indirect interest in Scottsdale but stating that he could not participate in day-to-day operations of a member firm.  Thus, not only
is that Scottsdale decision the subject of both a stay and an appeal but also it requires that Mr. Hurry not be involved in day to
day operations and so renders Mr. Hurry's interest in SCA irrelevant to any consideration of the operations of Alpine.

THOMPSON
HINE

Financial Industry Regulatory Authority
April 10, 2019
Page 5

("SARs"), which were then highlighted in the results of FINRA's 2012 Cycle Exam. It was largely those same issues concerning those 2011 and 2012 filings that led many years later to the filing of an action against Alpine by the SEC in which the SEC alleged that Alpine had failed to comply with the strict liability books and records provisions of the Exchange Act. *SEC v. Alpine*, Case No. 17 CV 4179 (DLC). The court in that SEC action has since issued a decision granting partial summary judgment to the SEC, and those proceedings are continuing. It has not resulted in any judgment against the member.

Most significant for purposes of this application, those alleged violations occurred primarily in the first two years after the acquisition, in 2011 and 2012, and they relate to certain filing issues under the Bank Secrecy Act that were not well understood in the industry at that point. The 2012 FINRA Cycle Exam focused on those issues, and Alpine responded to FINRA's findings by significantly expanding the scope of the information included in the narrative portions of SARs. The SEC's evidence in that action confirmed, and the Court has acknowledged, a pronounced drop in the number of the SEC's claims in the period after 2012. Thus, the circumstances underlying the SEC proceeding actually demonstrate Alpine's willingness and ability to address regulatory concerns and its commitment to compliance with the securities laws.

Alpine, on its own initiative and in response to regulatory examination and action, has continuously worked to enhance and improve its compliance program. Because of its issues in the past, and regulator's continuing concerns regarding transactions in the microcap markets, Alpine has been and will remain the subject of scrutiny and so it must and it will ensure its compliance with federal securities laws. Further, Alpine has operated since 2010 in accordance with the restrictions that were specifically designed and imposed by FINRA in the interest of investor protection, and Alpine will continue to abide by those restrictions in the future.

THOMPSON
HINE

Financial Industry Regulatory Authority
April 10, 2019
Page 6

## Conclusion

For the reasons set forth above, and based on the information contained in the CMA, Alpine asks that this application be approved.

Sincerely,

Maranda Fritz

Maranda E. Fritz

THOMPSON HINE   ATLANTA   CLEVELAND   DAYTON   WASHINGTON, D.C.
                CINCINNATI   COLUMBUS   NEW YORK

April 10, 2019

Financial Industry Regulatory Authority
Department of Member Regulation
1735 K Street, NW
Washington, D.C. 20006

  RE:  *Scottsdale Capital Advisors Continuing Membership Application*

Dear Sir/Madam:

  Scottsdale Capital Advisors ("Scottsdale"), by its counsel, hereby submits this
Continuing Membership Application ("CMA"). This CMA is provided in response to the Notice
of Suspension dated March 19, 2019 in which FINRA stated that, absent filing of a CMA on or
before April 10, 2019, FINRA would suspend the membership of the firm. FINRA based that
assertion on the fact that there were certain changes in the "ownership structure" of the firm. As
discussed below, those changes did not involve Scottsdale or its owner, SCA Capital Advisors
Holdings LLC ("SCA"). It involved only a reorganization of certain trust entities that hold the
interest in SCA, and consisted only of administrative and organizational shifts that did not
impact either the ownership or control of the member firm or the operation or management of the
trusts. Because the "change" does not impact the operations of the member firm, and based on
all of the circumstances discussed herein, Scottsdale requests that this application be approved.

**1. Description Concerning "Change of Ownership"**

  Scottsdale was previously, and continues to be, owned by SCA. SCA was, in turn,
owned by the Hurry Family Revocable Trust. Based on certain estate and tax planning issues,
trust counsel Eric Johnson then restructured the Hurry Trust into two trusts each of which then
held a partial interest in SCA. Subsequently, and based again on estate and tax planning
considerations, each of those trusts was broken into three trusts. As Mr. Johnson explains in his
accompanying Affidavit, there was no change in Trustees nor was there any change in the
management or operation of the trusts.

  Under Rule 1017, a CMA that "requests approval of a change in ownership or control"
should describe "the names of the new owners, their percentage of ownership, and the sources of
funding for the purchase and recapitalization of the member." Rule 1017(b)(2)(a). Notice to
Members 00-73 further provides that the application should include "details on the change in

Maranda.Fritz@ThompsonHine.com  Fax: 212.344.6101  Phone: 212.908.3966      baf

THOMPSON HINE LLP  335 Madison Avenue  www.ThompsonHine.com
ATTORNEYS AT LAW  12th Floor  O: 212.344.5680
  New York, New York 10017-4611  F: 212.344.6101

THOMPSON
HINE

Financial Industry Regulatory Authority
April 10, 2019
Page 2

ownership, control of business operations including a business plan, pro forma financial statements, an organizational chart, and written supervisory procedures that reflect the change."

Here, however, there is no change in ownership or control of the member, nor is there any change in the beneficial ownership or control of SCA. There is only an administrative or structural shift that is not even recognized by FINRA as governing the issue of ownership under Rule 1017. FINRA has made clear that it will not be guided by the existence of the particular trust entities or the fact that each of those entities holds less than 25% of SCA. To the contrary, FINRA has cited NASD Notice to Members 00-73 for the fact that FINRA does not consider those trust entities to be the operative "owners" because they are trust entities and are associated with one another. In its letter to Scottsdale, FINRA specifically relied on the language in Notice to Members 00-73 confirming that, where individuals are "acting in concert," it is the "group" that is the "'entity' for purposes of NASD Rule 1017(a)(4)" and that governs the determination of whether a new membership application must be filed (emphasis added).

This particular restructuring is less direct and substantial even than those that FINRA has described as "less significant." As reflected in FINRA Notice 13-11, FINRA considers changes in mere corporate form or shifts among existing owners as "less significant changes that do not require substantial staff review." Examples of such changes include instances where there are no "day-to-day changes in the applicant's business activities, management, supervision, assets or liabilities, and the applicant is only proposing a change in the: applicant's legal structure (e.g., changing from a corporation to an LLC)."

Here, the administrative shift is occurring not at the level of the member firm, or even the member firm's owner, but rather at a third level up, it does not affect any change in ownership or control, and it involves a structural shift that FINRA does not recognize as governing the analysis under Rule 1017.

Given these circumstances, and because this restructuring in no way impacts any of the operations of the member, the general guidance concerning the content of a CMA is inapplicable. The applicant here is not identifying any individuals who constitute "new owners" within the meaning of Rule 1017(b)(2)(A). There is no new funding involved and there are no new "owners" aside from the restructured trust entities. Nor are there any written supervisory procedures that "reflect the change" or are applicable to the shift in the trust entities. Notice to Members 00-73 at 573.

The application does include Trust Certificates and pertinent provisions relating to each of the trusts. Those Trust Certificates are provided because Scottsdale is advised by trust counsel that the underlying trust documents include confidential information and prohibit disclosure of the trust itself. See Letter of Eric Johnson, dated September 26, 2018. The disclosure of a Trust

THOMPSON
  HINE

Financial Industry Regulatory Authority
April 10, 2019
Page 3

Certificate in lieu of private and confidential trust material is an established means by which to disclose the operative trust provisions concerning operation and control without divulging personal family information.  Id.

While the NASD chose not to define the term "substantially complete" in connection with the submission of a CMA because the determination would vary based on the complexity of the filing, the staff has advised that it turns on whether a submission would enable a reviewer to "begin conducting a meaningful review."  See Notice to Member 00-73 at 571.  The current CMA filing, combined with the exhibits and with Scottsdale's prior submissions, more than meets that threshold.

**2.  The Applicant Will Meet the Standards in Rule 1014(a)**

Over the course of the many years since its formation in 2002, Scottsdale has developed and improved its compliance functions to ensure compliance with federal securities laws, and it will continue to do so in the future.

While Scottsdale has also been the subject of certain disciplinary actions, those proceedings should not impact this application.[1]  First, the FINRA proceeding is presently on appeal and there are substantial issues that Scottsdale has presented for review by the National Adjudicatory Council.  In fact, the SEC's decision to grant a stay in favor of Mr. Hurry pending consideration of that appeal may reflect the SEC's acknowledgement of issues regarding the merits and validity of that ruling.

Second, that FINRA proceeding involved an exhaustive airing of any and all of FINRA's concerns in relation to Scottsdale, and the Panel imposed those sanctions that it deemed appropriate; i.e., a fine for the firm and sanctions against certain individuals.[2]  It did so with the knowledge and consideration of the arguments and evidence presented by FINRA including the asserted Section 5 issues and FINRA's claims relating to John Hurry.  All of those issues were taken into account by the Panel which concluded as to Scottsdale that the firm would receive a fine.  Those issues should not now be repeated and relitigated here in the guise of a CMA.[3]

Further, that FINRA action was focused on specific Section 5 issues that are distinct from the overriding considerations concerning customer harm that are foremost in FINRA's analysis.

---

[1] Rule 1013 provides that an application under Rule 1017 need not include information provided to CRD.

[2] Suspensions of Michael Cruz and Timothy DiBlasi are stayed by the appeal of the decision.

[3] Any issue or claim concerning Mr. Hurry's interest in SCA was also fully considered and addressed in those proceedings and are no longer relevant to Scottsdale's operations because the SEC expressly confirmed that Mr. Hurry may continue to hold those interests but is not permitted to participate in day to day operations.



Financial Industry Regulatory Authority
April 10, 2019
Page 4

In fact, because Scottsdale has experienced regulatory issues in the past, and given regulator's continuing concerns regarding transactions in the microcap markets, it has been and will remain the subject of scrutiny and so it must and it will ensure its compliance with federal securities laws.

### Conclusion

For the reasons set forth above, and based on the information contained in the CMA, Scottsdale asks that this application be approved.

Sincerely,

Maranda Fritz

Maranda E. Fritz

# EXHIBIT F

# EXHIBIT F

PEE PEE POP TRUST

## CERTIFICATE OF TRUST EXISTENCE AND AUTHORITY

WE, THE UNDERSIGNED, CERTIFY THAT:

1.      The Pee Pee Pop Trust was created on July 22, 2013 (the "Trust Agreement").

2.      As of the date of this Certificate of Trust Existence and Authority, JOHN JOSEPH HURRY and JUSTINE HURRY, collectively, serve as Management Trustees, and, with their successors, collectively referred to as a "Trustee" or the "Trustees".

3.      The Trustees have such powers and authority provided in Section 6 of the Trust Agreement, a copy of which is attached hereto as **Exhibit A**.

4.      The Management Trustees have exercised their right to limit the powers of the Independent Trustee whereby the Management Trustees have exclusive control over business and investment decisions relating to the assets of the Trust.

5.      The Trust Agreement provides that no person dealing with, making payments to, or delivering property to a Trustee shall be obliged to inquire as to the powers of such Trustee, nor to see to the application of any money or property delivered to such Trustee.

6.      This Certification shall be construed under and regulated by the laws of the State of Nevada as are now or hereafter in effect.

7.      State law provides that any person refusing to accept this Certification shall be liable for damages, including attorneys' fees, if the court determines that the person acted in bad faith.

8.      The Trust Agreement is in full force and effect as of the present date.

9.      The Trust Agreement is Irrevocable.

10.     The Trust's taxpayer identification number is

11.     Title to trust property shall be taken as follows:

John Joseph Hurry and Justine Hurry, as Management Trustees of the Pee Pee Pop Trust dated July 22, 2013.

IN WITNESS WHEREOF, the undersigned Management Trustee has executed this Certificate of Trust Existence and Authority this _20_ day of July, 2017.

MANAGEMENT TRUSTEE:

_____
JOHN JOSEPH HURRY

_George Town_ )
_Grand Cayman_ ) ss:

On this _20th_ day of July, 2017, personally appeared before me, the undersigned Notary Public, JOHN JOSEPH HURRY, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

2

IN WITNESS WHEREOF, the undersigned Management Trustee has executed this Certificate of Trust Existence and Authority this _13_ day of July, 2017.

**MANAGEMENT TRUSTEE:**

JUSTINE HURRY

STATE OF ARIZONA )
                 ) ss:
County of Maricopa )

On this _13_ day of July, 2017, personally appeared before me, a Notary Public, JUSTINE HURRY, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

OFFICIAL SEAL
ERIC LYNN JOHNSON
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
APRIL 6, 2020

Notary Public

3

## EXHIBIT A

6.    **TRUSTEE POWERS**

    6.1.    **In General**.

        With respect to each trust hereunder, during its existence and until such time after its termination as all of its assets have been distributed, its Trustee(s), in their discretion, shall have the power and are authorized to;

        (a)    Enter upon and take possession of the trust property and invest and reinvest the same in real, personal and mixed assets, improved and unimproved, tangible and intangible, of any kind and nature whatsoever, foreign as well as domestic, that yield a high rate of income or no current income including, but without limitation, securities issued by an institution that is or may become a Trustee hereunder, common and preferred stocks (regardless of dividend arrearages), leverage type securities, options, puts and calls, fixed income bearing securities (secured or unsecured and notwithstanding default in interest), units of participation in limited partnerships, in real estate investment trusts and/or in common trust funds, investment trust stocks, mutual funds and other securities and investments of any kind, without regard to whether or not any such securities or investments are of a kind known to exist at the date of this instrument and whether or not any such investments shall be in (i) unseasoned or fledgling companies or securities that are (a) not listed on any stock exchange or public market nor registered with any securities commission, or (b) subject to contractual, legal or other restrictions (including "investment letter" restrictions), or (ii) oil, gas and other mineral interests and natural resources, leasehold interests (including agricultural, business, etc.), commodities, currencies, collectibles, insurance and/or annuity contracts of any kind on the life of any person or persons, life estates, remainder interests, etc., not being limited by any present or future investment law and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), all without regard to the "prudent man rule," to the relation any such investment may bear to the value of such trust or to the type or character of other investments in such trust, or to the effect such investment may have upon the diversification of the investments in such trust and even though such investment or reinvestment shall be when made or shall thereafter become unproductive of income, unmarketable, risky or speculative; and such investments may be purchased from or made in common with any person or persons, notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder; and any business partially or wholly owned by such trust may separately compensate any fiduciary and/or beneficiary hereunder for any services rendered directly to such business;

        (b)    Retain, for as long as may be deemed desirable, all property in the form in which the same shall be acquired by such trust, without regard to any trust investment rules of any kind nor to the proportion that anyone asset or class of assets may bear to the whole and without liability for any loss that may be incurred thereby;

(c)     Open checking, savings, custody, agency and cash and margin brokerage accounts and safe deposit boxes with any institution(s) empowered to accept the same, including any that may be a Trustee hereunder, either (i) in their names or any of their names (with or without disclosing fiduciary capacity), (ii) in the name of such trust (where an account is in the name of a trust, checks on that account and authorized signatures need not disclose the fiduciary nature of the account or refer to any trust or Trustee), or (iii) in the name of such trust's nominee(s), depositing therein any part or all of the funds and securities of such trust, and withdrawals therefrom and access thereto shall be permitted on the signature of anyone or more of the Trustees and/or nominees, with the right and power to authorize withdrawals and/or access on the sole signature of any agent or agents designated in writing by such Trustees;

(d)     Employ such accountants, custodians, experts, counsel (legal and/or investment), and other agents as may be deemed advisable (notwithstanding that such person or entity may be, or be affiliated in business with, any Trustees hereunder) and delegate discretionary powers to and rely upon information or advice furnished by them;

(e)     Sell (either for cash or partly for cash and partly on credit for any period, with or without security), option, convey, exchange (whether or not of like kind or similar use), lease (for any length of time regardless of the possible or actual prior termination of any trust), partition, plat, rezone, subdivide, improve and/or develop (and, where appropriate, dedicate for public use, demolish, construct, alter, reconstruct, change, etc.), repair, manage, operate or otherwise enter upon contracts or agreements regarding, deal with or dispose of any part or all of the trust property, whether real, personal or mixed, at any time, for any purpose or purposes, in any manner, either public or private, and upon any terms and with any party, including any who may be, directly or indirectly, a beneficiary or a fiduciary hereunder or an estate or trust of or for such a person;

(f)     Abandon or demolish any trust property deemed to be of insufficient value to warrant the expense of retention or abstain from the payment of taxes, liens, rents, assessments, repairs, etc. on such property and/or permit such property to be lost by tax sale, foreclosure or other proceedings, by conveyance for nominal or no consideration, or to charity;

(g)     Grant or release easements or charges of any kind (with or without consideration), effect and carry insurance (protecting against such hazards and liabilities as may be deemed advisable), renew or extend, amend, change or modify leases, grant options to lease and options to renew leases, all on such terms and conditions as may be deemed advisable and to pay any and all expenses in connection therewith;

(h)     Exercise or not exercise or otherwise deal with any and all options of any kind;

(i)     Vote, deal or consent, in person or by proxy (with or without power of substitution), including electing any Trustee or an employee or officer of any Trustee

5

as a director or officer of any corporation, with respect to any securities, including those of companies in which a Trustee may, directly or indirectly, have an interest of any kind;

(j)     Form or cause to be formed, alone or with others, such corporations, partnerships, limited partnerships and other business organizations organized under the laws of any state or country and to transfer and convey to such business organizations all or any part of the assets, real or personal, of any trust estate in exchange for stocks, bonds, notes, other securities or interest of such business organizations as the Trustees, in their absolute discretion, deem advisable;

(k)     Rent office space, whether or not from, or in conjunction with any such space being used by any beneficiary hereunder, or any relative of the Initial Primary Beneficiary or of any beneficiary hereunder, or any fiduciary hereunder in his, her or its individual capacity, and to pay the expenses thereof from the principal of the respective trust estate;

(l)     Enforce, abandon, adjust, arbitrate, compromise, sue on, prosecute and/or defend, and otherwise deal with and settle, on such terms as such Trustee(s) in good faith may deem advisable, even if the result would substantially diminish the trust property and/or materially affect the trust plan (whether or not with concurrence of the beneficiaries), any and all claims in favor of or against such trust, including those relating to tax matters;

(m)     Exercise all tax related elections, choices, etc. that they may have (whether or not specifically referred to in Section 8.1, including (i) the disclaimer of benefits receivable by such trust in any manner permitted by law or by a "transfer" meeting the requirements of Section 2518(c)(3) of the Internal Revenue Code, and (ii) the entering into of closing agreements relating to any trust matters (which shall be binding on all present and future trust beneficiaries), and to pay any income or similar tax properly imposed on or to be borne by such trust and any estate, inheritance, succession, generation-skipping or other similar tax that, under applicable tax and apportionment laws, is properly imposed upon or with respect to any property held (or being distributed) hereunder, such payment to be charged to such property;

(n)     Borrow money for the payment of taxes, the exercise of options, or for any other purpose or purposes Whatsoever, from any source, including the commercial department of any corporate Trustee hereunder, on the general credit of any trust property, and to pledge or mortgage any or all of said property as security for the repayment of such loans and/or of any loan, new or old, from any third party(ies) to any beneficiary hereunder and/or to any trust, estate or company in which any beneficiary and/or any trust hereunder has an interest, and to guarantee any such third party loans, and to pay interest on and to renew, extend, modify, reduce and/or payoff, from time to time, any such indebtedness incurred by such Trustee(s) or any of their predecessors in interest;

(o)     Loan money to anyone, including any beneficiary of that trust or of any trust hereunder (including any beneficiary who may at the time also be a fiduciary

6

hereunder), or to any estate, trust or company in which such person or any trust hereunder has an interest, for any purpose whatsoever, with or without security and at such rate of interest as the Trustee(s) of such trust shall determine in the exercise of reasonable fiduciary discretion, and, with respect to such loans and/or security interests, to renew, extend, modify, grant waivers, etc.;

      (p)    Make, execute and deliver any and all such instruments in writing as shall be necessary and proper to carry out any disposition whatever of any trust property;

      (q)    Carry securities or other properties requiring or permitting of registration or recording in their names, in anyone of their names, in the name of their nominee or nominees (with or without designation of fiduciary capacity), or unregistered (or in such form as will pass by delivery);

      (r)    Exercise, in general, all such control and power over the trust property as an individual might exercise with respect to his own property;

      (s)    Compromise, submit to arbitration, release, with or without consideration, or otherwise adjust claims in favor of or against any trust;

      (t)    Institute, compromise and defend actions and proceedings;

      (u)    Hold, retain, purchase or sell legal life estates, interests for a term of years, remainder interests, etc., whether or not they yield a reasonable rate of return or no current return, whether or not they result in the preservation of principal, and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper for Trustees. Such investments may be purchased from or made in conjunction with any persons notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder. The purchase or sales price for any transactions hereunder may, but need not, be determined under the Treasury Department Regulation Section 25.2512-9, as amended, or any successor regulation or tables;

      (v)    In addition to all other powers herein granted to the Trustees, the Trustee of each trust created hereunder is specifically authorized to hold and maintain any residence (whether held as real property, condominium or cooperative apartment) for the use and benefit of the beneficiaries of any trust. If the Trustees, in their sole and absolute discretion, determine that it would be in the best interests of the beneficiaries of any trust to maintain a residence for their use but that the residence owned by the Trustees should not be used for such purpose, the Trustees are authorized to sell said residence and to apply the net proceeds of sale to the purchase of such other residence or to make such other arrangements as the Trustees, in their sole and absolute discretion, deem suitable for the purpose. Any proceeds of sale not needed for reinvestment in a residence as provided above shall be added to the principal of this trust and thereafter held, administered and disposed of as a part thereof. The Trustees are authorized to pay all carrying charges of such residence, including, but not limited to, any taxes, assessments and maintenance thereon, and all expenses of the repair and operation

thereof, including the employment of domestic servants and other expenses incident to the running of a household for the benefit of the beneficiaries of the trust. Having in mind the extent to which funds will be available for expenditure for the benefit of the beneficiaries, the Trustees are authorized to expend such amounts as they, in their sole and absolute discretion, shall determine to maintain the current lifestyle of the beneficiaries, including, but not limited to, complete authority to provide for their personal care and comfort in any manner whatsoever.

The foregoing powers, as well as those now or hereafter conferred upon Trustees generally and those set forth in the following sections of this Section 6, may be exercised by such Trustees in such manner as they, in their sole judgment and discretion, deem appropriate under the then circumstances (insofar as they can be reasonably ascertained by such Trustees) to carry out the trust purposes of protecting and conserving property for the beneficiaries, all without obtaining authority therefor from any court. No person dealing with the Trustees shall be bound to see to the application or disposition of cash or property transferred to or upon the order of the Trustees or to inquire into the authority, validity or propriety of any action of the Trustees.

6.2.   **"Prudent Person" Rule**.

In addition to the investment powers conferred above, the Trustees are authorized (but are not directed) to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden by the "prudent person" rule. The Trustees may, in their sole discretion, invest in any type of property, wherever located, including any type of security or option, improved or unimproved real property, and tangible or intangible personal property, and in any manner, including direct purchase, joint ventures, partnerships, limited partnerships, corporations, mutual funds or any other form of participation or ownership whatsoever. In making investments, the Trustees may disregard all of the following factors;

(a)     Whether a particular investment, or the trust investments collectively, will produce a reasonable rate of return or result in the preservation of principal.

(b)     Whether the acquisition or retention of a particular investment, or the trust investments collectively, is consistent with any duty of impartiality as to the different beneficiaries. The Grantor intends that no such duty shall exist.

(c)     Whether the trust is diversified. The Grantor intends that no duty to diversify shall exist.

(d)     Whether any or all of the trust investments would traditionally be classified as too risky or speculative for trusts. The entire trust may be so invested. The Grantor intends the Trustees to have sole discretion in determining what constitutes acceptable risk and what constitutes proper investment strategy.

The Grantor's purpose in granting the foregoing authority is to modify the prudent person rule insofar as the rule would prohibit an investment or investments because of one or more factors listed above, or any other factor relating to the nature of the

8

investment itself. Accordingly, the Trustees shall not be liable for any loss in value of an investment merely because of the nature of the investment or the degree of risk presented by the investment, but shall be liable if the Trustees' procedures in selecting and monitoring the investment are proven by affirmative evidence to have been negligent, and that such negligence was the proximate cause of the loss.

### 6.3.   **Properties and Companies Owned in Common with Others**.

The Trustee(s) of each trust hereunder are specifically authorized, with or without the joinder of other owners of property or securities related to any that may be held in such trust (and notwithstanding that one or more such other owners may be, directly or indirectly, a beneficiary or a fiduciary hereunder), to enter upon and carry out any plan (i) for the foreclosure, lease or sale of any trust property, (ii) for the consolidation or merger, dissolution or liquidation, incorporation or reincorporation, recapitalization, reorganization or readjustment of the capital or financial structure of any corporation, company or association, the securities of which, whether closely held or publicly traded, may form a part of such trust, or (iii) for the creation of one or more holding companies to hold any such securities and/or properties (even if it leaves, following the termination of such trust, a trust beneficiary as a minority shareholder in such a holding company), all as such Trustee(s) may deem expedient or advisable for the furtherance of the interests of such trust and the carrying out of the Grantor's original intent as to such trust and as to those properties and/or securities. In carrying out such plan, such Trustee(s) may deposit any such securities or properties, pay any assessments, expenses and sums of money, give investment letters and other assurances, receive and, subject to the requirements of Section 6.4 below, retain as Investments of such trust any new properties or securities transferred or issued as a result  thereof, whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), and generally do any act with reference to such holdings as might be done by any person owning similar securities or properties in his own right, including the exercise of conversion, subscription, purchase or other rights or options, the entrance into voting trusts, etc., all without obtaining authority therefor from any court.

### 6.4.   **Authority to Operate Businesses**.

If an interest in any business, whether in the form of a general or limited partnership or sole proprietorship, at any time becomes an asset of any trust hereunder (by purchase, gift, the entrance of the trust into such business or otherwise), its Trustee(s) shall have the authority to engage in and to continue such trust in such business for such period, without limit, as such Trustee(s), in their sole judgment, may deem best for such trust (but only as long as such activity does not constitute "carrying on business" within the meaning of the federal tax laws defining associations taxable as a corporation) and, for that purpose, such Trustee(s) may retain and employ the capital in said business that shall at the time of trust acquisition be committed thereto or employed therein and such additional capital as such Trustee(s), in their sole judgment, shall think fit to advance from time to time out of such trust's other resources, whether for continuation or expansion or any other purpose; and such Trustee(s), in their sole discretion, may incorporate a part or all of said business (or any investment held in such trust) in one or

more corporations, with whatever capital structure may be deemed appropriate, alone or with others, in any jurisdiction, and/or form partnerships in which such trust may be a general or limited partner, and/or enter into joint ventures or associations with others on such terms as may be deemed appropriate, and/or enter into agreements respecting voting rights, management, incentive compensation, profit sharing, future sale or retention, etc., all without obtaining authority therefor from any court, and such Trustee(s), while acting in good faith, shall be free from any responsibility for losses arising in the prosecution of such business.

### 6.5.  Mineral and Oil and Gas Operations.

With respect to any and all mineral and oil and gas interests of any kind, regardless of where located, that may at any time form a part of or be acquired by any trust hereunder, the powers and discretions herein granted to Trustee(s) shall be broadly construed, regardless of technical terminology, to permit any contract, act or thing that may be deemed by the Trustee(s) of such trust to be advantageous to such trust, whether or not the same be now or hereafter recognized as common or proper practice by or among those engaged in the business of prospecting for, developing, producing, processing, transporting and/or marketing any such minerals, properties or interests. Without limiting the generality of the foregoing, such Trustee(s) are also specifically authorized and empowered, in their sole discretion as they may deem necessary or desirable, with respect to any and all such interests, to;

(a)  Pay all delay rentals, lease bonuses, royalties, overriding royalties, bottom hole or dry hole contributions, local taxes and assessments and all other proper charges

(b)  Make farm out agreements, engage in secondary recovery operations and enter into and execute pooling and/or unitization agreements and/or agreements for the installation and/or operation of absorption, repressuring and/or other processing plants;

(c)  Retain, sell, assign, transfer, lease, exchange, mortgage, pledge or otherwise hypothecate, surrender or abandon, with or without condition, either in cash or in kind, any or all of such interests (including making reservations and exacting conditions on the transfer of any such interests);

(d)  Drill, test, explore, mine, develop, operate and otherwise exploit, directly or by contract with others, any and all such interests to any extent;

(e)  Produce, process, sell or exchange all products recovered through the exploitation of such interests;

(f)  Exercise, in accordance with their best judgment, any right, power or privilege (including, but not by way of limitation, the right to consent to participate or to not participate in wells to be drilled) that the Trustee(s) or any predecessor in interest may have under any agreement that may have been entered into in connection with any of such interests;

10

(g)     Select, employ and enter into any appropriate business form in which to properly exploit such interests, including corporations, partnerships, limited partnerships, mining partnerships, joint ventures and co-tenancies;

(h)     Hire all necessary personnel, rent office space, buy or lease office equipment, contract and pay for geological surveys and studies, procure appraisals, rely on expert advice and generally conduct and engage in any and all activities incident to the foregoing powers set forth in Paragraphs (a) through (g), inclusive, with full power to borrow and pledge in order to finance such activities; and

(i)     Exercise broad and liberal discretion in making allocations under Section 5.3 above, notwithstanding the technical nature of any receipt or disbursement, notwithstanding any local law or custom to the contrary, and without being required to allocate to principal any reserve for depletion.

Such Trustee(s) are further hereby granted any other power that they deem necessary in order to properly conserve, develop, exploit and administer the interests described in this section, including the power to dispose of such interests in any manner and at any price, either in cash or in property, that they, in the exercise of their best judgment, deem reasonable at the time of such disposition. All fiduciaries hereunder shall be exonerated from liability for honest errors in judgment in connection with the exercise of the powers described in this section.

6.6.   **Agricultural Realty and Farming Operations**.

With respect to any real property used or useable for agricultural purposes and/or farming operation of any kind, regardless of its nature, that may at any time become an asset of any trust hereunder, its Trustee(s) shall have the authority to:

(a)     Operate all property and interests in property relating to such operation with hired labor, tenants and/or sharecroppers (including any who may be a beneficiary, Trustees and/or the Grantor hereunder), as such Trustee(s) from time to time deem best;

(b)     Hire a farm manager or professional farm management service to supervise such operation or operations;

(c)     Lease or rent land, equipment and/or livestock for cash or on shares, either to others or from others (including related parties and/or Trustee(s));

(d)     Sell, purchase, exchange and/or otherwise acquire or dispose of farm machinery, livestock, farm products, crops, timber, supplies and services used in connection with the property or any acreage or parcel of real estate constituting farm property;

(e)     Remove, construct, repair and improve fences, structures and buildings of all kinds on the property;

(f)     Fertilize, terrace, clear, level, ditch and/or drain farm lands;

(g)     Install irrigation systems, carry on reforestation and, in general, follow soil conservation and other practices designed to conserve, improve and maintain the fertility and productivity of the soil;

(h)     Enter into agreements and/or programs with any governmental agency relating to soil conservation, acreage reduction, agricultural, recreational or other similar purposes;

(i)     Carry on both crop and livestock programs, including the breeding, raising, purchasing and/or selling of livestock and any other farm products whatsoever; and

(j)     Borrow money and pledge harvested or growing crops, timber or livestock and mortgage or pledge farm property of any kind.

Regarding all such agricultural real property and farming operations, no Trustee shall be liable for any losses except as such losses are caused by that Trustee's bad faith or intentional misconduct. Furthermore, during such time as there is a Management Trustee acting with respect to any trust that owns or leases real property used or useable for agricultural purposes or that is thus involved in farming operations, that Management Trustee shall completely control and manage all of such trust's agricultural real property and/or farming operations and the Independent Trustee(s) of such trust shall not have any responsibility whatsoever with respect to such property and/or operations (except to approve acts of self dealing under Section 6.9, below), and to receive amounts of cash due the income or principal accounts of such trust from such property and/or operations and to provide such Management Trustee with all funds that such Management Trustee calls for, either from the income or principal account of such trust, in connection with such property and/or operations.

### 6.7.   Assistance to Estates and Trusts of Interested Persons.

The Trustee(s) of each trust hereunder are authorized, in the exercise of their discretion, to purchase and retain, as a trust investment, securities or other properties, for a fair consideration in money or money's worth, from the fiduciaries of the estate (and/or revocable trust) of the Grantor, the Grantor's spouse, the Initial Primary Beneficiary, the Initial Primary Beneficiary's spouse, and each of the Initial Primary Beneficiary's descendants (and each of their spouses), from the fiduciaries of each other separate trust hereunder, and from the fiduciaries of the estate (and/or revocable trust) of each deceased beneficiary of each trust hereunder (and each of their spouses) and to make loans to such fiduciaries, with or without security and at such rate of interest or no interest, all as such Trustee(s) shall determine to be appropriate in carrying out what they alone judge would be the Grantor's original intent under the circumstances. The propriety of any such purchase and/or loan and of the terms thereof shall not be questioned merely because any of the fiduciaries or beneficiaries of such estate or trust may also be a Trustee hereunder.

12

### 6.8. Enlarged Investment Perspective.

The investment policy of each Trustee hereunder shall be based primarily on the long-term best interests of the person or persons who, at the time, are entitled to trust income and only secondarily on the interests of remainder beneficiaries. If any Trustee considers it appropriate to determine the proportion of trust properties to be invested in (i) equities, and (ii) "fixed dollar" type assets, consideration should also be given to the amount and nature of all assets and means of support available from all sources to each income beneficiary to the extent known (even to the point of having all trust investments in one or the other type of holding). The soundness of trust investments shall be judged not on the basis of individual assets nor on the basis of the trust estate alone, but on the broader basis of each income beneficiary's economic circumstances as a whole, including said trust estate.

### 6.9. Permitted Self-Dealing.

Financial transactions, both direct and indirect, between any trust and any of the Trustee(s), beneficiaries and/or the Grantor of that trust (including, for instance, the purchase, sale or leasing of property, employment in any capacity, lending, etc.), whether or not specifically described in this article as permitted between such parties, except to the extent expressly prohibited by this instrument, are hereby expressly authorized, notwithstanding any rule of law relating to self dealing, provided only that the Trustee(s), in thus acting either on behalf of or with or for such trust, shall act in good faith to assure that such trust receives in such transaction adequate and full consideration in money or money's worth.

### 6.10. Certain Trustee's(s') Limited Power of Amendment.

(a)   In the case of each separate trust at any time in existence hereunder, such trust's then Trustee(s), other than any (i) who has ever made a gift transfer to such trust, or (ii) who is prohibited by the provisions of Paragraph (c)(1) below from participating in the amendment involved, from time to time may, notwithstanding any other provision of this instrument, amend or restate this instrument, including its dispositive, administrative and other provisions of all kinds, in order to permit such Trustee(s):

(1)   To cope with tax and/or other circumstantial changes that may affect such trust and/or its beneficiaries, and/or

(2)   To remove from the governing trust instrument any provisions which have become "deadwood" (i.e., no longer operative in the ongoing administration of such trust due to changed circumstances)

with respect to (i) such trust, and (ii) all trusts that are subsequently to come into existence under this instrument to hold part or all of the assets of such trust, in whatever way or ways such Trustee(s), in the exercise of such Trustee's(s') sale discretion, may deem appropriate in the best interests, as interpreted by such Trustee(s) alone, of the primary beneficiary(ies) of such trust(s) and of each such beneficiary's family as a whole. Such Trustee(s) shall be guided by what, in the sale judgment of such Trustee(s) alone,

would apparently be the Grantor's original intent hereunder in the light of the changed circumstances.

(b)     This power of amendment shall include, by way of example and not limitation, the power to:

(1)     Grant, reduce or eliminate general (as defined in Section 2041 of the Internal Revenue Code) and special powers of appointment with respect to part or all of any trust property (such powers may be made subject to any conditions or consents and limited to such objects as may be described in the grant or reduction of each power);

(2)     Add mandatory distribution or set aside provisions for one or more beneficiaries or Permissible Distributees;

(3)     Divide a trust at any time (before or after it is funded with assets) into two or more separate trusts (representing fractional shares of any property being divided) or merge separate trusts together;

(4)     Provide for the creation of one or more separate subaccounts (equivalent to a separate trust) in any trust hereunder with respect to which subaccount more restrictive or other administrative or dispositive provisions are made applicable in order to permit some or all of the properties or interests that may at any time be held in or allocable to that trust to be segregated and transferred to that subaccount to achieve some tax or other benefit that would otherwise not be available to such property or interest or to the primary beneficiary or one or more of the other current beneficiaries of that trust [such as, by way of example and not limitation, to permit (i) such property, interest or beneficiary to qualify for some governmental or tax benefit, generation-skipping transfer tax exemption or Code Section 2032A election, (ii) a disclaimer to be made, or (iii) shares of stock held in such subaccount to be a qualifying stockholder in an S corporation, and so on]; and

(5)     Restrict in anyway, revocably or irrevocably, the future exercise of any power held by any beneficiary(ies) and/or Trustee(s) hereunder.

(c)     Notwithstanding the foregoing, however, under no circumstances (i) shall any Trustee, who is also a beneficiary of any such trust, participate in any amendment which may result in such Trustee beneficiary receiving any direct or indirect financial benefit from any such trust, nor (ii) shall any such amendment:

(1)     Extend the period of any such trust's existence beyond the already applicable rule against perpetuities limitation period specified in Section 9.1;

(2)     Diminish in any way (that is not controlled by the beneficiary) any enforceable right any beneficiary may already have (under the then terms of this instrument) to receive the income of any trust, currently or at any time in the future (but, to the extent that an amendment benefits or grants a power to a current beneficiary of any trust, it may diminish the rights of one or more beneficiaries to receive in the future

14

the income of that trust or of any trust subsequently to come into existence to hold part or all of the assets of that trust);

(3)     Reduce in any way the restrictions and limitations on (i) grantor and fiduciary actions as set forth in Section 2.1 above and Section 7.10 below, (ii) the Trustee's(s') limited power of amendment under this Section 6.10, and (iii) who (or what institutions) can qualify to fill any office of Trustee hereunder as set forth in Section 7 below, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on such trust or any of its beneficiaries [all of which provisions, referred to in (i), (i) and (iii) above, however, may be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Trustee(s) may deem appropriate];

(4)     Give (i) any Trustee any powers or discretions that are either granted exclusively to a Co-Trustee or from the exercise of which such Trustee is excluded for any reason, or (ii) anyone acting in a non-fiduciary capacity any powers granted herein to fiduciaries unless, in either case, such amendment will not have any adverse tax effect on such trust or any of its beneficiaries;

(5)     Result in any direct or indirect financial benefit to anyone who is not, at the time of such amendment, both (i) a member of the Initial Primary Beneficiary's family within the meaning of Section 2036(c)(3)(B) of the Internal Revenue Code (as it reads on the date of this instrument), and (ii) already a present or contingent beneficiary of such trust(s) (unless it is to provide for after-born or after-adopted children of any such beneficiary), except through the exercise of a power of appointment held by or granted to a person described in (i) and (ii) above;

(6)     Discriminate in any significant financial way in favor of one or more siblings to the detriment of any other sibling(s) where such siblings are, under the terms of this instrument, to be treated in substantially equal fashion (for this purpose treating each sibling, his or her spouse and descendants, and their spouses as one unit); nor

(7)     Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (i) any exemption from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust, or (ii) any substantial deduction, credit, exclusion or other tax benefit (such as any marital or charitable deduction, any annual gift tax exclusion, a Code Section 2032A or Section 2057 election, a generation-skipping tax exemption, the opportunity to be a stockholder in an S corporation, a significant grandfathered status under some changed law, and so on).

(d)     Any such amendment shall be by written instrument, executed by such amending Trustee(s) with all the formalities of a deed, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment.

# PEE PEE POP TRUST II

## CERTIFICATE OF TRUST EXISTENCE AND AUTHORITY

WE, THE UNDERSIGNED, CERTIFY THAT:

1.      The Pee Pee Pop Trust II Trust dated October 13, 2017, was created by Declaration of Trust entered into by the then Trustees of the Pee Pee Pop Trust dated July 22, 2013 (the "Trust Agreement").

2.      As of the date of the Certificate of Trust Existence and Authority, JOHN JOSEPH HURRY and JUSTINE HURRY, collectively, serve as Management Trustees, and, with their successors, collectively referred to as a "Trustee" or the "Trustees".

3.      The Trustees have such powers and authority provided in Section 6 of the Trust Agreement, a copy of which is attached hereto as **Exhibit A**.

4.      The Management Trustees have exercised their right to limit the powers of the Independent Trustee whereby the Management Trustees have exclusive control over business and investment decisions relating to the assets of the Trust.

5.      The Trust Agreement provides that no person dealing with, making payments to, or delivering property to a Trustee shall be obliged to inquire as to the powers of such Trustee, nor to see to the application of any money or property delivered to such Trustee.

6.      This Certification shall be construed under and regulated by the laws of the State of Nevada as are now or hereafter in effect.

7.      State law provides that any person refusing to accept this Certification shall be liable for damages, including attorneys' fees, if the court determines that the person acted in bad faith.

8.      The Trust Agreement is in full force and effect as of the present date.

9.      The Trust Agreement is Irrevocable.

10.     The Trust's taxpayer identification number is .

11.     Title to trust property shall be taken as follows:

John Joseph Hurry and Justine Hurry, as Management Trustees of the Pee Pee Pop Trust II dated October 13, 2017.

IN WITNESS WHEREOF, the undersigned Management Trustee of the Pee Pee Pop Trust II dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

**MANAGEMENT TRUSTEE:**

_____
JOHN JOSEPH HURRY

GEORGETOWN            )
                      ) ss:
GRAND CAYMAN          )

The undersigned Notary Public hereby certifies that JOHN JOSEPH HURRY, in his capacity as Management Trustee of the Pee Pee Pop Trust II dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that he executed the instrument as his free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this 16th day of October 2017.

_____
Notary Public

2

IN WITNESS WHEREOF, the undersigned Management Trustee of the Pee Pee Pop Trust II dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

**MANAGEMENT TRUSTEE:**

_____
JUSTINE HURRY

STATE OF ARIZONA     )
                     ) ss:
County of Maricopa   )

The undersigned Notary Public hereby certifies that JUSTINE HURRY, in her capacity as Management Trustee of the Pee Pee Pop Trust II dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that she executed the instrument as her free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this __16__ day of October 2017.

OFFICIAL SEAL
ERIC LYNN JOHNSON
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
APRIL 6, 2020

_____
Notary Public

3

## EXHIBIT A

6.      **TRUSTEE POWERS**

    6.1.    **Trustee Discretion and Direction.**

        6.1.1. **Discretion.**

        The powers set forth in this Section 6, as well as those now or hereafter conferred upon Trustees generally may be exercised by such Trustees in such manner as they, in their sole judgment and discretion, deem appropriate under the then circumstances (insofar as they can be reasonably ascertained by such Trustees) to carry out the trust purposes of protecting and conserving property for the beneficiaries, all without obtaining authority therefor from any court. No person dealing with the Trustees shall be bound to see to the application or disposition of cash or property transferred to or upon the order of the Trustees or to inquire into the authority, validity or propriety of any action of the Trustees.

        6.1.2. **"Prudent Person" Rule.**

        In addition to the investment powers conferred above, the Trustees are authorized (but are not directed) to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden by the "prudent person" rule. The Trustees may, in their sole discretion, invest in any type of property, wherever located, including any type of security or option, improved or unimproved real property, and tangible or intangible personal property, and in any manner, including direct purchase, joint ventures, partnerships, limited partnerships, corporations, mutual funds or any other form of participation or ownership whatsoever. In making investments, the Trustees may disregard all of the following factors:

        (a)     Whether a particular investment, or the trust investments collectively, will produce a reasonable rate of return or result in the preservation of principal.

        (b)     Whether the acquisition or retention of a particular investment, or the trust investments collectively, is consistent with any duty of impartiality as to the different beneficiaries. The Grantor intends that no such duty shall exist.

        (c)     Whether the trust is diversified. The Grantor intends that no duty to diversify shall exist.

        (d)     Whether any or all of the trust investments would traditionally be classified as too risky or speculative for trusts. The entire trust may be so invested. The Grantor intends the Trustees to have sole discretion in determining what constitutes acceptable risk and what constitutes proper investment strategy.

        The Grantor's purpose in granting the foregoing authority is to modify the prudent person rule insofar as the rule would prohibit an investment or investments because of one or more factors listed above, or any other factor relating to the nature of

4

the investment itself. Accordingly, the Trustees shall not be liable for any loss in value of an investment merely because of the nature of the investment or the degree of risk presented by the investment, but shall be liable if the Trustees' procedures in selecting and monitoring the investment are proven by affirmative evidence to have been negligent, and that such negligence was the proximate cause of the loss.

### 6.1.3. Enlarged Investment Perspective.

The investment policy of each Trustee hereunder shall be based primarily on the long-term best interests of the person or persons who, at the time, are entitled to trust income and only secondarily on the interests of remainder beneficiaries. If any Trustee considers it appropriate to determine the proportion of trust properties to be invested in (i) equities, and (ii) "fixed dollar" type assets, consideration should also be given to the amount and nature of all assets and means of support available from all sources to each income beneficiary to the extent known (even to the point of having all trust investments in one or the other type of holding). The soundness of trust investments shall be judged not on the basis of individual assets nor on the basis of the trust estate alone, but on the broader basis of each income beneficiary's economic circumstances as a whole, including said trust estate.

### 6.2.  In General.

With respect to each trust hereunder, during its existence and until such time after its termination as all of its assets have been distributed, its Trustee(s), in their discretion, shall have the power and are authorized to:

### 6.2.1. Investment Powers.

(a)  Enter upon and take possession of the trust property and invest and reinvest the same in real, personal and mixed assets, improved and unimproved, tangible and intangible, of any kind and nature whatsoever, foreign as well as domestic, that yield a high rate of income or no current income including, but without limitation, securities issued by an institution that is or may become a Trustee hereunder, common and preferred stocks (regardless of dividend arrearages), leverage type securities, options, puts and calls, fixed income bearing securities (secured or unsecured and notwithstanding default in interest), units of participation in limited partnerships, in real estate investment trusts and/or in common trust funds, investment trust stocks, mutual funds and other securities and investments of any kind, without regard to whether or not any such securities or investments are of a kind known to exist at the date of this instrument and whether or not any such investments shall be in (i) unseasoned or fledgling companies or securities that are (a) not listed on any stock exchange or public market nor registered with any securities commission, or (b) subject to contractual, legal or other restrictions (including "investment letter" restrictions), or (ii) oil, gas and other mineral interests and natural resources, leasehold interests (including agricultural, business, etc.), commodities, currencies, collectibles, insurance and/or annuity contracts of any kind on the life of any person or persons, life estates, remainder interests, etc., not being limited by any present or future investment law and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for

5

Trustee(s), all without regard to the "prudent man rule," to the relation any such investment may bear to the value of such trust or to the type or character of other investments in such trust, or to the effect such investment may have upon the diversification of the investments in such trust and even though such investment or reinvestment shall be when made or shall thereafter become unproductive of income, unmarketable, risky or speculative; and such investments may be purchased from or made in common with any person or persons, notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder; and any business partially or wholly owned by such trust may separately compensate any fiduciary and/or beneficiary hereunder for any services rendered directly to such business;

(b)     Retain, for as long as may be deemed desirable, all property in the form in which the same shall be acquired by such trust, without regard to any trust investment rules of any kind nor to the proportion that anyone asset or class of assets may bear to the whole and without liability for any loss that may be incurred thereby;

(c)     Sell (either for cash or partly for cash and partly on credit for any period, with or without security), option, convey, exchange (whether or not of like kind or similar use), lease (for any length of time regardless of the possible or actual prior termination of any trust), partition, plat, rezone, subdivide, improve and/or develop (and, where appropriate, dedicate for public use, demolish, construct, alter, reconstruct, change, etc.), repair, manage, operate or otherwise enter upon contracts or agreements regarding, deal with or dispose of any part or all of the trust property, whether real, personal or mixed, at any time, for any purpose or purposes, in any manner, either public or private, and upon any terms and with any party, including any who may be, directly or indirectly, a beneficiary or a fiduciary hereunder or an estate or trust of or for such a person;

(d)     Abandon or demolish any trust property deemed to be of insufficient value to warrant the expense of retention or abstain from the payment of taxes, liens, rents, assessments, repairs, etc. on such property and/or permit such property to be lost by tax sale, foreclosure or other proceedings, by conveyance for nominal or no consideration, or to charity;

(e)     Grant or release easements or charges of any kind (with or without consideration), effect and carry insurance (protecting against such hazards and liabilities as may be deemed advisable), renew or extend, amend, change or modify leases, grant options to lease and options to renew leases, all on such terms and conditions as may be deemed advisable and to pay any and all expenses in connection therewith;

(f)     Exercise or not exercise or otherwise deal with any and all options of any kind;

(g)     Vote, deal or consent, in person or by proxy (with or without power of substitution), including electing any Trustee or an employee or officer of any Trustee as a director or officer of any corporation, with respect to any securities, including

those of companies in which a Trustee may, directly or indirectly, have an interest of any kind;

(h)     Form or cause to be formed, alone or with others, such corporations, partnerships, limited partnerships and other business organizations organized under the laws of any state or country and to transfer and convey to such business organizations all or any part of the assets, real or personal, of any trust estate in exchange for stocks, bonds, notes, other securities or interest of such business organizations as the Trustees, in their absolute discretion, deem advisable;

(i)     Rent office space, whether or not from, or in conjunction with any such space being used by any beneficiary hereunder, or any relative of the Initial Primary Beneficiary or of any beneficiary hereunder, or any fiduciary hereunder in his, her or its individual capacity, and to pay the expenses thereof from the principal of the respective trust estate;

(j)     Enforce, abandon, adjust, arbitrate, compromise, sue on, prosecute and/or defend, and otherwise deal with and settle, on such terms as such Trustee(s) in good faith may deem advisable, even if the result would substantially diminish the trust property and/or materially affect the trust plan (whether or not with concurrence of the beneficiaries), any and all claims in favor of or against such trust, including those relating to tax matters;

(k)     Borrow money for the payment of taxes, the exercise of options, or for any other purpose or purposes Whatsoever, from any source, including the commercial department of any corporate Trustee hereunder, on the general credit of any trust property, and to pledge or mortgage any or all of said property as security for the repayment of such loans and/or of any loan, new or old, from any third party(ies) to any beneficiary hereunder and/or to any trust, estate or company in which any beneficiary and/or any trust hereunder has an interest, and to guarantee any such third party loans, and to pay interest on and to renew, extend, modify, reduce and/or payoff, from time to time, any such indebtedness incurred by such Trustee(s) or any of their predecessors in interest;

(l)     Loan money to anyone, including any beneficiary of that trust or of any trust hereunder (including any beneficiary who may at the time also be a fiduciary hereunder), or to any estate, trust or company in which such person or any trust hereunder has an interest, for any purpose Whatsoever, with or without security and at such rate of interest as the Trustee(s) of such trust shall determine in the exercise of reasonable fiduciary discretion, and, with respect to such loans and/or security interests, to renew, extend, modify, grant waivers, etc.; and

(m)     Hold, retain, purchase or sell legal life estates, interests for a term of years, remainder interests, etc., whether or not they yield a reasonable rate of return or no current return, whether or not they result in the preservation of principal, and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper for Trustees. Such investments may be purchased from or made in conjunction with any persons notwithstanding that any such person may control such

7

investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder. The purchase or sales price for any transactions hereunder may, but need not, be determined under the Treasury Department Regulation Section 25.2512-9, as amended, or any successor regulation or tables.

### 6.2.2. Administrative Powers.

(a)     Open checking, savings, custody, agency and cash and margin brokerage accounts and safe deposit boxes with any institution(s) empowered to accept the same, including any that may be a Trustee hereunder, either (i) in their names or any of their names (with or without disclosing fiduciary capacity), (ii) in the name of such trust (where an account is in the name of a trust, checks on that account and authorized signatures need not disclose the fiduciary nature of the account or refer to any trust or Trustee), or (iii) in the name of such trust's nominee(s), depositing therein any part or all of the funds and securities of such trust, and withdrawals therefrom and access thereto shall be permitted on the signature of anyone or more of the Trustees and/or nominees, with the right and power to authorize withdrawals and/or access on the sole signature of any agent or agents designated in writing by such Trustees;

(b)     Employ such accountants, custodians, experts, counsel (legal and/or investment), and other agents as may be deemed advisable (notwithstanding that such person or entity may be, or be affiliated in business with, any Trustees hereunder) and delegate discretionary powers to and rely upon information or advice furnished by them;

(c)     Exercise all tax related elections, choices, etc. that they may have (whether or not specifically referred to in Section 8.1, including (i) the disclaimer of benefits receivable by such trust in any manner permitted by law or by a "transfer" meeting the requirements of Section 2518(c)(3) of the Internal Revenue Code, and (ii) the entering into of closing agreements relating to any trust matters (which shall be binding on all present and future trust beneficiaries), and to pay any income or similar tax properly imposed on or to be borne by such trust and any estate, inheritance, succession, generation-skipping or other similar tax that, under applicable tax and apportionment laws, is properly imposed upon or with respect to any property held (or being distributed) hereunder, such payment to be charged to such property;

(d)     Make, execute and deliver any and all such instruments in writing as shall be necessary and proper to carry out any disposition whatever of any trust property;

(e)     Carry securities or other properties requiring or permitting of registration or recording in their names, in anyone of their names, in the name of their nominee or nominees (with or without designation of fiduciary capacity), or unregistered (or in such form as will pass by delivery);

(f)     Exercise, in general, all such control and power over the trust property as an individual might exercise with respect to his own property;

8

(g)     Compromise, submit to arbitration, release, with or without consideration, or otherwise adjust claims in favor of or against any trust; and

(h)     Institute, compromise and defend actions and proceedings.

### 6.3.    Provisions Regarding Life Insurance.

#### 6.3.1. Powers Regarding Life Insurance Held in Trust.

The Trustees of each trust hereunder, other than any individual Trustee whose life may be insured under the life insurance policy in question, shall have and, in its sole discretion, may exercise all of the incidents of ownership in each and every policy of life insurance which may at any time be owned or purchased by the trust. The term "incidents of ownership" with respect to a policy shall include, by way of illustration and not limitation, the right to collect, receive and retain all payments, dividends, surrender values, sickness, accident, disability, retirement or other benefits, including all death benefits, maturing on such policy during the insured's lifetime and thereafter, as well as the right at any time to transfer, assign, sell, pledge, hypothecate, borrow on, surrender, prepay, convert, divide, change the beneficiary of, and/or exercise or select any options, elections and waivers with respect to such policy. All other provisions of this instrument to the contrary notwithstanding, any individual trustee whose life is insured under a trust owned policy under no circumstances shall be entitled to partake in any way in decisions relating to such policy (and in the absence of another then acting trustee, no incidents of ownership as to such policy shall be exercised).

#### 6.3.2. Payment of Premiums.

The payment of premiums on each policy owned by a trust hereunder shall be charged against the principal of that trust unless the Trustee of such trust (other than any who might be financially affected thereby), in the exercise of reasonable discretion, shall determine to charge such premiums against the income of such trust on the basis of that being (i) in the best interests of the present and future beneficiaries of such trust, and (ii) not contrary to the provisions of Section 7.8 above.

#### 6.3.3. Limitations Regarding Life Insurance Held in Trust.

Furthermore and also notwithstanding all other provisions of this Trust Agreement, if any insurance on the life of a beneficiary of a trust hereunder is an asset of such trust, such insurance and all proceeds thereof shall be excluded from the assets which might otherwise be subject to any use, enjoyment, withdrawal or appointment by that beneficiary (and on such beneficiary's death, such proceeds shall be disposed of as though any power of appointment held by such beneficiary had not been exercised).

#### 6.3.4. Collection of Death and Disability Benefits by Trustee.

(a)     Upon the receipt of notice, believed to be reliable, of the death or disability of anyone who (i) is insured by any policy (including accident and disability

9

policies of all kinds) which may be payable to any trust hereunder, or (ii) on account of whose death or disability any benefit may be payable to any trust hereunder, the Trustee of such trust shall use its best efforts to enforce such trust's rights (including the election of such annuity, installment, lump sum or other mode of settlement options as the Trustee may deem appropriate for the trust) with respect to each and every such policy upon such person's life or other benefit relating to such person's life which such Trustee believes may be payable in any way to such trust. For that purpose, such Trustee shall have full power to (i) execute and deliver any receipts and/or other instruments; (ii) compromise or adjust disputed claims in such manner as, in its sole discretion, it shall deem just (and its decision in this regard shall be final and binding upon all interested parties); and (iii) take such other actions, including the institution of proceedings at law or in equity, as in its judgment may seem necessary and proper to enforce payment of any sums which may be due to such trust under the terms of such policies or other death or disability arrangements.

(b)     Notwithstanding the foregoing, if the full payment on any death or disability benefit or policy proceeds is contested, such Trustee shall not be obligated, except at its option, to take any action for collection until it shall have been indemnified to its satisfaction against any loss, liability or expense, including attorneys' fees, which might be incurred thereby. Under these circumstances, however, such Trustee is authorized, in its sole discretion, to use any of such trust's assets to pay or reimburse itself for the costs of thus enforcing any such benefits and proceeds.

(c)     No insurance company, employer, plan administrator or other stakeholder making any payment to any Trustee hereunder shall be required to see to the use or application of such payment.

### 6.3.5. Insurance Incidents of Ownership in Independent Trustee.

The Trustee is authorized to continue to hold as part of the trust estate any insurance policy or policies on the life of a primary beneficiary's spouse which shall be distributed to the Trustee as part of the trust estate. The Independent Trustee solely shall hold all powers conferred on the owner of any such policy or policies and shall designate the trust as beneficiary of all such policies.

### 6.4.   Residences.

In addition to all other powers herein granted to the Trustees, the Trustee of each trust created hereunder is specifically authorized to hold and maintain any residence (whether held as real property, condominium or cooperative apartment) for the use and benefit of the beneficiaries of any trust. If the Trustees, in their sole and absolute discretion, determine that it would be in the best interests of the beneficiaries of any trust to maintain a residence for their use but that the residence owned by the Trustees should not be used for such purpose, the Trustees are authorized to sell said residence and to apply the net proceeds of sale to the purchase of such other residence or to make such other arrangements as the Trustees, in their sole and absolute discretion, deem suitable for the purpose. Any proceeds of sale not needed for reinvestment in a residence as provided above shall be added to the principal of this trust and thereafter held,

10

administered and disposed of as a part thereof. The Trustees are authorized to pay all carrying charges of such residence, including, but not limited to, any taxes, assessments and maintenance thereon, and all expenses of the repair and operation thereof, including the employment of domestic servants and other expenses incident to the running of a household for the benefit of the beneficiaries of the trust. Having in mind the extent to which funds will be available for expenditure for the benefit of the beneficiaries, the Trustees are authorized to expend such amounts as they, in their sole and absolute discretion, shall determine to maintain the current lifestyle of the beneficiaries, including, but not limited to, complete authority to provide for their personal care and comfort in any manner whatsoever.

### 6.5. Properties and Companies Owned in Common with Others.

The Trustee(s) of each trust hereunder are specifically authorized, with or without the joinder of other owners of property or securities related to any that may be held in such trust (and notwithstanding that one or more such other owners may be, directly or indirectly, a beneficiary or a fiduciary hereunder), to enter upon and carry out any plan (i) for the foreclosure, lease or sale of any trust property, (ii) for the consolidation or merger, dissolution or liquidation, incorporation or reincorporation, recapitalization, reorganization or readjustment of the capital or financial structure of any corporation, company or association, the securities of which, whether closely held or publicly traded, may form a part of such trust, or (iii) for the creation of one or more holding companies to hold any such securities and/or properties (even if it leaves, following the termination of such trust, a trust beneficiary as a minority shareholder in such a holding company), all as such Trustee(s) may deem expedient or advisable for the furtherance of the interests of such trust and the carrying out of the Grantor's original intent as to such trust and as to those properties and/or securities. In carrying out such plan, such Trustee(s) may deposit any such securities or properties, pay any assessments, expenses and sums of money, give investment letters and other assurances, receive and, subject to the requirements of Section 6.6 below, retain as Investments of such trust any new properties or securities transferred or issued as a result thereof, whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), and generally do any act with reference to such holdings as might be done by any person owning similar securities or properties in his own right, including the exercise of conversion, subscription, purchase or other rights or options, the entrance into voting trusts, etc., all without obtaining authority therefor from any court.

### 6.6. Authority to Operate Businesses.

If an interest in any business, whether in the form of a general or limited partnership or sole proprietorship, at any time becomes an asset of any trust hereunder (by purchase, gift, the entrance of the trust into such business or otherwise), its Trustee(s) shall have the authority to engage in and to continue such trust in such business for such period, without limit, as such Trustee(s), in their sole judgment, may deem best for such trust (but only as long as such activity does not constitute "carrying on business" within the meaning of the federal tax laws defining associations taxable as a corporation) and, for that purpose, such Trustee(s) may retain and employ the capital in said business

11

that shall at the time of trust acquisition be committed thereto or employed therein and such additional capital as such Trustee(s), in their sole judgment, shall think fit to advance from time to time out of such trust's other resources, whether for continuation or expansion or any other purpose; and such Trustee(s), in their sole discretion, may incorporate a part or all of said business (or any investment held in such trust) in one or more corporations, with whatever capital structure may be deemed appropriate, alone or with others, in any jurisdiction, and/or form partnerships in which such trust may be a general or limited partner, and/or enter into joint ventures or associations with others on such terms as may be deemed appropriate, and/or enter into agreements respecting voting rights, management, incentive compensation, profit sharing, future sale or retention, etc., all without obtaining authority therefor from any court, and such Trustee(s), while acting in good faith, shall be free from any responsibility for losses arising in the prosecution of such business.

### 6.7. Mineral and Oil and Gas Operations.

With respect to any and all mineral and oil and gas interests of any kind, regardless of where located, that may at any time form a part of or be acquired by any trust hereunder, the powers and discretions herein granted to Trustee(s) shall be broadly construed, regardless of technical terminology, to permit any contract, act or thing that may be deemed by the Trustee(s) of such trust to be advantageous to such trust, whether or not the same be now or hereafter recognized as common or proper practice by or among those engaged in the business of prospecting for, developing, producing, processing, transporting and/or marketing any such minerals, properties or interests. Without limiting the generality of the foregoing, such Trustee(s) are also specifically authorized and empowered, in their sole discretion as they may deem necessary or desirable, with respect to any and all such interests, to:

(a)     Pay all delay rentals, lease bonuses, royalties, overriding royalties, bottom hole or dry hole contributions, local taxes and assessments and all other proper charges;

(b)     Make farm out agreements, engage in secondary recovery operations and enter into and execute pooling and/or unitization agreements and/or agreements for the installation and/or operation of absorption, repressuring and/or other processing plants;

(c)     Retain, sell, assign, transfer, lease, exchange, mortgage, pledge or otherwise hypothecate, surrender or abandon, with or without condition, either in cash or in kind, any or all of such interests (including making reservations and exacting conditions on the transfer of any such interests);

(d)     Drill, test, explore, mine, develop, operate and otherwise exploit, directly or by contract with others, any and all such interests to any extent;

(e)     Produce, process, sell or exchange all products recovered through the exploitation of such interests;

12

(f)     Exercise, in accordance with their best judgment, any right, power or privilege (including, but not by way of limitation, the right to consent to participate or to not participate in wells to be drilled) that the Trustee(s) or any predecessor in interest may have under any agreement that may have been entered into in connection with any of such interests;

(g)     Select, employ and enter into any appropriate business form in which to properly exploit such interests, including corporations, partnerships, limited partnerships, mining partnerships, joint ventures and co-tenancies;

(h)     Hire all necessary personnel, rent office space, buy or lease office equipment, contract and pay for geological surveys and studies, procure appraisals, rely on expert advice and generally conduct and engage in any and all activities incident to the foregoing powers set forth in Paragraphs (a) through (g), inclusive, with full power to borrow and pledge in order to finance such activities; and

(i)     Exercise broad and liberal discretion in making allocations under Section 5.3 above, notwithstanding the technical nature of any receipt or disbursement, notwithstanding any local law or custom to the contrary, and without being required to allocate to principal any reserve for depletion.

Such Trustee(s) are further hereby granted any other power that they deem necessary in order to properly conserve, develop, exploit and administer the interests described in this section, including the power to dispose of such interests in any manner and at any price, either in cash or in property, that they, in the exercise of their best judgment, deem reasonable at the time of such disposition. All fiduciaries hereunder shall be exonerated from liability for honest errors in judgment in connection with the exercise of the powers described in this section.

### 6.8.    Agricultural Realty and Farming Operations.

With respect to any real property used or useable for agricultural purposes and/or farming operation of any kind, regardless of its nature, that may at any time become an asset of any trust hereunder, its Trustee(s) shall have the authority to:

(a)     Operate all property and interests in property relating to such operation with hired labor, tenants and/or sharecroppers (including any who may be a beneficiary, Trustees and/or the Grantor hereunder), as such Trustee(s) from time to time deem best;

(b)     Hire a farm manager or professional farm management service to supervise such operation or operations;

(c)     Lease or rent land, equipment and/or livestock for cash or on shares, either to others or from others (including related parties and/or Trustee(s));

(d)     Sell, purchase, exchange and/or otherwise acquire or dispose of farm machinery, livestock, farm products, crops, timber, supplies and services used in

13

connection with the property or any acreage or parcel of real estate constituting farm property;

(e)     Remove, construct, repair and improve fences, structures and buildings of all kinds on the property;

(f)     Fertilize, terrace, clear, level, ditch and/or drain farm lands;

(g)     Install irrigation systems, carry on reforestation and, in general, follow soil conservation and other practices designed to conserve, improve and maintain the fertility and productivity of the soil;

(h)     Enter into agreements and/or programs with any governmental agency relating to soil conservation, acreage reduction, agricultural, recreational or other similar purposes;

(i)     Carry on both crop and livestock programs, including the breeding, raising, purchasing and/or selling of livestock and any other farm products whatsoever; and

(j)     Borrow money and pledge harvested or growing crops, timber or livestock and mortgage or pledge farm property of any kind.

Regarding all such agricultural real property and farming operations, no Trustee shall be liable for any losses except as such losses are caused by that Trustee's bad faith or intentional misconduct. Furthermore, during such time as there is a Management Trustee acting with respect to any trust that owns or leases real property used or useable for agricultural purposes or that is thus involved in farming operations, that Management Trustee shall completely control and manage all of such trust's agricultural real property and/or farming operations and the Independent Trustee(s) of such trust shall not have any responsibility whatsoever with respect to such property and/or operations (except to approve acts of self-dealing under Section 6.10, below), and to receive amounts of cash due the income or principal accounts of such trust from such property and/or operations and to provide such Management Trustee with all funds that such Management Trustee calls for, either from the income or principal account of such trust, in connection with such property and/or operations.

### 6.9.    Assistance to Estates and Trusts of Interested Persons.

The Trustee(s) of each trust hereunder are authorized, in the exercise of their discretion, to purchase and retain, as a trust investment, securities or other properties, for a fair consideration in money or money's worth, from the fiduciaries of the estate (and/or revocable trust) of the Grantor, the Grantor's spouse, the Initial Primary Beneficiary, the Initial Primary Beneficiary's spouse, and each of the Initial Primary Beneficiary's descendants (and each of their spouses), from the fiduciaries of each other separate trust hereunder, and from the fiduciaries of the estate (and/or revocable trust) of each deceased beneficiary of each trust hereunder (and each of their spouses) and to make loans to such fiduciaries, with or without security and at such rate of interest or no

14

interest, all as such Trustee(s) shall determine to be appropriate in carrying out what they alone judge would be the Grantor's original intent under the circumstances. The propriety of any such purchase and/or loan and of the terms thereof shall not be questioned merely because any of the fiduciaries or beneficiaries of such estate or trust may also be a Trustee hereunder.

### 6.10.   Permitted Self-Dealing.

Financial transactions, both direct and indirect, between any trust and any of the Trustee(s), beneficiaries and/or the Grantor of that trust (including, for instance, the purchase, sale or leasing of property, employment in any capacity, lending, etc.), whether or not specifically described in this article as permitted between such parties, except to the extent expressly prohibited by this instrument, are hereby expressly authorized, notwithstanding any rule of law relating to self-dealing, provided only that the Trustee(s), in thus acting either on behalf of or with or for such trust, shall act in good faith to assure that such trust receives in such transaction adequate and full consideration in money or money's worth.

### 6.11.   Limited Power of Amendment.

(a)      In the case of each separate trust at any time in existence hereunder, such trust's then Trustee(s), other than any (i) who has ever made a gift transfer to such trust, or (ii) who is prohibited by the provisions of Paragraph (c)(1) below from participating in the amendment involved, from time to time may, notwithstanding any other provision of this instrument, amend or restate this instrument, including its dispositive, administrative and other provisions of all kinds, in order to permit such Trustee(s):

(1)      To cope with tax and/or other circumstantial changes that may affect such trust and/or its beneficiaries, and/or

(2)      To remove from the governing trust instrument any provisions which have become "deadwood" (i.e., no longer operative in the ongoing administration of such trust due to changed circumstances)

with respect to (i) such trust, and (ii) all trusts that are subsequently to come into existence under this instrument to hold part or all of the assets of such trust, in whatever way or ways such Trustee(s), in the exercise of such Trustee's(s') sole discretion, may deem appropriate in the best interests, as interpreted by such Trustee(s) alone, of the primary beneficiary(ies) of such trust(s) and of each such beneficiary's family as a whole. Such Trustee(s) shall be guided by what, in the sole judgment of such Trustee(s) alone, would apparently be the Grantor's original intent hereunder in the light of the changed circumstances.

(b)      This power of amendment shall include, by way of example and not limitation, the power to:

(1)      Grant, reduce or eliminate general (as defined in Section 2041 of the Internal Revenue Code) and special powers of appointment with respect to part or

15

all of any trust property (such powers may be made subject to any conditions or consents and limited to such objects as may be described in the grant or reduction of each power);

(2)     Add mandatory distribution or set aside provisions for one or more beneficiaries or Permissible Distributees;

(3)     Divide a trust at any time (before or after it is funded with assets) into two or more separate trusts (representing fractional shares of any property being divided) or merge separate trusts together;

(4)     Provide for the creation of one or more separate subaccounts (equivalent to a separate trust) in any trust hereunder with respect to which subaccount more restrictive or other administrative or dispositive provisions are made applicable in order to permit some or all of the properties or interests that may at any time be held in or allocable to that trust to be segregated and transferred to that subaccount to achieve some tax or other benefit that would otherwise not be available to such property or interest or to the primary beneficiary or one or more of the other current beneficiaries of that trust [such as, by way of example and not limitation, to permit (i) such property, interest or beneficiary to qualify for some governmental or tax benefit, generation-skipping transfer tax exemption or Code Section 2032A election, (ii) a disclaimer to be made, or (iii) shares of stock held in such subaccount to be a qualifying stockholder in an S corporation, and so on]; and

(5)     Restrict in anyway, revocably or irrevocably, the future exercise of any power held by any beneficiary(ies) and/or Trustee(s) hereunder.

(c)     Notwithstanding the foregoing, however, under no circumstances (i) shall any Trustee, who is also a beneficiary of any such trust, participate in any amendment which may result in such Trustee beneficiary receiving any direct or indirect financial benefit from any such trust, nor (ii) shall any such amendment:

(1)     Extend the period of any such trust's existence beyond the period specified in Section 8.1;

(2)     Diminish in any way (that is not controlled by the beneficiary) any enforceable right any beneficiary may already have (under the then terms of this instrument) to receive the income of any trust, currently or at any time in the future (but, to the extent that an amendment benefits or grants a power to a current beneficiary of any trust, it may diminish the rights of one or more beneficiaries to receive in the future the income of that trust or of any trust subsequently to come into existence to hold part or all of the assets of that trust);

(3)     Reduce in any way the restrictions and limitations on (i) grantor and fiduciary actions as set forth in Section 2.1 above and Section 7.8 below, (ii) the Trustee's(s') limited power of amendment under this Section 6.11, and (iii) who (or what institutions) can qualify to fill any office of Trustee hereunder as set forth in Section 7 below, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on such trust or any of its beneficiaries [all of which provisions, referred to in (i),

(i) and (iii) above, however, may be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Trustee(s) may deem appropriate];

(4)     Give (i) any Trustee any powers or discretions that are either granted exclusively to a Co-Trustee or from the exercise of which such Trustee is excluded for any reason, or (ii) anyone acting in a non-fiduciary capacity any powers granted herein to fiduciaries unless, in either case, such amendment will not have any adverse tax effect on such trust or any of its beneficiaries;

(5)     Result in any direct or indirect financial benefit to anyone who is not, at the time of such amendment, both (i) a member of the Initial Primary Beneficiary's family within the meaning of Section 2036(c)(3)(B) of the Internal Revenue Code (as it reads on the date of this instrument), and (ii) already a present or contingent beneficiary of such trust(s) (unless it is to provide for after-born or after-adopted children of any such beneficiary), except through the exercise of a power of appointment held by or granted to a person described in (i) and (ii) above;

(6)     Discriminate in any significant financial way in favor of one or more siblings to the detriment of any other sibling(s) where such siblings are, under the terms of this instrument, to be treated in substantially equal fashion (for this purpose treating each sibling, his or her spouse and descendants, and their spouses as one unit); nor

(7)     Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (i) any exemption from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust, or (ii) any substantial deduction, credit, exclusion or other tax benefit (such as any marital or charitable deduction, any annual gift tax exclusion, a Code Section 2032A or Section 2057 election, a generation-skipping tax exemption, the opportunity to be a stockholder in an S corporation, a significant grandfathered status under some changed law, and so on).

(d)     Any such amendment shall be by written instrument, executed by such amending Trustee(s) with all the formalities of a deed, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment

17

## PEE PEE POP TRUST III
## CERTIFICATE OF TRUST EXISTENCE AND AUTHORITY

WE, THE UNDERSIGNED, CERTIFY THAT:

1.     The Pee Pee Pop Trust III Trust dated October 13, 2017, was created by Declaration of Trust entered into by the then Trustees of the Pee Pee Pop Trust dated July 22, 2013 (the "Trust Agreement").

2.     As of the date of the Certificate of Trust Existence and Authority, JOHN JOSEPH HURRY and JUSTINE HURRY, collectively, serve as Management Trustees and, with their successors, collectively referred to as a "Trustee" or the "Trustees".

3.     The Trustees have such powers and authority provided in Section 6 of the Trust Agreement, a copy of which is attached hereto as **Exhibit A**.

4.     The Management Trustees have exercised their right to limit the powers of the Independent Trustee whereby the Management Trustees have exclusive control over business and investment decisions relating to the assets of the Trust.

5.     The Trust Agreement provides that no person dealing with, making payments to, or delivering property to a Trustee shall be obliged to inquire as to the powers of such Trustee, nor to see to the application of any money or property delivered to such Trustee.

6.     This Certification shall be construed under and regulated by the laws of the State of Nevada as are now or hereafter in effect.

7.     State law provides that any person refusing to accept this Certification shall be liable for damages, including attorneys' fees, if the court determines that the person acted in bad faith.

8.     The Trust Agreement is in full force and effect as of the present date.

9.     The Trust Agreement is Irrevocable.

10.    The Trust's taxpayer identification number is

11.    Title to trust property shall be taken as follows:

John Joseph Hurry and Justine Hurry, as Management Trustees of the Pee Pee Pop Trust III dated October 13, 2017.

IN WITNESS WHEREOF, the undersigned Management Trustee of the Pee Pee Pop Trust III dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

MANAGEMENT TRUSTEE:

_____
JOHN JOSEPH HURRY

GEORGETOWN      )
                    ) ss:
GRAND CAYMAN  )

The undersigned Notary Public hereby certifies that JOHN JOSEPH HURRY, in his capacity as Management Trustee of the Pee Pee Pop Trust III dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that he executed the instrument as his free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this _16_ day of October 2017.

_____
Notary Public

2

IN WITNESS WHEREOF, the undersigned Management Trustee of the Pee Pee Pop Trust III dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

**MANAGEMENT TRUSTEE:**

JUSTINE HURRY

STATE OF ARIZONA      )
                                            ) ss:
County of Maricopa      )

The undersigned Notary Public hereby certifies that JUSTINE HURRY, in her capacity as Management Trustee of the Pee Pee Pop Trust III dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that she executed the instrument as her free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this __16__ day of October 2017.

OFFICIAL SEAL
ERIC LYNN JOHNSON
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
APRIL 6, 2020

Notary Public

3

## EXHIBIT A

6.    **TRUSTEE POWERS**

    6.1.   **Trustee Discretion and Direction.**

        6.1.1. **Discretion**.

        The powers set forth in this Section 6, as well as those now or hereafter conferred upon Trustees generally may be exercised by such Trustees in such manner as they, in their sole judgment and discretion, deem appropriate under the then circumstances (insofar as they can be reasonably ascertained by such Trustees) to carry out the trust purposes of protecting and conserving property for the beneficiaries, all without obtaining authority therefor from any court. No person dealing with the Trustees shall be bound to see to the application or disposition of cash or property transferred to or upon the order of the Trustees or to inquire into the authority, validity or propriety of any action of the Trustees.

        6.1.2. **"Prudent Person" Rule.**

        In addition to the investment powers conferred above, the Trustees are authorized (but are not directed) to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden by the "prudent person" rule. The Trustees may, in their sole discretion, invest in any type of property, wherever located, including any type of security or option, improved or unimproved real property, and tangible or intangible personal property, and in any manner, including direct purchase, joint ventures, partnerships, limited partnerships, corporations, mutual funds or any other form of participation or ownership whatsoever. In making investments, the Trustees may disregard all of the following factors:

        (a)   Whether a particular investment, or the trust investments collectively, will produce a reasonable rate of return or result in the preservation of principal.

        (b)   Whether the acquisition or retention of a particular investment, or the trust investments collectively, is consistent with any duty of impartiality as to the different beneficiaries. The Grantor intends that no such duty shall exist.

        (c)   Whether the trust is diversified. The Grantor intends that no duty to diversify shall exist.

        (d)   Whether any or all of the trust investments would traditionally be classified as too risky or speculative for trusts. The entire trust may be so invested. The Grantor intends the Trustees to have sole discretion in determining what constitutes acceptable risk and what constitutes proper investment strategy.

        The Grantor's purpose in granting the foregoing authority is to modify the prudent person rule insofar as the rule would prohibit an investment or investments because of one or more factors listed above, or any other factor relating to the nature of

the investment itself. Accordingly, the Trustees shall not be liable for any loss in value of an investment merely because of the nature of the investment or the degree of risk presented by the investment, but shall be liable if the Trustees' procedures in selecting and monitoring the investment are proven by affirmative evidence to have been negligent, and that such negligence was the proximate cause of the loss.

### 6.1.3. Enlarged Investment Perspective.

The investment policy of each Trustee hereunder shall be based primarily on the long-term best interests of the person or persons who, at the time, are entitled to trust income and only secondarily on the interests of remainder beneficiaries. If any Trustee considers it appropriate to determine the proportion of trust properties to be invested in (i) equities, and (ii) "fixed dollar" type assets, consideration should also be given to the amount and nature of all assets and means of support available from all sources to each income beneficiary to the extent known (even to the point of having all trust investments in one or the other type of holding). The soundness of trust investments shall be judged not on the basis of individual assets nor on the basis of the trust estate alone, but on the broader basis of each income beneficiary's economic circumstances as a whole, including said trust estate.

### 6.2.   In General.

With respect to each trust hereunder, during its existence and until such time after its termination as all of its assets have been distributed, its Trustee(s), in their discretion, shall have the power and are authorized to:

### 6.2.1. Investment Powers.

(a)    Enter upon and take possession of the trust property and invest and reinvest the same in real, personal and mixed assets, improved and unimproved, tangible and intangible, of any kind and nature whatsoever, foreign as well as domestic, that yield a high rate of income or no current income including, but without limitation, securities issued by an institution that is or may become a Trustee hereunder, common and preferred stocks (regardless of dividend arrearages), leverage type securities, options, puts and calls, fixed income bearing securities (secured or unsecured and notwithstanding default in interest), units of participation in limited partnerships, in real estate investment trusts and/or in common trust funds, investment trust stocks, mutual funds and other securities and investments of any kind, without regard to whether or not any such securities or investments are of a kind known to exist at the date of this instrument and whether or not any such investments shall be in (i) unseasoned or fledgling companies or securities that are (a) not listed on any stock exchange or public market nor registered with any securities commission, or (b) subject to contractual, legal or other restrictions (including "investment letter" restrictions), or (ii) oil, gas and other mineral interests and natural resources, leasehold interests (including agricultural, business, etc.), commodities, currencies, collectibles, insurance and/or annuity contracts of any kind on the life of any person or persons, life estates, remainder interests, etc., not being limited by any present or future investment law and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for

5

Trustee(s), all without regard to the "prudent man rule," to the relation any such investment may bear to the value of such trust or to the type or character of other investments in such trust, or to the effect such investment may have upon the diversification of the investments in such trust and even though such investment or reinvestment shall be when made or shall thereafter become unproductive of income, unmarketable, risky or speculative; and such investments may be purchased from or made in common with any person or persons, notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder; and any business partially or wholly owned by such trust may separately compensate any fiduciary and/or beneficiary hereunder for any services rendered directly to such business;

(b)    Retain, for as long as may be deemed desirable, all property in the form in which the same shall be acquired by such trust, without regard to any trust investment rules of any kind nor to the proportion that anyone asset or class of assets may bear to the whole and without liability for any loss that may be incurred thereby;

(c)    Sell (either for cash or partly for cash and partly on credit for any period, with or without security), option, convey, exchange (whether or not of like kind or similar use), lease (for any length of time regardless of the possible or actual prior termination of any trust), partition, plat, rezone, subdivide, improve and/or develop (and, where appropriate, dedicate for public use, demolish, construct, alter, reconstruct, change, etc.), repair, manage, operate or otherwise enter upon contracts or agreements regarding, deal with or dispose of any part or all of the trust property, whether real, personal or mixed, at any time, for any purpose or purposes, in any manner, either public or private, and upon any terms and with any party, including any who may be, directly or indirectly, a beneficiary or a fiduciary hereunder or an estate or trust of or for such a person;

(d)    Abandon or demolish any trust property deemed to be of insufficient value to warrant the expense of retention or abstain from the payment of taxes, liens, rents, assessments, repairs, etc. on such property and/or permit such property to be lost by tax sale, foreclosure or other proceedings, by conveyance for nominal or no consideration, or to charity;

(e)    Grant or release easements or charges of any kind (with or without consideration), effect and carry insurance (protecting against such hazards and liabilities as may be deemed advisable), renew or extend, amend, change or modify leases, grant options to lease and options to renew leases, all on such terms and conditions as may be deemed advisable and to pay any and all expenses in connection therewith;

(f)    Exercise or not exercise or otherwise deal with any and all options of any kind;

(g)    Vote, deal or consent, in person or by proxy (with or without power of substitution), including electing any Trustee or an employee or officer of any Trustee as a director or officer of any corporation, with respect to any securities, including

6

those of companies in which a Trustee may, directly or indirectly, have an interest of any kind;

(h)     Form or cause to be formed, alone or with others, such corporations, partnerships, limited partnerships and other business organizations organized under the laws of any state or country and to transfer and convey to such business organizations all or any part of the assets, real or personal, of any trust estate in exchange for stocks, bonds, notes, other securities or interest of such business organizations as the Trustees, in their absolute discretion, deem advisable;

(i)     Rent office space, whether or not from, or in conjunction with any such space being used by any beneficiary hereunder, or any relative of the Initial Primary Beneficiary or of any beneficiary hereunder, or any fiduciary hereunder in his, her or its individual capacity, and to pay the expenses thereof from the principal of the respective trust estate;

(j)     Enforce, abandon, adjust, arbitrate, compromise, sue on, prosecute and/or defend, and otherwise deal with and settle, on such terms as such Trustee(s) in good faith may deem advisable, even if the result would substantially diminish the trust property and/or materially affect the trust plan (whether or not with concurrence of the beneficiaries), any and all claims in favor of or against such trust, including those relating to tax matters;

(k)     Borrow money for the payment of taxes, the exercise of options, or for any other purpose or purposes Whatsoever, from any source, including the commercial department of any corporate Trustee hereunder, on the general credit of any trust property, and to pledge or mortgage any or all of said property as security for the repayment of such loans and/or of any loan, new or old, from any third party(ies) to any beneficiary hereunder and/or to any trust, estate or company in which any beneficiary and/or any trust hereunder has an interest, and to guarantee any such third party loans, and to pay interest on and to renew, extend, modify, reduce and/or payoff, from time to time, any such indebtedness incurred by such Trustee(s) or any of their predecessors in interest;

(l)     Loan money to anyone, including any beneficiary of that trust or of any trust hereunder (including any beneficiary who may at the time also be a fiduciary hereunder), or to any estate, trust or company in which such person or any trust hereunder has an interest, for any purpose Whatsoever, with or without security and at such rate of interest as the Trustee(s) of such trust shall determine in the exercise of reasonable fiduciary discretion, and, with respect to such loans and/or security interests, to renew, extend, modify, grant waivers, etc.; and

(m)     Hold, retain, purchase or sell legal life estates, interests for a term of years, remainder interests, etc., whether or not they yield a reasonable rate of return or no current return, whether or not they result in the preservation of principal, and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper for Trustees. Such investments may be purchased from or made in conjunction with any persons notwithstanding that any such person may control such

7

investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder. The purchase or sales price for any transactions hereunder may, but need not, be determined under the Treasury Department Regulation Section 25.2512-9, as amended, or any successor regulation or tables.

### 6.2.2. Administrative Powers.

(a)     Open checking, savings, custody, agency and cash and margin brokerage accounts and safe deposit boxes with any institution(s) empowered to accept the same, including any that may be a Trustee hereunder, either (i) in their names or any of their names (with or without disclosing fiduciary capacity), (ii) in the name of such trust (where an account is in the name of a trust, checks on that account and authorized signatures need not disclose the fiduciary nature of the account or refer to any trust or Trustee), or (iii) in the name of such trust's nominee(s), depositing therein any part or all of the funds and securities of such trust, and withdrawals therefrom and access thereto shall be permitted on the signature of anyone or more of the Trustees and/or nominees, with the right and power to authorize withdrawals and/or access on the sole signature of any agent or agents designated in writing by such Trustees;

(b)     Employ such accountants, custodians, experts, counsel (legal and/or investment), and other agents as may be deemed advisable (notwithstanding that such person or entity may be, or be affiliated in business with, any Trustees hereunder) and delegate discretionary powers to and rely upon information or advice furnished by them;

(c)     Exercise all tax related elections, choices, etc. that they may have (whether or not specifically referred to in Section 8.1, including (i) the disclaimer of benefits receivable by such trust in any manner permitted by law or by a "transfer" meeting the requirements of Section 2518(c)(3) of the Internal Revenue Code, and (ii) the entering into of closing agreements relating to any trust matters (which shall be binding on all present and future trust beneficiaries), and to pay any income or similar tax properly imposed on or to be borne by such trust and any estate, inheritance, succession, generation-skipping or other similar tax that, under applicable tax and apportionment laws, is properly imposed upon or with respect to any property held (or being distributed) hereunder, such payment to be charged to such property;

(d)     Make, execute and deliver any and all such instruments in writing as shall be necessary and proper to carry out any disposition whatever of any trust property;

(e)     Carry securities or other properties requiring or permitting of registration or recording in their names, in anyone of their names, in the name of their nominee or nominees (with or without designation of fiduciary capacity), or unregistered (or in such form as will pass by delivery);

(f)     Exercise, in general, all such control and power over the trust property as an individual might exercise with respect to his own property;

8

(g)     Compromise, submit to arbitration, release, with or without consideration, or otherwise adjust claims in favor of or against any trust; and

(h)     Institute, compromise and defend actions and proceedings.

### 6.3.    Provisions Regarding Life Insurance.

#### 6.3.1. Powers Regarding Life Insurance Held in Trust.

The Trustees of each trust hereunder, other than any individual Trustee whose life may be insured under the life insurance policy in question, shall have and, in its sole discretion, may exercise all of the incidents of ownership in each and every policy of life insurance which may at any time be owned or purchased by the trust. The term "incidents of ownership" with respect to a policy shall include, by way of illustration and not limitation, the right to collect, receive and retain all payments, dividends, surrender values, sickness, accident, disability, retirement or other benefits, including all death benefits, maturing on such policy during the insured's lifetime and thereafter, as well as the right at any time to transfer, assign, sell, pledge, hypothecate, borrow on, surrender, prepay, convert, divide, change the beneficiary of, and/or exercise or select any options, elections and waivers with respect to such policy. All other provisions of this instrument to the contrary notwithstanding, any individual trustee whose life is insured under a trust owned policy under no circumstances shall be entitled to partake in any way in decisions relating to such policy (and in the absence of another then acting trustee, no incidents of ownership as to such policy shall be exercised).

#### 6.3.2. Payment of Premiums.

The payment of premiums on each policy owned by a trust hereunder shall be charged against the principal of that trust unless the Trustee of such trust (other than any who might be financially affected thereby), in the exercise of reasonable discretion, shall determine to charge such premiums against the income of such trust on the basis of that being (i) in the best interests of the present and future beneficiaries of such trust, and (ii) not contrary to the provisions of Section 7.8 above.

#### 6.3.3. Limitations Regarding Life Insurance Held in Trust.

Furthermore and also notwithstanding all other provisions of this Trust Agreement, if any insurance on the life of a beneficiary of a trust hereunder is an asset of such trust, such insurance and all proceeds thereof shall be excluded from the assets which might otherwise be subject to any use, enjoyment, withdrawal or appointment by that beneficiary (and on such beneficiary's death, such proceeds shall be disposed of as though any power of appointment held by such beneficiary had not been exercised).

#### 6.3.4. Collection of Death and Disability Benefits by Trustee.

(a)     Upon the receipt of notice, believed to be reliable, of the death or disability of anyone who (i) is insured by any policy (including accident and disability

9

policies of all kinds) which may be payable to any trust hereunder, or (ii) on account of whose death or disability any benefit may be payable to any trust hereunder, the Trustee of such trust shall use its best efforts to enforce such trust's rights (including the election of such annuity, installment, lump sum or other mode of settlement options as the Trustee may deem appropriate for the trust) with respect to each and every such policy upon such person's life or other benefit relating to such person's life which such Trustee believes may be payable in any way to such trust. For that purpose, such Trustee shall have full power to (i) execute and deliver any receipts and/or other instruments; (ii) compromise or adjust disputed claims in such manner as, in its sole discretion, it shall deem just (and its decision in this regard shall be final and binding upon all interested parties); and (iii) take such other actions, including the institution of proceedings at law or in equity, as in its judgment may seem necessary and proper to enforce payment of any sums which may be due to such trust under the terms of such policies or other death or disability arrangements.

(b)     Notwithstanding the foregoing, if the full payment on any death or disability benefit or policy proceeds is contested, such Trustee shall not be obligated, except at its option, to take any action for collection until it shall have been indemnified to its satisfaction against any loss, liability or expense, including attorneys' fees, which might be incurred thereby. Under these circumstances, however, such Trustee is authorized, in its sole discretion, to use any of such trust's assets to payor reimburse itself for the costs of thus enforcing any such benefits and proceeds.

(c)     No insurance company, employer, plan administrator or other stakeholder making any payment to any Trustee hereunder shall be required to see to the use or application of such payment.

### 6.3.5. Insurance Incidents of Ownership in Independent Trustee.

The Trustee is authorized to continue to hold as part of the trust estate any insurance policy or policies on the life of a primary beneficiary's spouse which shall be distributed to the Trustee as part of the trust estate. The Independent Trustee solely shall hold all powers conferred on the owner of any such policy or policies and shall designate the trust as beneficiary of all such policies.

### 6.4.   Residences.

In addition to all other powers herein granted to the Trustees, the Trustee of each trust created hereunder is specifically authorized to hold and maintain any residence (whether held as real property, condominium or cooperative apartment) for the use and benefit of the beneficiaries of any trust. If the Trustees, in their sole and absolute discretion, determine that it would be in the best interests of the beneficiaries of any trust to maintain a residence for their use but that the residence owned by the Trustees should not be used for such purpose, the Trustees are authorized to sell said residence and to apply the net proceeds of sale to the purchase of such other residence or to make such other arrangements as the Trustees, in their sole and absolute discretion, deem suitable for the purpose. Any proceeds of sale not needed for reinvestment in a residence as provided above shall be added to the principal of this trust and thereafter held,

10

administered and disposed of as a part thereof. The Trustees are authorized to pay all carrying charges of such residence, including, but not limited to, any taxes, assessments and maintenance thereon, and all expenses of the repair and operation thereof, including the employment of domestic servants and other expenses incident to the running of a household for the benefit of the beneficiaries of the trust. Having in mind the extent to which funds will be available for expenditure for the benefit of the beneficiaries, the Trustees are authorized to expend such amounts as they, in their sole and absolute discretion, shall determine to maintain the current lifestyle of the beneficiaries, including, but not limited to, complete authority to provide for their personal care and comfort in any manner whatsoever.

### 6.5.   Properties and Companies Owned in Common with Others.

The Trustee(s) of each trust hereunder are specifically authorized, with or without the joinder of other owners of property or securities related to any that may be held in such trust (and notwithstanding that one or more such other owners may be, directly or indirectly, a beneficiary or a fiduciary hereunder), to enter upon and carry out any plan (i) for the foreclosure, lease or sale of any trust property, (ii) for the consolidation or merger, dissolution or liquidation, incorporation or reincorporation, recapitalization, reorganization or readjustment of the capital or financial structure of any corporation, company or association, the securities of which, whether closely held or publicly traded, may form a part of such trust, or (iii) for the creation of one or more holding companies to hold any such securities and/or properties (even if it leaves, following the termination of such trust, a trust beneficiary as a minority shareholder in such a holding company), all as such Trustee(s) may deem expedient or advisable for the furtherance of the interests of such trust and the carrying out of the Grantor's original intent as to such trust and as to those properties and/or securities. In carrying out such plan, such Trustee(s) may deposit any such securities or properties, pay any assessments, expenses and sums of money, give investment letters and other assurances, receive and, subject to the requirements of Section 6.6 below, retain as Investments of such trust any new properties or securities transferred or issued as a result thereof, whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), and generally do any act with reference to such holdings as might be done by any person owning similar securities or properties in his own right, including the exercise of conversion, subscription, purchase or other rights or options, the entrance into voting trusts, etc., all without obtaining authority therefor from any court.

### 6.6.   Authority to Operate Businesses.

If an interest in any business, whether in the form of a general or limited partnership or sole proprietorship, at any time becomes an asset of any trust hereunder (by purchase, gift, the entrance of the trust into such business or otherwise), its Trustee(s) shall have the authority to engage in and to continue such trust in such business for such period, without limit, as such Trustee(s), in their sole judgment, may deem best for such trust (but only as long as such activity does not constitute "carrying on business" within the meaning of the federal tax laws defining associations taxable as a corporation) and, for that purpose, such Trustee(s) may retain and employ the capital in said business

that shall at the time of trust acquisition be committed thereto or employed therein and such additional capital as such Trustee(s), in their sole judgment, shall think fit to advance from time to time out of such trust's other resources, whether for continuation or expansion or any other purpose; and such Trustee(s), in their sole discretion, may incorporate a part or all of said business (or any investment held in such trust) in one or more corporations, with whatever capital structure may be deemed appropriate, alone or with others, in any jurisdiction, and/or form partnerships in which such trust may be a general or limited partner, and/or enter into joint ventures or associations with others on such terms as may be deemed appropriate, and/or enter into agreements respecting voting rights, management, incentive compensation, profit sharing, future sale or retention, etc., all without obtaining authority therefor from any court, and such Trustee(s), while acting in good faith, shall be free from any responsibility for losses arising in the prosecution of such business.

### 6.7.   Mineral and Oil and Gas Operations.

With respect to any and all mineral and oil and gas interests of any kind, regardless of where located, that may at any time form a part of or be acquired by any trust hereunder, the powers and discretions herein granted to Trustee(s) shall be broadly construed, regardless of technical terminology, to permit any contract, act or thing that may be deemed by the Trustee(s) of such trust to be advantageous to such trust, whether or not the same be now or hereafter recognized as common or proper practice by or among those engaged in the business of prospecting for, developing, producing, processing, transporting and/or marketing any such minerals, properties or interests. Without limiting the generality of the foregoing, such Trustee(s) are also specifically authorized and empowered, in their sole discretion as they may deem necessary or desirable, with respect to any and all such interests, to:

(a)   Pay all delay rentals, lease bonuses, royalties, overriding royalties, bottom hole or dry hole contributions, local taxes and assessments and all other proper charges;

(b)   Make farm out agreements, engage in secondary recovery operations and enter into and execute pooling and/or unitization agreements and/or agreements for the installation and/or operation of absorption, repressuring and/or other processing plants;

(c)   Retain, sell, assign, transfer, lease, exchange, mortgage, pledge or otherwise hypothecate, surrender or abandon, with or without condition, either in cash or in kind, any or all of such interests (including making reservations and exacting conditions on the transfer of any such interests);

(d)   Drill, test, explore, mine, develop, operate and otherwise exploit, directly or by contract with others, any and all such interests to any extent;

(e)   Produce, process, sell or exchange all products recovered through the exploitation of such interests;

12

(f)     Exercise, in accordance with their best judgment, any right, power or privilege (including, but not by way of limitation, the right to consent to participate or to not participate in wells to be drilled) that the Trustee(s) or any predecessor in interest may have under any agreement that may have been entered into in connection with any of such interests;

(g)     Select, employ and enter into any appropriate business form in which to properly exploit such interests, including corporations, partnerships, limited partnerships, mining partnerships, joint ventures and co-tenancies;

(h)     Hire all necessary personnel, rent office space, buy or lease office equipment, contract and pay for geological surveys and studies, procure appraisals, rely on expert advice and generally conduct and engage in any and all activities incident to the foregoing powers set forth in Paragraphs (a) through (g), inclusive, with full power to borrow and pledge in order to finance such activities; and

(i)     Exercise broad and liberal discretion in making allocations under Section 5.3 above, notwithstanding the technical nature of any receipt or disbursement, notwithstanding any local law or custom to the contrary, and without being required to allocate to principal any reserve for depletion.

Such Trustee(s) are further hereby granted any other power that they deem necessary in order to properly conserve, develop, exploit and administer the interests described in this section, including the power to dispose of such interests in any manner and at any price, either in cash or in property, that they, in the exercise of their best judgment, deem reasonable at the time of such disposition. All fiduciaries hereunder shall be exonerated from liability for honest errors in judgment in connection with the exercise of the powers described in this section.

### 6.8.   Agricultural Realty and Farming Operations.

With respect to any real property used or useable for agricultural purposes and/or farming operation of any kind, regardless of its nature, that may at any time become an asset of any trust hereunder, its Trustee(s) shall have the authority to:

(a)     Operate all property and interests in property relating to such operation with hired labor, tenants and/or sharecroppers (including any who may be a beneficiary, Trustees and/or the Grantor hereunder), as such Trustee(s) from time to time deem best;

(b)     Hire a farm manager or professional farm management service to supervise such operation or operations;

(c)     Lease or rent land, equipment and/or livestock for cash or on shares, either to others or from others (including related parties and/or Trustee(s));

(d)     Sell, purchase, exchange and/or otherwise acquire or dispose of farm machinery, livestock, farm products, crops, timber, supplies and services used in

13

connection with the property or any acreage or parcel of real estate constituting farm property;

(e)     Remove, construct, repair and improve fences, structures and buildings of all kinds on the property;

(f)     Fertilize, terrace, clear, level, ditch and/or drain farm lands;

(g)     Install irrigation systems, carry on reforestation and, in general, follow soil conservation and other practices designed to conserve, improve and maintain the fertility and productivity of the soil;

(h)     Enter into agreements and/or programs with any governmental agency relating to soil conservation, acreage reduction, agricultural, recreational or other similar purposes;

(i)     Carry on both crop and livestock programs, including the breeding, raising, purchasing and/or selling of livestock and any other farm products whatsoever; and

(j)     Borrow money and pledge harvested or growing crops, timber or livestock and mortgage or pledge farm property of any kind.

Regarding all such agricultural real property and farming operations, no Trustee shall be liable for any losses except as such losses are caused by that Trustee's bad faith or intentional misconduct. Furthermore, during such time as there is a Management Trustee acting with respect to any trust that owns or leases real property used or useable for agricultural purposes or that is thus involved in farming operations, that Management Trustee shall completely control and manage all of such trust's agricultural real property and/or farming operations and the Independent Trustee(s) of such trust shall not have any responsibility whatsoever with respect to such property and/or operations (except to approve acts of self-dealing under Section 6.10, below), and to receive amounts of cash due the income or principal accounts of such trust from such property and/or operations and to provide such Management Trustee with all funds that such Management Trustee calls for, either from the income or principal account of such trust, in connection with such property and/or operations.

### 6.9.   Assistance to Estates and Trusts of Interested Persons.

The Trustee(s) of each trust hereunder are authorized, in the exercise of their discretion, to purchase and retain, as a trust investment, securities or other properties, for a fair consideration in money or money's worth, from the fiduciaries of the estate (and/or revocable trust) of the Grantor, the Grantor's spouse, the Initial Primary Beneficiary, the Initial Primary Beneficiary's spouse, and each of the Initial Primary Beneficiary's descendants (and each of their spouses), from the fiduciaries of each other separate trust hereunder, and from the fiduciaries of the estate (and/or revocable trust) of each deceased beneficiary of each trust hereunder (and each of their spouses) and to make loans to such fiduciaries, with or without security and at such rate of interest or no

14

interest, all as such Trustee(s) shall determine to be appropriate in carrying out what they alone judge would be the Grantor's original intent under the circumstances. The propriety of any such purchase and/or loan and of the terms thereof shall not be questioned merely because any of the fiduciaries or beneficiaries of such estate or trust may also be a Trustee hereunder.

### 6.10.   Permitted Self-Dealing.

Financial transactions, both direct and indirect, between any trust and any of the Trustee(s), beneficiaries and/or the Grantor of that trust (including, for instance, the purchase, sale or leasing of property, employment in any capacity, lending, etc.), whether or not specifically described in this article as permitted between such parties, except to the extent expressly prohibited by this instrument, are hereby expressly authorized, notwithstanding any rule of law relating to self-dealing, provided only that the Trustee(s), in thus acting either on behalf of or with or for such trust, shall act in good faith to assure that such trust receives in such transaction adequate and full consideration in money or money's worth.

### 6.11.   Limited Power of Amendment.

(a)      In the case of each separate trust at any time in existence hereunder, such trust's then Trustee(s), other than any (i) who has ever made a gift transfer to such trust, or (ii) who is prohibited by the provisions of Paragraph (c)(1) below from participating in the amendment involved, from time to time may, notwithstanding any other provision of this instrument, amend or restate this instrument, including its dispositive, administrative and other provisions of all kinds, in order to permit such Trustee(s):

(1)      To cope with tax and/or other circumstantial changes that may affect such trust and/or its beneficiaries, and/or

(2)      To remove from the governing trust instrument any provisions which have become "deadwood" (i.e., no longer operative in the ongoing administration of such trust due to changed circumstances)

with respect to (i) such trust, and (ii) all trusts that are subsequently to come into existence under this instrument to hold part or all of the assets of such trust, in whatever way or ways such Trustee(s), in the exercise of such Trustee's(s') sole discretion, may deem appropriate in the best interests, as interpreted by such Trustee(s) alone, of the primary beneficiary(ies) of such trust(s) and of each such beneficiary's family as a whole. Such Trustee(s) shall be guided by what, in the sole judgment of such Trustee(s) alone, would apparently be the Grantor's original intent hereunder in the light of the changed circumstances.

(b)      This power of amendment shall include, by way of example and not limitation, the power to:

(1)      Grant, reduce or eliminate general (as defined in Section 2041 of the Internal Revenue Code) and special powers of appointment with respect to part or

all of any trust property (such powers may be made subject to any conditions or consents and limited to such objects as may be described in the grant or reduction of each power);

(2)     Add mandatory distribution or set aside provisions for one or more beneficiaries or Permissible Distributees;

(3)     Divide a trust at any time (before or after it is funded with assets) into two or more separate trusts (representing fractional shares of any property being divided) or merge separate trusts together;

(4)     Provide for the creation of one or more separate subaccounts (equivalent to a separate trust) in any trust hereunder with respect to which subaccount more restrictive or other administrative or dispositive provisions are made applicable in order to permit some or all of the properties or interests that may at any time be held in or allocable to that trust to be segregated and transferred to that subaccount to achieve some tax or other benefit that would otherwise not be available to such property or interest or to the primary beneficiary or one or more of the other current beneficiaries of that trust [such as, by way of example and not limitation, to permit (i) such property, interest or beneficiary to qualify for some governmental or tax benefit, generation-skipping transfer tax exemption or Code Section 2032A election, (ii) a disclaimer to be made, or (iii) shares of stock held in such subaccount to be a qualifying stockholder in an S corporation, and so on]; and

(5)     Restrict in anyway, revocably or irrevocably, the future exercise of any power held by any beneficiary(ies) and/or Trustee(s) hereunder.

(c)     Notwithstanding the foregoing, however, under no circumstances (i) shall any Trustee, who is also a beneficiary of any such trust, participate in any amendment which may result in such Trustee beneficiary receiving any direct or indirect financial benefit from any such trust, nor (ii) shall any such amendment:

(1)     Extend the period of any such trust's existence beyond the period specified in Section 8.1;

(2)     Diminish in any way (that is not controlled by the beneficiary) any enforceable right any beneficiary may already have (under the then terms of this instrument) to receive the income of any trust, currently or at any time in the future (but, to the extent that an amendment benefits or grants a power to a current beneficiary of any trust, it may diminish the rights of one or more beneficiaries to receive in the future the income of that trust or of any trust subsequently to come into existence to hold part or all of the assets of that trust);

(3)     Reduce in any way the restrictions and limitations on (i) grantor and fiduciary actions as set forth in Section 2.1 above and Section 7.8 below, (ii) the Trustee's(s') limited power of amendment under this Section 6.11, and (iii) who (or what institutions) can qualify to fill any office of Trustee hereunder as set forth in Section 7 below, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on such trust or any of its beneficiaries [all of which provisions, referred to in (i),

16

(i) and (iii) above, however, may be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Trustee(s) may deem appropriate];

      (4)    Give (i) any Trustee any powers or discretions that are either granted exclusively to a Co-Trustee or from the exercise of which such Trustee is excluded for any reason, or (ii) anyone acting in a non-fiduciary capacity any powers granted herein to fiduciaries unless, in either case, such amendment will not have any adverse tax effect on such trust or any of its beneficiaries;

      (5)    Result in any direct or indirect financial benefit to anyone who is not, at the time of such amendment, both (i) a member of the Initial Primary Beneficiary's family within the meaning of Section 2036(c)(3)(B) of the Internal Revenue Code (as it reads on the date of this instrument), and (ii) already a present or contingent beneficiary of such trust(s) (unless it is to provide for after-born or after-adopted children of any such beneficiary), except through the exercise of a power of appointment held by or granted to a person described in (i) and (ii) above;

      (6)    Discriminate in any significant financial way in favor of one or more siblings to the detriment of any other sibling(s) where such siblings are, under the terms of this instrument, to be treated in substantially equal fashion (for this purpose treating each sibling, his or her spouse and descendants, and their spouses as one unit); nor

      (7)    Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (i) any exemption from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust, or (ii) any substantial deduction, credit, exclusion or other tax benefit (such as any marital or charitable deduction, any annual gift tax exclusion, a Code Section 2032A or Section 2057 election, a generation-skipping tax exemption, the opportunity to be a stockholder in an S corporation, a significant grandfathered status under some changed law, and so on).

      (d)    Any such amendment shall be by written instrument, executed by such amending Trustee(s) with all the formalities of a deed, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment

17

## MAN CUB TRUST

## CERTIFICATE OF TRUST EXISTENCE AND AUTHORITY

WE, THE UNDERSIGNED, CERTIFY THAT:

1.    The Man Cub Trust was created on July 22, 2013 (the "Trust Agreement").

2.    As of the date of this Certificate of Trust Existence and Authority, JOHN JOSEPH HURRY and JUSTINE HURRY, collectively, serve as Management Trustee, and, with their successors, collectively referred to as a "Trustee" or the "Trustees".

3.    The Trustees have such powers and authority provided in Section 6 of the Trust Agreement, a copy of which is attached hereto as **Exhibit A**.

4.    The Management Trustees have exercised their right to limit the powers of the Independent Trustee whereby the Management Trustees have exclusive control over business and investment decisions relating to the assets of the Trust.

5.    The Trust Agreement provides that no person dealing with, making payments to, or delivering property to a Trustee shall be obliged to inquire as to the powers of such Trustee, nor to see to the application of any money or property delivered to such Trustee.

6.    This Certification shall be construed under and regulated by the laws of the State of Nevada as are now or hereafter in effect.

7.    State law provides that any person refusing to accept this Certification shall be liable for damages, including attorneys' fees, if the court determines that the person acted in bad faith.

8.    The Trust Agreement is in full force and effect as of the present date.

9.    The Trust Agreement is Irrevocable.

10.   The Trust's taxpayer identification number is

11.   Title to trust property shall be taken as follows:

John Joseph Hurry and Justine Hurry, as Management Trustees of the Man Cub Trust dated July 22, 2013.

IN WITNESS WHEREOF, the undersigned Management Trustee has executed this Certificate of Trust Existence and Authority this _ZO_ day of July, 2017.

MANAGEMENT TRUSTEE:

_____
JOHN JOSEPH HURRY

_George Town_        )
_Grand Cayman_       ) ss:
                     )

On this _20th_ day of July, 2017, personally appeared before me, the undersigned Notary Public, JOHN JOSEPH HURRY, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

2

IN WITNESS WHEREOF, the undersigned Management Trustee has executed this Certificate of Trust Existence and Authority this *13* day of July, 2017.

**MANAGEMENT TRUSTEE:**

JUSTINE HURRY

STATE OF ARIZONA     )
                     ) ss:
County of Maricopa   )

On this *13* day of July, 2017, personally appeared before me, a Notary Public, JUSTINE HURRY, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

OFFICIAL SEAL
ERIC LYNN JOHNSON
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
APRIL 8, 2020

Notary Public

3

## EXHIBIT A

6.      **TRUSTEE POWERS**

   6.1.   **In General**.

           With respect to each trust hereunder, during its existence and until such time after its termination as all of its assets have been distributed, its Trustee(s), in their discretion, shall have the power and are authorized to;

           (a)      Enter upon and take possession of the trust property and invest and reinvest the same in real, personal and mixed assets, improved and unimproved, tangible and intangible, of any kind and nature whatsoever, foreign as well as domestic, that yield a high rate of income or no current income including, but without limitation, securities issued by an institution that is or may become a Trustee hereunder, common and preferred stocks (regardless of dividend arrearages), leverage type securities, options, puts and calls, fixed income bearing securities (secured or unsecured and notwithstanding default in interest), units of participation in limited partnerships, in real estate investment trusts and/or in common trust funds, investment trust stocks, mutual funds and other securities and investments of any kind, without regard to whether or not any such securities or investments are of a kind known to exist at the date of this instrument and whether or not any such investments shall be in (i) unseasoned or fledgling companies or securities that are (a) not listed on any stock exchange or public market nor registered with any securities commission, or (b) subject to contractual, legal or other restrictions (including "investment letter" restrictions), or (ii) oil, gas and other mineral interests and natural resources, leasehold interests (including agricultural, business, etc.), commodities, currencies, collectibles, insurance and/or annuity contracts of any kind on the life of any person or persons, life estates, remainder interests, etc., not being limited by any present or future investment law and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), all without regard to the "prudent man rule," to the relation any such investment may bear to the value of such trust or to the type or character of other investments in such trust, or to the effect such investment may have upon the diversification of the investments in such trust and even though such investment or reinvestment shall be when made or shall thereafter become unproductive of income, unmarketable, risky or speculative; and such investments may be purchased from or made in common with any person or persons, notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder; and any business partially or wholly owned by such trust may separately compensate any fiduciary and/or beneficiary hereunder for any services rendered directly to such business;

           (b)      Retain, for as long as may be deemed desirable, all property in the form in which the same shall be acquired by such trust, without regard to any trust investment rules of any kind nor to the proportion that anyone asset or class of assets may bear to the whole and without liability for any loss that may be incurred thereby;

4

(c)     Open checking, savings, custody, agency and cash and margin brokerage accounts and safe deposit boxes with any institution(s) empowered to accept the same, including any that may be a Trustee hereunder, either (i) in their names or any of their names (with or without disclosing fiduciary capacity), (ii) in the name of such trust (where an account is in the name of a trust, checks on that account and authorized signatures need not disclose the fiduciary nature of the account or refer to any trust or Trustee), or (iii) in the name of such trust's nominee(s), depositing therein any part or all of the funds and securities of such trust, and withdrawals therefrom and access thereto shall be permitted on the signature of anyone or more of the Trustees and/or nominees, with the right and power to authorize withdrawals and/or access on the sole signature of any agent or agents designated in writing by such Trustees;

(d)     Employ such accountants, custodians, experts, counsel (legal and/or investment), and other agents as may be deemed advisable (notwithstanding that such person or entity may be, or be affiliated in business with, any Trustees hereunder) and delegate discretionary powers to and rely upon information or advice furnished by them;

(e)     Sell (either for cash or partly for cash and partly on credit for any period, with or without security), option, convey, exchange (whether or not of like kind or similar use), lease (for any length of time regardless of the possible or actual prior termination of any trust), partition, plat, rezone, subdivide, improve and/or develop (and, where appropriate, dedicate for public use, demolish, construct, alter, reconstruct, change, etc.), repair, manage, operate or otherwise enter upon contracts or agreements regarding, deal with or dispose of any part or all of the trust property, whether real, personal or mixed, at any time, for any purpose or purposes, in any manner, either public or private, and upon any terms and with any party, including any who may be, directly or indirectly, a beneficiary or a fiduciary hereunder or an estate or trust of or for such a person;

(f)     Abandon or demolish any trust property deemed to be of insufficient value to warrant the expense of retention or abstain from the payment of taxes, liens, rents, assessments, repairs, etc. on such property and/or permit such property to be lost by tax sale, foreclosure or other proceedings, by conveyance for nominal or no consideration, or to charity;

(g)     Grant or release easements or charges of any kind (with or without consideration), effect and carry insurance (protecting against such hazards and liabilities as may be deemed advisable), renew or extend, amend, change or modify leases, grant options to lease and options to renew leases, all on such terms and conditions as may be deemed advisable and to pay any and all expenses in connection therewith;

(h)     Exercise or not exercise or otherwise deal with any and all options of any kind;

(i)     Vote, deal or consent, in person or by proxy (with or without power of substitution), including electing any Trustee or an employee or officer of any Trustee

5

as a director or officer of any corporation, with respect to any securities, including those of companies in which a Trustee may, directly or indirectly, have an interest of any kind;

(j)     Form or cause to be formed, alone or with others, such corporations, partnerships, limited partnerships and other business organizations organized under the laws of any state or country and to transfer and convey to such business organizations all or any part of the assets, real or personal, of any trust estate in exchange for stocks, bonds, notes, other securities or interest of such business organizations as the Trustees, in their absolute discretion, deem advisable;

(k)     Rent office space, whether or not from, or in conjunction with any such space being used by any beneficiary hereunder, or any relative of the Initial Primary Beneficiary or of any beneficiary hereunder, or any fiduciary hereunder in his, her or its individual capacity, and to pay the expenses thereof from the principal of the respective trust estate;

(l)     Enforce, abandon, adjust, arbitrate, compromise, sue on, prosecute and/or defend, and otherwise deal with and settle, on such terms as such Trustee(s) in good faith may deem advisable, even if the result would substantially diminish the trust property and/or materially affect the trust plan (whether or not with concurrence of the beneficiaries), any and all claims in favor of or against such trust, including those relating to tax matters;

(m)     Exercise all tax related elections, choices, etc. that they may have (whether or not specifically referred to in Section 8.1, including (i) the disclaimer of benefits receivable by such trust in any manner permitted by law or by a "transfer" meeting the requirements of Section 2518(c)(3) of the Internal Revenue Code, and (ii) the entering into of closing agreements relating to any trust matters (which shall be binding on all present and future trust beneficiaries), and to pay any income or similar tax properly imposed on or to be borne by such trust and any estate, inheritance, succession, generation-skipping or other similar tax that, under applicable tax and apportionment laws, is properly imposed upon or with respect to any property held (or being distributed) hereunder, such payment to be charged to such property;

(n)     Borrow money for the payment of taxes, the exercise of options, or for any other purpose or purposes Whatsoever, from any source, including the commercial department of any corporate Trustee hereunder, on the general credit of any trust property, and to pledge or mortgage any or all of said property as security for the repayment of such loans and/or of any loan, new or old, from any third party(ies) to any beneficiary hereunder and/or to any trust, estate or company in which any beneficiary and/or any trust hereunder has an interest, and to guarantee any such third party loans, and to pay interest on and to renew, extend, modify, reduce and/or payoff, from time to time, any such indebtedness incurred by such Trustee(s) or any of their predecessors in interest;

(o)     Loan money to anyone, including any beneficiary of that trust or of any trust hereunder (including any beneficiary who may at the time also be a fiduciary

6

hereunder), or to any estate, trust or company in which such person or any trust hereunder has an interest, for any purpose Whatsoever, with or without security and at such rate of interest as the Trustee(s) of such trust shall determine in the exercise of reasonable fiduciary discretion, and, with respect to such loans and/or security interests, to renew, extend, modify, grant waivers, etc.;

   (p) Make, execute and deliver any and all such instruments in writing as shall be necessary and proper to carry out any disposition whatever of any trust property;

   (q) Carry securities or other properties requiring or permitting of registration or recording in their names, in anyone of their names, in the name of their nominee or nominees (with or without designation of fiduciary capacity), or unregistered (or in such form as will pass by delivery);

   (r) Exercise, in general, all such control and power over the trust property as an individual might exercise with respect to his own property;

   (s) Compromise, submit to arbitration, release, with or without consideration, or otherwise adjust claims in favor of or against any trust;

   (t) Institute, compromise and defend actions and proceedings;

   (u) Hold, retain, purchase or sell legal life estates, interests for a term of years, remainder interests, etc., whether or not they yield a reasonable rate of return or no current return, whether or not they result in the preservation of principal, and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper for Trustees. Such investments may be purchased from or made in conjunction with any persons notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder. The purchase or sales price for any transactions hereunder may, but need not, be determined under the Treasury Department Regulation Section 25.2512-9, as amended, or any successor regulation or tables;

   (v) In addition to all other powers herein granted to the Trustees, the Trustee of each trust created hereunder is specifically authorized to hold and maintain any residence (whether held as real property, condominium or cooperative apartment) for the use and benefit of the beneficiaries of any trust. If the Trustees, in their sole and absolute discretion, determine that it would be in the best interests of the beneficiaries of any trust to maintain a residence for their use but that the residence owned by the Trustees should not be used for such purpose, the Trustees are authorized to sell said residence and to apply the net proceeds of sale to the purchase of such other residence or to make such other arrangements as the Trustees, in their sole and absolute discretion, deem suitable for the purpose. Any proceeds of sale not needed for reinvestment in a residence as provided above shall be added to the principal of this trust and thereafter held, administered and disposed of as a part thereof. The Trustees are authorized to pay all carrying charges of such residence, including, but not limited to, any taxes, assessments and maintenance thereon, and all expenses of the repair and operation

7

thereof, including the employment of domestic servants and other expenses incident to the running of a household for the benefit of the beneficiaries of the trust. Having in mind the extent to which funds will be available for expenditure for the benefit of the beneficiaries, the Trustees are authorized to expend such amounts as they, in their sole and absolute discretion, shall determine to maintain the current lifestyle of the beneficiaries, including, but not limited to, complete authority to provide for their personal care and comfort in any manner whatsoever.

The foregoing powers, as well as those now or hereafter conferred upon Trustees generally and those set forth in the following sections of this Section 6, may be exercised by such Trustees in such manner as they, in their sole judgment and discretion, deem appropriate under the then circumstances (insofar as they can be reasonably ascertained by such Trustees) to carry out the trust purposes of protecting and conserving property for the beneficiaries, all without obtaining authority therefor from any court. No person dealing with the Trustees shall be bound to see to the application or disposition of cash or property transferred to or upon the order of the Trustees or to inquire into the authority, validity or propriety of any action of the Trustees.

6.2.   **"Prudent Person" Rule**.

In addition to the investment powers conferred above, the Trustees are authorized (but are not directed) to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden by the "prudent person" rule. The Trustees may, in their sole discretion, invest in any type of property, wherever located, including any type of security or option, improved or unimproved real property, and tangible or intangible personal property, and in any manner, including direct purchase, joint ventures, partnerships, limited partnerships, corporations, mutual funds or any other form of participation or ownership whatsoever. In making investments, the Trustees may disregard all of the following factors;

(a)   Whether a particular investment, or the trust investments collectively, will produce a reasonable rate of return or result in the preservation of principal.

(b)   Whether the acquisition or retention of a particular investment, or the trust investments collectively, is consistent with any duty of impartiality as to the different beneficiaries. The Grantor intends that no such duty shall exist.

(c)   Whether the trust is diversified. The Grantor intends that no duty to diversify shall exist.

(d)   Whether any or all of the trust investments would traditionally be classified as too risky or speculative for trusts. The entire trust may be so invested. The Grantor intends the Trustees to have sole discretion in determining what constitutes acceptable risk and what constitutes proper investment strategy.

The Grantor's purpose in granting the foregoing authority is to modify the prudent person rule insofar as the rule would prohibit an investment or investments because of one or more factors listed above, or any other factor relating to the nature of the

8

investment itself. Accordingly, the Trustees shall not be liable for any loss in value of an investment merely because of the nature of the investment or the degree of risk presented by the investment, but shall be liable if the Trustees' procedures in selecting and monitoring the investment are proven by affirmative evidence to have been negligent, and that such negligence was the proximate cause of the loss.

### 6.3.   Properties and Companies Owned in Common with Others.

The Trustee(s) of each trust hereunder are specifically authorized, with or without the joinder of other owners of property or securities related to any that may be held in such trust (and notwithstanding that one or more such other owners may be, directly or indirectly, a beneficiary or a fiduciary hereunder), to enter upon and carry out any plan (i) for the foreclosure, lease or sale of any trust property, (ii) for the consolidation or merger, dissolution or liquidation, incorporation or reincorporation, recapitalization, reorganization or readjustment of the capital or financial structure of any corporation, company or association, the securities of which, whether closely held or publicly traded, may form a part of such trust, or (iii) for the creation of one or more holding companies to hold any such securities and/or properties (even if it leaves, following the termination of such trust, a trust beneficiary as a minority shareholder in such a holding company), all as such Trustee(s) may deem expedient or advisable for the furtherance of the interests of such trust and the carrying out of the Grantor's original intent as to such trust and as to those properties and/or securities. In carrying out such plan, such Trustee(s) may deposit any such securities or properties, pay any assessments, expenses and sums of money, give investment letters and other assurances, receive and, subject to the requirements of Section 6.4 below, retain as Investments of such trust any new properties or securities transferred or issued as a result  thereof, whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), and generally do any act with reference to such holdings as might be done by any person owning similar securities or properties in his own right, including the exercise of conversion, subscription, purchase or other rights or options, the entrance into voting trusts, etc., all without obtaining authority therefor from any court.

### 6.4.   Authority to Operate Businesses.

If an interest in any business, whether in the form of a general or limited partnership or sole proprietorship, at any time becomes an asset of any trust hereunder (by purchase, gift, the entrance of the trust into such business or otherwise), its Trustee(s) shall have the authority to engage in and to continue such trust in such business for such period, without limit, as such Trustee(s), in their sole judgment, may deem best for such trust (but only as long as such activity does not constitute "carrying on business" within the meaning of the federal tax laws defining associations taxable as a corporation) and, for that purpose, such Trustee(s) may retain and employ the capital in said business that shall at the time of trust acquisition be committed thereto or employed therein and such additional capital as such Trustee(s), in their sole judgment, shall think fit to advance from time to time out of such trust's other resources, whether for continuation or expansion or any other purpose; and such Trustee(s), in their sole discretion, may incorporate a part or all of said business (or any investment held in such trust) in one or

more corporations, with whatever capital structure may be deemed appropriate, alone or with others, in any jurisdiction, and/or form partnerships in which such trust may be a general or limited partner, and/or enter into joint ventures or associations with others on such terms as may be deemed appropriate, and/or enter into agreements respecting voting rights, management, incentive compensation, profit sharing, future sale or retention, etc., all without obtaining authority therefor from any court, and such Trustee(s), while acting in good faith, shall be free from any responsibility for losses arising in the prosecution of such business.

6.5.    **Mineral and Oil and Gas Operations.**

With respect to any and all mineral and oil and gas interests of any kind, regardless of where located, that may at any time form a part of or be acquired by any trust hereunder, the powers and discretions herein granted to Trustee(s) shall be broadly construed, regardless of technical terminology, to permit any contract, act or thing that may be deemed by the Trustee(s) of such trust to be advantageous to such trust, whether or not the same be now or hereafter recognized as common or proper practice by or among those engaged in the business of prospecting for, developing, producing, processing, transporting and/or marketing any such minerals, properties or interests. Without limiting the generality of the foregoing, such Trustee(s) are also specifically authorized and empowered, in their sole discretion as they may deem necessary or desirable, with respect to any and all such interests, to;

(a)    Pay all delay rentals, lease bonuses, royalties, overriding royalties, bottom hole or dry hole contributions, local taxes and assessments and all other proper charges

(b)    Make farm out agreements, engage in secondary recovery operations and enter into and execute pooling and/or unitization agreements and/or agreements for the installation and/or operation of absorption, repressuring and/or other processing plants;

(c)    Retain, sell, assign, transfer, lease, exchange, mortgage, pledge or otherwise hypothecate, surrender or abandon, with or without condition, either in cash or in kind, any or all of such interests (including making reservations and exacting conditions on the transfer of any such interests);

(d)    Drill, test, explore, mine, develop, operate and otherwise exploit, directly or by contract with others, any and all such interests to any extent;

(e)    Produce, process, sell or exchange all products recovered through the exploitation of such interests;

(f)    Exercise, in accordance with their best judgment, any right, power or privilege (including, but not by way of limitation, the right to consent to participate or to not participate in wells to be drilled) that the Trustee(s) or any predecessor in interest may have under any agreement that may have been entered into in connection with any of such interests;

(g)     Select, employ and enter into any appropriate business form in which to properly exploit such interests, including corporations, partnerships, limited partnerships, mining partnerships, joint ventures and co-tenancies;

(h)     Hire all necessary personnel, rent office space, buy or lease office equipment, contract and pay for geological surveys and studies, procure appraisals, rely on expert advice and generally conduct and engage in any and all activities incident to the foregoing powers set forth in Paragraphs (a) through (g), inclusive, with full power to borrow and pledge in order to finance such activities; and

(i)     Exercise broad and liberal discretion in making allocations under Section 5.3 above, notwithstanding the technical nature of any receipt or disbursement, notwithstanding any local law or custom to the contrary, and without being required to allocate to principal any reserve for depletion.

Such Trustee(s) are further hereby granted any other power that they deem necessary in order to properly conserve, develop, exploit and administer the interests described in this section, including the power to dispose of such interests in any manner and at any price, either in cash or in property, that they, in the exercise of their best judgment, deem reasonable at the time of such disposition. All fiduciaries hereunder shall be exonerated from liability for honest errors in judgment in connection with the exercise of the powers described in this section.

### 6.6.   **Agricultural Realty and Farming Operations**.

With respect to any real property used or useable for agricultural purposes and/or farming operation of any kind, regardless of its nature, that may at any time become an asset of any trust hereunder, its Trustee(s) shall have the authority to:

(a)     Operate all property and interests in property relating to such operation with hired labor, tenants and/or sharecroppers (including any who may be a beneficiary, Trustees and/or the Grantor hereunder), as such Trustee(s) from time to time deem best;

(b)     Hire a farm manager or professional farm management service to supervise such operation or operations;

(c)     Lease or rent land, equipment and/or livestock for cash or on shares, either to others or from others (including related parties and/or Trustee(s));

(d)     Sell, purchase, exchange and/or otherwise acquire or dispose of farm machinery, livestock, farm products, crops, timber, supplies and services used in connection with the property or any acreage or parcel of real estate constituting farm property;

(e)     Remove, construct, repair and improve fences, structures and buildings of all kinds on the property;

(f)     Fertilize, terrace, clear, level, ditch and/or drain farm lands;

(g)     Install irrigation systems, carry on reforestation and, in general, follow soil conservation and other practices designed to conserve, improve and maintain the fertility and productivity of the soil;

(h)     Enter into agreements and/or programs with any governmental agency relating to soil conservation, acreage reduction, agricultural, recreational or other similar purposes;

(i)     Carry on both crop and livestock programs, including the breeding, raising, purchasing and/or selling of livestock and any other farm products whatsoever; and

(j)     Borrow money and pledge harvested or growing crops, timber or livestock and mortgage or pledge farm property of any kind.

Regarding all such agricultural real property and farming operations, no Trustee shall be liable for any losses except as such losses are caused by that Trustee's bad faith or intentional misconduct. Furthermore, during such time as there is a Management Trustee acting with respect to any trust that owns or leases real property used or useable for agricultural purposes or that is thus involved in farming operations, that Management Trustee shall completely control and manage all of such trust's agricultural real property and/or farming operations and the Independent Trustee(s) of such trust shall not have any responsibility whatsoever with respect to such property and/or operations (except to approve acts of self dealing under Section 6.9, below), and to receive amounts of cash due the income or principal accounts of such trust from such property and/or operations and to provide such Management Trustee with all funds that such Management Trustee calls for, either from the income or principal account of such trust, in connection with such property and/or operations.

### 6.7.    Assistance to Estates and Trusts of Interested Persons.

The Trustee(s) of each trust hereunder are authorized, in the exercise of their discretion, to purchase and retain, as a trust investment, securities or other properties, for a fair consideration in money or money's worth, from the fiduciaries of the estate (and/or revocable trust) of the Grantor, the Grantor's spouse, the Initial Primary Beneficiary, the Initial Primary Beneficiary's spouse, and each of the Initial Primary Beneficiary's descendants (and each of their spouses), from the fiduciaries of each other separate trust hereunder, and from the fiduciaries of the estate (and/or revocable trust) of each deceased beneficiary of each trust hereunder (and each of their spouses) and to make loans to such fiduciaries, with or without security and at such rate of interest or no interest, all as such Trustee(s) shall determine to be appropriate in carrying out what they alone judge would be the Grantor's original intent under the circumstances. The propriety of any such purchase and/or loan and of the terms thereof shall not be questioned merely because any of the fiduciaries or beneficiaries of such estate or trust may also be a Trustee hereunder.

12

6.8.   **Enlarged Investment Perspective.**

The investment policy of each Trustee hereunder shall be based primarily on the long-term best interests of the person or persons who, at the time, are entitled to trust income and only secondarily on the interests of remainder beneficiaries. If any Trustee considers it appropriate to determine the proportion of trust properties to be invested in (i) equities, and (ii) "fixed dollar" type assets, consideration should also be given to the amount and nature of all assets and means of support available from all sources to each income beneficiary to the extent known (even to the point of having all trust investments in one or the other type of holding). The soundness of trust investments shall be judged not on the basis of individual assets nor on the basis of the trust estate alone, but on the broader basis of each income beneficiary's economic circumstances as a whole, including said trust estate.

6.9.   **Permitted Self-Dealing.**

Financial transactions, both direct and indirect, between any trust and any of the Trustee(s), beneficiaries and/or the Grantor of that trust (including, for instance, the purchase, sale or leasing of property, employment in any capacity, lending, etc.), whether or not specifically described in this article as permitted between such parties, except to the extent expressly prohibited by this instrument, are hereby expressly authorized, notwithstanding any rule of law relating to self dealing, provided only that the Trustee(s), in thus acting either on behalf of or with or for such trust, shall act in good faith to assure that such trust receives in such transaction adequate and full consideration in money or money's worth.

6.10.   **Certain Trustee's(s') Limited Power of Amendment.**

(a)   In the case of each separate trust at any time in existence hereunder, such trust's then Trustee(s), other than any (i) who has ever made a gift transfer to such trust, or (ii) who is prohibited by the provisions of Paragraph (c)(1) below from participating in the amendment involved, from time to time may, notwithstanding any other provision of this instrument, amend or restate this instrument, including its dispositive, administrative and other provisions of all kinds, in order to permit such Trustee(s):

(1)   To cope with tax and/or other circumstantial changes that may affect such trust and/or its beneficiaries, and/or

(2)   To remove from the governing trust instrument any provisions which have become "deadwood" (i.e., no longer operative in the ongoing administration of such trust due to changed circumstances**)**

with respect to (i) such trust, and (ii) all trusts that are subsequently to come into existence under this instrument to hold part or all of the assets of such trust, in whatever way or ways such Trustee(s), in the exercise of such Trustee's(s') sale discretion, may deem appropriate in the best interests, as interpreted by such Trustee(s) alone, of the primary beneficiary(ies) of such trust(s) and of each such beneficiary's family as a whole. Such Trustee(s) shall be guided by what, in the sale judgment of such Trustee(s) alone,

13

would apparently be the Grantor's original intent hereunder in the light of the changed circumstances.

(b)     This power of amendment shall include, by way of example and not limitation, the power to:

(1)     Grant, reduce or eliminate general (as defined in Section 2041 of the Internal Revenue Code) and special powers of appointment with respect to part or all of any trust property (such powers may be made subject to any conditions or consents and limited to such objects as may be described in the grant or reduction of each power);

(2)     Add mandatory distribution or set aside provisions for one or more beneficiaries or Permissible Distributees;

(3)     Divide a trust at any time (before or after it is funded with assets) into two or more separate trusts (representing fractional shares of any property being divided) or merge separate trusts together;

(4)     Provide for the creation of one or more separate subaccounts (equivalent to a separate trust) in any trust hereunder with respect to which subaccount more restrictive or other administrative or dispositive provisions are made applicable in order to permit some or all of the properties or interests that may at any time be held in or allocable to that trust to be segregated and transferred to that subaccount to achieve some tax or other benefit that would otherwise not be available to such property or interest or to the primary beneficiary or one or more of the other current beneficiaries of that trust [such as, by way of example and not limitation, to permit (i) such property, interest or beneficiary to qualify for some governmental or tax benefit, generation-skipping transfer tax exemption or Code Section 2032A election, (ii) a disclaimer to be made, or (iii) shares of stock held in such subaccount to be a qualifying stockholder in an S corporation, and so on]; and

(5)     Restrict in anyway, revocably or irrevocably, the future exercise of any power held by any beneficiary(ies) and/or Trustee(s) hereunder.

(c)     Notwithstanding the foregoing, however, under no circumstances (i) shall any Trustee, who is also a beneficiary of any such trust, participate in any amendment which may result in such Trustee beneficiary receiving any direct or indirect financial benefit from any such trust, nor (ii) shall any such amendment:

(1)     Extend the period of any such trust's existence beyond the already applicable rule against perpetuities limitation period specified in Section 9.1;

(2)     Diminish in any way (that is not controlled by the beneficiary) any enforceable right any beneficiary may already have (under the then terms of this instrument) to receive the income of any trust, currently or at any time in the future (but, to the extent that an amendment benefits or grants a power to a current beneficiary of any trust, it may diminish the rights of one or more beneficiaries to receive in the future

14

the income of that trust or of any trust subsequently to come into existence to hold part or all of the assets of that trust);

(3) Reduce in any way the restrictions and limitations on (i) grantor and fiduciary actions as set forth in Section 2.1 above and Section 7.10 below, (ii) the Trustee's(s') limited power of amendment under this Section 6.10, and (iii) who (or what institutions) can qualify to fill any office of Trustee hereunder as set forth in Section 7 below, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on such trust or any of its beneficiaries [all of which provisions, referred to in (i), (i) and (iii) above, however, may be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Trustee(s) may deem appropriate];

(4) Give (i) any Trustee any powers or discretions that are either granted exclusively to a Co-Trustee or from the exercise of which such Trustee is excluded for any reason, or (ii) anyone acting in a non-fiduciary capacity any powers granted herein to fiduciaries unless, in either case, such amendment will not have any adverse tax effect on such trust or any of its beneficiaries;

(5) Result in any direct or indirect financial benefit to anyone who is not, at the time of such amendment, both (i) a member of the Initial Primary Beneficiary's family within the meaning of Section 2036(c)(3)(B) of the Internal Revenue Code (as it reads on the date of this instrument), and (ii) already a present or contingent beneficiary of such trust(s) (unless it is to provide for after-born or after-adopted children of any such beneficiary), except through the exercise of a power of appointment held by or granted to a person described in (i) and (ii) above;

(6) Discriminate in any significant financial way in favor of one or more siblings to the detriment of any other sibling(s) where such siblings are, under the terms of this instrument, to be treated in substantially equal fashion (for this purpose treating each sibling, his or her spouse and descendants, and their spouses as one unit); nor

(7) Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (i) any exemption from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust, or (ii) any substantial deduction, credit, exclusion or other tax benefit (such as any marital or charitable deduction, any annual gift tax exclusion, a Code Section 2032A or Section 2057 election, a generation-skipping tax exemption, the opportunity to be a stockholder in an S corporation, a significant grandfathered status under some changed law, and so on).

(d) Any such amendment shall be by written instrument, executed by such amending Trustee(s) with all the formalities of a deed, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment.

15

## MAN CUB TRUST II

## CERTIFICATE OF TRUST EXISTENCE AND AUTHORITY

WE, THE UNDERSIGNED, CERTIFY THAT:

1.     The Man Cub Trust II Trust dated October 13, 2017, was created by Declaration of Trust entered into by the then Trustees of the Man Cub Trust dated July 22, 2013 (the "Trust Agreement").

2.     As of the date of the Certificate of Trust Existence and Authority, JOHN JOSEPH HURRY and JUSTINE HURRY, collectively, serve as Management Trustees, and, with their successors, collectively referred to as a "Trustee" or the "Trustees".

3.     The Trustees have such powers and authority provided in Section 6 of the Trust Agreement, a copy of which is attached hereto as **Exhibit A**.

4.     The Management Trustees have exercised their right to limit the powers of the Independent Trustee whereby the Management Trustees have exclusive control over business and investment decisions relating to the assets of the Trust.

5.     The Trust Agreement provides that no person dealing with, making payments to, or delivering property to a Trustee shall be obliged to inquire as to the powers of such Trustee, nor to see to the application of any money or property delivered to such Trustee.

6.     This Certification shall be construed under and regulated by the laws of the State of Nevada as are now or hereafter in effect.

7.     State law provides that any person refusing to accept this Certification shall be liable for damages, including attorneys' fees, if the court determines that the person acted in bad faith.

8.     The Trust Agreement is in full force and effect as of the present date.

9.     The Trust Agreement is Irrevocable.

10.    The Trust's taxpayer identification number is

11.    Title to trust property shall be taken as follows:

John Joseph Hurry and Justine Hurry, as Management Trustees of the Man Cub Trust II dated October 13, 2017.

IN WITNESS WHEREOF, the undersigned Management Trustee of the Man Cub Trust II dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

MANAGEMENT TRUSTEE:

_____
JOHN JOSEPH HURRY

GEORGETOWN            )
                      ) ss:
GRAND CAYMAN          )

The undersigned Notary Public hereby certifies that JOHN JOSEPH HURRY, in his capacity as Management Trustee of the Man Cub Trust II dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that he executed the instrument as his free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this _16th_ day of October 2017.

_____
Notary Public

2

IN WITNESS WHEREOF, the undersigned Management Trustee of the Man Cub Trust II dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

**MANAGEMENT TRUSTEE:**

JUSTINE HURRY

STATE OF ARIZONA )
)  ss:
County of Maricopa )

The undersigned Notary Public hereby certifies that JUSTINE HURRY, in her capacity as Management Trustee of the Man Cub Trust II dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that she executed the instrument as her free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this __16__ day of October 2017.

OFFICIAL SEAL
ERIC LYNN JOHNSON
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
APRIL 6, 2020

Notary Public

3

## EXHIBIT A

6.    **TRUSTEE POWERS**

   6.1.    **Trustee Discretion and Direction.**

      6.1.1. **Discretion**.

               The powers set forth in this Section 6, as well as those now or hereafter conferred upon Trustees generally may be exercised by such Trustees in such manner as they, in their sole judgment and discretion, deem appropriate under the then circumstances (insofar as they can be reasonably ascertained by such Trustees) to carry out the trust purposes of protecting and conserving property for the beneficiaries, all without obtaining authority therefor from any court. No person dealing with the Trustees shall be bound to see to the application or disposition of cash or property transferred to or upon the order of the Trustees or to inquire into the authority, validity or propriety of any action of the Trustees.

      6.1.2. **"Prudent Person" Rule.**

               In addition to the investment powers conferred above, the Trustees are authorized (but are not directed) to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden by the "prudent person" rule. The Trustees may, in their sole discretion, invest in any type of property, wherever located, including any type of security or option, improved or unimproved real property, and tangible or intangible personal property, and in any manner, including direct purchase, joint ventures, partnerships, limited partnerships, corporations, mutual funds or any other form of participation or ownership whatsoever. In making investments, the Trustees may disregard all of the following factors:

               (a)    Whether a particular investment, or the trust investments collectively, will produce a reasonable rate of return or result in the preservation of principal.

               (b)    Whether the acquisition or retention of a particular investment, or the trust investments collectively, is consistent with any duty of impartiality as to the different beneficiaries. The Grantor intends that no such duty shall exist.

               (c)    Whether the trust is diversified. The Grantor intends that no duty to diversify shall exist.

               (d)    Whether any or all of the trust investments would traditionally be classified as too risky or speculative for trusts. The entire trust may be so invested. The Grantor intends the Trustees to have sole discretion in determining what constitutes acceptable risk and what constitutes proper investment strategy.

               The Grantor's purpose in granting the foregoing authority is to modify the prudent person rule insofar as the rule would prohibit an investment or investments because of one or more factors listed above, or any other factor relating to the nature of

4

the investment itself. Accordingly, the Trustees shall not be liable for any loss in value of an investment merely because of the nature of the investment or the degree of risk presented by the investment, but shall be liable if the Trustees' procedures in selecting and monitoring the investment are proven by affirmative evidence to have been negligent, and that such negligence was the proximate cause of the loss.

### 6.1.3. Enlarged Investment Perspective.

The investment policy of each Trustee hereunder shall be based primarily on the long-term best interests of the person or persons who, at the time, are entitled to trust income and only secondarily on the interests of remainder beneficiaries. If any Trustee considers it appropriate to determine the proportion of trust properties to be invested in (i) equities, and (ii) "fixed dollar" type assets, consideration should also be given to the amount and nature of all assets and means of support available from all sources to each income beneficiary to the extent known (even to the point of having all trust investments in one or the other type of holding). The soundness of trust investments shall be judged not on the basis of individual assets nor on the basis of the trust estate alone, but on the broader basis of each income beneficiary's economic circumstances as a whole, including said trust estate.

### 6.2. In General.

With respect to each trust hereunder, during its existence and until such time after its termination as all of its assets have been distributed, its Trustee(s), in their discretion, shall have the power and are authorized to:

### 6.2.1. Investment Powers.

(a)     Enter upon and take possession of the trust property and invest and reinvest the same in real, personal and mixed assets, improved and unimproved, tangible and intangible, of any kind and nature whatsoever, foreign as well as domestic, that yield a high rate of income or no current income including, but without limitation, securities issued by an institution that is or may become a Trustee hereunder, common and preferred stocks (regardless of dividend arrearages), leverage type securities, options, puts and calls, fixed income bearing securities (secured or unsecured and notwithstanding default in interest), units of participation in limited partnerships, in real estate investment trusts and/or in common trust funds, investment trust stocks, mutual funds and other securities and investments of any kind, without regard to whether or not any such securities or investments are of a kind known to exist at the date of this instrument and whether or not any such investments shall be in (i) unseasoned or fledgling companies or securities that are (a) not listed on any stock exchange or public market nor registered with any securities commission, or (b) subject to contractual, legal or other restrictions (including "investment letter" restrictions), or (ii) oil, gas and other mineral interests and natural resources, leasehold interests (including agricultural, business, etc.), commodities, currencies, collectibles, insurance and/or annuity contracts of any kind on the life of any person or persons, life estates, remainder interests, etc., not being limited by any present or future investment law and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for

5

Trustee(s), all without regard to the "prudent man rule," to the relation any such investment may bear to the value of such trust or to the type or character of other investments in such trust, or to the effect such investment may have upon the diversification of the investments in such trust and even though such investment or reinvestment shall be when made or shall thereafter become unproductive of income, unmarketable, risky or speculative; and such investments may be purchased from or made in common with any person or persons, notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder; and any business partially or wholly owned by such trust may separately compensate any fiduciary and/or beneficiary hereunder for any services rendered directly to such business;

(b)     Retain, for as long as may be deemed desirable, all property in the form in which the same shall be acquired by such trust, without regard to any trust investment rules of any kind nor to the proportion that anyone asset or class of assets may bear to the whole and without liability for any loss that may be incurred thereby;

(c)     Sell (either for cash or partly for cash and partly on credit for any period, with or without security), option, convey, exchange (whether or not of like kind or similar use), lease (for any length of time regardless of the possible or actual prior termination of any trust), partition, plat, rezone, subdivide, improve and/or develop (and, where appropriate, dedicate for public use, demolish, construct, alter, reconstruct, change, etc.), repair, manage, operate or otherwise enter upon contracts or agreements regarding, deal with or dispose of any part or all of the trust property, whether real, personal or mixed, at any time, for any purpose or purposes, in any manner, either public or private, and upon any terms and with any party, including any who may be, directly or indirectly, a beneficiary or a fiduciary hereunder or an estate or trust of or for such a person;

(d)     Abandon or demolish any trust property deemed to be of insufficient value to warrant the expense of retention or abstain from the payment of taxes, liens, rents, assessments, repairs, etc. on such property and/or permit such property to be lost by tax sale, foreclosure or other proceedings, by conveyance for nominal or no consideration, or to charity;

(e)     Grant or release easements or charges of any kind (with or without consideration), effect and carry insurance (protecting against such hazards and liabilities as may be deemed advisable), renew or extend, amend, change or modify leases, grant options to lease and options to renew leases, all on such terms and conditions as may be deemed advisable and to pay any and all expenses in connection therewith;

(f)     Exercise or not exercise or otherwise deal with any and all options of any kind;

(g)     Vote, deal or consent, in person or by proxy (with or without power of substitution), including electing any Trustee or an employee or officer of any Trustee as a director or officer of any corporation, with respect to any securities, including

those of companies in which a Trustee may, directly or indirectly, have an interest of any kind;

(h)　Form or cause to be formed, alone or with others, such corporations, partnerships, limited partnerships and other business organizations organized under the laws of any state or country and to transfer and convey to such business organizations all or any part of the assets, real or personal, of any trust estate in exchange for stocks, bonds, notes, other securities or interest of such business organizations as the Trustees, in their absolute discretion, deem advisable;

(i)　Rent office space, whether or not from, or in conjunction with any such space being used by any beneficiary hereunder, or any relative of the Initial Primary Beneficiary or of any beneficiary hereunder, or any fiduciary hereunder in his, her or its individual capacity, and to pay the expenses thereof from the principal of the respective trust estate;

(j)　Enforce, abandon, adjust, arbitrate, compromise, sue on, prosecute and/or defend, and otherwise deal with and settle, on such terms as such Trustee(s) in good faith may deem advisable, even if the result would substantially diminish the trust property and/or materially affect the trust plan (whether or not with concurrence of the beneficiaries), any and all claims in favor of or against such trust, including those relating to tax matters;

(k)　Borrow money for the payment of taxes, the exercise of options, or for any other purpose or purposes Whatsoever, from any source, including the commercial department of any corporate Trustee hereunder, on the general credit of any trust property, and to pledge or mortgage any or all of said property as security for the repayment of such loans and/or of any loan, new or old, from any third party(ies) to any beneficiary hereunder and/or to any trust, estate or company in which any beneficiary and/or any trust hereunder has an interest, and to guarantee any such third party loans, and to pay interest on and to renew, extend, modify, reduce and/or payoff, from time to time, any such indebtedness incurred by such Trustee(s) or any of their predecessors in interest;

(l)　Loan money to anyone, including any beneficiary of that trust or of any trust hereunder (including any beneficiary who may at the time also be a fiduciary hereunder), or to any estate, trust or company in which such person or any trust hereunder has an interest, for any purpose Whatsoever, with or without security and at such rate of interest as the Trustee(s) of such trust shall determine in the exercise of reasonable fiduciary discretion, and, with respect to such loans and/or security interests, to renew, extend, modify, grant waivers, etc.; and

(m)　Hold, retain, purchase or sell legal life estates, interests for a term of years, remainder interests, etc., whether or not they yield a reasonable rate of return or no current return, whether or not they result in the preservation of principal, and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper for Trustees. Such investments may be purchased from or made in conjunction with any persons notwithstanding that any such person may control such

7

investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder. The purchase or sales price for any transactions hereunder may, but need not, be determined under the Treasury Department Regulation Section 25.2512-9, as amended, or any successor regulation or tables.

### 6.2.2. Administrative Powers.

(a)     Open checking, savings, custody, agency and cash and margin brokerage accounts and safe deposit boxes with any institution(s) empowered to accept the same, including any that may be a Trustee hereunder, either (i) in their names or any of their names (with or without disclosing fiduciary capacity), (ii) in the name of such trust (where an account is in the name of a trust, checks on that account and authorized signatures need not disclose the fiduciary nature of the account or refer to any trust or Trustee), or (iii) in the name of such trust's nominee(s), depositing therein any part or all of the funds and securities of such trust, and withdrawals therefrom and access thereto shall be permitted on the signature of anyone or more of the Trustees and/or nominees, with the right and power to authorize withdrawals and/or access on the sole signature of any agent or agents designated in writing by such Trustees;

(b)     Employ such accountants, custodians, experts, counsel (legal and/or investment), and other agents as may be deemed advisable (notwithstanding that such person or entity may be, or be affiliated in business with, any Trustees hereunder) and delegate discretionary powers to and rely upon information or advice furnished by them;

(c)     Exercise all tax related elections, choices, etc. that they may have (whether or not specifically referred to in Section 8.1, including (i) the disclaimer of benefits receivable by such trust in any manner permitted by law or by a "transfer" meeting the requirements of Section 2518(c)(3) of the Internal Revenue Code, and (ii) the entering into of closing agreements relating to any trust matters (which shall be binding on all present and future trust beneficiaries), and to pay any income or similar tax properly imposed on or to be borne by such trust and any estate, inheritance, succession, generation-skipping or other similar tax that, under applicable tax and apportionment laws, is properly imposed upon or with respect to any property held (or being distributed) hereunder, such payment to be charged to such property;

(d)     Make, execute and deliver any and all such instruments in writing as shall be necessary and proper to carry out any disposition whatever of any trust property;

(e)     Carry securities or other properties requiring or permitting of registration or recording in their names, in anyone of their names, in the name of their nominee or nominees (with or without designation of fiduciary capacity), or unregistered (or in such form as will pass by delivery);

(f)     Exercise, in general, all such control and power over the trust property as an individual might exercise with respect to his own property;

(g)     Compromise, submit to arbitration, release, with or without consideration, or otherwise adjust claims in favor of or against any trust; and

(h)     Institute, compromise and defend actions and proceedings.

### 6.3.    Provisions Regarding Life Insurance.

#### 6.3.1. Powers Regarding Life Insurance Held in Trust.

The Trustees of each trust hereunder, other than any individual Trustee whose life may be insured under the life insurance policy in question, shall have and, in its sole discretion, may exercise all of the incidents of ownership in each and every policy of life insurance which may at any time be owned or purchased by the trust. The term "incidents of ownership" with respect to a policy shall include, by way of illustration and not limitation, the right to collect, receive and retain all payments, dividends, surrender values, sickness, accident, disability, retirement or other benefits, including all death benefits, maturing on such policy during the insured's lifetime and thereafter, as well as the right at any time to transfer, assign, sell, pledge, hypothecate, borrow on, surrender, prepay, convert, divide, change the beneficiary of, and/or exercise or select any options, elections and waivers with respect to such policy. All other provisions of this instrument to the contrary notwithstanding, any individual trustee whose life is insured under a trust owned policy under no circumstances shall be entitled to partake in any way in decisions relating to such policy (and in the absence of another then acting trustee, no incidents of ownership as to such policy shall be exercised).

#### 6.3.2. Payment of Premiums.

The payment of premiums on each policy owned by a trust hereunder shall be charged against the principal of that trust unless the Trustee of such trust (other than any who might be financially affected thereby), in the exercise of reasonable discretion, shall determine to charge such premiums against the income of such trust on the basis of that being (i) in the best interests of the present and future beneficiaries of such trust, and (ii) not contrary to the provisions of Section 7.8 above.

#### 6.3.3. Limitations Regarding Life Insurance Held in Trust.

Furthermore and also notwithstanding all other provisions of this Trust Agreement, if any insurance on the life of a beneficiary of a trust hereunder is an asset of such trust, such insurance and all proceeds thereof shall be excluded from the assets which might otherwise be subject to any use, enjoyment, withdrawal or appointment by that beneficiary (and on such beneficiary's death, such proceeds shall be disposed of as though any power of appointment held by such beneficiary had not been exercised).

#### 6.3.4. Collection of Death and Disability Benefits by Trustee.

(a)     Upon the receipt of notice, believed to be reliable, of the death or disability of anyone who (i) is insured by any policy (including accident and disability

9

policies of all kinds) which may be payable to any trust hereunder, or (ii) on account of whose death or disability any benefit may be payable to any trust hereunder, the Trustee of such trust shall use its best efforts to enforce such trust's rights (including the election of such annuity, installment, lump sum or other mode of settlement options as the Trustee may deem appropriate for the trust) with respect to each and every such policy upon such person's life or other benefit relating to such person's life which such Trustee believes may be payable in any way to such trust. For that purpose, such Trustee shall have full power to (i) execute and deliver any receipts and/or other instruments; (ii) compromise or adjust disputed claims in such manner as, in its sole discretion, it shall deem just (and its decision in this regard shall be final and binding upon all interested parties); and (iii) take such other actions, including the institution of proceedings at law or in equity, as in its judgment may seem necessary and proper to enforce payment of any sums which may be due to such trust under the terms of such policies or other death or disability arrangements.

(b)     Notwithstanding the foregoing, if the full payment on any death or disability benefit or policy proceeds is contested, such Trustee shall not be obligated, except at its option, to take any action for collection until it shall have been indemnified to its satisfaction against any loss, liability or expense, including attorneys' fees, which might be incurred thereby. Under these circumstances, however, such Trustee is authorized, in its sole discretion, to use any of such trust's assets to pay or reimburse itself for the costs of thus enforcing any such benefits and proceeds.

(c)     No insurance company, employer, plan administrator or other stakeholder making any payment to any Trustee hereunder shall be required to see to the use or application of such payment.

### 6.3.5. Insurance Incidents of Ownership in Independent Trustee.

The Trustee is authorized to continue to hold as part of the trust estate any insurance policy or policies on the life of a primary beneficiary's spouse which shall be distributed to the Trustee as part of the trust estate. The Independent Trustee solely shall hold all powers conferred on the owner of any such policy or policies and shall designate the trust as beneficiary of all such policies.

### 6.4.   Residences.

In addition to all other powers herein granted to the Trustees, the Trustee of each trust created hereunder is specifically authorized to hold and maintain any residence (whether held as real property, condominium or cooperative apartment) for the use and benefit of the beneficiaries of any trust. If the Trustees, in their sole and absolute discretion, determine that it would be in the best interests of the beneficiaries of any trust to maintain a residence for their use but that the residence owned by the Trustees should not be used for such purpose, the Trustees are authorized to sell said residence and to apply the net proceeds of sale to the purchase of such other residence or to make such other arrangements as the Trustees, in their sole and absolute discretion, deem suitable for the purpose. Any proceeds of sale not needed for reinvestment in a residence as provided above shall be added to the principal of this trust and thereafter held,

10

administered and disposed of as a part thereof. The Trustees are authorized to pay all carrying charges of such residence, including, but not limited to, any taxes, assessments and maintenance thereon, and all expenses of the repair and operation thereof, including the employment of domestic servants and other expenses incident to the running of a household for the benefit of the beneficiaries of the trust. Having in mind the extent to which funds will be available for expenditure for the benefit of the beneficiaries, the Trustees are authorized to expend such amounts as they, in their sole and absolute discretion, shall determine to maintain the current lifestyle of the beneficiaries, including, but not limited to, complete authority to provide for their personal care and comfort in any manner whatsoever.

### 6.5.   Properties and Companies Owned in Common with Others.

The Trustee(s) of each trust hereunder are specifically authorized, with or without the joinder of other owners of property or securities related to any that may be held in such trust (and notwithstanding that one or more such other owners may be, directly or indirectly, a beneficiary or a fiduciary hereunder), to enter upon and carry out any plan (i) for the foreclosure, lease or sale of any trust property, (ii) for the consolidation or merger, dissolution or liquidation, incorporation or reincorporation, recapitalization, reorganization or readjustment of the capital or financial structure of any corporation, company or association, the securities of which, whether closely held or publicly traded, may form a part of such trust, or (iii) for the creation of one or more holding companies to hold any such securities and/or properties (even if it leaves, following the termination of such trust, a trust beneficiary as a minority shareholder in such a holding company), all as such Trustee(s) may deem expedient or advisable for the furtherance of the interests of such trust and the carrying out of the Grantor's original intent as to such trust and as to those properties and/or securities. In carrying out such plan, such Trustee(s) may deposit any such securities or properties, pay any assessments, expenses and sums of money, give investment letters and other assurances, receive and, subject to the requirements of Section 6.6 below, retain as Investments of such trust any new properties or securities transferred or issued as a result thereof, whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), and generally do any act with reference to such holdings as might be done by any person owning similar securities or properties in his own right, including the exercise of conversion, subscription, purchase or other rights or options, the entrance into voting trusts, etc., all without obtaining authority therefor from any court.

### 6.6.   Authority to Operate Businesses.

If an interest in any business, whether in the form of a general or limited partnership or sole proprietorship, at any time becomes an asset of any trust hereunder (by purchase, gift, the entrance of the trust into such business or otherwise), its Trustee(s) shall have the authority to engage in and to continue such trust in such business for such period, without limit, as such Trustee(s), in their sole judgment, may deem best for such trust (but only as long as such activity does not constitute "carrying on business" within the meaning of the federal tax laws defining associations taxable as a corporation) and, for that purpose, such Trustee(s) may retain and employ the capital in said business

11

that shall at the time of trust acquisition be committed thereto or employed therein and such additional capital as such Trustee(s), in their sole judgment, shall think fit to advance from time to time out of such trust's other resources, whether for continuation or expansion or any other purpose; and such Trustee(s), in their sole discretion, may incorporate a part or all of said business (or any investment held in such trust) in one or more corporations, with whatever capital structure may be deemed appropriate, alone or with others, in any jurisdiction, and/or form partnerships in which such trust may be a general or limited partner, and/or enter into joint ventures or associations with others on such terms as may be deemed appropriate, and/or enter into agreements respecting voting rights, management, incentive compensation, profit sharing, future sale or retention, etc., all without obtaining authority therefor from any court, and such Trustee(s), while acting in good faith, shall be free from any responsibility for losses arising in the prosecution of such business.

### 6.7. Mineral and Oil and Gas Operations.

With respect to any and all mineral and oil and gas interests of any kind, regardless of where located, that may at any time form a part of or be acquired by any trust hereunder, the powers and discretions herein granted to Trustee(s) shall be broadly construed, regardless of technical terminology, to permit any contract, act or thing that may be deemed by the Trustee(s) of such trust to be advantageous to such trust, whether or not the same be now or hereafter recognized as common or proper practice by or among those engaged in the business of prospecting for, developing, producing, processing, transporting and/or marketing any such minerals, properties or interests. Without limiting the generality of the foregoing, such Trustee(s) are also specifically authorized and empowered, in their sole discretion as they may deem necessary or desirable, with respect to any and all such interests, to:

(a) Pay all delay rentals, lease bonuses, royalties, overriding royalties, bottom hole or dry hole contributions, local taxes and assessments and all other proper charges;

(b) Make farm out agreements, engage in secondary recovery operations and enter into and execute pooling and/or unitization agreements and/or agreements for the installation and/or operation of absorption, repressuring and/or other processing plants;

(c) Retain, sell, assign, transfer, lease, exchange, mortgage, pledge or otherwise hypothecate, surrender or abandon, with or without condition, either in cash or in kind, any or all of such interests (including making reservations and exacting conditions on the transfer of any such interests);

(d) Drill, test, explore, mine, develop, operate and otherwise exploit, directly or by contract with others, any and all such interests to any extent;

(e) Produce, process, sell or exchange all products recovered through the exploitation of such interests;

12

(f)     Exercise, in accordance with their best judgment, any right, power or privilege (including, but not by way of limitation, the right to consent to participate or to not participate in wells to be drilled) that the Trustee(s) or any predecessor in interest may have under any agreement that may have been entered into in connection with any of such interests;

(g)     Select, employ and enter into any appropriate business form in which to properly exploit such interests, including corporations, partnerships, limited partnerships, mining partnerships, joint ventures and co-tenancies;

(h)     Hire all necessary personnel, rent office space, buy or lease office equipment, contract and pay for geological surveys and studies, procure appraisals, rely on expert advice and generally conduct and engage in any and all activities incident to the foregoing powers set forth in Paragraphs (a) through (g), inclusive, with full power to borrow and pledge in order to finance such activities; and

(i)     Exercise broad and liberal discretion in making allocations under Section 5.3 above, notwithstanding the technical nature of any receipt or disbursement; notwithstanding any local law or custom to the contrary, and without being required to allocate to principal any reserve for depletion.

Such Trustee(s) are further hereby granted any other power that they deem necessary in order to properly conserve, develop, exploit and administer the interests described in this section, including the power to dispose of such interests in any manner and at any price, either in cash or in property, that they, in the exercise of their best judgment, deem reasonable at the time of such disposition. All fiduciaries hereunder shall be exonerated from liability for honest errors in judgment in connection with the exercise of the powers described in this section.

**6.8.   Agricultural Realty and Farming Operations.**

With respect to any real property used or useable for agricultural purposes and/or farming operation of any kind, regardless of its nature, that may at any time become an asset of any trust hereunder, its Trustee(s) shall have the authority to:

(a)     Operate all property and interests in property relating to such operation with hired labor, tenants and/or sharecroppers (including any who may be a beneficiary, Trustees and/or the Grantor hereunder), as such Trustee(s) from time to time deem best;

(b)     Hire a farm manager or professional farm management service to supervise such operation or operations;

(c)     Lease or rent land, equipment and/or livestock for cash or on shares, either to others or from others (including related parties and/or Trustee(s));

(d)     Sell, purchase, exchange and/or otherwise acquire or dispose of farm machinery, livestock, farm products, crops, timber, supplies and services used in

13

connection with the property or any acreage or parcel of real estate constituting farm property;

(e)   Remove, construct, repair and improve fences, structures and buildings of all kinds on the property;

(f)   Fertilize, terrace, clear, level, ditch and/or drain farm lands;

(g)   Install irrigation systems, carry on reforestation and, in general, follow soil conservation and other practices designed to conserve, improve and maintain the fertility and productivity of the soil;

(h)   Enter into agreements and/or programs with any governmental agency relating to soil conservation, acreage reduction, agricultural, recreational or other similar purposes;

(i)   Carry on both crop and livestock programs, including the breeding, raising, purchasing and/or selling of livestock and any other farm products whatsoever; and

(j)   Borrow money and pledge harvested or growing crops, timber or livestock and mortgage or pledge farm property of any kind.

Regarding all such agricultural real property and farming operations, no Trustee shall be liable for any losses except as such losses are caused by that Trustee's bad faith or intentional misconduct. Furthermore, during such time as there is a Management Trustee acting with respect to any trust that owns or leases real property used or useable for agricultural purposes or that is thus involved in farming operations, that Management Trustee shall completely control and manage all of such trust's agricultural real property and/or farming operations and the Independent Trustee(s) of such trust shall not have any responsibility whatsoever with respect to such property and/or operations (except to approve acts of self-dealing under Section 6.10, below), and to receive amounts of cash due the income or principal accounts of such trust from such property and/or operations and to provide such Management Trustee with all funds that such Management Trustee calls for, either from the income or principal account of such trust, in connection with such property and/or operations.

### 6.9.   Assistance to Estates and Trusts of Interested Persons.

The Trustee(s) of each trust hereunder are authorized, in the exercise of their discretion, to purchase and retain, as a trust investment, securities or other properties, for a fair consideration in money or money's worth, from the fiduciaries of the estate (and/or revocable trust) of the Grantor, the Grantor's spouse, the Initial Primary Beneficiary, the Initial Primary Beneficiary's spouse, and each of the Initial Primary Beneficiary's descendants (and each of their spouses), from the fiduciaries of each other separate trust hereunder, and from the fiduciaries of the estate (and/or revocable trust) of each deceased beneficiary of each trust hereunder (and each of their spouses) and to make loans to such fiduciaries, with or without security and at such rate of interest or no

interest, all as such Trustee(s) shall determine to be appropriate in carrying out what they alone judge would be the Grantor's original intent under the circumstances. The propriety of any such purchase and/or loan and of the terms thereof shall not be questioned merely because any of the fiduciaries or beneficiaries of such estate or trust may also be a Trustee hereunder.

### 6.10. Permitted Self-Dealing.

Financial transactions, both direct and indirect, between any trust and any of the Trustee(s), beneficiaries and/or the Grantor of that trust (including, for instance, the purchase, sale or leasing of property, employment in any capacity, lending, etc.), whether or not specifically described in this article as permitted between such parties, except to the extent expressly prohibited by this instrument, are hereby expressly authorized, notwithstanding any rule of law relating to self-dealing, provided only that the Trustee(s), in thus acting either on behalf of or with or for such trust, shall act in good faith to assure that such trust receives in such transaction adequate and full consideration in money or money's worth.

### 6.11. Limited Power of Amendment.

(a)     In the case of each separate trust at any time in existence hereunder, such trust's then Trustee(s), other than any (i) who has ever made a gift transfer to such trust, or (ii) who is prohibited by the provisions of Paragraph (c)(1) below from participating in the amendment involved, from time to time may, notwithstanding any other provision of this instrument, amend or restate this instrument, including its dispositive, administrative and other provisions of all kinds, in order to permit such Trustee(s):

(1)     To cope with tax and/or other circumstantial changes that may affect such trust and/or its beneficiaries, and/or

(2)     To remove from the governing trust instrument any provisions which have become "deadwood" (i.e., no longer operative in the ongoing administration of such trust due to changed circumstances)

with respect to (i) such trust, and (ii) all trusts that are subsequently to come into existence under this instrument to hold part or all of the assets of such trust, in whatever way or ways such Trustee(s), in the exercise of such Trustee's(s') sole discretion, may deem appropriate in the best interests, as interpreted by such Trustee(s) alone, of the primary beneficiary(ies) of such trust(s) and of each such beneficiary's family as a whole. Such Trustee(s) shall be guided by what, in the sole judgment of such Trustee(s) alone, would apparently be the Grantor's original intent hereunder in the light of the changed circumstances.

(b)     This power of amendment shall include, by way of example and not limitation, the power to:

(1)     Grant, reduce or eliminate general (as defined in Section 2041 of the Internal Revenue Code) and special powers of appointment with respect to part or

all of any trust property (such powers may be made subject to any conditions or consents and limited to such objects as may be described in the grant or reduction of each power);

(2) Add mandatory distribution or set aside provisions for one or more beneficiaries or Permissible Distributees;

(3) Divide a trust at any time (before or after it is funded with assets) into two or more separate trusts (representing fractional shares of any property being divided) or merge separate trusts together;

(4) Provide for the creation of one or more separate subaccounts (equivalent to a separate trust) in any trust hereunder with respect to which subaccount more restrictive or other administrative or dispositive provisions are made applicable in order to permit some or all of the properties or interests that may at any time be held in or allocable to that trust to be segregated and transferred to that subaccount to achieve some tax or other benefit that would otherwise not be available to such property or interest or to the primary beneficiary or one or more of the other current beneficiaries of that trust [such as, by way of example and not limitation, to permit (i) such property, interest or beneficiary to qualify for some governmental or tax benefit, generation-skipping transfer tax exemption or Code Section 2032A election, (ii) a disclaimer to be made, or (iii) shares of stock held in such subaccount to be a qualifying stockholder in an S corporation, and so on]; and

(5) Restrict in anyway, revocably or irrevocably, the future exercise of any power held by any beneficiary(ies) and/or Trustee(s) hereunder.

(c) Notwithstanding the foregoing, however, under no circumstances (i) shall any Trustee, who is also a beneficiary of any such trust, participate in any amendment which may result in such Trustee beneficiary receiving any direct or indirect financial benefit from any such trust, nor (ii) shall any such amendment:

(1) Extend the period of any such trust's existence beyond the period specified in Section 8.1;

(2) Diminish in any way (that is not controlled by the beneficiary) any enforceable right any beneficiary may already have (under the then terms of this instrument) to receive the income of any trust, currently or at any time in the future (but, to the extent that an amendment benefits or grants a power to a current beneficiary of any trust, it may diminish the rights of one or more beneficiaries to receive in the future the income of that trust or of any trust subsequently to come into existence to hold part or all of the assets of that trust);

(3) Reduce in any way the restrictions and limitations on (i) grantor and fiduciary actions as set forth in Section 2.1 above and Section 7.8 below, (ii) the Trustee's(s') limited power of amendment under this Section 6.11, and (iii) who (or what institutions) can qualify to fill any office of Trustee hereunder as set forth in Section 7 below, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on such trust or any of its beneficiaries [all of which provisions, referred to in (i),

16

(i) and (iii) above, however, may be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Trustee(s) may deem appropriate];

(4)     Give (i) any Trustee any powers or discretions that are either granted exclusively to a Co-Trustee or from the exercise of which such Trustee is excluded for any reason, or (ii) anyone acting in a non-fiduciary capacity any powers granted herein to fiduciaries unless, in either case, such amendment will not have any adverse tax effect on such trust or any of its beneficiaries;

(5)     Result in any direct or indirect financial benefit to anyone who is not, at the time of such amendment, both (i) a member of the Initial Primary Beneficiary's family within the meaning of Section 2036(c)(3)(B) of the Internal Revenue Code (as it reads on the date of this instrument), and (ii) already a present or contingent beneficiary of such trust(s) (unless it is to provide for after-born or after-adopted children of any such beneficiary), except through the exercise of a power of appointment held by or granted to a person described in (i) and (ii) above;

(6)     Discriminate in any significant financial way in favor of one or more siblings to the detriment of any other sibling(s) where such siblings are, under the terms of this instrument, to be treated in substantially equal fashion (for this purpose treating each sibling, his or her spouse and descendants, and their spouses as one unit); nor

(7)     Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (i) any exemption from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust, or (ii) any substantial deduction, credit, exclusion or other tax benefit (such as any marital or charitable deduction, any annual gift tax exclusion, a Code Section 2032A or Section 2057 election, a generation-skipping tax exemption, the opportunity to be a stockholder in an S corporation, a significant grandfathered status under some changed law, and so on).

(d)     Any such amendment shall be by written instrument, executed by such amending Trustee(s) with all the formalities of a deed, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment

## MAN CUB TRUST III

## CERTIFICATE OF TRUST EXISTENCE AND AUTHORITY

WE, THE UNDERSIGNED, CERTIFY THAT:

1.     The Man Cub Trust III Trust dated October 13, 2017, was created by Declaration of Trust entered into by the then Trustees of the Man Cub Trust dated July 22, 2013 (the "Trust Agreement").

2.     As of the date of the Certificate of Trust Existence and Authority, JOHN JOSEPH HURRY and JUSTINE HURRY, collectively, serve as Management Trustees, and, with their successors, collectively referred to as a "Trustee" or the "Trustees".

3.     The Trustees have such powers and authority provided in Section 6 of the Trust Agreement, a copy of which is attached hereto as **Exhibit A**.

4.     The Management Trustees have exercised their right to limit the powers of the Independent Trustee whereby the Management Trustees have exclusive control over business and investment decisions relating to the assets of the Trust.

5.     The Trust Agreement provides that no person dealing with, making payments to, or delivering property to a Trustee shall be obliged to inquire as to the powers of such Trustee, nor to see to the application of any money or property delivered to such Trustee.

6.     This Certification shall be construed under and regulated by the laws of the State of Nevada as are now or hereafter in effect.

7.     State law provides that any person refusing to accept this Certification shall be liable for damages, including attorneys' fees, if the court determines that the person acted in bad faith.

8.     The Trust Agreement is in full force and effect as of the present date.

9.     The Trust Agreement is Irrevocable.

10.    The Trust's taxpayer identification number is

11.    Title to trust property shall be taken as follows:

> John Joseph Hurry and Justine Hurry, as Management Trustees of the Man Cub Trust III dated October 13, 2017.

IN WITNESS WHEREOF, the undersigned Management Trustee of the Man Cub Trust III dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

**MANAGEMENT TRUSTEE:**

JOHN JOSEPH HURRY

GEORGETOWN        )
                  ) ss:
GRAND CAYMAN      )

The undersigned Notary Public hereby certifies that JOHN JOSEPH HURRY, in his capacity as Management Trustee of the Man Cub Trust III dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that he executed the instrument as his free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this _16th_ day of October 2017.

Notary Public

2

IN WITNESS WHEREOF, the undersigned Management Trustee of the Man Cub Trust III dated October 13, 2017, does hereby execute this Certificate of Trust Existence and Authority as of the date provided below.

**MANAGEMENT TRUSTEE:**

JUSTINE HURRY

STATE OF ARIZONA    )
                    ) ss:
County of Maricopa  )

The undersigned Notary Public hereby certifies that JUSTINE HURRY, in her capacity as Management Trustee of the Man Cub Trust III dated October 13, 2017, known to me to be the person described in and who executed the foregoing instrument, appeared before me this day in person and acknowledged that she executed the instrument as her free and voluntary act, for the uses and purposes therein stated.

Given under my hand and official seal this __16__ day of October 2017.

OFFICIAL SEAL
ERIC LYNN JOHNSON
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
APRIL 6, 2020

Notary Public

3

## EXHIBIT A

6.     **TRUSTEE POWERS**

    6.1.    **Trustee Discretion and Direction.**

        6.1.1. **Discretion**.

            The powers set forth in this Section 6, as well as those now or hereafter conferred upon Trustees generally may be exercised by such Trustees in such manner as they, in their sole judgment and discretion, deem appropriate under the then circumstances (insofar as they can be reasonably ascertained by such Trustees) to carry out the trust purposes of protecting and conserving property for the beneficiaries, all without obtaining authority therefor from any court. No person dealing with the Trustees shall be bound to see to the application or disposition of cash or property transferred to or upon the order of the Trustees or to inquire into the authority, validity or propriety of any action of the Trustees.

        6.1.2. **"Prudent Person" Rule.**

            In addition to the investment powers conferred above, the Trustees are authorized (but are not directed) to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden by the "prudent person" rule. The Trustees may, in their sole discretion, invest in any type of property, wherever located, including any type of security or option, improved or unimproved real property, and tangible or intangible personal property, and in any manner, including direct purchase, joint ventures, partnerships, limited partnerships, corporations, mutual funds or any other form of participation or ownership whatsoever. In making investments, the Trustees may disregard all of the following factors:

            (a)     Whether a particular investment, or the trust investments collectively, will produce a reasonable rate of return or result in the preservation of principal.

            (b)     Whether the acquisition or retention of a particular investment, or the trust investments collectively, is consistent with any duty of impartiality as to the different beneficiaries. The Grantor intends that no such duty shall exist.

            (c)     Whether the trust is diversified. The Grantor intends that no duty to diversify shall exist.

            (d)     Whether any or all of the trust investments would traditionally be classified as too risky or speculative for trusts. The entire trust may be so invested. The Grantor intends the Trustees to have sole discretion in determining what constitutes acceptable risk and what constitutes proper investment strategy.

            The Grantor's purpose in granting the foregoing authority is to modify the prudent person rule insofar as the rule would prohibit an investment or investments because of one or more factors listed above, or any other factor relating to the nature of

4

the investment itself. Accordingly, the Trustees shall not be liable for any loss in value of an investment merely because of the nature of the investment or the degree of risk presented by the investment, but shall be liable if the Trustees' procedures in selecting and monitoring the investment are proven by affirmative evidence to have been negligent, and that such negligence was the proximate cause of the loss.

### 6.1.3. Enlarged Investment Perspective.

The investment policy of each Trustee hereunder shall be based primarily on the long-term best interests of the person or persons who, at the time, are entitled to trust income and only secondarily on the interests of remainder beneficiaries. If any Trustee considers it appropriate to determine the proportion of trust properties to be invested in (i) equities, and (ii) "fixed dollar" type assets, consideration should also be given to the amount and nature of all assets and means of support available from all sources to each income beneficiary to the extent known (even to the point of having all trust investments in one or the other type of holding). The soundness of trust investments shall be judged not on the basis of individual assets nor on the basis of the trust estate alone, but on the broader basis of each income beneficiary's economic circumstances as a whole, including said trust estate.

### 6.2. In General.

With respect to each trust hereunder, during its existence and until such time after its termination as all of its assets have been distributed, its Trustee(s), in their discretion, shall have the power and are authorized to:

### 6.2.1. Investment Powers.

(a) Enter upon and take possession of the trust property and invest and reinvest the same in real, personal and mixed assets, improved and unimproved, tangible and intangible, of any kind and nature whatsoever, foreign as well as domestic, that yield a high rate of income or no current income including, but without limitation, securities issued by an institution that is or may become a Trustee hereunder, common and preferred stocks (regardless of dividend arrearages), leverage type securities, options, puts and calls, fixed income bearing securities (secured or unsecured and notwithstanding default in interest), units of participation in limited partnerships, in real estate investment trusts and/or in common trust funds, investment trust stocks, mutual funds and other securities and investments of any kind, without regard to whether or not any such securities or investments are of a kind known to exist at the date of this instrument and whether or not any such investments shall be in (i) unseasoned or fledgling companies or securities that are (a) not listed on any stock exchange or public market nor registered with any securities commission, or (b) subject to contractual, legal or other restrictions (including "investment letter" restrictions), or (ii) oil, gas and other mineral interests and natural resources, leasehold interests (including agricultural, business, etc.), commodities, currencies, collectibles, insurance and/or annuity contracts of any kind on the life of any person or persons, life estates, remainder interests, etc., not being limited by any present or future investment law and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for

5

Trustee(s), all without regard to the "prudent man rule," to the relation any such investment may bear to the value of such trust or to the type or character of other investments in such trust, or to the effect such investment may have upon the diversification of the investments in such trust and even though such investment or reinvestment shall be when made or shall thereafter become unproductive of income, unmarketable, risky or speculative; and such investments may be purchased from or made in common with any person or persons, notwithstanding that any such person may control such investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder; and any business partially or wholly owned by such trust may separately compensate any fiduciary and/or beneficiary hereunder for any services rendered directly to such business;

(b)     Retain, for as long as may be deemed desirable, all property in the form in which the same shall be acquired by such trust, without regard to any trust investment rules of any kind nor to the proportion that anyone asset or class of assets may bear to the whole and without liability for any loss that may be incurred thereby;

(c)     Sell (either for cash or partly for cash and partly on credit for any period, with or without security), option, convey, exchange (whether or not of like kind or similar use), lease (for any length of time regardless of the possible or actual prior termination of any trust), partition, plat, rezone, subdivide, improve and/or develop (and, where appropriate, dedicate for public use, demolish, construct, alter, reconstruct, change, etc.), repair, manage, operate or otherwise enter upon contracts or agreements regarding, deal with or dispose of any part or all of the trust property, whether real, personal or mixed, at any time, for any purpose or purposes, in any manner, either public or private, and upon any terms and with any party, including any who may be, directly or indirectly, a beneficiary or a fiduciary hereunder or an estate or trust of or for such a person;

(d)     Abandon or demolish any trust property deemed to be of insufficient value to warrant the expense of retention or abstain from the payment of taxes, liens, rents, assessments, repairs, etc. on such property and/or permit such property to be lost by tax sale, foreclosure or other proceedings, by conveyance for nominal or no consideration, or to charity;

(e)     Grant or release easements or charges of any kind (with or without consideration), effect and carry insurance (protecting against such hazards and liabilities as may be deemed advisable), renew or extend, amend, change or modify leases, grant options to lease and options to renew leases, all on such terms and conditions as may be deemed advisable and to pay any and all expenses in connection therewith;

(f)     Exercise or not exercise or otherwise deal with any and all options of any kind;

(g)     Vote, deal or consent, in person or by proxy (with or without power of substitution), including electing any Trustee or an employee or officer of any Trustee as a director or officer of any corporation, with respect to any securities, including

those of companies in which a Trustee may, directly or indirectly, have an interest of any kind;

(h)   Form or cause to be formed, alone or with others, such corporations, partnerships, limited partnerships and other business organizations organized under the laws of any state or country and to transfer and convey to such business organizations all or any part of the assets, real or personal, of any trust estate in exchange for stocks, bonds, notes, other securities or interest of such business organizations as the Trustees, in their absolute discretion, deem advisable;

(i)   Rent office space, whether or not from, or in conjunction with any such space being used by any beneficiary hereunder, or any relative of the Initial Primary Beneficiary or of any beneficiary hereunder, or any fiduciary hereunder in his, her or its individual capacity, and to pay the expenses thereof from the principal of the respective trust estate;

(j)   Enforce, abandon, adjust, arbitrate, compromise, sue on, prosecute and/or defend, and otherwise deal with and settle, on such terms as such Trustee(s) in good faith may deem advisable, even if the result would substantially diminish the trust property and/or materially affect the trust plan (whether or not with concurrence of the beneficiaries), any and all claims in favor of or against such trust, including those relating to tax matters;

(k)   Borrow money for the payment of taxes, the exercise of options, or for any other purpose or purposes Whatsoever, from any source, including the commercial department of any corporate Trustee hereunder, on the general credit of any trust property, and to pledge or mortgage any or all of said property as security for the repayment of such loans and/or of any loan, new or old, from any third party(ies) to any beneficiary hereunder and/or to any trust, estate or company in which any beneficiary and/or any trust hereunder has an interest, and to guarantee any such third party loans, and to pay interest on and to renew, extend, modify, reduce and/or payoff, from time to time, any such indebtedness incurred by such Trustee(s) or any of their predecessors in interest;

(l)   Loan money to anyone, including any beneficiary of that trust or of any trust hereunder (including any beneficiary who may at the time also be a fiduciary hereunder), or to any estate, trust or company in which such person or any trust hereunder has an interest, for any purpose Whatsoever, with or without security and at such rate of interest as the Trustee(s) of such trust shall determine in the exercise of reasonable fiduciary discretion, and, with respect to such loans and/or security interests, to renew, extend, modify, grant waivers, etc.; and

(m)   Hold, retain, purchase or sell legal life estates, interests for a term of years, remainder interests, etc., whether or not they yield a reasonable rate of return or no current return, whether or not they result in the preservation of principal, and whether or not the same may be regarded by any statute, rule of law or otherwise as being proper for Trustees. Such investments may be purchased from or made in conjunction with any persons notwithstanding that any such person may control such

investment and/or may be, directly or indirectly, a beneficiary or a fiduciary hereunder. The purchase or sales price for any transactions hereunder may, but need not, be determined under the Treasury Department Regulation Section 25.2512-9, as amended, or any successor regulation or tables.

### 6.2.2. Administrative Powers.

(a)     Open checking, savings, custody, agency and cash and margin brokerage accounts and safe deposit boxes with any institution(s) empowered to accept the same, including any that may be a Trustee hereunder, either (i) in their names or any of their names (with or without disclosing fiduciary capacity), (ii) in the name of such trust (where an account is in the name of a trust, checks on that account and authorized signatures need not disclose the fiduciary nature of the account or refer to any trust or Trustee), or (iii) in the name of such trust's nominee(s), depositing therein any part or all of the funds and securities of such trust, and withdrawals therefrom and access thereto shall be permitted on the signature of anyone or more of the Trustees and/or nominees, with the right and power to authorize withdrawals and/or access on the sole signature of any agent or agents designated in writing by such Trustees;

(b)     Employ such accountants, custodians, experts, counsel (legal and/or investment), and other agents as may be deemed advisable (notwithstanding that such person or entity may be, or be affiliated in business with, any Trustees hereunder) and delegate discretionary powers to and rely upon information or advice furnished by them;

(c)     Exercise all tax related elections, choices, etc. that they may have (whether or not specifically referred to in Section 8.1, including (i) the disclaimer of benefits receivable by such trust in any manner permitted by law or by a "transfer" meeting the requirements of Section 2518(c)(3) of the Internal Revenue Code, and (ii) the entering into of closing agreements relating to any trust matters (which shall be binding on all present and future trust beneficiaries), and to pay any income or similar tax properly imposed on or to be borne by such trust and any estate, inheritance, succession, generation-skipping or other similar tax that, under applicable tax and apportionment laws, is properly imposed upon or with respect to any property held (or being distributed) hereunder, such payment to be charged to such property;

(d)     Make, execute and deliver any and all such instruments in writing as shall be necessary and proper to carry out any disposition whatever of any trust property;

(e)     Carry securities or other properties requiring or permitting of registration or recording in their names, in anyone of their names, in the name of their nominee or nominees (with or without designation of fiduciary capacity), or unregistered (or in such form as will pass by delivery);

(f)     Exercise, in general, all such control and power over the trust property as an individual might exercise with respect to his own property;

(g)     Compromise, submit to arbitration, release, with or without consideration, or otherwise adjust claims in favor of or against any trust; and

(h)     Institute, compromise and defend actions and proceedings.

### 6.3.   Provisions Regarding Life Insurance.

#### 6.3.1. Powers Regarding Life Insurance Held in Trust.

The Trustees of each trust hereunder, other than any individual Trustee whose life may be insured under the life insurance policy in question, shall have and, in its sole discretion, may exercise all of the incidents of ownership in each and every policy of life insurance which may at any time be owned or purchased by the trust. The term "incidents of ownership" with respect to a policy shall include, by way of illustration and not limitation, the right to collect, receive and retain all payments, dividends, surrender values, sickness, accident, disability, retirement or other benefits, including all death benefits, maturing on such policy during the insured's lifetime and thereafter, as well as the right at any time to transfer, assign, sell, pledge, hypothecate, borrow on, surrender, prepay, convert, divide, change the beneficiary of, and/or exercise or select any options, elections and waivers with respect to such policy. All other provisions of this instrument to the contrary notwithstanding, any individual trustee whose life is insured under a trust owned policy under no circumstances shall be entitled to partake in any way in decisions relating to such policy (and in the absence of another then acting trustee, no incidents of ownership as to such policy shall be exercised).

#### 6.3.2. Payment of Premiums.

The payment of premiums on each policy owned by a trust hereunder shall be charged against the principal of that trust unless the Trustee of such trust (other than any who might be financially affected thereby), in the exercise of reasonable discretion, shall determine to charge such premiums against the income of such trust on the basis of that being (i) in the best interests of the present and future beneficiaries of such trust, and (ii) not contrary to the provisions of Section 7.8 above.

#### 6.3.3. Limitations Regarding Life Insurance Held in Trust.

Furthermore and also notwithstanding all other provisions of this Trust Agreement, if any insurance on the life of a beneficiary of a trust hereunder is an asset of such trust, such insurance and all proceeds thereof shall be excluded from the assets which might otherwise be subject to any use, enjoyment, withdrawal or appointment by that beneficiary (and on such beneficiary's death, such proceeds shall be disposed of as though any power of appointment held by such beneficiary had not been exercised).

#### 6.3.4. Collection of Death and Disability Benefits by Trustee.

(a)     Upon the receipt of notice, believed to be reliable, of the death or disability of anyone who (i) is insured by any policy (including accident and disability

9

policies of all kinds) which may be payable to any trust hereunder, or (ii) on account of whose death or disability any benefit may be payable to any trust hereunder, the Trustee of such trust shall use its best efforts to enforce such trust's rights (including the election of such annuity, installment, lump sum or other mode of settlement options as the Trustee may deem appropriate for the trust) with respect to each and every such policy upon such person's life or other benefit relating to such person's life which such Trustee believes may be payable in any way to such trust. For that purpose, such Trustee shall have full power to (i) execute and deliver any receipts and/or other instruments; (ii) compromise or adjust disputed claims in such manner as, in its sole discretion, it shall deem just (and its decision in this regard shall be final and binding upon all interested parties); and (iii) take such other actions, including the institution of proceedings at law or in equity, as in its judgment may seem necessary and proper to enforce payment of any sums which may be due to such trust under the terms of such policies or other death or disability arrangements.

(b)     Notwithstanding the foregoing, if the full payment on any death or disability benefit or policy proceeds is contested, such Trustee shall not be obligated, except at its option, to take any action for collection until it shall have been indemnified to its satisfaction against any loss, liability or expense, including attorneys' fees, which might be incurred thereby. Under these circumstances, however, such Trustee is authorized, in its sole discretion, to use any of such trust's assets to payor reimburse itself for the costs of thus enforcing any such benefits and proceeds.

(c)     No insurance company, employer, plan administrator or other stakeholder making any payment to any Trustee hereunder shall be required to see to the use or application of such payment.

### 6.3.5. Insurance Incidents of Ownership in Independent Trustee.

The Trustee is authorized to continue to hold as part of the trust estate any insurance policy or policies on the life of a primary beneficiary's spouse which shall be distributed to the Trustee as part of the trust estate. The Independent Trustee solely shall hold all powers conferred on the owner of any such policy or policies and shall designate the trust as beneficiary of all such policies.

### 6.4.   Residences.

In addition to all other powers herein granted to the Trustees, the Trustee of each trust created hereunder is specifically authorized to hold and maintain any residence (whether held as real property, condominium or cooperative apartment) for the use and benefit of the beneficiaries of any trust. If the Trustees, in their sole and absolute discretion, determine that it would be in the best interests of the beneficiaries of any trust to maintain a residence for their use but that the residence owned by the Trustees should not be used for such purpose, the Trustees are authorized to sell said residence and to apply the net proceeds of sale to the purchase of such other residence or to make such other arrangements as the Trustees, in their sole and absolute discretion, deem suitable for the purpose. Any proceeds of sale not needed for reinvestment in a residence as provided above shall be added to the principal of this trust and thereafter held,

administered and disposed of as a part thereof. The Trustees are authorized to pay all carrying charges of such residence, including, but not limited to, any taxes, assessments and maintenance thereon, and all expenses of the repair and operation thereof, including the employment of domestic servants and other expenses incident to the running of a household for the benefit of the beneficiaries of the trust. Having in mind the extent to which funds will be available for expenditure for the benefit of the beneficiaries, the Trustees are authorized to expend such amounts as they, in their sole and absolute discretion, shall determine to maintain the current lifestyle of the beneficiaries, including, but not limited to, complete authority to provide for their personal care and comfort in any manner whatsoever.

### 6.5.   Properties and Companies Owned in Common with Others.

The Trustee(s) of each trust hereunder are specifically authorized, with or without the joinder of other owners of property or securities related to any that may be held in such trust (and notwithstanding that one or more such other owners may be, directly or indirectly, a beneficiary or a fiduciary hereunder), to enter upon and carry out any plan (i) for the foreclosure, lease or sale of any trust property, (ii) for the consolidation or merger, dissolution or liquidation, incorporation or reincorporation, recapitalization, reorganization or readjustment of the capital or financial structure of any corporation, company or association, the securities of which, whether closely held or publicly traded, may form a part of such trust, or (iii) for the creation of one or more holding companies to hold any such securities and/or properties (even if it leaves, following the termination of such trust, a trust beneficiary as a minority shareholder in such a holding company), all as such Trustee(s) may deem expedient or advisable for the furtherance of the interests of such trust and the carrying out of the Grantor's original intent as to such trust and as to those properties and/or securities. In carrying out such plan, such Trustee(s) may deposit any such securities or properties, pay any assessments, expenses and sums of money, give investment letters and other assurances, receive and, subject to the requirements of Section 6.6 below, retain as Investments of such trust any new properties or securities transferred or issued as a result thereof, whether or not the same may be regarded by any statute, rule of law or otherwise as being proper investments for Trustee(s), and generally do any act with reference to such holdings as might be done by any person owning similar securities or properties in his own right, including the exercise of conversion, subscription, purchase or other rights or options, the entrance into voting trusts, etc., all without obtaining authority therefor from any court.

### 6.6.   Authority to Operate Businesses.

If an interest in any business, whether in the form of a general or limited partnership or sole proprietorship, at any time becomes an asset of any trust hereunder (by purchase, gift, the entrance of the trust into such business or otherwise), its Trustee(s) shall have the authority to engage in and to continue such trust in such business for such period, without limit, as such Trustee(s), in their sole judgment, may deem best for such trust (but only as long as such activity does not constitute "carrying on business" within the meaning of the federal tax laws defining associations taxable as a corporation) and, for that purpose, such Trustee(s) may retain and employ the capital in said business

11

that shall at the time of trust acquisition be committed thereto or employed therein and such additional capital as such Trustee(s), in their sole judgment, shall think fit to advance from time to time out of such trust's other resources, whether for continuation or expansion or any other purpose; and such Trustee(s), in their sole discretion, may incorporate a part or all of said business (or any investment held in such trust) in one or more corporations, with whatever capital structure may be deemed appropriate, alone or with others, in any jurisdiction, and/or form partnerships in which such trust may be a general or limited partner, and/or enter into joint ventures or associations with others on such terms as may be deemed appropriate, and/or enter into agreements respecting voting rights, management, incentive compensation, profit sharing, future sale or retention, etc., all without obtaining authority therefor from any court, and such Trustee(s), while acting in good faith, shall be free from any responsibility for losses arising in the prosecution of such business.

### 6.7.   Mineral and Oil and Gas Operations.

With respect to any and all mineral and oil and gas interests of any kind, regardless of where located, that may at any time form a part of or be acquired by any trust hereunder, the powers and discretions herein granted to Trustee(s) shall be broadly construed, regardless of technical terminology, to permit any contract, act or thing that may be deemed by the Trustee(s) of such trust to be advantageous to such trust, whether or not the same be now or hereafter recognized as common or proper practice by or among those engaged in the business of prospecting for, developing, producing, processing, transporting and/or marketing any such minerals, properties or interests. Without limiting the generality of the foregoing, such Trustee(s) are also specifically authorized and empowered, in their sole discretion as they may deem necessary or desirable, with respect to any and all such interests, to:

(a)   Pay all delay rentals, lease bonuses, royalties, overriding royalties, bottom hole or dry hole contributions, local taxes and assessments and all other proper charges;

(b)   Make farm out agreements, engage in secondary recovery operations and enter into and execute pooling and/or unitization agreements and/or agreements for the installation and/or operation of absorption, repressuring and/or other processing plants;

(c)   Retain, sell, assign, transfer, lease, exchange, mortgage, pledge or otherwise hypothecate, surrender or abandon, with or without condition, either in cash or in kind, any or all of such interests (including making reservations and exacting conditions on the transfer of any such interests);

(d)   Drill, test, explore, mine, develop, operate and otherwise exploit, directly or by contract with others, any and all such interests to any extent;

(e)   Produce, process, sell or exchange all products recovered through the exploitation of such interests;

12

(f)     Exercise, in accordance with their best judgment, any right, power or privilege (including, but not by way of limitation, the right to consent to participate or to not participate in wells to be drilled) that the Trustee(s) or any predecessor in interest may have under any agreement that may have been entered into in connection with any of such interests;

(g)     Select, employ and enter into any appropriate business form in which to properly exploit such interests, including corporations, partnerships, limited partnerships, mining partnerships, joint ventures and co-tenancies;

(h)     Hire all necessary personnel, rent office space, buy or lease office equipment, contract and pay for geological surveys and studies, procure appraisals, rely on expert advice and generally conduct and engage in any and all activities incident to the foregoing powers set forth in Paragraphs (a) through (g), inclusive, with full power to borrow and pledge in order to finance such activities; and

(i)     Exercise broad and liberal discretion in making allocations under Section 5.3 above, notwithstanding the technical nature of any receipt or disbursement, notwithstanding any local law or custom to the contrary, and without being required to allocate to principal any reserve for depletion.

Such Trustee(s) are further hereby granted any other power that they deem necessary in order to properly conserve, develop, exploit and administer the interests described in this section, including the power to dispose of such interests in any manner and at any price, either in cash or in property, that they, in the exercise of their best judgment, deem reasonable at the time of such disposition. All fiduciaries hereunder shall be exonerated from liability for honest errors in judgment in connection with the exercise of the powers described in this section.

### 6.8.   Agricultural Realty and Farming Operations.

With respect to any real property used or useable for agricultural purposes and/or farming operation of any kind, regardless of its nature, that may at any time become an asset of any trust hereunder, its Trustee(s) shall have the authority to:

(a)     Operate all property and interests in property relating to such operation with hired labor, tenants and/or sharecroppers (including any who may be a beneficiary, Trustees and/or the Grantor hereunder), as such Trustee(s) from time to time deem best;

(b)     Hire a farm manager or professional farm management service to supervise such operation or operations;

(c)     Lease or rent land, equipment and/or livestock for cash or on shares, either to others or from others (including related parties and/or Trustee(s));

(d)     Sell, purchase, exchange and/or otherwise acquire or dispose of farm machinery, livestock, farm products, crops, timber, supplies and services used in

connection with the property or any acreage or parcel of real estate constituting farm property;

(e)   Remove, construct, repair and improve fences, structures and buildings of all kinds on the property;

(f)   Fertilize, terrace, clear, level, ditch and/or drain farm lands;

(g)   Install irrigation systems, carry on reforestation and, in general, follow soil conservation and other practices designed to conserve, improve and maintain the fertility and productivity of the soil;

(h)   Enter into agreements and/or programs with any governmental agency relating to soil conservation, acreage reduction, agricultural, recreational or other similar purposes;

(i)   Carry on both crop and livestock programs, including the breeding, raising, purchasing and/or selling of livestock and any other farm products whatsoever; and

(j)   Borrow money and pledge harvested or growing crops, timber or livestock and mortgage or pledge farm property of any kind.

Regarding all such agricultural real property and farming operations, no Trustee shall be liable for any losses except as such losses are caused by that Trustee's bad faith or intentional misconduct. Furthermore, during such time as there is a Management Trustee acting with respect to any trust that owns or leases real property used or useable for agricultural purposes or that is thus involved in farming operations, that Management Trustee shall completely control and manage all of such trust's agricultural real property and/or farming operations and the Independent Trustee(s) of such trust shall not have any responsibility whatsoever with respect to such property and/or operations (except to approve acts of self-dealing under Section 6.10, below), and to receive amounts of cash due the income or principal accounts of such trust from such property and/or operations and to provide such Management Trustee with all funds that such Management Trustee calls for, either from the income or principal account of such trust, in connection with such property and/or operations.

### 6.9.   Assistance to Estates and Trusts of Interested Persons.

The Trustee(s) of each trust hereunder are authorized, in the exercise of their discretion, to purchase and retain, as a trust investment, securities or other properties, for a fair consideration in money or money's worth, from the fiduciaries of the estate (and/or revocable trust) of the Grantor, the Grantor's spouse, the Initial Primary Beneficiary, the Initial Primary Beneficiary's spouse, and each of the Initial Primary Beneficiary's descendants (and each of their spouses), from the fiduciaries of each other separate trust hereunder, and from the fiduciaries of the estate (and/or revocable trust) of each deceased beneficiary of each trust hereunder (and each of their spouses) and to make loans to such fiduciaries, with or without security and at such rate of interest or no

14

interest, all as such Trustee(s) shall determine to be appropriate in carrying out what they alone judge would be the Grantor's original intent under the circumstances. The propriety of any such purchase and/or loan and of the terms thereof shall not be questioned merely because any of the fiduciaries or beneficiaries of such estate or trust may also be a Trustee hereunder.

### 6.10.  Permitted Self-Dealing.

Financial transactions, both direct and indirect, between any trust and any of the Trustee(s), beneficiaries and/or the Grantor of that trust (including, for instance, the purchase, sale or leasing of property, employment in any capacity, lending, etc.), whether or not specifically described in this article as permitted between such parties, except to the extent expressly prohibited by this instrument, are hereby expressly authorized, notwithstanding any rule of law relating to self-dealing, provided only that the Trustee(s), in thus acting either on behalf of or with or for such trust, shall act in good faith to assure that such trust receives in such transaction adequate and full consideration in money or money's worth.

### 6.11.  Limited Power of Amendment.

(a)      In the case of each separate trust at any time in existence hereunder, such trust's then Trustee(s), other than any (i) who has ever made a gift transfer to such trust, or (ii) who is prohibited by the provisions of Paragraph (c)(1) below from participating in the amendment involved, from time to time may, notwithstanding any other provision of this instrument, amend or restate this instrument, including its dispositive, administrative and other provisions of all kinds, in order to permit such Trustee(s):

(1)      To cope with tax and/or other circumstantial changes that may affect such trust and/or its beneficiaries, and/or

(2)      To remove from the governing trust instrument any provisions which have become "deadwood" (i.e., no longer operative in the ongoing administration of such trust due to changed circumstances)

with respect to (i) such trust, and (ii) all trusts that are subsequently to come into existence under this instrument to hold part or all of the assets of such trust, in whatever way or ways such Trustee(s), in the exercise of such Trustee's(s') sole discretion, may deem appropriate in the best interests, as interpreted by such Trustee(s) alone, of the primary beneficiary(ies) of such trust(s) and of each such beneficiary's family as a whole. Such Trustee(s) shall be guided by what, in the sole judgment of such Trustee(s) alone, would apparently be the Grantor's original intent hereunder in the light of the changed circumstances.

(b)      This power of amendment shall include, by way of example and not limitation, the power to:

(1)      Grant, reduce or eliminate general (as defined in Section 2041 of the Internal Revenue Code) and special powers of appointment with respect to part or

all of any trust property (such powers may be made subject to any conditions or consents and limited to such objects as may be described in the grant or reduction of each power);

(2)     Add mandatory distribution or set aside provisions for one or more beneficiaries or Permissible Distributees;

(3)     Divide a trust at any time (before or after it is funded with assets) into two or more separate trusts (representing fractional shares of any property being divided) or merge separate trusts together;

(4)     Provide for the creation of one or more separate subaccounts (equivalent to a separate trust) in any trust hereunder with respect to which subaccount more restrictive or other administrative or dispositive provisions are made applicable in order to permit some or all of the properties or interests that may at any time be held in or allocable to that trust to be segregated and transferred to that subaccount to achieve some tax or other benefit that would otherwise not be available to such property or interest or to the primary beneficiary or one or more of the other current beneficiaries of that trust [such as, by way of example and not limitation, to permit (i) such property, interest or beneficiary to qualify for some governmental or tax benefit, generation-skipping transfer tax exemption or Code Section 2032A election, (ii) a disclaimer to be made, or (iii) shares of stock held in such subaccount to be a qualifying stockholder in an S corporation, and so on]; and

(5)     Restrict in anyway, revocably or irrevocably, the future exercise of any power held by any beneficiary(ies) and/or Trustee(s) hereunder.

(c)     Notwithstanding the foregoing, however, under no circumstances (i) shall any Trustee, who is also a beneficiary of any such trust, participate in any amendment which may result in such Trustee beneficiary receiving any direct or indirect financial benefit from any such trust, nor (ii) shall any such amendment:

(1)     Extend the period of any such trust's existence beyond the period specified in Section 8.1;

(2)     Diminish in any way (that is not controlled by the beneficiary) any enforceable right any beneficiary may already have (under the then terms of this instrument) to receive the income of any trust, currently or at any time in the future (but, to the extent that an amendment benefits or grants a power to a current beneficiary of any trust, it may diminish the rights of one or more beneficiaries to receive in the future the income of that trust or of any trust subsequently to come into existence to hold part or all of the assets of that trust);

(3)     Reduce in any way the restrictions and limitations on (i) grantor and fiduciary actions as set forth in Section 2.1 above and Section 7.8 below, (ii) the Trustee's(s') limited power of amendment under this Section 6.11, and (iii) who (or what institutions) can qualify to fill any office of Trustee hereunder as set forth in Section 7 below, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on such trust or any of its beneficiaries [all of which provisions, referred to in (i),

(i) and (iii) above, however, may be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Trustee(s) may deem appropriate];

(4)     Give (i) any Trustee any powers or discretions that are either granted exclusively to a Co-Trustee or from the exercise of which such Trustee is excluded for any reason, or (ii) anyone acting in a non-fiduciary capacity any powers granted herein to fiduciaries unless, in either case, such amendment will not have any adverse tax effect on such trust or any of its beneficiaries;

(5)     Result in any direct or indirect financial benefit to anyone who is not, at the time of such amendment, both (i) a member of the Initial Primary Beneficiary's family within the meaning of Section 2036(c)(3)(B) of the Internal Revenue Code (as it reads on the date of this instrument), and (ii) already a present or contingent beneficiary of such trust(s) (unless it is to provide for after-born or after-adopted children of any such beneficiary), except through the exercise of a power of appointment held by or granted to a person described in (i) and (ii) above;

(6)     Discriminate in any significant financial way in favor of one or more siblings to the detriment of any other sibling(s) where such siblings are, under the terms of this instrument, to be treated in substantially equal fashion (for this purpose treating each sibling, his or her spouse and descendants, and their spouses as one unit); nor

(7)     Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (i) any exemption from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust, or (ii) any substantial deduction, credit, exclusion or other tax benefit (such as any marital or charitable deduction, any annual gift tax exclusion, a Code Section 2032A or Section 2057 election, a generation-skipping tax exemption, the opportunity to be a stockholder in an S corporation, a significant grandfathered status under some changed law, and so on).

(d)     Any such amendment shall be by written instrument, executed by such amending Trustee(s) with all the formalities of a deed, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment

1   **2550**
    William E. Peterson, Bar No. 1528
2   Janine C. Prupas, Bar No. 9156
    SNELL & WILMER L.L.P.
3   50 West Liberty Street, Suite 510
    Reno, Nevada 89501
4   Telephone: 775-785-5440
    Facsimile: 775-785-5441
5   Email: wpeterson@swlaw.com
           jprupas@swlaw.com
6
    *Attorneys for Petitioners*
7

8           IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
9                      IN AND FOR THE COUNTY OF WASHOE
10

11  IN THE MATTER OF THE                    Case No.   PR19-00231

12  PEE PEE POP TRUST, PEE PEE POP          Dept. No.   PR
    TRUST II, PEE PEE POP TRUST III, MAN
13  CUB TRUST, MAN CUB TRUST II, MAN
    CUB TRUST III, DATED JULY 22, 2013.
14

15                          **NOTICE OF HEARING**

16          NOTICE IS HEREBY GIVEN that John Hurry, Trustee of Pee Pee Pop Trust, Pee Pee

17  Pop Trust II, Pee Pee Pop Trust III, Man Cub Trust, Man Cub Trust II and Man Cub Trust III

18  dated July 22, 2013 ("Trusts"), and Alpine Securities Corporation ("Alpine") and Scottsdale

19  Capital Advisors Corporation ("Scottsdale") filed a Petition to Assume Jurisdiction on April 26,

20  2019 and has set the matter for hearing on Wednesday, June 12, 2019 at 10:00 a.m., in the

21  Probate Court, Washoe County Courthouse, Reno, NV. This matter will be approved without

22  further hearing unless an objection is filed. You do not need to appear unless you wish to object.

23          The Petition seeks a declaratory order from the Court that Alpine and Scottsdale shall  not

24  be required to submit full and complete copies of the trusts to Financial Industry Regulatory

25  Authority, Inc. ("FINRA") as a condition of membership in FINRA and engaged in the security

26  clearing business in Nevada or elsewhere, and Certificates of Trust in Lieu of Trust Instruments

27  under NRS 164.400 shall be sufficient.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

**AFFIRMATION**
**Pursuant to NRS 239B.030**

The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

Dated: May 1, 2019

SNELL & WILMER L.L.P.

By: _____
William E. Peterson, No. 1528
Janine C. Prupas, No. 9156
50 West Liberty Street, Suite 510
Reno, Nevada 89501

*Attorneys for Petitioners*

- 2 -

1  **3860**
   William E. Peterson, Bar No. 1528
2  Janine C. Prupas, Bar No. 9156
   SNELL & WILMER L.L.P.
3  50 West Liberty Street, Suite 510
   Reno, Nevada 89501
4  Telephone: 775-785-5440
   Facsimile: 775-785-5441
5  Email: wpeterson@swlaw.com
          jprupas@swlaw.com
6
   *Attorneys for Petitioners*
7

8
          IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
9
                    IN AND FOR THE COUNTY OF WASHOE
10

11 IN THE MATTER OF THE                    Case No.   PR19-00231

12 PEE PEE POP TRUST, PEE PEE POP          Dept. No.   PR
   TRUST II, PEE PEE POP TRUST III, MAN
13 CUB TRUST, MAN CUB TRUST II, MAN
   CUB TRUST III, DATED JULY 22, 2013.
14

15                        **REQUEST FOR SUBMISSION**

16        John Hurry, Trustee of Pee Pee Pop Trust, Pee Pee Pop Trust II, Pee Pee Pop Trust III,

17 Man Cub Trust, Man Cub Trust II and Man Cub Trust III dated July 22, 2013 and Alpine

18 Securities Corporation and Scottsdale Capital Advisors Corporation request that the Motion for

19 Temporary Restraining Order and Preliminary Injunction filed April 26, 2019 be submitted to the

20 Court for decision,

21        I hereby certify that a copy of Petitioners' Petition to Assume Jurisdiction, Motion for

22 Temporary Restraining Order and Preliminary Injunction, Notice of Hearing, and this Request

23 have been mailed to:

24
   Financial Industry Regulatory Authority,      Anand Ramtahal
25 Inc.                                           Senior Vice President
   c/o Resident Agent, CSC Services of            Financial Industry Regulatory Authority
26 Nevada, Inc.                                    Office of Hearing Officers
   2215-B Renaissance Drive                       1735 K Street, NW
27 Las Vegas, NV 89119                            Washington, DC 20006

28

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1   Alissa-Robinson, Senior Director                Eric Levine, Surveillance Director
    FINRA Membership Application Program             FINRA Member Supervision
2   Financial Industry Regulatory Authority         Financial Industry Regulatory Authority
    Office of Hearing Officers                      Office of Hearing Officers
3   1735 K Street, NW                               1735 K Street, NW
    Washington, DC 20006                            Washington, DC 20006
4
    Ann-Marie Mason, Vice President &               Robert Ishak, Principal Regulatory
5   Counsel                                         Coordinator
    FINRA Member Supervision                        FINRA Member Supervision
6   Financial Industry Regulatory Authority         Financial Industry Regulatory Authority
    Office of Hearing Officers                      Office of Hearing Officers
7   1735 K Street, NW                               1735 K Street, NW
    Washington, DC 20006                            Washington, DC 20006
8
    Rosemarie Fanelli, Senior Director              Lisa Manzo, Associate Principal Examiner
9   FINRA Member Supervision                        Membership Application Program
    Financial Industry Regulatory Authority         Financial Industry Regulatory Authority
10  Office of Hearing Officers                      One World Financial Center
    1735 K Street, NW                               200 Liberty Street, 9th Floor
11  Washington, DC 20006                            New York, NY 10281
12  Meredith MacVicar, Principal Counsel
    FINRA Member Supervision
13  Financial Industry Regulatory Authority
    Office of Hearing Officers
14  1735 K Street, NW
    Washington, DC 20006
15
                            **AFFIRMATION**
16                       **Pursuant to NRS 239B.030**

17          The undersigned does hereby affirm that the preceding document does not contain the social

18  security number of any person.

19

20  Dated: May 1, 2019                      SNELL & WILMER L.L.P.

21

22                                          By: _____
                                            William E. Peterson, No. 1528
23                                          Janine C. Prupas, No. 9156
                                            50 West Liberty Street, Suite 510
24                                          Reno, Nevada 89501

25                                          *Attorneys for Petitioners*

26

27

28

                              - 2 -

F I L E D
Electronically
PR19-00231
2019-05-06 05:18:58 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7255848

**CODE 1312**

**IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR THE COUNTY OF WASHOE**

In the Matter of the:

**PEE PEE POP TRUST, PEE PEE POP PR TRUST II, PEE PEE POP TRUST III, MAN CUB TRUST, MAN CUB TRUST II, MAN CUB TRUST III, DATED JULY 22, 2013,**

**Case No: PR19-00231**

**Dept. No:  PR**

_____/

**CASE ASSIGNMENT NOTIFICATION**

     I hereby certify the above-entitled matter has been randomly reassigned to alternate Probate Department 3 from Probate Department 15.

     Additional information:

     On May 6, 2019, an **ORDER DIRECTING RANDOM ASSIGNMENT** was filed.

     Dated May 6, 2019.

                                 ____JACQUELINE BRYANT____
                                     Clerk of the Court

                    By _____**/s/N. Mason**_____
                                 N. Mason- Deputy Clerk

**CERTIFICATE OF SERVICE**

Case No. PR19-00231

        I certify that I am an employee of the Second Judicial District Court; that on May 6, 2019, I electronically filed the Case Assignment Notification with the clerk of the Court System which will send a notice of electronic filing to the following:

HONORABLE JEROME POLAHA

WILLIAM E. PETERSON, ESQ. for JOHN HURRY

JANINE C. PRUPAS, ESQ. for JOHN HURRY

        Pursuant to NRCP 5 (b), I certify that I am an employee of the Second Judicial District Court, and that on May 6, 2019, I deposited in the Washoe County mailing system for postage and mailing with the U.S. Postal Service in Reno, Nevada, a true copy of the attached document, addressed to:

        The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

        Dated May 6, 2019.

                            **/s/N. Mason**_____

                            N. Mason
                            Deputy Clerk

F I L E D
Electronically
PR19-00231
2019-05-07 02:20:09 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7257717

1
2
3
4
5
6
7
8

## IN THE SECOND JUDICIAL DISTRICT COURT OF
## THE STATE OF NEVADA IN AND FOR THE
## COUNTY OF WASHOE

In the Matter of the:

**PEE PEE POP TRUST, PEE PEE POP PR TRUST II, PEE PEE POP TRUST III, MAN CUB TRUST, MAN CUB TRUST II, MAN CUB TRUST III, DATED JULY 22, 2013,**

    **For a change of name.**

_____/

Case No.    PR19-00231

Dept. No.    PR

## ORDER DENYING RANDOM ASSIGNMENT

The above-entitled matter was randomly re-assigned to Department 3 by an Order Directing Random Assignment entered May 6, 2019. The assignment to Department 3 is hereby DENIED due to Judge Polaha attending a conference and unavailable. In order to manage this matter expeditiously, the undersigned Judge directs the Clerk of the Court to re-assign it to alternate Probate Judge Lynne Simons in Department 6.

IT IS SO ORDERED.

Dated this _____7TH_____ day of May, 2019.

For Di A.by

JEROME POLAHA
DISTRICT JUDGE

1