**LEACH KERN GRUCHOW ANDERSON SONG**
SEAN L. ANDERSON
Nevada Bar No. 7259
sanderson@lkglawfirm.com
RYAN D. HASTINGS
Nevada Bar No. 12394
E-mail: rhastings@lkglawfirm.com
2525 Box Canyon Drive
Las Vegas, Nevada 89128
Telephone:     (702) 538-9074
Facsimile:      (702) 538-9113

**SQUIRE PATTON BOGGS (US) LLP**
Gregory A. Davis *(pro hac vice)*
gregory.davis@squirepb.com
Gregory Schneider *(pro hac vice forthcoming)*
gregory.schneider@squirepb.com
1 East Washington Street, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 528-4000
Facsimile: (602) 253-8129
*Attorneys for Financial Industry Regulatory Authority, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN THE MATTER OF THE<br><br>PEE PEE POP TRUST, PEE PEE POP TRUST II, PEE PEE POP TRUST III, MAN CUB TRUST, MAN CUB TRUST II, MAN CUB TRUST III, DATED JULY 22, 2013. | Case No.: 3:19-cv-00240-MMD-CBC<br><br>**MOTION TO DISMISS** |

Pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and (6), Financial Industry Regulatory Authority, Inc. ("FINRA") moves to dismiss all claims asserted by plaintiffs Pee Pee Pop Trust; Pee Pee Pop Trust II; Pee Pee Pop Trust III; Man Cub Trust; Man Cub Trust II; and Man Cub Trust III, Dated July 22, 2013 (collectively, the "Trusts").

**Introduction**

FINRA members Scottsdale Capital Advisors Corporation ("Scottsdale") and Alpine Securities Corporation ("Alpine") violated FINRA rules by refusing to produce certain trust documents, and as a result are the subjects of an ongoing FINRA enforcement proceeding. [*See* Petition to Assume Jurisdiction (Doc. 1-1) (the "Complaint") at ¶¶ 6, 7, 9.] Through this action, John Hurry, who is trustee of the Trusts and who controls Scottsdale and Alpine, impermissibly seeks to circumvent that FINRA enforcement proceeding. [*See id.* at ¶ 6.]

This tactic of filing lawsuits to avoid legitimate regulatory oversight has unfortunately been repeatedly deployed by the Hurrys. In 2014, the Hurrys sued FINRA in the United States District Court for the District of Arizona ("Scottsdale I") regarding FINRA's on-site examination of Scottsdale. *See Hurry v. FINRA*, 2016 U.S. Dist. LEXIS 90147 (D. Ariz. Apr. 1, 2016). The claims in Scottsdale I were dismissed with prejudice on immunity grounds.[1] *Id.* at *5. In 2016, Scottsdale sued FINRA in the United States District Court for the District of Maryland ("Scottsdale II") to enjoin a then-ongoing FINRA enforcement proceeding. *See Scottsdale Capital Advisors Corp. v. FINRA*, 844 F.3d 414, 417 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1838 (2017). The district court and Fourth Circuit Court of Appeals both held in Scottsdale II that the comprehensive administrative review process established by the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq*. (the "Exchange Act"), deprived the district court of subject-matter jurisdiction. *See id.* at 417, 424. And in 2018, Scottsdale sued FINRA in the United States District Court for the District of Columbia ("Scottsdale III") for declaratory judgment and breach of contract regarding FINRA's interpretation of its own rules. *See Scottsdale Capital Advisors Corp. v. FINRA*, No. 1:18-cv-2973-CRC (D.D.C. Dec. 17, 2018). FINRA's motion to dismiss in Scottsdale III is pending.

Plaintiffs' claims in this case—for an injunction of FINRA's ongoing enforcement proceeding against Scottsdale and Alpine, and a judicial declaration that FINRA's rules do not

---

[1] The Hurrys filed additional claims in Scottsdale I that were unrelated to the on-site examination of Scottsdale, which claims were disposed of on summary judgment. *See Hurry v. FINRA*, 2018 U.S. Dist. LEXIS 54551 (D. Ariz. Mar. 29, 2018).

LEACH KERN GRUCHOW ANDERSON SONG
2525 Box Canyon Drive, Las Vegas, Nevada 89128
Telephone: (702) 538-9074 – Facsimile (702) 538-9113

require the submission of trust documents—are just as deficient as those previously filed by the Hurrys in Scottsdale I, II, and III. [*See* Complaint (Doc. 1-1) at ¶¶ 6–7, 9–12.] As the Fourth Circuit Court of Appeals held in Scottsdale II, district courts lack subject-matter jurisdiction over claims regarding ongoing FINRA enforcement proceedings. See *Scottsdale II*, 844 F.3d at 424. Indeed, even in the absence of an ongoing enforcement proceeding, "a party has no private right of action against [FINRA] for violating its own rules or for actions taken to perform its self-regulatory duties under the [Exchange] Act." *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1213 (9th Cir. 1998). Further, as the court in Scottsdale I correctly held, FINRA is immune from claims arising out of the exercise of its regulatory authority. See *Scottsdale I*, 2016 U.S. Dist. LEXIS at \*\*5–6; *see also Sparta*, 159 F.3d at 1213 ("[A] self-regulatory organization is immune from liability based on the discharge of its duties under the Exchange Act."). Dismissal is also appropriate here because this Court lacks personal jurisdiction over FINRA, a Delaware corporation that has its principal place of business in Washington, D.C. [*See* Declaration of Marcia E. Asquith ("Asquith Dec.") at ¶¶ 3–4, attached hereto as **Exhibit A**.]

### Background

**I.    FINRA Has An Essential Role In Regulating The Securities Industry And Disciplining Its Members.**

Through the Exchange Act, Congress established a comprehensive statutory plan for "cooperative regulation" of the securities market, "under which self-regulatory organizations [('SROs')] would exercise a primary supervisory role subject to ultimate SEC control." *Sparta*, 159 F.3d at 1213-14. Any person desiring to use any instrumentality of interstate commerce to sell securities must join an association of broker dealers registered as a national securities association. 15 U.S.C. § 78o(a)(1), (b)(1). FINRA, previously known as the National Association of Securities Dealers ("NASD") is a private not-for-profit SRO, which since 1939 has been the only registered national securities association in the United States. See *Turbeville v. Fin. Indus. Regulatory Auth.*, 874 F.3d 1268, 1270 n.2 (11th Cir. 2017).

The Exchange Act requires FINRA to establish rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade . . . and, in

general, to protect investors and the public interest . . . ." 15 U.S.C. § 78o-3(b)(6). Those rules must be approved by the Securities and Exchange Commission ("SEC"), after a public notice and comment period, as being "consistent with the requirements of [the Exchange Act]." 15 U.S.C. § 78s(b)(1), (2). FINRA is also required by the Exchange Act to "enforce compliance by its members and persons associated with its members," and to "appropriately discipline[]" such persons for violation of FINRA's rules or the Exchange Act. 15 U.S.C. § 78o-3(b)(2), (7).

Pursuant to FINRA's mandate to discipline its members, FINRA's rules establish a "multi-layered hearing and appeals process that governs disciplinary actions against FINRA-affiliated brokers and dealers." *Turbeville*, 874 F.3d at 1271. That process includes (1) a full hearing before a three-person hearing panel, (2) an appeal to FINRA's National Adjudicatory Council, (3) a subsequent *de novo* appeal to the SEC, and (4) another appeal to the United States Court of Appeals. *See* FINRA Rule 9200 *et seq.*; 15 U.S.C. § 78s(d)(2); 15 U.S.C. § 78y(a)(1).

## II.     **FINRA's Enforcement Proceedings Against Scottsdale And Alpine Are Ongoing.**

FINRA Rule 1017 requires FINRA members to file a Continuing Membership Application ("CMA") for approval of various "changes to . . . ownership, control, or business operation," including "a change in the equity ownership or partnership capital of the member that results in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity or partnership capital." FINRA Rule 1017(a)(4). Rule 1017 also authorizes FINRA to request from a member filing a CMA "any additional information or documents necessary to render a decision on the application." FINRA Rule 1017(e). A member that refuses to keep its membership application current, or refuses to provide information or documents requested by FINRA, may have its FINRA membership suspended. *See* FINRA Rule 9552(a).

Prior to 2017, FINRA members Scottsdale and Alpine were not owned by the Trusts. [*See* Complaint (Doc. 1-1) at ¶¶ 1, 2, 6.] After the Trusts were formed in 2017, they indirectly acquired Scottsdale and Alpine. [*See id*. at ¶¶ 2, 4.] Scottsdale and Alpine were required by FINRA Rule 1017 to file CMAs and obtain the approval of FINRA prior to being acquired by the Trusts. *See* FINRA Rule 1017(a)(4); *see also* NASD Notice to Members 00-73 (November 15, 2000) at 573 ("[A] group of individuals acting in concert to obtain control of 25 percent or

-4-

more of the equity or partnership capital of a member will be deemed to be an 'entity' for purposes of [FINRA Rule 1017(a)(4)], and as such, will trigger the requirement to submit an application to obtain approval of the ownership change."); [*see also* Complaint (Doc. 1-1) at ¶¶ 2, 4.] Despite multiple requests from FINRA, Scottsdale and Alpine did not file the required CMAs, and as a result, on March 19, 2019, FINRA served Scottsdale and Alpine with Notices of Suspension. [*See* Complaint (Doc. 1-1) at ¶ 9; *see also* Scottsdale Notice of Suspension (Doc. 1-2); *see also* Alpine Notice of Suspension (Doc. 1-3).][2]

After receiving the Notices of Suspension, Scottsdale and Alpine belatedly filed incomplete CMAs regarding the Trusts' 2017 acquisitions. [*See* Complaint (Doc. 1-1) at ¶ 6.] The CMAs themselves require the disclosure of, and various FINRA personnel explicitly requested that Scottsdale and Alpine provide FINRA with, the Trusts' formation documents. [*See id*. at ¶ 9.] Scottsdale and Alpine refused. [*See id*. at ¶¶ 7–9.] That refusal rendered the CMAs substantially incomplete, which required that FINRA reject them. See FINRA Rule 1017(d). As is their right under FINRA rules, Scottsdale and Alpine requested a hearing to dispute the validity of the Notices of Suspension served by FINRA. [*See* Scottsdale Request for Hearing, attached hereto as **Exhibit B**; *see also* Alpine Request for Hearing, attached hereto as **Exhibit C**.] That hearing is scheduled to be held on June 18, 2019. [*See* Order Rescheduling Hearing Date (Doc. 1-4) at 3.]

Less than three weeks after Scottsdale and Alpine requested a FINRA hearing—and before any portion of the four-step administrative review scheme established by the Exchange Act had been completed—plaintiffs filed this action in Nevada probate court seeking an injunction of FINRA's enforcement proceeding and a judicial determination of Scottsdale's and

---

[2] The Notices of Suspension are matters intrinsic to the complaint and consideration of such documents is permitted on a Motion to Dismiss. *See Damarco v. MSC Indus. Supply*, 2019 U.S. Dist. LEXIS 3966, at *6 n.1 (D. Nev. Jan. 9, 2019) ("Documents that are not attached to a complaint 'may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the documents forms the basis of plaintiff's claim.'") (quoting *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003)). The Court may also consider matters outside the pleadings to determine whether it has subject-matter jurisdiction over plaintiffs' claims. *See St. Clair v. City of Chico*, 880 F.2d 199, 201–02 (9th Cir. 1989).

Alpine's obligations under FINRA Rule 1017.  [*See* Complaint (Doc. 1-1) at p. 7.]

**Argument**

I. **The Exchange Act's Exclusive Review Process Strips This Court Of Subject-Matter Jurisdiction.**

Here, like in Scottsdale II, FINRA initiated enforcement proceedings against Scottsdale. [*See* Complaint (Doc. 1-1) at ¶ 9]; *see also Scottsdale II*, 844 F.3d at 418.  Here, like in Scottsdale II, plaintiffs sought injunctive and declaratory relief to alternatively halt or dictate the outcome of the FINRA enforcement proceeding.  [*See* Complaint (Doc. 1-1) at 7]; *see also Scottsdale II*, 844 F.3d at 419.  Thus here, like in Scottsdale II, plaintiffs' claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  *See Scottsdale II*, 844 F.3d at 424.  Indeed, the comprehensive administrative review process set forth in the Exchange Act is the exclusive avenue for resolving disputes that are subject to ongoing FINRA enforcement proceedings.  *Id*.

Article III courts are "courts of limited jurisdiction," possessing "only the power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Congress has the absolute authority to grant or withhold subject-matter jurisdiction of the lower federal courts.  *See Palmore v. United States*, 411 U.S. 389, 401 (1973).  The withholding of subject-matter jurisdiction need not be express.  Rather, as the Supreme Court explained in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), Congress shall be deemed to have stripped the subject-matter jurisdiction of the lower federal courts when (1) such intent is "fairly discernible in the statutory scheme" and (2) the litigant's claims are "of the type Congress intended to be reviewed within [the] statutory structure." *See Thunder Basin*, 510 U.S. at 207, 212 (quoting *Block v. Community Nutrition Institute*, 467 U.S. 340, 351 (1984)).

In considering whether Congress intended through the Exchange Act to strip the district court of jurisdiction over claims that are the subject of ongoing regulatory enforcement proceedings, this Court is not working on a clean slate.  On the contrary, courts around the country—including the Fourth Circuit Court of Appeals in Scottsdale II—have repeatedly and consistently held that the comprehensive administrative review process established by the

-6-

Exchange Act deprives district courts of subject-matter jurisdiction.  See *Scottsdale II*, 844 F.3d 414, 424 (4th Cir. 2016); *Hill v. SEC*, 825 F.3d 1236, 1241 (11th Cir. 2016); *Tilton v. SEC*, 824 F.3d 276, 282 (2d Cir. 2016); *Jarkesy v. SEC*, 803 F.3d 9, 12 (D.C. Cir. 2015); *Bebo v. SEC*, 799 F.3d 765, 767 (7th Cir. 2015); *Swirsky v. NASD*, 124 F.3d 59, 62 (1st Cir. 1997); *SEC v. Waco Financial*, 751 F.2d 831, 834 (6th Cir. 1985); *Merrill Lynch, Pierce, Fenner & Smith v. NASD*, 616 F.2d 1363, 1370 (5th Cir. 1980); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 700 (3rd Cir. 1979); *Charles Schwab & Co. Inc. v. FINRA*, 861 F. Supp. 2d 1063, 1069–70 (N.D. Cal. 2012); *Pyramid Fin. Corp. v. Fin. Indus. Regulatory Auth.*, 2010 U.S. Dist. LEXIS 90543, **4–8 (N.D. Cal. Aug. 27, 2010); *Hayden v. N.Y. Stock Exch., Inc.*, 4 F. Supp. 2d 335, 340 (S.D.N.Y. 1998).

Those decisions were correctly decided and should be followed here.  Indeed, application of the Supreme Court's two-part test in *Thunder Basin* plainly demonstrates that Congress intended to strip this Court of subject-matter jurisdiction over plaintiffs' claims.

**A.    It Is "Fairly Discernable In The Statutory Scheme" That Congress Allocated Initial Review To FINRA.**

The first step of the *Thunder Basin* test is met here because it is "fairly discernable" that Congress intended the Exchange Act to channel challenges to FINRA's enforcement proceedings through the Act's comprehensive administrative scheme.  See *Thunder Basin*, 510 U.S. at 207. "Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose . . . ." *Id*.  "Generally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Free Enterprise Fund v. Public Co. Acctg. Oversight Bd.*, 561 U.S. 477, 489 (2010).  With the Exchange Act Congress did just that, providing for two levels of FINRA review and one level of SEC review of any contested FINRA enforcement action.  See FINRA Rules 9211, 9311, 9370.

Furthermore, as the D.C. Circuit Court of Appeals observed in *Jarkesy*, "the securities laws' scheme of [regulatory] adjudication and ensuring judicial review resembles in material respects the enforcement scheme the Supreme Court found exclusive in *Thunder Basin*."

LEACH KERN GRUCHOW ANDERSON SONG
2525 Box Canyon Drive, Las Vegas, Nevada 89128
Telephone: (702) 538-9074 – Facsimile (702) 538-9113

*Jarkesy*, 803 F.3d at 16. Specifically, under the statutory scheme deemed to be exclusive in *Thunder Basin*, a party challenging regulatory action receives (1) a hearing before an administrative law judge, (2) discretionary review by the regulator, and (3) judicial review by a United States Court of Appeals. *See Thunder Basin*, 510 U.S. at 207–08. Likewise, under the Exchange Act a party to any FINRA enforcement proceeding receives (1) a hearing before a three-person hearing panel, (2) an appeal to FINRA's National Adjudicatory Council, (3) a subsequent *de novo* appeal to the SEC, and (4) another appeal to the United States Court of Appeals. *See* 15 U.S.C. § 78s(d)(2) (requiring FINRA to establish regulatory review of its enforcement decisions); *see also* FINRA Rules 9211(a) ("If a Respondent requests a hearing, a hearing shall be granted."), 9311 ("A Respondent . . . may file a written notice of appeal within 25 days after service of a decision issued pursuant to Rule 9268 or 9269."), 9370 ("A Respondent aggrieved by final disciplinary action pursuant to the Rule 9200 Series or the Rule 9300 Series may apply for review by the SEC pursuant to Section 19(d)(2) of the Exchange Act."); *see also* 15 U.S.C. § 78y(a)(1) ("A person aggrieved by a final order . . . may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit . . . .").

To the extent that the Exchange Act and the statutory scheme at issue in *Thunder Basin* differ, the Exchange Act is more robust and evidences an even clearer intent by Congress to direct review of enforcement proceedings exclusively through the statutory framework of administrative and judicial review. Indeed, whereas regulatory appeals are permissive under the statutory framework at issue in *Thunder Basin*, the Exchange Act provides any party that receives an adverse ruling from a FINRA hearing panel two administrative appeals: first to the National Adjudicatory Counsel and then the SEC. *Compare* FINRA Rules 9311, 9370 *to Thunder Basin*, 510 U.S. at 207–08.

Congress crafted the Exchange Act's administrative review scheme in "painstaking detail," and for that reason every court to consider the issue has concluded that the Exchange Act meets the first step of the *Thunder Basin* test, except for one district court decision that was

reversed on appeal.[3] *See Jarkesy*, 803 F.3d at 17 ("It is fairly discernible that Congress intended [through the Exchange Act] to deny aggrieved respondents an additional avenue of review in district court."); *Tilton v. SEC*, 824 F.3d at 282 ("Generally, therefore, persons responding to [regulatory] enforcement actions are precluded from initiating lawsuits in federal courts as a means to defend against them."); *Bebo v. SEC*, 799 F.3d at 767 ("It is fairly discernible from the [Exchange Act] that Congress intended plaintiffs in [the member's] position to proceed exclusively through the statutory review scheme set forth in 15 U.S.C. § 78y.") (quotation omitted); *Charles Schwab*, 861 F. Supp. 2d at 1069–70; *Hayden*, 4 F. Supp. 2d at 339 ("Congress's failure to assign any role to the district court strongly suggests that Congress intended the statutory review procedure to be exclusive.  Indeed, any other conclusion would subvert the Congressional purpose of creating a partnership between government and private enterprise as the cornerstone for regulation of the nation's securities markets.").

### B. Congress Intended To Preclude Initial Judicial Review.

The second step of the *Thunder Basin* test is also met here because plaintiffs' claims are "of the type Congress intended to be reviewed within [the Exchange Act's] statutory structure." *See Thunder Basin*, 510 U.S. at 212.  "To unsettle the presumption of initial administrative review—made apparent by the structure of the [Exchange Act]—requires a strong countervailing rationale." *Jarkesy*, 803 F.3d at 17 (quotation omitted).  That "strong countervailing rationale," may be present "if a finding of preclusion could foreclose all meaningful judicial review; if the suit is wholly collateral to a statute's review provisions; and if the claims are outside the agency's expertise." *Free Enterprise*, 561 US at 489 (citing *Thunder Basin*, 510 U.S. at 212–13).  None of those countervailing rationales to exclusive administrative review are present here.

First, the Exchange Act provides for meaningful judicial review.  Any final action against Scottsdale or Alpine can be appealed directly to one of multiple United States Court of Appeals. *See* 15 U.S.C. § 78y(a)(1); *see also Jarkesy*, 803 F.3d at 20 (The Exchange Act "presents an entirely 'meaningful' avenue of relief to [enforcement proceeding] respondents.").

---

[3] *Hill v. SEC*, 114 F. Supp. 3d 1297 (2015), *rev'd by Hill v. SEC*, 825 F.3d 1236 (11th Cir. 2016).

Second, there can be no reasonable assertion that plaintiffs' claims are "wholly collateral" to the Exchange Act's statutory scheme because plaintiffs' claims seek to enjoin an ongoing enforcement proceeding that is a very part of that statutory scheme. [*See* Complaint (Doc. 1-1) at p. 7]; *see Elgin v. Dep't of the Treasury*, 567 U.S. 1, 22 (2012) (A claim cannot be wholly collateral to a statutory scheme where plaintiff's challenge was "at bottom an attempt to reverse an agency's decision . . . .") (citing *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). A claim is only collateral "if it is not bound up with the merits so closely that the court's decision would constitute interference with agency process." *McBride Cotton and Cattle Corp. v. Veneman*, 290 F.3d 973, 980 (9th Cir. 2002). And as the court in *Charles Schwab* correctly held, seeking to "enjoin the disciplinary process and obtain a contrary interpretation or invalidation of the FINRA Rule on which the disciplinary action is based [are] issues central to the merits." *Charles Schwab*, 861 F. Supp. 3d at 1079.

Third, plaintiffs' claims are not outside of FINRA's expertise. Plaintiffs challenge FINRA's interpretation of FINRA Rule 1017 and its application of that rule to Scottsdale and Alpine. [*See* Complaint (Doc. 1-1) at ¶¶ 9, 17.] FINRA's application of its rules to its members is a central component of its statutorily-mandated regulatory function, and thus well within its expertise. See 15 U.S.C. § 78o-3.

The Hurrys' tactical choice to name non-FINRA members as the only plaintiffs in this matter does not change the result. Plaintiffs' "claims" are nothing more than Scottsdale's and Alpine's defenses to FINRA's disciplinary action. And the relief plaintiffs seek is merely to have the district court substitute the FINRA hearing panel's interpretation of FINRA Rule 1017 with its own. [*See* Complaint (Doc. 1-1) at 7.] Congress, however, has made plain through the Exchange Act that the district courts lack subject-matter jurisdiction to interfere with ongoing enforcement proceedings, and instead that exclusive Article III jurisdiction is vested in the United States Court of Appeals, but only after the FINRA hearing panel, National Adjudicatory Council, and SEC have ruled on the dispute. *See* FINRA Rule 9200 *et seq.*; 15 U.S.C. § 78s(d)(2); 15 U.S.C. § 78y(a)(1).

## II. **<u>Plaintiffs Lack A Private Right Of Action Against FINRA</u>**.

Plaintiffs' claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for the additional reason that there is no private right of action against FINRA for violation of its own rules.

Congress did not provide in the Exchange Act for a private right of action against FINRA for violating its own rules. Instead, as explained *supra*, FINRA's rules establish a "multi-layered hearing and appeals process that governs disciplinary actions against FINRA-affiliated brokers and dealers." *Turbeville*, 874 F.3d at 1271. Given the comprehensiveness of the Exchange Act, and Congress' silence regarding any private right of action, the Ninth Circuit Court of Appeals concluded that "there is no implied right of action for [a FINRA] rule violation." *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 681 (9th Cir. 1980) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979)). The Ninth Circuit Court of Appeals reiterated that holding in *Sparta*: "It is undisputed . . . that a party has no private right of action against an exchange for violating its own rules or for actions taken to perform its self-regulatory duties under the [Exchange] Act." *Sparta*, 159 F.3d at 1213.

The Second, Eighth, D.C., and Eleventh Circuits have each reached the same conclusion. *See Desiderio v. NASD*, 191 F.3d 198, 208 (2d Cir. 1999) ("[T]here is no private right of action available under the Securities Exchange Act to . . . challenge an exchange's failure to follow its own rules.") (citation omitted); *MM&S Fin., Inc. v. NASD*, 364 F.3d 908, 912 (8th Cir. 2004) ("Any attempt by [plaintiff] to bypass the Exchange Act by asserting a private breach of contract claim . . . is fruitless."); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) ("[C]ourts have consistently found Congress's intent under the Exchange Act precludes common law causes of action, and we agree with the reasoning of our sister circuits."); *Turbeville*, 874 F.3d at 1273 ("[W]e hold that no private right of action exists for SRO members and associated persons to sue SROs for violating their own internal rules.").

The absence of a private right of action defeats plaintiffs' claims here because, according to plaintiffs themselves, their claims are predicated on the assertion that "FINRA's actions are not . . . permitted under its own operating rules and procedures . . . ." [*See* Complaint (Doc. 1-1)

-11-

at ¶ 10.] It is immaterial that plaintiffs frame their attack on FINRA's enforcement decisions as state law claims because resolving those claims requires analyzing whether FINRA properly applied FINRA Rule 1017. Such an analysis can only be performed through the Exchange Act's comprehensive administrative review process, of which state courts and federal district courts are not a part. *See* 15 U.S.C. § 78aa (conferring federal courts with exclusive jurisdiction over claims asserting violation of the Exchange Act or "rules and regulations thereunder"); 15 U.S.C. § 78s(d)(2); 15 U.S.C. § 78y(a)(1); *see also Touche Ross*, 442 U.S. at 568 ("[T]he fact that a . . . statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."). A contrary "rule permitting recovery under . . . a [state law] theory would allow states to define . . . the regulatory duties of a self-regulatory organization, a result which cannot co-exist with the Congressional scheme of delegated regulatory authority under the Exchange Act." *Sparta*, 159 F.3d at 1215.

### III.   **FINRA Is Immune From Claims Regarding Its Regulatory Conduct.**

FINRA's immunity is yet another independent basis for dismissing all plaintiffs' claims. SROs like FINRA "enjoy complete immunity . . . when they are acting under the aegis of the Exchange Act's delegated authority . . . ." *See Sparta*, 159 F.3d at 1214. FINRA acts "under the aegis of the Exchange Act's delegated authority," and is thus immune from suit, when it performs a regulatory function while acting in a quasi-governmental capacity. *See id.* at 1214-15; *see also P'ship Exch. Sec. Co. v. NASD*, 169 F.3d 606, 608 (9th Cir. 1999); *In re Series 7*, 548 F.3d at 115; *Standard Inv. Chartered*, 637 F.3d 112, 116 (2d Cir. 2011).

Regulatory functions include those that are statutorily delegated to FINRA under the Exchange Act or are otherwise set forth in SEC-approved FINRA rules. *See, e.g.*, *Sparta*, 159 F.3d at 1214-15; *D'Alessio v. NYSE*, 258 F.3d 93, 106 (2d Cir. 2001) ("[FINRA], when acting in its capacity as a SRO, is entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder."). FINRA acts in a quasi-governmental capacity when conducting business that would be performed by a government agency in the absence of the Exchange Act. *See Sparta*, 159 F.3d at 1213. It is only "[w]hen conducting private

-12-

business" that FINRA does not act in a quasi-governmental capacity. Id. at 1214.

Applying this functional test, it is clear that plaintiffs' claims must be dismissed on immunity grounds. First, FINRA's interpretation of FINRA Rule 1017 and request for the production of trust documents, which is the conduct giving rise to plaintiffs' claims, are plainly regulatory functions. Indeed, FINRA Rule 1017(e) expressly provides that "FINRA may request additional information or documents at any time during the [CMA] process." FINRA Rule 1017(e). Second, FINRA was acting in its quasi-governmental capacity, and not a private capacity, when it initiated enforcement proceedings against Scottsdale and Alpine. Absent FINRA's oversight role mandated by the Exchange Act, FINRA would not have requested CMAs from Scottsdale and Alpine, or disciplined them for non-compliance.

Plaintiffs' assertion that FINRA's demands exceeded its authority under FINRA Rule 1017 does not change the conclusion that FINRA is immune from suit. The determination of whether a function is regulatory, and therefore eligible for immunity, is independent of the determination of whether the regulatory function was performed in accordance with FINRA rules. In *Sparta*, for example, the court held that the de-listing of stock and suspension of trading was a regulatory function despite that the plaintiff in that case alleged that the "foregoing actions of [FINRA] were in direct violation of its own rules and procedures . . . ." See *Sparta*, 159 F.3d at 1211, 1214.

Then-Judge Sotomayor similarly has explained that "immunity protects the power to regulate, not the mandate to perform regulatory functions in a certain manner. Thus, the immunity depends only on *whether* specific acts and forbearances were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 98 (2d Cir. 2007). Were it otherwise, "the immunity doctrine would be effectively subverted. After all, individuals characteristically do not bring suit alleging an SRO is obeying its statutory and legal obligations; they bring suit alleging an SRO is violating the law or acting inconsistently with its legal obligations." *Id*.

The fact that plaintiffs are not FINRA members likewise does not deprive FINRA of its immunity. In fact, the Second Circuit Court of Appeals in *DL Capital Group, LLC v. NASDAQ*,

-13-

409 F.3d 93 (2d Cir. 2005) expressly rejected that supposed limitation. Id. at 99 ("[T]his Court has never suggested that the identity of the plaintiff is what drives the absolute immunity analysis. Rather . . . it is the SRO's *function* as a quasi-governmental authority that entitles it to absolute immunity."). FINRA's immunity is not reserved to claims made by a select group of plaintiffs, but rather extends to all claims by any party regarding regulatory functions performed in a quasi-governmental capacity. See Sparta, 159 F.3d at 1214.

The focus on FINRA's function, and not the identity of the particular plaintiff, is consistent with this Court's conclusion that FINRA's immunity is intended to support the "Congressional scheme of delegated regulatory authority under the Exchange Act." See id. at 1215. FINRA's immunity, and consequently the effectiveness of the self-regulatory structure of the securities market constructed by Congress, would be illusory if it only prevented claims asserted by the relatively small group of people that have expressly agreed to be bound by FINRA's rules.

## IV. This Court Lacks Personal Jurisdiction Over FINRA.

Plaintiffs' claims should also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) because this Court lacks personal jurisdiction over FINRA. Personal jurisdiction over a non-resident such as FINRA is tested by a two-part analysis. See Pacific Atl. Trading Co. v. M/V Main Express, 758 F.2d 1325, 1327 (9th Cir. 1985). First, the exercise of jurisdiction must satisfy the requirements of the forum state's long-arm statute. Id. Second, the exercise of jurisdiction must comport with due process. Id. "Since 'Nevada's long-arm statute, NRS § 14.065, reaches the limits of due process set by the United States Constitution,'" the personal jurisdiction inquiry collapses into an analysis of due process. Schaetzl-Saubert v. Turkish Airlines, Inc., 2018 U.S. Dist. LEXIS 37015 at *5 (D. Nev. Mar. 7, 2018) (Du, J.) (quoting Baker v. Eighth Judicial Dist. Court, 116 Nev. 527, 531 (2000)).

Due process requires that a non-resident have certain minimum contacts with the forum state such that the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Personal jurisdiction over a non-resident may be either general or specific. Here, neither general nor

specific personal jurisdiction over FINRA exists.

### A. There Is No General Personal Jurisdiction Over FINRA In Nevada.

A court may only exercise general personal jurisdiction when a non-resident's contacts with the forum state "are so 'continuous and systematic' as to render [it] *essentially at home in the forum State*." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (emphasis added). For a corporation the "paradigm all-purpose forums" for general jurisdiction are its (1) "formal place of incorporation" and (2) "principal place of business." *Id*. at 760-61. Nevada is neither FINRA's formal place of incorporation nor its principal place of business. [*See* Asquith Dec. at ¶¶ 3–4.] FINRA is a Delaware corporation that has its principal place of business in Washington, D.C. [*See id.*]

Only in a truly "exceptional case" will a corporation be deemed "essentially at home" in a place where it is not incorporated or headquartered. *See Daimler*, 134 S. Ct. at 761 n.19. Indeed, the general jurisdiction standard is so exacting that Justice Sotomayor pointedly acknowledged "it is *virtually inconceivable*" that "large multistate or multinational corporations" "will ever be subject to general jurisdiction in any location other than their principal places of business or of incorporation," regardless of where they "have continuous and systematic contacts within the United States." *BNSF Railway Co. v. Tyrell*, 137 S. Ct. 1549, 1560 (2017) (Sotomayor, J., dissenting) (emphasis added).

Plaintiffs have not alleged any facts demonstrating that this is the "exceptional case" hypothesized in *Daimler* or that FINRA is "essentially at home" in Nevada. *See Daimler*, 134 S. Ct. at 761. Nor could plaintiffs make any such showing. FINRA is a private, not-for-profit Delaware corporation and SRO that, subject to oversight by the SEC, determines the qualifications of broker-dealer firms and individual stockbrokers seeking to enter the industry, imposes binding rules that govern FINRA members, and "enforce[s] compliance by its members" with those same rules and regulations. [Asquith Dec. at ¶ 3.] FINRA has 16 offices throughout the United States and employs approximately 3,600 employees. [*See id*. at ¶¶ 5–6.] None of those offices or employees are in Nevada. [*See id*.] There are 70 hearing venues at which FINRA members may arbitrate disputes. [*Id*. at ¶ 7.] Only two of those venues are in

Nevada, and they are at locations that are not owned by FINRA. [*Id*.] Approximately 3,700 broker-dealer firms are currently under FINRA's supervision, but only 9 of those firms (≈ 0.24%) are headquartered in Nevada. [*See id*. at ¶ 8.] FINRA has no mailing address or telephone numbers in Nevada and owns no real estate in Nevada. [*See id*. at ¶¶ 9–10.]

FINRA is a nationwide regulator of broker-dealer firms. [*See id*. at ¶¶ 3–8.] As the Supreme Court made plain in *Daimler*, "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 134 S. Ct. at 766 n.20. FINRA is not "essentially at home" in Nevada, thus this Court lacks general personal jurisdiction over it. *Id*.

### B.     There Is No Specific Personal Jurisdiction Over FINRA Here.

Specific personal jurisdiction may be exercised over a non-resident, "only when three requirements are satisfied: (1) the defendant either purposefully directs its activities or purposefully avails itself of the benefits afforded by the forum's laws; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is reasonable." *Williams v. Yamaha Motor Co., Ltd.*, 851 F.3d 1015, 1023 (9th Cir. 2017). "The plaintiff has the burden of proving the first two prongs," which burden plaintiffs have not and cannot carry here. *See Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015).

FINRA has not availed itself of the benefits afforded by Nevada's laws. Rather, it regulates Scottsdale and Alpine pursuant to authority granted by the Maloney Act of 1938, 15 U.S.C. §§ 78o-3, *et seq.*, amending the Exchange Act; SEC rules; and FINRA's own rules. That plaintiffs may be domiciled in Nevada is irrelevant to the jurisdictional analysis because "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014); *see also Hempel v. Cydan Dev., Inc.*, 2018 U.S. Dist. LEXIS 187820, *7 (D. Nev. Nov. 2, 2018) (Du, J.) ("To be clear, a plaintiff's contacts with the defendant and the forum state cannot drive the jurisdictional analysis, even though a defendant's contacts with the forum state may be intertwined with its transactions or interactions with the plaintiff or other parties."). Additionally, plaintiffs' claims do not arise out of FINRA's forum-related activities, as is

required to exercise specific personal jurisdiction over FINRA.  Rather, the claims arise out of FINRA's regulatory oversight of Scottsdale and Alpine, which are Arizona and Utah companies, respectively.  [*See* Complaint (Doc. 1-1) at ¶ 17.]

## **Conclusion**

For the foregoing reasons, all plaintiffs' claims should be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 24th day of May, 2019.

**LEACH KERN GRUCHOW ANDERSON SONG**

*/s/ Sean L. Anderson*
Sean L. Anderson
Nevada Bar No. 7259
Ryan D. Hastings
Nevada Bar No. 12394
2525 Box Canyon Drive
Las Vegas, Nevada 89128

# CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), the undersigned, an employee of LEACH KERN GRUCHOW ANDERSON SONG, hereby certifies that on the 9th day of May, 2019, a copy of the foregoing, **MOTION TO DISMISS** was electronically filed with the Clerk of the Court for the United States District Court by using the Court's EM/ECF system and served through the Court's Notice of electronic filing system automatically generated to those parties registered on the Court's Master E-Service List as follows:

William E. Peterson
(wpeterson@swlaw.com)
Janine C. Prupas
(jprupas@swlaw.com)
SNELL & WILMER L.L.P.
50 West Liberty Street, Suite 510
Reno, Nevada 89501

*/s/ Robin Callaway*
An Employee of LEACH KERN GRUCHOW ANDERSON SONG