# Exhibit “C”

Exhibit “C”



ATLANTA CLEVELAND DAYTON WASHINGTON, D.C.
CINCINNATI COLUMBUS NEW YORK

April 9, 2019

*Via Email OHOCaseFilings@finra.org*

Financial Industry Regulatory Authority
Office of Hearing Officers
1735 K Street, NW
Washington, D.C. 20006

RE: ***Request for Hearing of Alpine Securities Corp. in Relation to Notice of Suspension Pursuant to FINRA Rule 9552***

Dear Sir/Madam:

Alpine Securities Corp. ("Alpine), by its counsel, hereby submits a request for a hearing in response to the above-referenced Notice of Suspension Pursuant to FINRA Rule 9552 ("Notice"). In that Notice, FINRA asserts that Alpine "has failed to comply with Rule 1017(a)(4) because it has not filed" a Continuing Membership Application ("CMA") "despite undergoing at least two known changes in its ownership structure." Notice at 1. The referenced "changes in its ownership structure" do not actually relate to the ownership or control of Alpine which has, at all times, been owned by SCA Clearing LLC ("SCA"). The only changes occurred in relation to trust entities that hold the interests in SCA, and involved restructuring of those trusts without any change in beneficial ownership. As discussed below, that allocation of interests between and among certain trusts did not alter the ownership of Alpine in any respect, nor did it change the beneficial ownership or control of SCA.

Because there was no change in the ownership of Alpine, and no change in the ownership or control of SCA, Alpine seeks a hearing on the following question: did the administrative restructuring of the trust entities necessitate the filing of a CMA?

## Ownership of Alpine

Since its acquisition in 2011, Alpine has been owned by SCA. At the time of that acquisition, SCA was, in turn, owned by the Hurry Family Revocable Trust. In connection with that application, a CMA was filed that identified the ownership of both Alpine and SCA and confirmed the identity of the Trustees of the Trust, Justine and John Hurry. Information and

Maranda.Fritz@ThompsonHine.com Fax: 212.344.6101 Phone: 212.908.3966 baf

THOMPSON HINE LLP
ATTORNEYS AT LAW

335 Madison Avenue
12th Floor
New York, New York 10017-4611

www.ThompsonHine.com
O: 212.344.5680
F: 212.344.6101





materials were submitted in connection with that application, and as further requested by FINRA.[1] That application was granted.

In 2017, and based on certain estate and tax planning issues, trust counsel Eric Johnson restructured the Hurry Trust into two trusts each of which then held the interest in SCA. Two months later, and based again on estate and tax planning considerations, each of those trusts was broken into three trusts. As Mr. Johnson explains in the attached Affidavit, there was no change in Trustees nor was there any change in the management or operation of the trusts.

In November, 2017, Alpine advised FINRA in advance of the contemplated change in the structure of the trusts. Exhibit 1: Email communications dated Not. 17, 2017 & Nov. 22, 2017. Chris Frankel explained at that time that there was no change in beneficial ownership or control of the trusts as the beneficiaries and the trustees remained the same, and there was no change in the actual ownership of Alpine because SCA continued to own 100% of the firm. *Id.*

Notably, Eric Levine of FINRA, in his response, did not advise that a continuing membership application needed to be filed, nor did he demand copies of the trust documents. Instead, he suggested that the firm file a "materiality consultation" regarding whether any additional filings were necessary. *Id.*

Alpine then filed that consult and, in December of 2017, received an email from FINRA stating that the "indirect ownership changes" "appear to require an application." Exhibit 2: Email from Liza Manzo dated December 12, 2017. That assumption was based on FINRA's application and interpretation of NASD Notice to Members 00-73 which states that "a group of individuals acting in concert to obtain control of 25% or more of the equity or partnership capital of a member will be deemed to be an 'entity' for purposes of the Rule." According to FINRA, the fact that particular trust entities each held less than 25% of SCA was not dispositive of the issues under Rule 1017. FINRA looked to the fact that the "owners" were trust entities, and the relatedness among those entities, and focused instead on beneficial ownership.

That conclusion by FINRA appears to have been based solely on the issue of whether the 16.7% interest held by each of the trusts would be aggregated pursuant to Notice to Member 00-73. It does not consider or address the issue presented here of whether the restructuring of the trusts constitutes a change in "owner" within the meaning of Rule 1017.

[1] At no time did FINRA maintain that disclosure of confidential trust documents was necessary to "complete" the application.





**There was no Change in the Beneficial Ownership or Control of Alpine within the Meaning of Rule 1017(a)(4)**

Rule 1017(a)(4) provides that a member shall file an application for membership when there is a change in ownership "that results in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity or partnership capital." The plain language of that provision is not implicated by the events that occurred in relation to Alpine. No "change" occurred in 2017 that "resulted" in "one person or entity gaining control of the equity or capital of Alpine." The ownership of Alpine remained precisely the same: it was and is owned by SCA. The ownership and control of SCA remained the same. The restructuring of the trusts altered nothing in relation to its beneficial ownership or control.

The only change that occurred is one that relates to the particular structure of trusts that hold the interest in SCA, and that administrative or structural shift is one that is plainly not viewed by FINRA as governing the issue of ownership under Rule 1017. If the precise structure and the names given to the trust entities were actually the operative fact, then no application would need to be filed because no trust entity holds more than a 16% percent interest in SCA, the actual owner of Alpine. But FINRA has made clear that it will not be guided by the fact that those entities were separated or have different names.[2] To the contrary, FINRA has cited NASD Notice to Members 00-73 for the fact that FINRA does *not* consider those trust entities to be the operative "owners" because of their structure and their interrelatedness. In its letter to Alpine, FINRA specifically relied on the language in Notice to Members 00-73 confirming that, where individuals are "acting in concert," it is ***the "group"*** that is the "'entity' for purposes of NASD Rule 1017(a)(4)" and that governs the determination of whether a new membership application must be filed (emphasis added). Certainly it cannot work both ways, *i.e.*, either the trust entities each own 16.7% and no CMA is required, or the trust entities are viewed and treated as a "group" and as the relevant "entity," and ownership and control have not changed since 2011. *See also FinCEN Guidance*, FIN 2018 G001 dated April 13, 2018 at 4 (Trustee entity as a beneficial owner).

That the restructuring of the trust entities does not constitute a change in ownership within the meaning of Rule 1017 is illustrated by and consistent with FINRA's own practices and related decisional authority. This firm has consulted with FINRA regarding similar changes in the name or corporate form of entities that hold even a *direct* ownership of a member, much

[2] FINRA's position that it will not recognize the trust entities as the operative "owners" is consistent with trust law. It is a widely recognized principle that "[a] trust is not a legal entity. A trust is not an entity distinct from its trustees and capable of legal action on its own behalf . . . ."*See Am. Jur. 2d Trusts* § 3 (2013); Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's Trusts and Trustees* § 712 (2012) ("A trust is not a legal person, nor is the trust property."). Thus, the trusts are embodied by and can only act through the trustees, which have not changed.





less an indirect interest, and FINRA has confirmed that, for example, a shift from a limited liability company to a limited liability partnership does not require a CMA. FINRA itself has made clear that such organizational changes, ***even if made by the member itself***, are considered "less significant." FINRA Notice 13-11, in fact, specifically refers to circumstances where the member "is proposing less significant changes that do not require substantial staff review." Examples of such changes include instances where there is no "day-to-day changes in the applicant's business activities, management, supervision, assets or liabilities, and the applicant is only proposing a change in the: applicant's legal structure (e.g., changing from a corporation to an LLC)."[3]

Thus, FINRA acknowledges that these kinds of administrative or organizational changes, even ***within the member firm***, are "less significant" and "do not require substantial staff review." Where that administrative shift occurs not at the level of the member firm, or even the member firm's owner, but rather at a third level up -- and particularly where it does not affect any change in ownership or control and involves a structural shift that FINRA does not recognize as being operative – no application is required. Further, there appears to be no reported instance in which a member firm was faulted for a failure to file a CMA under the circumstances here of a structural reorganization at the indirect ownership level.

**Conclusion**

Here, FINRA's position was and remains clear: it considers the trusts to constitute an "entity" or group subject to Notice to Members 00-73. It looks past the particular structures of the trusts and views the individuals who possess ownership and control as the entity under Rule 1017. Viewed from FINRA's perspective, and focusing on the substance and reality as opposed to the structure, the "group" or "entity" that owns SCA has remained exactly the same from 2011 through 2017. Under the precise provisions cited by FINRA, therefore, there is no requirement that a new membership application be filed.

---

[3] The FINRA Notice and Schedule also provide for a waiver where there is a change in "equity ownership, partnership capital or other ownership interest in an applicant held by a corporate legal structure that is due solely to a reorganization of ownership or control of the applicant within the corporate legal structure (e.g., reorganizing only to add a holding company to the corporate legal structure's ownership or control chain of the applicant); or a change in "percentage of ownership interest or partnership capital of an applicant's existing owners or partners resulting in an owner or partner owning or controlling 25 percent or more of the ownership interest or partnership and that owner or partner has no disclosure or disciplinary issues in the preceding five years." It should be noted that no "owner or partner" has had any cognizable disciplinary history in the preceding five years. A decision was issued in a FINRA matter relating to Scottsdale and John Hurry, but that decision as to Mr. Hurry was stayed and remains on appeal. Further, the definition of "disciplinary history" contained in Notice 00-73 does not include books and records issues.





In the alternative, and without waiving its objection to that filing requirement or its position as articulated in this request for hearing, Alpine has also submitted a CMA. It is Alpine's understanding that, under Rule 9559, it will receive a hearing on the issue of whether that filing is required. If, notwithstanding the fact that there has been no material or substantive change in the ownership of Alpine, the Hearing Panel concludes that an application must be submitted, Alpine will proceed with that membership application and, in the event of lapse or denial, will conduct itself in accordance with Rule 1017(l).

Sincerely,

Maranda E. Fritz

cc: Anand Ramtahal, Senior Vice President, FINRA
Alissa Robinson, Senior Director, FINRA Membership Application Program
Ann-Marie Mason, Vice President & Counsel, FINRA Member Supervision
Rosemarie Fanelli, Senior Director, FINRA Member Supervision
Meredith MacVicar, Principal Counsel, FINRA Member Supervision
Eric Levine, Surveillance Director, FINRA Member Supervision
Robert Ishak, Principal Regulatory Coordinator, FINRA Member Supervision

Attachment

STATE OF ARIZONA )
) ss.
County of Maricopa )

## AFFIDAVIT OF ERIC L. JOHNSON

THE UNDERSIGNED, being first duly sworn, says:

1. I am a licensed attorney in the State of Arizona and with the United States Tax Court.

2. I have represented John Hurry and Justine Hurry since January of 2013 regarding tax and estate related matters and am fully familiar with the provisions and management of The Hurry Family Revocable Trust and subsequently formed trusts.

3. For certain tax and estate planning purposes, The Hurry Family Trust was restructured on two occasions. First, in 2013, the trust was reorganized into two trusts. In 2017, that structure was revised to six trust entities. To accomplish those administrative changes, the following trusts were created (each of which has identical trust agreement provisions): Man Cub Trust dated July 22, 2013; Pee Pee Pop Trust dated July 22, 2013; Man Cub Trust II dated October 13, 2017; Man Cub Trust III dated October 13, 2017; Pee Pee Pop Trust dated October 13, 2017; and Pee Pee Pop Trust dated October 13, 2017 (collectively, the "Trusts").

4. At no time was there any change in terms of the participants or the provisions of the Trusts. John Hurry is and has been the current beneficiary of the Trusts at all times since their creation. John Hurry and Justine Hurry have been trustees of the Trusts at all times since their creation.

This Affidavit is made from my own knowledge, and I will testify positively to the truth of the same in any court whenever called upon for that purpose.

DATED this 8th day of April 2019.

**AFFIANT:**

ERIC L. JOHNSON

SUBSCRIBED AND SWORN TO before me this 8th day of April 2019

OFFICIAL SEAL
TRAVIS R CAMPBELL
Notary Public - Arizona
MARICOPA COUNTY
Commission # 340124
My Commission Expires
JULY 31, 2019

Notary Public