# Exhibit A

# Declaration of William Peterson

1  William E. Peterson, Bar No. 1528
2  Janine C. Prupas, Bar No. 9156
   SNELL & WILMER L.L.P.
3  50 West Liberty Street, Suite 510
   Reno, Nevada 89501
4  Telephone: 775-785-5440
   Facsimile: 775-785-5441
5  Email: wpeterson@swlaw.com
           jprupas@swlaw.com
6
   *Attorneys for Petitioners*
7

8                  UNITED STATES DISTRICT COURT

9                       DISTRICT OF NEVADA

10

11  IN THE MATTER OF THE                Case No.   3:19-cv-00240-MMD-CBC

12  PEE PEE POP TRUST, PEE PEE POP      **DECLARATION OF WILLIAM**
    TRUST II, PEE PEE POP TRUST III, MAN **PETERSON IN SUPPORT OF MOTION**
13  CUB TRUST, MAN CUB TRUST II, MAN   **FOR TEMPORARY RESTRAINING**
    CUB TRUST III, DATED JULY 22, 2013. **ORDER AND PRELIMINARY**
14                                      **INJUNCTION**

15

16          I, William Peterson, under penalty of perjury under the laws of the State of Nevada, do state

17  as follows:

18          1.      I am the attorney for the Petitioners in this matter and prepared the Petition to

19  Assume Jurisdiction in state court that was removed to this court and all related motion papers in

20  this court, as well as all opposition and reply papers.

21          2.      Concomitant with this filing, I have served by email all the attorneys for FINRA

22  admitted in this action.

23          3.      Attached hereto as Exhibit 1 is a copy of an email from FINRA indicating that it

24  will require considerable time to review the complete trust instruments and will require them to be

25  kept and maintained in FINRA's files.

26  / /

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1    3.    Attached hereto as Exhibit 2 is a true and correct copy of an Order from FINRA

2  suspending the membership interests of Alpine Securities Corporation (Alpine) and Scottsdale

3  Capital Advisors Corporation in FINRA.

William Peterson

4816-9121-0657

EXHIBIT 1 - Email

EXHIBIT 1 - Email

**Peterson, William**

From: "Petrocelli, Gina" <Gina.Petrocelli@finra.org<mailto:Gina.Petrocelli@finra.org>>
Date: August 17, 2019 at 9:38:38 PM EDT
To: "maranda.fritz@thompsonhine.com<mailto:maranda.fritz@thompsonhine.com>"
<maranda.fritz@thompsonhine.com<mailto:maranda.fritz@thompsonhine.com>>
Subject: Alpine and Scottsdale

CAUTION EXTERNAL EMAIL
Maranda,

I write to follow up on our telephone call of yesterday regarding your request for a meeting with FINRA to present the trust agreements for the Six Trusts that indirectly own Alpine and Scottsdale.

During our call, you estimated that the trust agreements contain approximately 600 pages.  You also stated that your clients have not agreed to submit copies of those agreements to FINRA or to permit FINRA to make or retain any copies of those agreements.  Instead, you are proposing to make the trust agreements available to FINRA only while you meet with FINRA.

As we discussed, FINRA staff is available to meet with you on Monday at our offices at Brookfield Place at 2:30.  As we also discussed, however, FINRA will not be able to perform a complete review of these voluminous trust agreements during the limited time period of a meeting, and it is necessary for FINRA staff to have the opportunity to review these documents outside of a meeting.

Further, as we also discussed, it is necessary and required for your clients to provide a copy of the trust agreements to FINRA as part of the CMA application process.  In addition, it is necessary for FINRA to maintain a copy of these agreements for its records.

Although FINRA staff will be required to assess multiple factors in determining whether the firms' CMAs are substantially complete, the CMAs certainly will not be considered substantially complete unless and until the firms provide copies of the trust agreements to FINRA for its review and retention.


Gina M. Petrocelli
Chief Counsel
Department of Enforcement
FINRA | Brookfield Place, 200 Liberty Street -- 11th Floor |  New York, NY 10281
Tel.: 646.315.7310
Fax: 202.689.3504

Confidentiality Notice:: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.

# EXHIBIT 2 - Order from FINRA

EXHIBIT 2 - Order from FINRA

FINANCIAL INDUSTRY REGULATORY AUTHORITY
OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT,<br><br>Complainant,<br><br>v.<br><br>ALPINE SECURITIES CORP.<br>(CRD No. 14952)<br><br>and<br><br>SCOTTSDALE CAPITAL ADVISORS CORP.<br>(CRD No. 118786),<br><br>Respondents. | Expedited Proceeding<br>Nos. FPI190001<br>FPI190002<br><br>STAR Nos. 20190622633<br>20190622637<br><br>Hearing Officer–RES<br><br>**EXPEDITED HEARING<br>PANEL DECISION**<br><br>August 15, 2019 |

**Alpine Securities Corporation and Scottsdale Capital Advisors Corporation failed to file Continuing Membership Applications, as required by NASD Rule 1017. For this violation, Respondents are suspended from membership in FINRA until they file their Continuing Membership Applications. Respondents are also assessed costs.**

*Appearances*

For Complainant: Meredith MacVicar, Esq., Jonathan Golomb, Esq., Department of Enforcement, Financial Industry Regulatory Authority

For Respondents: Maranda Fritz, Esq., Thompson Hine LLP

## DECISION

**I.     Introduction**

On March 19, 2019, FINRA sent Notices of Suspension ("Notices") to Respondents Alpine Securities Corporation ("Alpine") and Scottsdale Capital Advisors Corporation ("Scottsdale") (collectively, "Respondents") for their alleged failure to file Continuing

Membership Applications ("CMAs") under NASD Rule 1017.[1] That Rule requires a member of FINRA to file a CMA for, among other things, approval of a change in the member's equity ownership that results in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity.[2] The Notices informed Respondents that: (1) under FINRA Rule 9552, Respondents' memberships with FINRA would be suspended effective April 10, 2019, unless Respondents submitted CMAs by that date; and (2) under FINRA Rule 9559(c)(1), a timely written request for a hearing filed with the Office of Hearing Officers would stay the effectiveness of the suspensions.[3] On April 9, 2019, Respondents timely filed Requests for Hearing under FINRA Rules 9552 and 9559.[4]

Alpine has been a member of FINRA since 1984.[5] In 2011, SCA Clearing LLC ("SCA Clearing") became sole owner of Alpine.[6] John Hurry was the sole owner of SCA Clearing. SCA Clearing is still the sole owner of Alpine.[7] However, SCA Clearing is now owned in equal parts by six common-law trusts ("Six Trusts").[8] Alpine has represented to FINRA that the trustees of the Six Trusts are John Hurry and his wife, Justine Hurry, that the current beneficiaries of the Six Trusts are John and Justine Hurry, and that their children are the residual beneficiaries.[9]

Scottsdale has been a member of FINRA since 2002.[10] At that time, Justine Hurry was the sole owner of Scottsdale in her capacity as sole owner of Scottsdale Capital Advisors Holdings LLC ("SCA Holdings").[11] At the present time, SCA Holdings is the sole owner of Scottsdale. Scottsdale has represented to FINRA that SCA Holdings is owned in equal parts by

---

[1] Effective May 8, 2019–i.e., after the events relevant to this proceeding–FINRA Rule 1017 superseded NASD Rule 1017. FINRA Rule 1017 does not enact any change that would have an effect on the outcome of the proceeding. This Decision will therefore refer to NASD Rule 1017 as opposed to FINRA Rule 1017.

[2] NASD Rule 1017(a)(4).

[3] Complainant's Exhibit ("CX-") 6, at 3, 34. The Hearing Panel has jurisdiction to decide this expedited proceeding. Alpine and Scottsdale are members of FINRA. Hearing Transcript ("Tr.") 44-45. FINRA sent the Notices to Respondents by overnight courier, and the Notices were properly delivered. Tr. 91; *See* FINRA Rule 9134(a)(3) ("Service by courier may be accomplished by sending the papers through a courier service that generates a written confirmation of receipt or of attempts at delivery.").

[4] CX-7, at 1, 8.

[5] Tr. 44.

[6] Tr. 45, 144; CX-7, at 1; CX-13, at 6.

[7] CX-29, at 7.

[8] The Six Trusts are Man Cub Trust I, Man Cub Trust II, Man Cub Trust III, Pee Pee Pop Trust I, Pee Pee Pop Trust II, and Pee Pee Pop Trust III. Tr. 246; CX-7, at 6, 13.

[9] Tr. 105, 258-59; CX-4, at 1; CX-7, at 6.

[10] Tr. 44-45.

[11] Tr. 47, 145; CX-13, at 22.

the same Six Trusts identified above, with John and Justine Hurry as trustees and beneficiaries and their children as residual beneficiaries.[12]

On April 19, 2019, the Chief Hearing Officer consolidated these two expedited proceedings because Alpine and Scottsdale have the same indirect owners (two of whom are married to each other), and because the principal issue in each proceeding is the same: whether Respondents underwent changes in their equity ownership that resulted in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity.[13] On June 18, the parties participated by telephone in a hearing before a FINRA Hearing Panel.

## II.    Findings of Fact

### A.    Background

Before the events giving rise to the Notices, Alpine and Scottsdale underwent changes in ownership without seeking FINRA approval through the CMA process. In addition, Alpine filed contradictory amendments to its FINRA Form BD concerning the identities of the firm's direct and indirect owners.

#### 1.   Alpine

In a Form BD amendment filed March 9, 2011, Alpine reported that SCA Clearing was direct owner of Alpine, and that John Hurry was Alpine's indirect owner in his capacity as managing member of SCA Clearing.[14] This was consistent with the ownership representations in a CMA that Alpine filed and FINRA approved in December 2010—i.e., just a few months before the filing of the Form BD amendment.[15]

In a Form BD amendment filed September 21, 2016, however, Alpine reported that Justine Hurry had acquired a membership interest in SCA Clearing in January 2011 and that, in that capacity, she was an indirect owner of Alpine.[16] This indicates that Justine Hurry was an indirect owner of Alpine just a month after FINRA approved the CMA in December 2010, and two months before the Form BD amendment identifying John Hurry as Alpine's sole indirect owner. If Justine Hurry was in fact an indirect owner beginning in January 2011, Alpine did not file a CMA seeking FINRA approval of that change in ownership.

In a Form BD amendment filed June 30, 2017, Alpine reported that in May 2013 the Hurry Family Revocable Trust ("Hurry Family Trust"), a common-law trust of which John and

---

[12] Tr. 105, 258-59; CX-4, at 6; CX-7, at 13.

[13] Notice of Consolidation of Two Expedited Proceedings and Order Amending Caption, at 1-2 (Apr. 19, 2019).

[14] Tr. 50-51, 94; CX-29, at 42-43.

[15] CX-13, at 6, 15, 22.

[16] Tr. 96-97; CX-29, at 38.

Justine Hurry were trustees,[17] became an indirect owner of Alpine in its capacity as sole member of SCA Clearing.[18] If the Hurry Family Trust was in fact an indirect owner beginning in May 2013, Alpine did not file a Form BD amendment disclosing that fact for four years, and did not file a CMA seeking FINRA approval of that change in ownership.[19] Furthermore, this factual representation as to the Hurry Family Trust brings into question the accuracy of the information provided in Alpine's September 21, 2016 Form BD amendment, which identified Justine Hurry as an indirect owner all the way back to January 2011.

### 2.   Scottsdale

In a Form BD amendment filed August 28, 2002, Scottsdale reported to FINRA that Justine Hurry was indirect owner of Scottsdale in her capacity as sole member of SCA Holdings.[20] In a Form BD amendment filed June 7, 2013, Scottsdale reported that the Hurry Family Trust, with John and Justine Hurry as trustees, became an indirect owner of Scottsdale in its capacity as sole member of SCA Holdings.[21] As with Alpine, the Hurry Family Trust obtained its interest in May 2013.[22] Scottsdale did not file a CMA seeking approval for the Hurry Family Trust to become indirect owner of Scottsdale.

### B.   Alpine and Scottsdale Inform FINRA of Changes in Ownership Structure

As stated above, Alpine filed a Form BD amendment on June 30, 2017, identifying the Hurry Family Trust as an indirect owner of the firm.[23] After receiving this filing, FINRA staff asked Alpine to explain the reason for the amendment and the impact on Alpine's ownership structure.[24] Alpine responded that the amendment was simply a "cleanup" of the Form BD and that no changes had occurred at that time.[25]

---

[17] Tr. 51; CX-29, at 28.

[18] Tr. 51-53; CX-29, at 28.

[19] Tr. 53; CX-29, at 28. The record does not disclose how the Hurry Family Trust came to be the sole member of SCA Clearing.

[20] Tr. 48-49; CX-30, at 73-74. In a Form BD amendment filed June 3, 2013, Scottsdale reported that Justine Hurry was indirect owner of Scottsdale in her capacity as manager (as opposed to member) of SCA Holdings. CX-30, at 44.

[21] Tr. 49, 98-99, 247; CX-30, at 39. The Form BD amendment identified the Hurry Family Trust as the "Hurry Family Irrevocable Trust." CX-30, at 39. Aside from this identification, the record does not reveal the existence of a Hurry Family Irrevocable Trust separate from the Hurry Family Revocable Trust. The Hearing Panel considers the identification of a "Hurry Family Irrevocable Trust" to be a typographical error. The record does not disclose how the Hurry Family Trust came to be the sole member of SCA Holdings.

[22] CX-30, at 39.

[23] Tr. 103; CX-29, at 28.

[24] Tr. 55; CX-5, at 6-7. The FINRA division communicating with Alpine and Scottsdale at this stage was the Risk Oversight and Operational Division of Member Supervision. See Tr. 39-40.

[25] Tr. 55-56; CX-5, at 6.

Alpine and Scottsdale each filed a Form BD amendment dated August 31, 2017.[26] In these amendments, Respondents represented that the Hurry Family Trust was being replaced as indirect owner by two trusts, Man Cub Trust and Pee Pee Pop Trust ("Two Trusts").[27] The Two Trusts were created in July 2013, and their trustees were John and Justine Hurry.[28] No assets were transferred into the Two Trusts for the first four years of their existence.[29] In June 2017, the membership interests in SCA Clearing and SCA Holdings were transferred to the Two Trusts.[30] Each of the Two Trusts was assigned a 50 percent membership interest in SCA Clearing and SCA Holdings.[31]

After receiving the August 31, 2017 Form BD amendments, FINRA staff inquired about the reasons for the amendments and the impact on the ownership structures of Alpine and Scottsdale.[32] Respondents stated the impact was that the Two Trusts each owned a 50 percent interest in SCA Clearing and SCA Holdings.[33] At FINRA's request, Respondents provided organizational charts showing the before-and after-effects of the changes disclosed in the Form BD amendments.[34]

On November 8, 2017, Alpine and Scottsdale informed FINRA staff by email that they had made additional changes to their ownership structures.[35] These changes consisted of adding four new trusts to Man Cub Trust and Pee Pee Pop Trust, thereby giving rise to the Six Trusts. Each of the Six Trusts owned 16.7 percent of SCA Clearing and SCA Holdings.[36] The four new trusts were created on October 13, 2017.[37]

"EJ," the estates and trusts attorney who created the Six Trusts, testified in the hearing that John and Justine Hurry are the trustees and beneficiaries of the Six Trusts, and that the trustees' powers are the same for each of the Six Trusts.[38]

---

[26] Tr. 56; CX-2, at 1; CX-3, at 1.

[27] Tr. 57; CX-2, at 4; CX-3, at 4. Two months after these Form BD amendments, the Two Trusts came to be known as Man Cub Trust I and Pee Pee Pop Trust I. CX-7, at 6, 13; CX-8, at 10-11.

[28] Tr. 57, 246-47, 253; CX-2, at 4; CX-3, at 4.

[29] Tr. 254.

[30] Tr. 255.

[31] Tr. 256.

[32] Tr. 59; CX-5, at 22.

[33] Tr. 63; CX-5, at 20.

[34] Tr. 64-65; CX-5, at 10-14.

[35] Tr. 67-68; CX-5, at 24-26, 32.

[36] Tr. 67-68.

[37] Tr. 260.

[38] Tr. 258-59, 284-85.

The day after the November 8, 2017 emails, FINRA staff sent a reply asking Alpine and Scottsdale their opinion whether the changes in the trusts triggered an NASD Rule 1017 requirement to file CMAs.[39] Chris Frankel, the Chief Executive Officer of Alpine, wrote back:

> I wish I knew! I do not think so. My understanding is that the Hold Co, which owns 100% of the stock in Alpine remains the same, the management company for the Hold Co remains the same but there are now multiple entities under common control that own the Hold Co.[40]

About two weeks later, Alpine and Scottsdale represented to FINRA staff that each of the Six Trusts "ha[d] the same beneficiaries as the Hurry Family Trust (John & Justine Hurry and their 4 children) as well as the same Trustees (John & Justine Hurry)."[41] Respondents stated that "none of the Trusts (and hence none of the Trustees) need to be disclosed on the Form BD because no Trust owns 25% or more of the holding companies."[42]

The next day, FINRA staff recommended that Alpine and Scottsdale submit a "materiality consult" for the substitution of the Two Trusts by the Six Trusts to determine if any additional filing requirements had to be satisfied.[43] Eric Levine, a FINRA Surveillance Director, testified that a materiality consult "is a voluntarily [sic] request for guidance from a firm to our membership department with respect to a change in ownership or business and whether that change triggers a CMA filing requirement pursuant to Rule 1017."[44]

Alpine and Scottsdale submitted materiality consults dated November 24, 2017 and which described: the original involvement of the Hurry Family Trust in Respondents' organizational structures; the Two Trusts; and the most recent change, in which the ownership interests were divided in equal parts among the Six Trusts.[45] The materiality consults represented that, before the recent changes to the Two Trusts and the Six Trusts, each of the holding companies "was 100% owned by The Hurry Family Trust of which the beneficiaries are The Hurry Family (consisting of John and Justine Hurry and their 4 children)."[46] Respondents stated that "[t]he first change to form BD reflects a change to the ownership of [the holding company]

---

[39] Tr. 122; CX-5, at 31.

[40] CX-5, at 31.

[41] CX-5, at 38.

[42] CX-5, at 38. Schedule B of the Form BD requires the member-applicant to disclose, "in the case of an owner that is a Limited Liability Company ('LLC'), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital." CX-45, at 11.

[43] Tr. 79-80; CX-5, at 37.

[44] Tr. 80; Accord Tr. 139 (A materiality consult enables a FINRA member to "submit to the [membership] group a description of the given change they are contemplating and the group will in turn opine on the materiality of that change for the firm.").

[45] Tr. 113; CX-4, at 1, 6. The materiality consults were in the form of letters from Alpine and Scottsdale with the subject line "Request for Materiality Consultation." CX-4, at 1, 6.

[46] CX-4, at 1, 6.

… where it became owned equally by two separate trusts. (1. The Man Cub Trust & 2. PeePop Trust)."[47] Then, "[t]he most recent change to form BD is meant to reflect another change to the ownership of [the holding company]. It is now owned in equal parts of approximately 16.7% by six different Trusts."[48]

On November 27, 2017, Alpine and Scottsdale filed Form BD amendments removing the Two Trusts as indirect owners, with the result that no trusts or individuals were disclosed as indirect owners on the Forms BD.[49]

### C.    FINRA Determines That CMAs Are Required for Alpine's and Scottsdale's 2017 Changes in Ownership Structure

On December 12, 2017, FINRA's Membership Application Program Group ("MAP") issued decision letters to Alpine and Scottsdale stating MAP's conclusion that CMAs were required for Respondents' changes in indirect ownership.[50] Liza Manzo, a FINRA Senior Examiner, stated in the decision letters that although the Six Trusts "will individually hold below 25% ownership interests, collectively, their indirect ownership will equate to 25% or more of the Firm."[51] Manzo informed Respondents that, according to NASD Notice to Members 00-73, a group of individuals acting in concert to obtain ownership of 25 percent or more of a FINRA member would be deemed a single entity for the purpose of NASD Rule 1017.[52] Leyna Goro, Associate Director of MAP, testified that MAP "viewed the trusts that were coming into the ownership structure of the broker-dealer to be acting in concert to acquire more than 25 percent of this broker-dealer."[53] In the decision letters, Manzo informed Respondents that FINRA staff would "need to review the trust documents for all trusts through the CMA process."[54]

Alpine and Scottsdale did not file CMAs in response to MAP's decision letters. FINRA staff emailed Respondents in January 2018 about the status of the CMAs,[55] and Respondents

---

[47] CX-4, at 1, 6. "PeePop Trust" appears to be the same as Pee Pee Pop Trust I.

[48] CX-4, at 1, 6.

[49] CX-2, at 9; CX-3, at 9. This was consistent with the filing instructions for Form BD because no single trust held a 25 percent or more ownership interest in SCA Clearing or SCA Holdings, and there is no provision in the instructions requiring the aggregation of ownership interests of entities acting in concert. Tr. 77. Because there is no provision for aggregation, a FINRA member's compliance with Form BD instructions is not necessarily relevant to whether ownership changes require a CMA. Tr. 114.

[50] Tr. 81, 152; CX-4, at 4, 9.

[51] CX-4, at 4, 9.

[52] Tr. 158-59; CX-4, at 4, 9.

[53] Tr. 204.

[54] CX-4, at 4, 9.

[55] Tr. 82-83; CX-5, at 45.

stated they anticipated filing a formal answer no later than February 13, 2018.[56] But Respondents did not file a formal answer.[57]

In June 2018—in response to a further inquiry by FINRA staff about their ownership structures—Alpine and Scottsdale provided updated organizational charts.[58] These charts showed that SCA Clearing and SCA Holdings were Respondents' direct parent owners, but did not show who owned the holding companies.[59] FINRA staff raised this question, but principals of Respondents said they did not know for sure.[60] Two months later, FINRA sent Rule 8210 requests to Respondents and to John Hurry seeking information about the direct and indirect ownership structures of Respondents, and requesting production of the trust documents for the Six Trusts, including the trust agreements.[61] Respondents and John Hurry did not produce the trust documents.[62]

Alpine and Scottsdale did not file CMAs before FINRA issued the Notices of Suspension on March 19, 2019.[63] There are no CMAs on file now.[64] The Department of Enforcement asserts that Respondents were required to file CMAs because of the replacement of the Hurry Family Trust by the Two Trusts, and the replacement of the Two Trusts by the Six Trusts.[65] Respondents assert they were not required to file CMAs because the changes cited by Enforcement did not result in one person or entity directly or indirectly owning 25 percent or more of Respondents' equity.[66]

## III.    Conclusions of Law

In the sections below, the Hearing Panel concludes, first, that CMAs are membership applications within the scope of FINRA Rule 9552, and therefore that Alpine's and Scottsdale's failure to file CMAs may subject them to suspensions if such filings were required. Second, we conclude that the Six Trusts acted in concert to indirectly obtain 25 percent or more of the equity of Respondents, within the meaning of NASD Notice to Members 00-73. Third, we conclude

---

[56] Tr. 83-84; CX-5, at 48.

[57] Tr. 83-84.

[58] Tr. 85.

[59] Tr. 86-87; CX-5, at 54, 59.

[60] Tr. 86-87; CX-5, at 52 (Chris Frankel for Alpine: "I don't know for sure."), 56 (Henry Diekman for Scottsdale: "I have the same problem Chris has.").

[61] Tr. 88-89. Trust agreements identify the beneficiaries and delineate the trustees' right and ability to control the trust property.

[62] Tr. 89. Because the trust agreements were not produced, it appears that the only proof of the identity of the beneficiaries is the hearing testimony of EJ, estates and trusts attorney for John and Justine Hurry. Tr. 258-59.

[63] Tr. 173.

[64] Tr. 173.

[65] CX-6, at 1, 2, 32, 33.

[66] CX-7, at 1, 3-4, 8, 10-11.

that because the Two Trusts indirectly owned Respondents, and the Six Trusts indirectly own Respondents now, NASD Rule 1017 required them to file CMAs. Fourth, in the CMA process, Respondents are required to make full disclosure and meet all 14 standards for FINRA membership set forth in NASD Rule 1014, including the standard that Respondents are capable of complying with the federal securities laws, the rules and regulations thereunder, and NASD and FINRA Rules, so that the goal of investor protection is promoted.

### A.   CMAs Are Membership Applications

It is undisputed that Respondents did not file CMAs for the substitution of the Two Trusts for the Hurry Family Trust, or the substitution of the Six Trusts for the Two Trusts. The issue to be decided in this proceeding, therefore, is whether these events constituted material changes in the indirect equity ownership of Alpine and Scottsdale requiring that Respondents file CMAs.[67]

FINRA Rule 9552 provides that FINRA may issue a Notice of Suspension if a member "fails to provide any information, report, material, data, or testimony requested or required to be filed pursuant to FINRA By-Laws or FINRA rules, or fails to keep its membership application or supporting documents current."[68] The Hearing Panel concludes that CMAs—Continuing Membership Applications—fall within FINRA Rule 9552 as being "information, report[s], material, data," and "membership applications." Accordingly, Respondents may be subject to suspension if the Hearing Panel finds they were required to file CMAs, but did not.

### B.   The Six Trusts Acted in Concert

NASD Rule 1017 requires a member to file a CMA for FINRA approval of "a change in the equity ownership or partnership capital of the member that results in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity or partnership capital."[69] The member must file the CMA at least 30 days before the change in ownership or control.[70] Enforcement has the burden of proving that a change in ownership has occurred to trigger the requirement to file CMAs.

Each of the Six Trusts holds a 16.7 percent indirect ownership interest in Alpine and Scottsdale—that is, below the 25 percent threshold set in NASD Rule 1017. But NASD Notice to Members 00-73 explains what the word "entity" in NASD Rule 1017 encompasses:

> [A] group of individuals acting in concert to obtain control of 25 percent or more of the equity or partnership capital of a member will be deemed to be an "entity"

---

[67] This Decision is limited to the issues raised in the Notices and the Requests for Hearing, and does not address the issue of whether the Hurry Family Trust's putative indirect ownership of Alpine and Scottsdale in the period from 2013 through August 2017 required the filing of CMAs.

[68] FINRA Rule 9552(a).

[69] NASD Rule 1017(a)(4).

[70] NASD Rule 1017(c)(1).

for purposes of the Rule, and as such, will trigger the requirement to submit an application to obtain approval of the ownership change.[71]

The Hearing Panel concludes that the Six Trusts acted in concert to indirectly obtain 25 percent or more of the equity of Alpine and Scottsdale, within the meaning of Notice to Members 00-73. Respondents admit that the Six Trusts, created by the same estates and trusts attorney, share common trustees and common beneficiaries. Each of the Two Trusts indirectly held more than 25 percent of Respondents' equity. Consequently, the only dispute between Enforcement and Respondents is whether the Two Trusts owned, and whether the Six Trusts now own, Respondents through SCA Clearing and SCA Holdings.

C.    **The Two Trusts Indirectly Owned, and the Six Trusts Indirectly Own, the Equity of Alpine and Scottsdale**

In applying NASD Rule 1017, FINRA has taken a flexible approach to the concept of ownership. As Associate Director Goro testified, a CMA is required if an individual owner of a FINRA member decides to own the member through a holding company that she wholly owns, or if the individual owner decides to have the ownership of the member changed from a corporation to a limited liability company.[72] FINRA's treatment of ownership by a trust is evident in the Form BD. Schedule A, section 2(d) of the Form BD directs that a member-applicant identify any trust "that directly *owns* 5% or more of a class of a voting security of the *applicant*."[73] As for indirect owners, Form BD requires the member to disclose, "in the case of an *owner* that is a trust, the trust and each trustee."[74] FINRA thus considers a trust capable of being a direct and indirect owner of a member.

Alpine and Scottsdale contend that under the common law, trusts are incapable of owning property.[75] Respondents cite cases suggesting that a trust is not a separate legal entity, but instead is a fiduciary relationship.[76]

---

[71] NASD Notice to Members 00-73, 2000 NASD LEXIS 82, at *26 (Oct. 2000), www.finra.org/industry/notices/00-73.

[72] Tr. 175-76. A CMA may qualify for a waiver of the FINRA application fee where the member "is only proposing a change in the … applicant's legal structure (e.g., changing from a corporation to an LLC)." FINRA Notice to Members 13-11, 2013 FINRA LEXIS 14, at *2 (Mar. 2013), www.finra.org/industry/notices/13-11. Still, the member is required to file a CMA for approval of the proposed change even if the application fee is waived.

[73] CX-45, at 10 (emphasis added).

[74] CX-45, at 11 (emphasis added).

[75] Tr. 311; CX-7, at 3 n.2; 10 n.2.

[76] Tr. 307-08; *See Ln Mgmt. Llc Series 9481 v. Lett*, No. A-13-691320-C, 2018 Nev. Dist. LEXIS 1164, at *13 (Dist. Ct. Nev. Oct. 2, 2018) ("Courts in the District of Columbia … confirm that a common-law trust is not a legally cognizable entity capable of owning property, but instead can act only through a trustee, which holds legal title to trust property.") (applying District of Columbia law); *Lane v. Wells Fargo Bank, N.A.*, No. 3:12-cv-00015-RJC-VPC, 2012 U.S. Dist. LEXIS 145600, at *17-19 (D. Nev. Oct. 8, 2012) ("[A] traditional common law trust is a legal relationship between legal entities, not a legal entity in-and-of-itself.").

The Hearing Panel concludes that the common-law definition of a trust does not circumscribe the scope of NASD Rule 1017. The purpose of Rule 1017, and the CMA process in general, is to enable FINRA staff to know the identities of the persons who will control, manage, own, and benefit from a FINRA member as a result of a change in ownership, and to vet those persons before the change is made.[77] Adjudicators determining the scope of NASD Rule 1017 should do so consistently with the Rule's purposes of full disclosure and investor protection.[78]

### D.   The CMA Process Requires Alpine and Scottsdale to Make Full Disclosure and Meet the Fourteen Standards for FINRA Membership

Any CMA that is filed must be substantially complete.[79] In the vetting process following the filing of a CMA, FINRA's Department of Member Regulation ("Member Regulation") must consider whether the member, and the member's associated persons, meet each of the 14 standards set forth in NASD Rule 1014(a).[80] Among these standards is whether the member and its associated persons are capable of complying with the federal securities laws, the rules and regulations thereunder, and FINRA Rules, including observing high standards of commercial honor and just and equitable principles of trade.[81] In determining whether this standard is met, Member Regulation may consider whether any of the following criteria apply:

- A state or federal authority or self-regulatory organization has taken permanent or temporary adverse action with respect to the member.

- The member is the subject of a pending, adjudicated, or settled regulatory action or investigation by the Securities and Exchange Commission, the Commodity Futures Trading Commission, a federal, state, or foreign regulatory agency, or a self-regulatory organization.

- One or more of the member's associated persons was terminated or permitted to resign after an investigation of an alleged violation of a federal or state securities law, a rule or regulation thereunder, a self-regulatory organization rule, or industry standard of conduct.

---

[77] Here, the regulatory objective of vetting the owners in advance was thwarted when Alpine and Scottsdale effected the substitutions of the trusts before notifying FINRA staff. *See* NASD Rule 1017(c)(1).

[78] *See* NASD Rule 1017(l) (after FINRA denies a CMA, the member has 60 days to unwind the proposed transaction except that "[f]or the protection of investors, the Department may shorten the 60-day period"); NASD Notice to Members 00-73, 2000 NASD LEXIS 82, at *1 (amendments to the NASD Rule 1010 Series "are designed to streamline and reorganize the current rules to make them more efficient for member firms and new applicants, while preserving their investor protection function"), www.finra.org/industry/notices/00-73.

[79] NASD Rule 1017(d).

[80] NASD Rule 1017(h)(1).

[81] NASD Rule 1014(a)(3).

- A state or federal authority or self-regulatory organization has imposed a remedial action, such as special training, continuing education requirements, or heightened supervision, on one or more of the member's associated persons.[82]

FINRA has a legitimate interest in ensuring that a member undergoing a change of ownership meets these standards and will continue to do so going forward. But disclosure is lacking in this case. Although Alpine and Scottsdale are indirectly owned by the Six Trusts, the extent of the trustees' right and ability to control Respondents is unknown. This information is set forth in the trust agreements for the Six Trusts,[83] but Respondents have not produced the trust agreements to FINRA.

Instead, Alpine and Scottsdale have proffered trust certificates.[84] A trust certificate lists who the trustees are and describes their powers.[85] To understand the structure and control of a trust, however, one has to read the trust agreement.[86] According to estates and trusts attorney EJ, the trust agreement provides complete information about legal ownership, trust powers, and beneficial ownership.[87] In particular, "the trust agreement would give you the details as to who the beneficiary is."[88]

Alpine and Scottsdale also contend that the individuals who indirectly own Respondents have always remained the same—John and Justine Hurry.[89] Assuming this is true,[90] as with ownership changes involving corporations and limited liability companies, FINRA still requires

---

[82] NASD Rule 1014(a)(3)(A), (C), (D), (E). The existence of any of these events creates a rebuttable presumption that the CMA should be denied. *See* NASD Rule 1014(b)(1). In 2004, the NASD directed the staff to apply this presumption "in light of the specific standards of Rule 1014(a), the public interest, protection of investors, and NASD's responsibility to provide a fair procedure in accordance with membership rules." NASD Notice to Members 04-10, 2004 NASD LEXIS 13, at *11 (Feb. 23, 2004), www.finra.org/industry/notices/04-10.

[83] Tr. 238.

[84] CX-8, at 26-125.

[85] Tr. 280-81.

[86] Tr. 277-78.

[87] Tr. 277-78.

[88] Tr. 278. FINRA's Form CMA instructions, available at www.finra.org/industry/rule-filings/sr-finra-2012-018p125709.pdf, require the member to submit "[f]ormation documents for any entities (e.g., corporations, partnerships, *trusts*), including holding companies, that are or will be new owners, directly or indirectly, of the Applicant." (Emphasis added). *Accord* CX-8, at 4.

[89] CX-7, at 3, 10. If the trustees, the trust powers, and the trust beneficiaries are all the same as to the Six Trusts, one might ask, what is the point of the Six Trusts, as opposed to two trusts or a single trust? When asked the reason why the Six Trusts were created, EJ declined to answer on the ground of attorney-client privilege, and testified generally that the reason was for estate planning purposes. Tr. 257-58.

[90] In fact, the ultimate individual owners have not remained the same. The only original indirect owner of Alpine was John Hurry. Tr. 45, 50-51, 94, 144-45; CX-13, at 6; CX-29, at 43. Later, Justine Hurry was added to Alpine's ownership structure. The only original indirect owner of Scottsdale was Justine Hurry. Tr. 47, 145; CX-13, at 22. Later, John Hurry was added to Scottsdale's ownership structure in his capacity as trustee of the Hurry Family Trust. CX-30, at 39.

CMAs to be filed.[91] John and Justine Hurry do not own SCA Clearing and SCA Holdings as individuals, but in trust for the beneficiaries. And the indirect ownership structures of Respondents have changed because different trusts have been placed into those structures.

### E. Conclusion

For the above reasons, the Hearing Panel concludes that the substitution of the Two Trusts for the Hurry Family Trust, and the substitution of the Six Trusts for the Two Trusts, were material changes in the equity ownership of Alpine and Scottsdale. These changes resulted in one person or entity indirectly owning 25 percent or more of Respondents. Their failure to file CMAs violated NASD Rule 1017. Alpine and Scottsdale are therefore subject to suspension for failure to file substantially complete CMAs.[92]

## IV. Order

Respondents Alpine Securities Corporation and Scottsdale Capital Advisors Corporation are suspended from FINRA membership for failure to file CMAs, in violation of NASD Rule 1017. The suspensions will be effective upon the issuance of this Decision and will remain in effect until Respondents file CMAs complying with the requirements of FINRA Rules 1014 and 1017. If Respondents file substantially complete CMAs, they may apply to Enforcement for termination of the suspensions.

Alpine and Scottsdale are jointly and severally liable to pay hearing costs of $3,625.66, consisting of a $750 administrative fee and $2,875.66 for the cost of the transcript. The costs shall be due on a date established by FINRA.[93]

For The Hearing Panel

*Richard E. Simpson*

Richard E. Simpson
Hearing Officer

Copies to:    Alpine Securities Corp. (via overnight courier and first-class mail)
Scottsdale Capital Advisors Corp. (via overnight courier and first-class mail)
Maranda Fritz, Esq. (via email and first-class mail)
Meredith MacVicar, Esq. (via email and first-class mail)
Jonathan Golomb, Esq. (via email)
Jennifer L. Crawford, Esq. (via email)

---

[91] Tr. 175-77.

[92] FINRA Rule 9552(a).

[93] The Hearing Panel has considered and rejects without discussion all other arguments of the parties.